JAMES E. DOROSHOW (SBN 112920)
JDoroshow@FoxRothschild.com
**FOX ROTHSCHILD LLP**
Constellation Place
10250 Constellation Blvd, Suite 900
Los Angeles, CA 90067
Telephone:   (310) 598-4150
Facsimile:    (310) 556-9828

Attorneys for Defendant & Counterclaim
Plaintiff, AGELESS SERUMS LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| EDGE SYSTEMS LLC, a California limited liability company,<br><br>                    Plaintiff,<br><br>    v.<br><br>AGELESS SERUMS LLC, a Texas limited liability company,<br><br>                    Defendant. | Case No. 2:20-cv-09669<br><br>Judge: Hon. Fernando M. Olguin<br><br>**DEFENDANT AGELESS SERUMS LLC'S THIRD AMENDED:  (1) ANSWER TO PLAINTIFF EDGE SYSTEMS LLC'S COMPLAINT; AND (2) COUNTERCLAIMS**<br><br><br>**[DEMAND FOR JURY TRIAL]**<br><br>Complaint Filed:    October 21, 2020 |

1

AGELESS SERUMS' THIRD AMENDED ANSWER TO
EDGE'S COMPLAINT AND COUNTERCLAIMS

123709225.1

AGELESS SERUMS LLC, a Texas
limited liability company,,

                Counterclaim Plaintiff,

      v.

EDGE SYSTEMS LLC, a California
limited liability company; THE
BEAUTY HEALTH COMPANY, a
Delaware corporation; THE
HYDRAFACIAL COMPANY, a
California corporation; CLINT E.
CARNELL, an individual; and DOES 1
through 100, inclusive

                Counterclaim Defendants.

For its Third Amended Answer to the Complaint of Edge Systems LLC ("Edge" or "Plaintiff"), Defendant Ageless Serums LLC ("Ageless" or "Defendant") responds and alleges as follows:

## I. <u>JURISDICTION AND VENUE</u>

1. In response to paragraph 1, Ageless admits that the Complaint purports to include claims for trademark infringement, tortious interference with contractual relations, and unfair competition under federal, state and common law, but denies that there is any grounds or basis (factual or legal) for these claims.

2. In response to paragraph 2, Ageless admits the allegations in this paragraph are legally accurate at this time subject to Ageless's right to challenge jurisdiction if one or more of the claims are determined to lack merit or are dismissed by this Court.

3. In response to paragraph 3 of the Complaint, Ageless admits that it does business in California, but denies that Ageless has committed any wrongful or illegal action in doing so, including, but not limited to, in a manner that infringes, interferes or violates any of Edge's claimed rights.  Except as expressly admitted in this response, the allegations in paragraph 3 of the Complaint are denied.

4.      In response to paragraph 4 of the Complaint, Ageless admits that venue is proper in this judicial district.  Ageless otherwise denies the allegations of paragraph 4 of the Complaint.

## II.      **THE PARTIES**

5.      In response to paragraph 5 of the Complaint, Ageless lacks sufficient knowledge or information to respond to the allegations in this paragraph and therefore denies them at this time.

6.      In response to paragraph 6 of the Complaint, Ageless admits that it is a Texas limited liability company with a principal place of business at the address alleged. Ageless lacks sufficient information or knowledge what Edge knows or believes and therefore denies the balance of the remaining allegations in this paragraph.

7.      In response to paragraph 7 of the Complaint, Ageless lacks sufficient information and knowledge to know what specific "acts" Edge is referring thereto and therefore denies the allegations in this paragraph at this time.

## III.      **GENERAL ALLEGATIONS**

### A.      **Edge Trademark and Trademark Licenses**

8.      In response to paragraph 8 of the Complaint, Ageless lacks sufficient knowledge or information to respond to the allegations in this paragraph and therefore denies them at this time.

9.      In response to paragraph 9 of the Complaint, Ageless is informed and believes that Edge designs and sells one or more of the serums described in this paragraph, but lacks sufficient knowledge or information to respond to the remaining allegations in this paragraph and therefore denies them at this time.

10.      In response to paragraph 10 of the Complaint, Ageless lacks sufficient knowledge or information to respond to the allegations in this paragraph and therefore denies them at this time.

AGELESS SERUMS' THIRD AMENDED ANSWER TO
EDGE'S COMPLAINT AND COUNTERCLAIMS

123709225.1

11.     In response to paragraph 11 of the Complaint, Ageless lacks sufficient knowledge or information to respond to the allegations in this paragraph and therefore denies them at this time.

12.     In response to paragraph 12 of the Complaint, Ageless lacks sufficient knowledge or information to respond to the allegations in this paragraph and therefore denies them at this time.

13.     In response to paragraph 13 of the Complaint, Ageless lacks sufficient knowledge or information to respond to the allegations in this paragraph and therefore denies them at this time.

14.     In response to paragraph 14 of the Complaint, Ageless lacks sufficient knowledge or information to respond to the allegations in this paragraph and therefore denies them at this time.

15.     In response to paragraph 15 of the Complaint, Ageless lacks sufficient knowledge or information to respond to the allegations in this paragraph and therefore denies them at this time.

16.     In response to paragraph 16 of the Complaint, Ageless lacks sufficient knowledge or information to respond to the allegations in this paragraph and therefore denies them at this time.

17.     In response to paragraph 17 of the Complaint, Ageless lacks sufficient knowledge or information to respond to the allegations in this paragraph and therefore denies them at this time.

18.     In response to paragraph 18 of the Complaint, Ageless lacks sufficient knowledge or information to respond to the allegations in this paragraph and therefore denies them at this time.

19.     In response to paragraph 19 of the Complaint, Ageless lacks sufficient knowledge or information to respond to the allegations in this paragraph and therefore denies them at this time.

AGELESS SERUMS' THIRD AMENDED ANSWER TO
EDGE'S COMPLAINT AND COUNTERCLAIMS

123709225.1

20.     In response to paragraph 20 of the Complaint, Ageless lacks sufficient knowledge or information to respond to the allegations in this paragraph and therefore denies them at this time.

**B.     Alleged Infringement of Edge's HydraFacial Mark**

21.     In response to paragraph 21 of the Complaint, Ageless admits that it is in the business of selling serums for use with hydrodermabrasion systems.  Ageless admits that it promotes and sells serum that can be used as replacement for serums sold by others, including Edge.  Ageless denies the remaining allegations in this paragraph.

22.     In response to paragraph 22 of the Complaint, Ageless admits that Edge brought suit against Ageless in or about 2017.  Ageless lacks sufficient knowledge or information about when or what Edge claims to have "discovered," and denies this allegation.  Ageless also denies that it had done anything "improper," and therefore denies the remaining allegations in this paragraph of the Complaint.

23.     In response to paragraph 23 of the Complaint, Ageless lacks sufficient knowledge or information as to what "rights" Edge is referring to in the first sentence of paragraph 23 of the Complaint, and therefore denies this sentence.  Ageless admits the remaining allegations of paragraph 23 of the Complaint.

24.     In response to paragraph 24 of the Complaint, Ageless denies the allegations in this paragraph.

25.     In response to paragraph 25 of the Complaint, Ageless lacks sufficient knowledge or information to respond to the allegations in this paragraph and therefore denies them at this time.

26.     In response to paragraph 25 of the Complaint, Ageless lacks sufficient knowledge or information to respond to the allegations in this paragraph and therefore denies them at this time.

27.     In response to paragraph 27 of the Complaint, Ageless admits the allegations in this paragraph to the extent it relates to the present.

AGELESS SERUMS' THIRD AMENDED ANSWER TO
EDGE'S COMPLAINT AND COUNTERCLAIMS

123709225.1

28.     In response to paragraph 28 of the Complaint, Ageless lacks sufficient knowledge or information to respond to this paragraph and therefore denies this paragraph at this time.

29.     In response to paragraph 28 of the Complaint, Ageless lacks sufficient knowledge or information to respond to this paragraph and therefore denies this paragraph at this time.

30.     In response to paragraph 30 of the Complaint, Ageless denies the allegations in this paragraph.

31.     In response to paragraph 31 of the Complaint, Ageless admits it instructs its customers how to use Ageless Serums, but denies it instructs them to do so.  Ageless admits the remaining allegations of this paragraph.

32.     In response to paragraph 32 of the Complaint, Ageless denies the allegations of this paragraph.  Ageless merely engages in lawful comparative advertising and promotion to demonstrate that its serum is of higher quality than serums used by Edge and others.

33.     In response to paragraph 33 of the Complaint, Ageless denies that is infringing any Edge mark or misleading or instructing its customers or anyone else about doing so.  Ageless admits the remaining allegations in this paragraph.

34.     In response to paragraph 34 of the Complaint, Ageless denies the allegations in this paragraph.

35.     In response to paragraph 35 of the Complaint, Ageless denies the allegations in this paragraph.

36.     In response to paragraph 36 of the Complaint, Ageless denies the allegations in this paragraph.

37.     In response to paragraph 37 of the Complaint, Ageless lacks sufficient knowledge or information to respond to the allegations in the first sentence of this paragraph and therefore denies them at this time.  Ageless denies the remaining allegations in this paragraph.

AGELESS SERUMS' THIRD AMENDED ANSWER TO
EDGE'S COMPLAINT AND COUNTERCLAIMS

123709225.1

38.     In response to paragraph 38 of the Complaint, Ageless denies the allegations in this paragraph.

39.     In response to paragraph 39 of the Complaint, Ageless denies the allegations in this paragraph.

40.     In response to paragraph 40 of the Complaint, Ageless denies the allegations in this paragraph.

## IV.   COUNT I

## ALLEGED CONTRIBUTORY TRADEMARK INFRINGEMENT

41.     In response to paragraph 41 of the Complaint, Ageless repeats and re-alleges its responses to paragraphs 1-40 of this Answer as if set forth fully herein.

42.     In response to paragraph 42 of the Complaint, Ageless denies the allegations in this paragraph.

43.     In response to paragraph 43 of the Complaint, Ageless denies the allegations in this paragraph.

44.     In response to paragraph 44 of the Complaint, Ageless denies the allegations in this paragraph.

45.     In response to paragraph 45 of the Complaint, Ageless lacks sufficient knowledge or information to respond to the allegations what Ageless's individual customers are authorized or not authorized to do and therefore denies the allegations in this paragraph, including, but not limited to, the allegation claiming what knowledge Ageless has about its customers' authorization or lack thereof.

46.     In response to paragraph 46 of the Complaint, Ageless denies the allegations in this paragraph.

47.     In response to paragraph 47 of the Complaint, Ageless denies the allegations in this paragraph.

48.     In response to paragraph 48 of the Complaint, Ageless denies the allegations in this paragraph.

49.     In response to paragraph 49 of the Complaint, Ageless denies the allegations

AGELESS SERUMS' THIRD AMENDED ANSWER TO
EDGE'S COMPLAINT AND COUNTERCLAIMS

123709225.1

in this paragraph.

50.     In response to paragraph 50 of the Complaint, Ageless denies the allegations in this paragraph.

51.     In response to paragraph 51 of the Complaint, Ageless denies the allegations in this paragraph.

52.     In response to paragraph 52 of the Complaint, Ageless denies the allegations in this paragraph.

53.     In response to paragraph 53 of the Complaint, Ageless denies the allegations in this paragraph.

## V.  COUNT II

## ALLEGED FEDERAL UNFAIR COMPETITION AND CONTRIBUTORY FALSE DESIGNATION OF ORIGIN

54.     In response to paragraph 54 of the Complaint, Ageless repeats and re-alleges its responses to paragraphs 1-53 of this Answer as if set forth fully herein.

55.     In response to paragraph 55 of the Complaint, Ageless denies the allegations in this paragraph.

56.     In response to paragraph 56 of the Complaint, Ageless denies the allegations in this paragraph.

57.     In response to paragraph 57 of the Complaint, Ageless denies the allegations in this paragraph.

58.     In response to paragraph 58 of the Complaint, Ageless denies the allegations in this paragraph.

59.     In response to paragraph 59 of the Complaint, Ageless denies the allegations in this paragraph.

60.     In response to paragraph 60 of the Complaint, Ageless denies the allegations in this paragraph.

61.     In response to paragraph 61 of the Complaint, Ageless denies the allegations in this paragraph.

AGELESS SERUMS' THIRD AMENDED ANSWER TO
EDGE'S COMPLAINT AND COUNTERCLAIMS

123709225.1

## VI.    COUNT III

## ALLEGED INDUCING BREACH OF CONTRACT

62.    In response to paragraph 62 of the Complaint, Ageless repeats and re-alleges its responses to paragraphs 1-61 of this Answer as if set forth fully herein.

63.    In response to paragraph 63 of the Complaint, Ageless lacks sufficient knowledge or information to respond to the allegations of this paragraph and therefore denies them at this time.

64.    In response to paragraph 64 of the Complaint, Ageless lacks sufficient knowledge or information to respond to the allegations of this paragraph and therefore denies them at this time.

65.    In response to paragraph 65 of the Complaint, Ageless lacks sufficient knowledge or information about the terms of Edge's alleged contracts or Trademark License Agreements with any of its individual customers or licensees in the past or present, and therefore denies the allegations in this paragraph at this time.

66.    In response to paragraph 66 of the Complaint, Ageless denies the allegations in this paragraph.

67.    In response to paragraph 67 of the Complaint, Ageless lacks sufficient knowledge or information to respond to the allegations of this paragraph and therefore denies them at this time.

68.    In response to paragraph 68 of the Complaint, Ageless denies the allegations in this paragraph.

69.    In response to paragraph 69 of the Complaint, Ageless denies the allegations in this paragraph.

70.    In response to paragraph 70 of the Complaint, Ageless denies the allegations in this paragraph.

## VII.    COUNT IV

## ALLEGED TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

AGELESS SERUMS' THIRD AMENDED ANSWER TO
EDGE'S COMPLAINT AND COUNTERCLAIMS

123709225.1

71.     In response to paragraph 71 of the Complaint, Ageless repeats and re-alleges its responses to paragraphs 1-70 of this Answer as if set forth fully herein.

72.     In response to paragraph 72 of the Complaint, Ageless lacks sufficient knowledge or information to respond to the allegations of this paragraph and therefore denies them at this time.

73.     In response to paragraph 73 of the Complaint, Ageless lacks sufficient knowledge or information to respond to the allegations of this paragraph and therefore denies them at this time.

74.     In response to paragraph 74 of the Complaint, Ageless lacks sufficient knowledge or information about the allegations in the first sentence of this paragraph and therefore denies them at this time.  Ageless denies the remaining allegations in this paragraph of the Complaint.

75.     In response to paragraph 75 of the Complaint, Ageless lacks sufficient knowledge or information about the terms of Edge's alleged contracts or Trademark License Agreements with any of its individual customers or licensees, and therefore denies the allegations in this paragraph at this time.

76.     In response to paragraph 76 of the Complaint, Ageless denies the allegations in this paragraph.

77.     In response to paragraph 77 of the Complaint, Ageless denies the allegations in this paragraph.

78.     In response to paragraph 78 of the Complaint, Ageless denies the allegations in this paragraph.

## VIII.  <u>COUNT V</u>
## <u>ALLEGED UNFAIR COMPETITION UNDER CALIFORNIA BUSINESS & PROFESSIONS CODE SECTIONS 17200 *et seq.*</u>

79.     In response to paragraph 79 of the Complaint, Ageless repeats and re-alleges its responses to paragraphs 1-78 of this Answer as if set forth fully herein.

80.     In response to paragraph 80 of the Complaint, Ageless denies the allegations

123709225.1

in this paragraph.

81.    In response to paragraph 81 of the Complaint, Ageless denies the allegations in this paragraph.

82.    In response to paragraph 82 of the Complaint, Ageless denies the allegations in this paragraph.

## IX.    COUNT VI
## ALLEGED CALIFORNIA COMMON LAW UNFAIR COMPETITION

83.    In response to paragraph 83 of the Complaint, Ageless repeats and re-alleges its responses to paragraphs 1-82 of this Answer as if set forth fully herein.

84.    In response to paragraph 84 of the Complaint, Ageless denies the allegations in this paragraph.

85.    In response to paragraph 85 of the Complaint, Ageless denies the allegations in this paragraph.

86.    In response to paragraph 86 of the Complaint, Ageless denies the allegations in this paragraph.

87.    In response to paragraph 87 of the Complaint, Ageless denies the allegations in this paragraph.

88.    In response to paragraph 88 of the Complaint, Ageless denies the allegations in this paragraph.

## AFFIRMATIVE DEFENSES

By asserting these affirmative defenses, Ageless does not admit that it necessarily bears the burden of proof or persuasion for any of the defenses or issues alleged below. Moreover, at this time, Ageless has insufficient information and knowledge upon which to form a belief as to whether additional defenses are or may later become available to it. Ageless reserves the right to amend its responses to the Complaint to add, delete, or modify defenses based upon additional facts and legal theories which it may or will learn, including that which may be divulged through clarification of the Complaint, through discovery, through change or clarification of governing law, or through further analysis

of Edge's allegations and claims in this litigation.  Subject to the foregoing, for its affirmative defenses in this action, Ageless hereby presently asserts and alleges the following affirmative defenses:

**FIRST AFFIRMATIVE DEFENSE**

**(Failure to State a Claim)**

1.  Edge's Complaint, including one or more claims alleged therein, fails to state a claim upon which relief can be granted.

**SECOND AFFIRMATIVE DEFENSE**

**(Waiver, Estoppel, Unclean Hands, And/Or Laches)**

2.  The equitable doctrines of waiver, estoppel, unclean hands, and/or laches bar at least one or more of Edge's claims for damages and other relief.  Among other grounds supporting these defenses, as alleged in Edge's Complaint (¶ 22), Edge asserts it has known of what it describes as "Ageless's improper use of Edge's Mark since at least August 2017," but nevertheless waited until filing this lawsuit until October 21, 2020. Edge has also violated federal and state antitrust and unfair competition law by illegally trying to prevent Ageless from competing with Edge.

**THIRD AFFIRMATIVE DEFENSE**

**(Lack of Standing and Injury)**

3.  Edge lacks standing, including because it has not suffered economic injury.  As alleged in Ageless' Answer and below in Ageless' Counterclaim, Ageless is not responsible for any injury Edge claims to have suffered for any of the allegations and claims asserted in its Complaint.

**FOURTH AFFIRMATIVE DEFENSE**

**(Absence of Irreparable Harm)**

4.  Edge's claims for injunctive relief are barred because Edge has not suffered irreparable harm and has an adequate remedy at law.  Even in the unlikely event Ageless is determined to be liable for some or all of Edge's claims, Edge has an adequate remedy at law for monetary damages that does not permit equitable or injunctive relief.

AGELESS SERUMS' THIRD AMENDED ANSWER TO
EDGE'S COMPLAINT AND COUNTERCLAIMS

123709225.1

## FIFTH AFFIRMATIVE DEFENSE

### (Inequitable Relief)

5.  Edge's claims for injunctive relief are barred because such relief would be inequitable.  Given the facts alleged in Ageless' Counterclaims below (including Edge's antitrust and unfair competitive practices), it would be inequitable to award any of the equitable relief Edge seeks in its Complaint.

## SIXTH AFFIRMATIVE DEFENSE

### (Innocent Infringement)

6.  Edge's claims for relief are barred because any alleged infringement was innocent and not willful.

## SEVENTH AFFIRMATIVE DEFENSE

### (Absence of Confusion)

7.  Edge's claims for relief are barred because Ageless' alleged use of Edge's claimed mark is not likely to cause any form of confusion.  There is no proof that Ageless has created any confusion in the marketplace by advertising or selling its products.  Thus, there is no support for a claim of trademark infringement or any of the other claims in the Complaint.

## EIGHTH AFFIRMATIVE DEFENSE

### (Fair Use)

8.  Edge's claims are barred against Ageless under the fair use doctrine.  Ageless is entitled by law to compare its products with Edges' products without violating any law. In its website, Ageless clearly states that Edge has a trademark for its name and the products it sells.  *See* also Counterclaim at para. 8.

## NINTH AFFIRMATIVE DEFENSE

### (Unlawful Tying and Illegality)

9.  One or more of Edge's claims are barred because they are illegal and constitute unlawful tying in violation of federal and state antitrust laws.  *See e.g.* Sherman Act *15 U.S.C. § 1* and the Clayton Act *(15 U.S.C. § 114),* as well as State law (*see e.g.,* the

California Cartwright Act *§ 16700 et. seq.* and *§ 16727).  See also* Counterclaim at para. 10.

## TENTH AFFIRMATIVE DEFENSE

### (No Trademark or Claim)

10.   One or more of Edge's claims are barred, in whole or in part, because Edge's claims do not constitute trademark infringement or give rise to any other claim alleged in the Complaint.

## ELEVENTH AFFIRMATIVE DEFENSE

### (No Causation)

11.   Ageless is not the cause of any of the claims alleged or relief sought in the Complaint.  Any of the injuries Edge claims to have suffered, were not caused by Ageless.  For example, Edge's customers-licensees choose not to purchase Edge's products, but instead to purchase Ageless' products.  Ageless did not cause them to do so. They made this decision on their own.  *See* also Counterclaim at para. 11 below.

## TWELFTH AFFIRMATIVE DEFENSE

### (No Damages)

12.   Edge's claims are barred because there has been no damage in any amount by reason of any act alleged against Ageless.  *See* Affirmative Defense No. 3 above.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Reservation of Additional Defenses)

13.   Ageless presently has insufficient knowledge or information on which to form a belief as to whether there may be additional, as yet unstated, affirmative defenses. Thus, subject to discovery and other proceedings and developments in this action, Ageless expressly reserves its right to assert additional affirmative defenses when and if they are appropriate.

## COUNTERCLAIMS

For is Counterclaims against Counterclaim-Defendants Edge Systems LLC, the Beauty Health Company, the Hydra Facial Company, Clinton E. Carnwell, and Does 1

through 100 (collectively "Edge"), Counterclaim Plaintiff Ageless Serums LLC ("Ageless") states and alleges as follows:

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over these Counterclaims pursuant to *28 U.S.C. Sections 1331, 1338, 2201* and *2202*, as well as the *Lanham Act, 35 U.S.C. Sections 1051 et seq.*

2.     This Court has personal jurisdiction over Edge because Counterclaim-Defendant has invoked the jurisdiction of this Court by filing the Complaint herein.  The remaining Counter-Defendants are believed to actively conduct business in the State of California and have voluntarily agreed to enter an appearance in this action in any event.

3.     Venue is proper in this District pursuant to *28 U.S.C. Section 1391.*

## THE PARTIES

4.     Counterclaimant Ageless is a limited liability corporation organized and existing under the laws of Texas with its principal place of business at 6140 Highway 6, Suite 226, Missouri City, Texas 77459.

5.     Ageless is informed and believes, and thereon alleges, that Counterclaim Defendant Edge is a California corporation having its principal place of business at 2165 E. Spring Street, Long Beach, California 90806.

6.     Ageless is informed and believes, and thereon alleges, that Counterclaim Defendant The HydraFacial Company ("HydraFacial") is a California corporation, having its principal place of business at 2165 E. Spring Street, Long Beach, California 90806.  Ageless has been advised by HydraFacial's counsel that HydraFacial is simply a name Edge uses as a d/b/a and is not an independent, separate existing legal entity.  If this is in fact the case, Ageless has agreed for now to dismiss HydraFacial from this action without prejudice.

7.     Ageless is informed and believes, and thereon alleges, that Counterclaim Defendant The Beauty Health Company ("Beauty Health") is a Delaware corporation, having its principal place of business at 2165 E. Spring Street, Long Beach, California

90806.  Ageless is informed and believes, and on that basis alleges, that Beauty Health actively participated in the conduct alleged below.

8.      Ageless is informed and believes, and thereon alleges, that Counterclaim Defendant Clint E. Carnell ("Carnell") is an individual residing in Long Beach, California.  Ageless is further informed and believes, and thereon alleges, that Carnell served as the Chief Executive Officer of HydraFacial, and is currently the Chief Executive Officer of Beauty Health.  Ageless is informed and believes, and on that basis alleges, that Carnell actively participated in the conduct alleged below.

9.      Ageless is currently unaware of the identity of those parties named herein as Does 1 through 100 and the specific role they may have played in the conduct alleged below.  Nevertheless, Ageless is informed and believes, and thereon alleges, that each of these parties is responsible for some or all of the conduct alleged below and therefore liable to Ageless for one or more of the claims alleged below.  Ageless will amend this Counterclaim once the identity of these parties and their conduct and role becomes fully known to Ageless.  Unless otherwise alleged, all Counterclaim Defendants are hereinafter sometimes collectively referred to as "Edge."

## EDGE'S HISTORY AND GROWTH

10.     Edge was founded in 1997.  Edge holds itself out today as the first United States manufacturer to design and sell microdermabrasion systems and to have created the category of hyrdrodermabrasion.  As alleged further below, Ageless is informed and believes, and on that basis alleges, that Edge owns a blocking book of patents for the HydraFacial systems it created and sold.  According to Edge, Edge's HydraFacial Systems are patented products with 38 awarded and 18 patents pending.  In addition, according to Edge, its products are available in over 87 countries with over 17,000 delivery services globally and millions of treatments performed each year.  Edge has experienced significant growth since the company was originally founded in 1997.  As alleged below, Edge has also been part of a large number of acquisitions and mergers

AGELESS SERUMS' THIRD AMENDED ANSWER TO
EDGE'S COMPLAINT AND COUNTERCLAIMS

123709225.1

with public companies who have significant resources which have also contributed to a large increase in revenue and increased market power for Edge.

11.     For example, in December 2016, two healthcare-focused private equity firms, Linden Capital Partners ("Linden") and DW Healthcare Partners ("DWHP"), jointly acquired Edge with a reported "vision to invest in the global expansion of the HydraFacial brand." At that time, Ageless is informed and believes that Counter-Defendant Carnell was named as CEO of Edge. Ageless is further informed Linden and DWHP have helped Edge to expand internationally and to sell at least 18,000 systems worldwide at minimum. In 2016, at the time of the Linden/DWHP acquisition, Ageless is informed Edge had 140 employees and generated $48 million in net annual sales. From that point forward, however, revenue grew under the leadership of Carnell and Linden/DWHP, with revenue climbing to over $66 million in 2017. Edge has reported that there was a growth of 52% in annualized sales and 38% annualized EBITDA (Earnings Before Interest, Taxes, Depreciation and Amortization) growth between 2016 and 2019. Thereafter, Edge's share of the hydrodermabrasion market growth continued to climb to $119 million by 2020.

12.     HydraFacial Equipment is offered and sold by Edge to mom-and-pop spas to the most luxurious hotel destinations such as The Mandarin Oriental and the Four Seasons. Edge has recently announced that it believes it can reach 12% of the United States population, and that "demand has returned swiftly after company Covid-related spa shutdowns." Edge has also recently announced that it expects "rapid growth for the foreseeable future," with revenue to rise 57% in 2021 and 38% by 2022, "with profits also continuing to grow." Edge now projects it should reach $250 million through the sale of its Equipment and consumables (including its serums) to $250 million by 2022, and increasing thereafter.

13.     In May 2017, Edge announced a name change and became known as The HydraFacial Company. After changing its name, Counterclaim Defendant Carnell became CEO of The HydraFacial Company.

14.     In 2020, a public company named Vesper Healthcare ("Vesper") acquired HydraFacial at a purchase price consisting of $975 million payable at closing, and up to an additional $75 million subject to certain contingencies.

15.     On December 8, 2020, Counterclaim-Defendant Beauty Health (a publicly traded company) acquired HydraFacial under the terms of a merger agreement.  Pursuant to the merger agreement, the aggregate merger consideration payable to the stockholders of HydraFacial was paid in a combination of stock and cash equal to $975,000,000, subject to certain adjustments.  HydraFacial is now part of the Beauty Healthcare Company, which is publicly traded on NASDAQ under the symbol "SKIN".  When Beauty Healthcare merged with HydraFacial, Counter-Defendant Carnell was appointed CEO of Beauty Health and, Ageless is informed and believes, and on that basis alleges, that he continues to operate as CEO of Beauty Health to the present day.

## GENERAL ALLEGATIONS

16.     In its Complaint, Edge maintains that "it is a *worldwide leader* in the design, development, manufacturer, and sale of skin resurfacing systems and rejuvenation systems, including microdermabrasion and hydrodermabrasion systems." *See* Complaint at para. 8. (Emphasis supplied).  As part of these systems, Edge claims to be able to rejuvenate skin by using a *separate product* which it calls a "therapeutic solution, called a 'serum,' that moisturizes and protects the treated skin surface." *Id.*  Edge also alleges that its "flagship system is its revolutionary HydraFacial MD® system, which is the *premier hydrodermabrasion system* sold in the United States." *Id.*  (emphasis supplied).  Edge further alleges that "Edge's HydraFacial MD® System [and Edge's other hydrodermabrasion systems] are *so revolutionary* that [they are] protected by numerous United States patents." *Id.*  (emphasis supplied).  Based upon these allegations and other information Edge provided to its customers-licensees (including Edge's allegations that appear in Edge's Complaint (*see* Compl. at 8-20 which are incorporated herein by this reference), Ageless is informed and believes, and on that basis alleges, that Edge and the other Counter Defendants in this action have obtained market power for the HydraFacial

Systems they sell in the United States, including having obtained a competitive advantage not shared by its competitors in the relevant market for hydrodermabrasion systems Edge manufactures and sells.  Even though Edge sells its products worldwide, the relevant profit for purposes of this Counterclaim is the United States.  Because Edge owns a blocking book of patents, and because the HydraFacial Systems are considered to be a unique product, Edge's competitors (actual and potential) according to Edge are prohibited from selling products using Edge's patented technology.  Ageless is further informed and believes, and on that basis alleges, that in contrast to its Equipment, Edge does not have market power for the serums it manufactures and sells which are sold separately from Edge's HydraFacial Systems.  As explained further below, there can be no question that Edge's Systems and serums are offered and sold as separate products.  This is established, among others, by Edge's License Department, blocking book of patents, and by the conditions and penalties Edge imposes on its customers-licensees if they do not purchase and use Edge's serums with Edge's Systems.  Ageless is also informed and believes, Edge is able to sell its Equipment at significantly higher price than its competitors yet still generate significant revenues and profits by the sale of its patented HydraFacial Systems, with consumer demand according to Edge increasing despite Edge's higher pricing.

17.  **Separate Products.**  The fact that Edge sells its Serums as a separate product separate from its HydraFacial Systems is unquestionably proven, among others, by the terms of Edge's Trademark-License Agreements.  As previously alleged in Ageless Second Amended Complaint (Dkt No. 36 at 16), Edge sells its Systems to customers across the United States pursuant to "trademark licensing programs," which allows Edge's customers-licensees to use and take advantage of the "HYDRAFACIAL" Mark (hereinafter the "HydraFacial Mark") when offering and ***providing HydraFacial treatments, provided Edge's customers-licensees render the treatments by exclusively purchasing and using Edge's HydraFacial Systems with Edge's Serums***.  *Id.*  As also previously shown, Edge has attached to its Complaint as Exhibit 2 what it characterizes

as a "sample Trademark License Agreement" that it alleges it enters into with its customers-licensees and requires its customers-licensees to sign as a condition of selling, using and promoting Edge's HydraFacial System and Edge's Mark, conditional upon "…*the Licensee solely and exclusively uses Licensor's [Edge's] serums and/or consumables in the operation of the Purchased Equipment.*" *See* Compl., Exh. 2, para. 1.1(a) (emphasis supplied).  In accord, *see id.* at para. 3.1.  Should any customer-licensee fail to comply with the terms of the Agreement and only use Edge's Serums with the use of Edge's Equipment, the license and other rights granted under the Trademark License Agreement provide that the right to use Edge's Mark shall immediately terminate; other rights are forfeited (including warranties); and Edge is entitled to certain stated relief (including the right to collect monetary damages, injunctive relief and the payment of attorney fees should it prevail in the resolution or litigation of any dispute).  *Id.* at paras. 1.1(a), 10.1 and 16.  *See also* Complaint at para. 25 and 26.  Thus, by the terms of Edge's License Agreement, *Edge  itself confirmed that its Equipment and Serum are sold as separate products*.  The fact that there are two separate products at issue in this case is also proven by the fact Edge charges a *separate price* for its Serums as part of the purchase and use of Edge's Equipment and the rendition of HydraFacial treatments using Edge and its customers-licensees offer consumers.

18.    What Edge fails to address in its Complaint, however, is that not only are a customer's-licensee's right to use the HydraFacial Mark terminated if a competitor's serum is used, there are other consequences if a customer-licensee does not purchase and use Edge's Serums with Edge's HydraFacial Equipment that proves that an illegal tie has occurred under federal and State antitrust laws.  This includes, but is not limited to, a customer-licensee's ability to use Edge's Tower machines (such as the HydraFacial MD system) (one of Edge's "Tying Products") which prominently displays Edge's HydraFacial Mark on Edge's Equipment.  The HydraFacial Mark that customers-licensees are prohibited from using or displaying if they purchase serum from anyone other than Edge includes a flat screen monitor that displays a user interface screen where

the HydraFacial Mark appears.  Ageless is informed and believes, and thereon alleges, that the display of the HydraFacial Mark on the user interface screen is preprogrammed. As such, Ageless is informed and believes, and on that basis alleges, that a customer-licensee cannot remove the Edge Mark from the flat screen monitor after its purchase of Edge's HydraFacial Equipment, even though Edge claims its License Agreement requires that a customer-licensee stop all use of the Edge Mark if a consumer-licensee uses or purchases serum from a third party.  Therefore, if the right to use the HydraFacial Mark is terminated, Ageless is informed and believes, and on that basis alleges, that a customer-licensee must also discontinue use of the HydraFacial Equipment that it purchased because the HydraFacial Mark cannot be removed from it.  These circumstances result in customers-licensees having to use Edge's Serum (the "Tied Product") in order to use Edge's Equipment (the "Tying Product") since as a practical matter Edge's HydraFacial Mark cannot be removed from Edge's Equipment.  A copy of an image of Edge's HydraFacial MD Equipment is shown on **Exhibit A** hereto showing how the HydraFacial Mark appears, among others, on the preprogrammed flat screen monitor.

19.    Edge also imposes additional conditions and penalties on customers-licensees that not only result in the forfeiture of their ability to use the HydraFacial Mark if they do not use Edge's Serum with Edge's Equipment (as the License Agreement mandates). For example, as part of Edge's so-called "Authenticity Campaign," Ageless is informed and believes, and on that basis alleges, that Edge sent an email to its customer-licensees on or about August 13, 2020 ***advising them that their license to use the Edge System would be revoked if anyone purchased or used a third party's serum, such that Edge's customer licensees not only forfeit their right to use Edge's HydraFacial Mark, but are also unable to market or provide HydraFacial services or treatments.***  As such, Edge's customers-licensees are required to purchase only Edge's Serums as a condition of using the HydraFacial Equipment which they purchased from Edge for the exact purpose they buy Edge's Equipment, *i.e.,* to provide HydraFacial services and treatments. Other benefits of owning HydraFacial Equipment are also revoked by Edge in the event

its customer-licensees purchase and use third party serums with Edge's HydraFacial Equipment.  This includes the loss of preferred pricing, removal from Edge's "Find a Provider" site and loss of device support, training and education, and so-called LINQ benefits (which include free marketing materials, giveaways, and business building tools).  Therefore, in effect, a customer/licensee is required to purchase Edge's Serum from Edge as a condition of not only using Edge's Mark, ***but also as a condition of purchasing and using Edge's Equipment for the exact purpose for which they acquired it***.  Otherwise, by reason of Edge tying the purchase of Edge's Equipment to the purchase and use of Edge's Serums, the HydraFacial Equipment is rendered worthless and cannot be purchased unless a customer-licensee purchases Serum solely from Edge.  A copy of the Carnell August 13, 2020 Edge email reflecting the terms of the Authentic Campaign is quoted fully below at paragraph 24 of this Counterclaim.

20.    For its part, Counterclaimant Ageless has designed, developed and sold high-quality serums that can be used, among others, for use with Edge's HydraFacial Systems (hereinafter the "Ageless Serums")  As is its legal right, like others, Ageless lawfully and fairly competes in the sale of serums it sells with those serums sold by Edge. To avoid any possible confusion, Ageless also prominently displays a notation on its website that the term HydraFacial "is a trademarked name and should be noted throughout the website."  By lawfully engaging in comparative advertising and the sale of Ageless Serums, Ageless is not engaged in direct or indirect trademark infringement or violating any other intellectual property (patent or otherwise) Edge maintains it owns.  In fact, Edge has never sued Ageless for direct infringement of any of its patents because of the sale by Ageless of any of its Serums.

21.    Apart from Edge's efforts to try to expand its market share and to establish monopoly power for the sale of Edge's Serums that Edge has already obtained for Edge's patented Equipment and because of the other reasons discussed below, the sale and advertisement of Ageless' and other competitor's serums is according to Edge impermissible for use with Edge's patented Equipment.  Stated differently, because of

AGELESS SERUMS' THIRD AMENDED ANSWER TO
EDGE'S COMPLAINT AND COUNTERCLAIMS

123709225.1

Edge's illegal tie Ageless and other actual or perceived competitors are prohibited from offering or selling their serums for use with Edge's patented Equipment—thereby unlawfully depriving them of the ability to sell their serums to consumers at competitive prices and to profit from sale of their serums.  At the same time, consumers and Edge's customers-licensees would otherwise be free to purchase any serum they desired if Edge did not seek to improperly expand its market power and patent monopoly by tying the sale and use of Edge's patented Equipment to the purchase and use of a product (*i.e.*, Edge's Serums) that is either unpatented and/or non-infringing.

22.     By demanding consumers, including Edge's customers-licensees, to purchase Edge's Serums as a condition of using Edge's Equipment, Edge's Trademark License Agreement combined with the additional conditions Edge has imposed under the terms of its Authenticity Campaign are, among others, illegal because they constitute an unlawful tie in violation of United States and California antitrust and unfair business practices laws, including, but not limited to, the *Sherman Act* (*15 U.S.C. Section 1*), the *Clayton Act* (*15 U.S.C. Section 14*),  Business and Professions Code §§ 17200 et. seq.,* and California's *Cartwright Act Sections 16720 and 16727*.

23.     Based upon Edge's illegal effort to try to expand its patent monopoly by prohibiting the purchase of serums from anyone other than Edge, Edge deprives Ageless and Edge's other competitors from profiting from the sale and use of their serums for use with Edge's patented Equipment in spite of the fact that there have been many consumer testimonials attesting to their belief that Ageless' Serums are better and of higher quality than Edge's Serums.

24.     To further prevent consumers and Edge's customers-licensees from using third party serums, Edge has also falsely represented to them that Ageless' Serums are "inferior" and of "lower quality" than Edge's Serum (in fact may be "harmful" to them), and should not be purchased or used by consumers or Edge's customers-licensees when purchasing and operating Edge's HydraFacial Equipment and the treatments provided by them.

25. Thus, as part of Edge's so-called "Authenticity Campaign," HydraFacial customers were sent an August 13, 2020 email from Edge and Beauty Health and their CEO (Counterclaim Defendant Clint E. Carnell) a video link of Carnell which appears  at https://vimeo.com/446939770/53853b87ea?utm_source=Elite+ML+LAUNCH+Announcement+7.27.2020&utm_campaign=5da70ce5cd-EMAIL_CAMPAIGN_2020_02_24_07_03_COPY_01&utm_medium=email&utm_term=0_ac68df26ed-5da70ce5cd-583560574&mc_cid=5da70ce5cd&mc_eid=[1a71e34242.  This August 13, 2020 email communication is reproduced below:



HydraFacial Nation,

Now more than ever, the HydraFacial® brand will play a critical role for your business - as our investments in our brand and in you are driving business through our collective doors and enhancing your capabilities and offerings.  During the past several months (while navigating through this trying pandemic which has affected us all), The HydraFacial Company has increased our social reach and awareness, has received over **1 Billion media impressions YTD**, and remains the top facial treatment search term based on Google search comparisons.  To ensure this momentum continues and that the brand stays strong, The HydraFacial Company is introducing a **new authenticity campaign** – with the simple goal of protecting our consumers, our brand, and you -- by making sure that the HydraFacial experience remains true and exceptional.   Please listen in as Clint Carnell, CEO, introduces this new initiative and then read below for more detail:

As Clint stated, unfortunately some providers are promoting HydraFacials but using ***inferior, third party serums***. This gives those clients an ***inferior*** (***or, even worse, possibly harmful***) experience, which - in turn - damages the HydraFacial brand and lessens our collective success.   Emphasis supplied. That can't happen. We have the highest quality standards for our serums, and we constantly re-invest in our brand and tools, trainings, and new products to help bring customers into your practices.   For those of you that are good partners in building the HydraFacial brand (and the VAST majority of you <u>are</u> good partners), we thank you and will continue to support you with all the following programs. For any offending providers who use third party serums (***and bring this risk and harm to the HydraFacial family), the following changes will take place:***

- **Preferred Pricing**. Providers who use third party serums will no longer receive our preferred pricing. ***The new price list for these providers can be seen here.***  [Emphasis supplied.]

- **Customer Acquisition and Provider Status**. Providers using third party serums will also be removed from our "Find a Provider" site, ***and their***

AGELESS SERUMS' THIRD AMENDED ANSWER TO
EDGE'S COMPLAINT AND COUNTERCLAIMS

*licenses will be revoked such that they are no longer able to market or provide HydraFacial services.*  [Emphasis supplied.]

•       **Device Support.** *Using non-HydraFacial serums voids the warranty on your device, and we will no longer service or repair devices in which third party serums are used.  Offending providers will also NOT be eligible to receive the new Elite ML upgrade, with enhanced protocols and additional treatment categories.*  [Emphasis supplied.]

•       **Training & Education.** *Offending providers will no longer be able to access our online resources such as Insider and Connect, nor will they be eligible to participate in live training events such as HFX, Sprout, or Jump Start.*  [Emphasis supplied.]

**Rewards**. *Third party serum users will have their LINQ status reset, and they will be ineligible for LINQ benefits (including any free marketing materials, giveaways, and business building tools).*  [Emphasis supplied.] These actions are necessary for us to *protect the brand* and the experience that so many of us have all spent so much time building together.  Emphasis supplied.  Ensuring that our customers' experiences are best in class and keeping the trust of those customers who believe they are receiving a HydraFacial are our top priorities.  As Clint said, the money you spend on consumables directly supports our marketing efforts to help drive new clients to your practices – and new client acquisition is one of the biggest expenses for a provider.  Our good partners have nothing to worry about – but *if it's possible that YOU have not been following our brand authenticity standards and you don't want to lose all of these benefits*, the time to change is now! We are committed to this partnership and want to make sure that you are too. [Emphasis supplied.]

**Let's Do This Together!**

The HydraFacial Company

AGELESS SERUMS' THIRD AMENDED ANSWER TO
EDGE'S COMPLAINT AND COUNTERCLAIMS

123709225.1

# COUNTERCLAIM COUNT I

# (VIOLATION OF FEDERAL AND CALIFORNIA ANTITRUST LAWS—
SHERMAN ACT §1; CLAYTON ACT §§ 3 AND 14; AND CALIFORNIA
CARTWRIGHT ACT §§16720, 16726)

26.     Ageless repeats and re-alleges the allegations of paragraphs 1-25 of this
Counterclaim as if set forth fully herein.

## A.     THE RELEVANT MARKETS

### 1.     The HydraFacial Equipment (The "Tying Product")

27.     Edge claims it is a "***worldwide leader***" in the design, development,
manufacture, and sale of high-quality resurfacing and rejuvenation systems, including
hydra-dermabrasion systems.  Emphasis supplied.  Edge calls its Equipment and the
treatments that are offered with it to provide treatments "HydraFacial" — which takes its
name from the root word hydrate.  According to Edge, HydraFacial treatments include a
3-stage process that can be completed within a 30-minute session.  This process includes
rejuvenating skin by cleaning and exfoliating the skin surface, extracting debris, and then
"nourishing" the skin's surface with solutions called "serums."  This regiment, according
to Edge, uses a ***patented medical-grade hydrodermabrasion device***, including a patented
vortex technology hand piece, that Edge claims "gently" vacuums out pores while
pushing in, and activates and enhances the skin by moisturizing, brightening, and
protecting it.  Among other guidance, Edge's User Guide states the HydraFacial
handpiece works with Edge's HydraFacial Systems "to store serum and control serum
flow allowing for personalized treatments."

28.     The use of serums as part of the treatment is included with a HydraFacial
treatment ***only if the customer pays an additional price for the serum***.  Thus, Edge
unquestionably offers and sells its serums as a ***separate product***.  According to Edge, its
patented cleaning, rejuvenation, and resurfacing process that is performed as part of a
HydraFacial treatment uses Edges' patented, proprietary machines – including what Edge
characterizes as its "flagship" product, *i.e.* Edge's HydraFacial MD.  This Equipment and

other patented Edge HydraFacial Equipment according to Edge provides a treatment that Edge maintains is the "***most effective type of facial you can get***." Emphasis added. Edge markets and sells its Systems throughout the United States to end users such as dermatologists, plastic surgeons, cosmetic physicians, and aestheticians at medical spas. Unlike Botox, Edge's HydraFacial treatments are noninvasive, meaning that they do not require surgery or other invasive treatment as part of a HydraFacial treatment.

29.    In addition to Edge's patented products, there are alternate products and systems for noninvasive skin resurfacing and rejuvenation treatments available in the United States. They include:

• ***Microdermabrasion*** (which uses a crystal or diamond-tip device to sand the skin in order to remove the thick, outer layers). However, unlike the manual extractions performed through sanding in microdermabrasion, HydraFacial uses a vacuum tip to cleanse and remove impurities. As such, Edge maintains that its HydraFacial method is gentler, less painful and more effective. According to Edge: "[as] Edge expands its international footprint, it will meet some resistance from the cheaper Chinese serums and alternative products like microdermabrasion, especially in the developing world. Continued esthetician and favorable media coverage will be essential ***to keeping the brand premium*** in international expansion." Emphasis supplied. Thus, Edge claims, among others, that it has strong brand recognition in the United States and throughout the world.

• Other forms of non-invasive skin rejuvenation treatments also include ***micro needling***, also known as collagen therapy. This process helps rejuvenate the skin using tiny needles that pierce the outermost layer, which forces the skin to produce more collagen. However, the primary drawback of micro needling is it has been reported to cause scarring and to come with a higher risk of infection.

• ***Chemical peels*** can also be used as a possible alternate to HydraFacials. Both HydraFacial and chemical peels work by removing dead skin cells. Chemical peels employ acids, however. As such, they have been reported to not be for everyone. Due to

AGELESS SERUMS' THIRD AMENDED ANSWER TO
EDGE'S COMPLAINT AND COUNTERCLAIMS

123709225.1

the acids chemical peels use, they are generally not recommended for those with certain skin disorders. Also, while chemical peels may be effective for those with lighter skin tones, HydraFacial is reported to be recommended for people of any skin tone.  Chemical peels also need to be avoided if a person is nursing, pregnant, or has eczema, dermatitis, rosacea or psoriasis.  On the other hand, it is reported HydraFacials can be used by people with hyper-sensitive skin, and that it is actually recommended for treating rosacea and dry, peeling skin.

- ***Intense pulsed light ("IPL")*** is also known as a possible alternate choice for HydraFacials.  IPL is a photo rejuvenation cosmetic skin procedure that employs laser-like pulses of non-coherent light to fix sunspots, age spots, blotches, large pores, and other common skin conditions.  These lights penetrate into the skin and cause the collagen and blood vessels to constrict, which may help to reduce the appearance of redness and age lines.  IPL treatments are also reported to have drawbacks.  For one, they allegedly don't work on all discolorations.  Side effects have also been reported to include redness, enlarged pores, and the appearance of aged skin for several weeks following treatment.  Some people have also reported that the treatment affected their teeth that had fillings, causing discomfort similar to chewing on tinfoil.  IPL treatments are also reported not to be a good choice for people with surface discoloration, rosacea, and other skin issues.

30.    In its Complaint in this action (Dkt. 1 at 8), Edge alleges that its:

"flagship system is its revolutionary HydraFacial MD system***, which is the premier hydra-dermabrasion system sold in the United States.  Edge's HydraFacial system is so revolutionary that is protected by numerous United States patents***. In addition to the HydraFacial system, Edge designs, develops and manufactures and sells ***other patented hydra-dermabrasion system***s, including the HydraFacial Tower, HydraFacial Allegro, the HydraFacial Wave, the HydraFacial Elite, the HydraFacial Nectre and the HydraFacial Core systems" (which Edge defines as "the HydraFacial Systems").  *Id*.  (Emphasis supplied.)

31.    Ageless is informed and believes, and on that basis alleges, that Edge has consistently charged a much higher price for its patented HydraFacial Systems than its

AGELESS SERUMS' THIRD AMENDED ANSWER TO
EDGE'S COMPLAINT AND COUNTERCLAIMS

123709225.1

competitors without reducing demand for its Equipment.  On information and belief, Edge charges as much as $25,000 to $30,000 per System.  The sale of Edge's Equipment according to Edge accounts for roughly 49% of Edge's sales.  By contrast, Ageless is informed and believes, and on that basis alleges, that other hydrodermabrasion skin resurfacing and rejuvenation equipment is sold at a significantly lower prices despite high market even though they competitive products are used for a similar purpose with some similar qualities and intended results.  For example, Ageless is informed and believes, and on that basis alleges, that a company called Cosmetic Solutions sells its equipment at a price ranging from only a couple of hundred dollars to less than $12,000.  In this Counterclaim, Edge's HydraFacial Systems (Equipment) and the treatment they provide are what Ageless alleges are the "Tying Product(s)."

32.    Like its Equipment, Ageless is informed and believes, and on that basis, alleges that HydraFacial treatments generally cost more than competitive treatments.  For example, Ageless is informed and believes, and on that basis, alleges that as a general rule of thumb, HydraFacials costs anywhere between $150 and $300 per treatment (with serums added at a separate price only if the consumer wants to include them as part of their treatment).  By comparison, microdermabrasion is less, at approximately $75 to $200 per session.  Similarly, chemical peels can go as little as $150 per peel.  Ageless is informed and believes, and on that basis alleges, that despite higher pricing this too has not affected what Edge alleges is rising consumer demand for Edge's treatments.

33.    In fact, according to Edge and market analysis, given HydraFacials established brand, customer loyalty and Edge's monopoly over what it claims is unique, patented Equipment, Edge claims it is able to implement "value creation levels," including "annual price increases" for its products.  In addition, because of Edge's brand recognition, customer loyalty and patents, Edge is able to charge higher prices not only for Edge's Equipment, but also for its treatments.  This can be proven by, among others, the growing increase in sales and revenue obtained by Edge in the United States despite the depressed 2020 levels that were caused by Covid.  Despite not having market power

AGELESS SERUMS' THIRD AMENDED ANSWER TO
EDGE'S COMPLAINT AND COUNTERCLAIMS

for its Serums, Edge now seeks to use its market power for its Equipment, by tying the purchase and use of its Equipment to the purchase and use of its Serums not only to increase Edge's profits and revenue, but to exclude competition in the Tied market.

## 2. Edge's HydraFacial Serums (The "Tied Product")

34. In its Complaint (Dkt. 1 at 9), Edge alleges that: "Edge also designs, develops, manufactures, and sells high quality serums for use in the HydraFacial Systems. These serums include Activ-4, Antiox+, Antiox-6, Beta-HD Clear, and the HydraFacial Dermabuilder serums." Edge's Serums are hereinafter collectively referred to as "the HydraFacial Serums" or "Tied Product(s)".

35. Skin care serums are generally fat-based formulations that have gathered steam in cosmetic care products. Their popularity and high demand stems, among other factors, on the back of higher hydrating characteristics than most products use for moisturizing. Ageless is informed that demand for serums is very high and increasing even though it is a discretionary (not essential) product for consumers. Unlike its competitors, Edge has stated that (other than during the COVID period) Edge has not suffered from a decline in sales, revenue or demand.

36. Edge's unpatented HydraFacial Serums and noninfringing serums sold by third parties can both be used with Edge's Systems so Equipment and in the rendition of HydraFacial treatments. Currently, however, competitors cannot sell their competing products, including because Edge maintains it is able to prohibit it because Edge has a blocking book of patents covering Edge's Equipment. Thus, Edge has the ability to both control prices and exclude competition for the Tied Product.

37. As shown in the picture attached hereto as **Exhibit B**, Edge's Equipment has serum ports that store the serum for use as part of a HydraFacial treatment. What in part makes Edge's treatment unique according to Edge is the application of serums as moisturizers as part of a single, 30-minute HydraFacial treatment through the use of a patented Vortex Technology hand piece that is sold with Edge's Equipment. A

picture depicting how Edge's Systems look and how it cleans and removes impurities and applies moisturizers as part of a 30-minute HydraFacial treatment is attached hereto as **Exhibit C**.

38.   For its part, Ageless sells Serums that can be used with Edge's HydraFacial Systems. In its Complaint, Edge alleges as much: "Ageless is in the business of promoting and selling serums for use with hydra-dermabrasion systems manufactured by others, including the Edge hydra-dermabrasion systems."  Dkt. 1 at 21. Edge does not allege that its Equipment patents or any other patent prohibits Ageless from selling its Serums with Edge's HydraFacial Equipment or as part of a HydraFacial treatment.  In fact, Edge has never sued Ageless (or, as far as Ageless is aware, any other third party) for direct patent infringement by offering or selling competitive serums.  Edge however has recently filed a lawsuit in Texas claiming Ageless has induced patent infringement *by third parties* who are potential competitors to Edge for the sale of what Edge alleges in the Texas action (as in this action) are unique, patented HydraFacial Systems.  See *Edge Systems LLC v. Ageless Serums LLC*, Civ. Action No. 4:20-cv-04335 (S.D. Tex.) (hereinafter the "Texas Action").  A copy of the Complaint in the Texas Action is attached hereto as **Exhibit N**.

39.   As shown, Edge's HydraFacial Systems and Edge's HydraFacial Serums are indisputably sold as separate products.  As alleged above, this is evidenced, among other reasons, by the terms of the Edge License Agreements attached to Edge's Complaint which state, among other terms, that: "[in] recognition that the HydraFacial system and equipment and the Perk system and equipment *only operate properly and effectively with the use of Licensor's [Edge's] serum and solutions and consumables, Licensee agrees to purchase solutions used in the Purchased Equipment solely and exclusively from Licensor or its authorized distributor in good standing.*"  Complaint Exh. 2 at 3.1 and Exh. 3 at 2 (emphasis supplied). Edge  also charges  a *separate price* for  the use of  Edge's Serums as part of

123709225.1

a HydraFacial treatment.  As also alleged above, Edge also currently has an Authenticity Campaign *that requires its customers-licensees to purchase separately Edge's Serums as a condition of providing HydraFacial treatments and services*. Thus, by the terms and conditions found in Edge's contracts and its stated policies, it is indisputable that Edge's HydraFacial Systems (or Equipment) are sold separately from Edge's Serums.

40.   The relevant market for the "Tied Product" in this Counterclaim is Edge's Serums consisting of those Serums that Edge alleges it manufactures and sells and which Edge demands its customers-licensees use to the exclusion of any competitive product (hereinafter the "Tied Product(s)").  There are a number of other actual or potential competitors that sell serums that could otherwise be used with Edge's HydraFacial Systems instead of Edge's Serums.  In fact, Ageless is informed and believes, and on that basis alleges, that Edge currently allows a limited number of third parties to sell serums for use with its HydraFacial Equipment and treatments (including Murad Inc., ZO Skin Health Inc. and Paul Nassif M.D. Inc.).  At the same time, Edge prohibits other potential competitors (like Ageless, Zemits, OOMNEX and Adonyss) from selling serums even though they could in fact be "properly and effectively" used with Edge's patented HydraFacial Systems at competitive prices.  Ageless is informed and believes, and on that basis alleges, that third-party serums can in fact be used properly as a substitute for Edge's Serums with the same results as Edge's Serums as part of a HydraFacial treatment.  A copy of a section from Ageless' website showing the compatibility of Ageless Serums sold at competitive prices which can be used as a substitute for HydraFacial Serums is attached hereto as **Exhibit D**.

   **3.   Edge's Market Power**

41.   **Blocking Book of Patents:**  Edge's patent portfolio includes a "blocking book" of strikingly similar patents containing system, apparatus, and method claims relating to hydrodermabrasion technology, including, but not limited

AGELESS SERUMS' THIRD AMENDED ANSWER TO
EDGE'S COMPLAINT AND COUNTERCLAIMS

to, at least the following eight patents:  U.S. Patent No. 6,641,591; U.S. Patent No. 7,678,120; U.S. Patent No. 7,789,886; U.S. Patent No. 8,337,513; U.S. Patent No. 9,468,464; U.S. Patent No. 9,550,052; U.S. Patent No. 8,066,716; and U.S. Patent No. 9,775,646.

42.     In an effort to stifle competition and monopolize the hydrodermabrasion market for the record sales of Edge's Equipment, Edge has waged a decade-long campaign to aggressively enforce these patents.  Over the past ten years, Edge has brought no less than ten different patent infringement lawsuits in four different jurisdictions against eight different defendants.  True and correct copies of the Complaints filed in these cases are attached hereto as **Exhibits E through N**: (1) *Edge Systems LLC v. Bio-Therapeutic, Inc.*, C.A. No. 2:11-cv-04993-JFW (C.D. Cal.) – filed 6/13/11 (**Exhibit E**); (2) *Edge Systems LLC v. Image Microderm Inc.*, C.A. No. 2:14-cv-04428 (C.D. Cal.) – filed 6/9/14 (**Exhibit F**); (3) *Edge Systems LLC v. Naumkeag Spa & Medical Supplies, LLC*, C.A. No. 2:14-cv-04663 (C.D. Cal.) – filed 6/17/14 (**Exhibit G**); (4) *Edge Systems LLC v. Aguila*, C.A. No. 1:14-cv-24517-KMM (S.D. Fla.) – filed 11/2/14 (**Exhibit H**); (5) *Edge Systems LLC v. Ageless Serums LLC*, C.A. No. 2:17-cv-02720 (C.D. Cal.) – filed 4/10/17 (**Exhibit I**); (6) *Edge Systems LLC v. Aesthetic Skin Systems LLC*, C.A. No. 2:17-cv-04597 (C.D. Cal.) – filed 6/22/17 (**Exhibit J**); (7) *Edge Systems LLC v. Image Microderm Inc.*, C.A. No. 2:17-cv-8699 (C.D. Cal.) – filed 12/1/17 (**Exhibit K**); (8) *Edge Systems LLC v. Venus Concept USA Inc.*, C.A. No. 18-cv-62588-UU (S.D. Fla.) – filed 10/26/18 (**Exhibit L**); (9) *Edge Systems LLC v. Cartessa Aesthetics, LLC*, C.A. No. 2:20-cv-06082 (E.D.N.Y.) – filed 12/14/20 (**Exhibit M**); (10) *Edge Systems LLC v. Ageless Serums LLC*, C.A. No. 4:20-cv-04335 (S.D. Tex.) – filed 12/22/20 (**Exhibit N**).

43.     **Edge's Claimed High Brand Recognition and Customer Loyalty:**  Edge also claims to have ***high brand*** recognition and ***customer loyalty*** that also allows it to preclude competition in the Tied Product market.  Ageless is informed and believes, and on that basis alleges, Edge is also charges more for its Equipment than any competitor.

At the same time, by tying the purchase and use of its Equipment to the purchase of Edge's Serums, there is reduced competition in the market for the Tied Product, *i.e.* serums that could otherwise be sold and used with Edge's Equipment. As a result, there is a substantial amount of actual or potential business measured by dollar-volume that is foreclosed to competition because of Edge's illegal tie.

44. According to Edge, it operates a "razor and blade" model with "highly attractive blended gross margins of 75%." The "razor" according to Edge is its ***HydraFacial Equipment (which it calls a "delivery machine") estimated at $25K-30K per unit and accounting for "roughly 49% of sales.***" Emphasis supplied. In addition, what Edge calls the "razorblade," Edge states that **10% of the $200/session [or treatment] fee comes from the use of consumables (including serums) that HydraFacial sells to estheticians. Edge further states: "[t]heir recurring revenue (the sale of consumables like serum) currently represents 51% of sales and will grow bigger as a % of sales as the install base of delivery equipment expands**." Emphasis supplied. For 2022 alone, Edge has stated it projects with 18,000 units already sold and 3,000 users ($30,000 each), and $8,500 consumables (including serum) per unit, HydraFacial ***"will reach $250 million in revenue just by keeping up with its past performance."*** Emphasis supplied. Thus, it is clearly Edge's intent and business model to try to sell more of its high cost HydraFacial Equipment in a market it monopolizes to try to increase revenue for the sale of its unpatented Serums. Edge is now seeking to accomplish this by illegally tying the purchase and use of its Equipment conditioned upon the purchase and use of Edge's Serums.

45. Edge has further advertised: "[w]hile the upfront cost of a HydraFacial delivery machine and training time is fairly high, **the economics gained by the esthetician are highly compelling.**" Edge has stated that a standard $200 HydraFacial treatment yields a 90% gross margin/$180 gross profit to the esthetician," ***and that adding consumables (like serums) can lead to greater profits***. Edge further promotes its products by claiming that an esthetician can expect a large amount of annual revenue:

"**[a]ssuming 60 treatments per month at a $200 session, that's $144,000 of revenue or $129,600 of profit a year for the esthetician**." Emphasis supplied.

46.     Edge also maintains that "HydraFacial is known for its ***strong customer loyalty***" which is a further barrier to competition.  Emphasis supplied.  Edge also claims that there is not serious competition in the Tying Product market  According to Edge "while there are very few direct competitors to HydraFacial, Chinese knockoffs known as HydraPeel (or AquaPeel) exist.  **However, these competitors have failed to gain any meaningful traction outside of the Greater Chinese market.  Likewise, alternative procedures such as microdermabrasion have not mounted a serious challenge.**" Emphasis supplied.

47.     While Edge claims to be the industry leader in the hydrodermabrasion market (and thereby have market power in the market for the sale and use of its patented Equipment and the treatments they are designed to provide), there are numerous companies that would otherwise be able to compete with Edge at competitive prices in the tied market.  Among other competitors, Edge has alleged that its competitors include Image MicroDerm, Inc. and Aesthetic Skin Systems LLC which offer to perform services and treatments that compete with Edge's HydraFacial Systems and, Edge is informed and believes, who charge a lower price.

48.     In addition to Ageless, other companies compete with Edge in the manufacture and sale of HydraFacial serums.  Some of these other serum manufacturers and sellers not only include Ageless but others like Zeemits, OOMNEX and Adonyss that advertise they can be used with any hydrodermabrasion equipment, including Edge's HydraFacial Systems.

49.     Edge further claims it has ***high brand recognition*** which allows it to keep its product pricing higher than its competitors and is a further barrier to competition even though others charge less for their products and services.  Thus, Edge maintains "…**branding power matters a LOT in the beauty industry (think Hermes or Louis Vuitton) with high price inelasticity, and HydraFacial is the undisputed leader.**"

Emphasis supplied.

50.     Similarly, Edge further maintains that: "**[g]iven HydraFacial's established brand and leading market position, it has unique value creation levels it can pull, including annual price increase for consumables [like serums].**" Emphasis supplied. Nevertheless, because of Edge's contracts and Authenticity Campaign, the purchase and use of Edge's HydraFacial Equipment is conditioned upon a customer-licensee only purchasing and using Edge's Serums -- which stifles competition of competitive products for the purchase and use of competitive products and has an onerous effect on an appreciable number of buyers in the serum market.  Edge's efforts to expand its patents to non-patented and non-infringing products constitutes an illegal tie in violation of federal and State law.  *See Sherman Act § 1; Clayton Act §§ 3 and 14; Cartwright Act §§ 16720 and 16727*; and *California Business and Performance Code  §§ 17200 et seq*.

51.     Ageless is further informed and believes, and on that basis alleges, that because of Edge's unlawful tying agreements and policies, Edge has restrained commerce, including by enabling Edge to exclude competition, and to set prices higher for Edge Equipment and treatments than those of third parties who could otherwise sell competitive products and offer treatments at a lower price.  At the same time, this conduct has precluded Ageless and other actual or potential competitors from selling serums to Edge's customers-licensees at a significant loss to Ageless and other competitors.  Because of Ageless' illegal tie, there is significant loss to Ageless and other competitors which would otherwise allow these parties to share in the lucrative consumables and services markets that Edge states represents has allowed it to earn $125 million in revenue in 2020 alone, with increased sales and profits thereafter. Obviously, these sales and profits could be shared  if Edge did not prohibit the sale of unpatented, non-infringing serums for use with Edge's patented HydraFacial Equipment.  Not only are competitors harmed by Edge's illegal conduct. Consumers are also harmed by Edge's conduct by being unable to purchase and use third party products and services at a competitive price which many prefer to the purchase of Edge's products and treatments.

AGELESS SERUMS' THIRD AMENDED ANSWER TO
EDGE'S COMPLAINT AND COUNTERCLAIMS
123709225.1

Thus, Edge's unlawful use of its market power in one market to try to expand it to a second market in which it does not have market power results in harm to competitors, consumers and creates consumer welfare loss.  A substantial amount of commerce is thereby affected by Edge's illegal tying.

52.    Because of Edge's unlawful and anticompetitive conduct, Ageless has suffered and is entitled to monetary damages (including compensation for pecuniary losses), trebled pursuant to 28 U.S.C. § 15, as well as injunctive relief (including a court order restraining Edge from continuing to tie separate products).

## COUNTERCLAIM COUNT II
## (UNFAIR COMPETITION UNDER CALIFORNIA
## BUSINESS &PROFESSIONS CODE SECTIONS 17200 *et seq.*
## AND COMMON LAW)

53.    Ageless repeats and re-alleges the allegations of paragraphs 1-52 of this Counterclaim as if set forth fully herein.

54.    Edge's conduct as alleged above, including, but not limited to, its unlawful tying and false statements about the quality of Ageless' serum, constitutes unfair competition under *California Business & Professions Code Sections 17200 et seq.* and state common law.

55.    Because of Edge's unfair conduct, Ageless is informed and believes, and thereon alleges, that Edge has derived and received, and will continue to derive and receive, gains, profits, and advantages from Edge's unfair competition in an amount not presently known by Ageless.

56.    By its actions, Edge has injured and violated the rights of Ageless and has irreparably injured Ageless, and such irreparable injury will continue unless Edge is enjoined by this Court.

57.    Ageless' willful acts of unfair competition under California common law constitute oppression, malice, defamation, and false advertising.  Accordingly, in addition to monetary damages, Ageless is entitled to exemplary damages pursuant to *Cal. Civ.*

*Code Section 3294(a).*

## COUNTERCLAIM COUNT III
## (DEFAMATION AND FALSE ADVERTISING)

58.     Ageless repeats and re-alleges the allegations of paragraphs 1-57 of this Counterclaim as if fully set forth herein.

59.     The development of Ageless Serums began in 2014.  Three commercially available HydraFacial base formulations were analyzed, and include Active4, BetaHD, and Antioxidant.  An outside chemist analyzed the ingredients and reformulated the serums in order to improve upon updated standards, such as aqua solubility.  These became the Ageless Serums.  The manufacturer of the Ageless Serums is registered with the U.S. Food and Drug Administration (FDA) and is fully licensed for cosmetic manufacturing.  As a licensed manufacturer, Ageless must adhere to strict CGMP controls to ensure batch consistency and quality for the Ageless Serums and standards of the Independent Cosmetic Manufacturers and Distributors (ICMAD), Society of Cosmetic Chemists (SCC), and the Better Business Bureau.  The manufacturing facility has clean manufacturing and filling rooms, as well as full R&D, QA and analytical labs.

60.     Ageless is informed that, on several instances, an Edge representative or Edge and its employees have characterized Ageless Serums as "inferior," "less effective," and even potentially "harmful" to consumers and Edge's customers and by making similar false statements (including, but not limited to, as part of Counter-Defendants' Trademark License Agreement and Edge's Authenticity Campaign discussed above).  These statements are false and known to be false by Counter Defendants since Ageless Serums are not "inferior" to Edge's serums, "less effective," "less efficient" or potentially "harmful."  Ageless does not presently know all names of the specific Edge employees or representatives who made these false statements about Ageless' products (other than those identified in these Counterclaims such as Counter Defendant Carnell), but only knows from what Ageless customers have informed Ageless that these were either Edge employees or representatives.

AGELESS SERUMS' THIRD AMENDED ANSWER TO
EDGE'S COMPLAINT AND COUNTERCLAIMS

123709225.1

61.    In addition to these statements, Ageless is aware that Edge has also described Ageless Serums as "lower quality products" or by using similar descriptions. This too is false since Ageless Serums are not of a "lower quality" than Edge's Serums and Edge knows it.  Edge has also made false and defamatory statements about Ageless Serums in at least its Trademark License Agreement.  For example, Section 3.1 of the Agreement states that "the HydraFacial system and equipment…*only function properly and effectively* with the use of Licensor's serum solutions and consumables," thus suggesting that other serum solutions and consumables, such as Ageless Serums, do not and will not allow these serums or consumables to function "properly" or "effectively" with HydraFacial Systems when in fact they do.  *See* Exhibit 2 of Complaint [D.I.1] at Section 3.1 (emphasis supplied); *see also* Exhibit 3 of Complaint [D.I.1] at Section 2, Exhibit 4 of Complaint [D.I.1] at Section 2.  These statements are, as alleged above, false since the HydraFacial System and Equipment do function "properly" and "effectively" with Ageless Serums.

62.    Ageless is informed and believes, and on that basis alleges, that in approximately November, 2020, a Hala Tailfour of Aurora Medi Spa, East Lansing, Michigan was approached by a HydraFacial representative who aggressively marketed HydraFacial serums to her and characterized the Ageless serums as "inferior."

63.    Upon information and belief, on approximately November 11, 2020, a Daniel and Melissa Coats of Cocoa Beach Spa, Melbourne, Florida, were emailed a letter from HydraFacial informing them among other things that their license to use any HydraFacial Marks had been terminated, that their LINQ status had been reset and that they would no longer receive loyalty pricing, and their warranty on their HydraFacial device was revoked.  The letter also discussed the "Authenticity Campaign" message that was emailed to all HydraFacial customers on August 13, 2020, which included a video of Edge's CEO Carnell and written materials which characterized serums, such as Ageless Serums, as "inferior, third party serums."

64.    Upon information and belief, on approximately January 29, 2021, a Bonnie

AGELESS SERUMS' THIRD AMENDED ANSWER TO
EDGE'S COMPLAINT AND COUNTERCLAIMS

123709225.1

Benedetto of Philadelphia, Pennsylvania was approached by a HydraFacial representative and received similar statements from Edge and its employees.

65.      Upon information and belief, on or about March 2, 2021, Marissa Hervey of St. Petersburg, Florida informed Rene Chlumecky of Ageless that the CEO of Edge had sent out a video that asked all of Edge's customers to stop using "non HydraFacial products" or risk losing their licensing rights.  Ageless believes that this video described above is the same video described above regarding Edge's "Authenticity Campaign."

66.      Also, upon information and belief, on approximately August 28, 2020, Gale Pingleton of Clearwater, Florida contacted Rene Chlumecky of Ageless regarding Edge's "Authenticity Campaign" and expressed her disappointment that Edge would characterize persons who use Ageless Serums as "offenders" and that she believed Ageless Serums were "very good" and not inferior products as characterized by Edge.

67.      By its actions (including under the terms of its Trademark License Agreement and its Authenticity Campaign), Ageless is informed and believes, and on that basis alleges, that Edge has deliberately induced one or more of Ageless' customers-licensees to terminate their business relations with Ageless.

68.      There is not now and has never been legal justification or right for Edge to have engaged in such unfair, illegal actions.

69.      Because of Edge's unlawful and unfair conduct as alleged herein, Ageless has lost customers and profits, revenue and other benefits it might otherwise have obtained.

70.      Edge's acts complained of herein have caused Ageless to suffer substantial monetary loss and irreparable injury.  Ageless will continue to suffer substantial loss and irreparable injury unless and until Edge is enjoined from continuing to interfere with Ageless' ability to sell its serums to customers-licensees.

71.      Edge's acts complained of herein have been willful and deliberate, thereby entitling Ageless to exemplary damages.

72.      Edge's statements about Ageless and the quality of its products are false, and

known to be false by Edge.

73.     Edge was at all times relevant hereto that its statements were false and/or unsupported and knew that the statements made by it would and did cause serious injury to Ageless.

74.     In truth, Ageless' products are not of "inferior quality" to Edge's serum. Instead Ageless' serums work equally well (if not better) with Edge's Equipment than Edge's serum do, and create equal, if not superior, skin care results.

75.     Edge's acts complained of herein have caused Ageless to suffer substantial monetary loss and irreparable injury.  Ageless will continue to suffer substantial loss and irreparable injury unless and until Edge is enjoined from defaming Ageless and making false statements about it.

76.     Edge's acts complained of herein entitle Ageless to compensatory damages and other relief and, because they have been willful and deliberate, entitle Ageless to exemplary damages.

## COUNTERCLAIM COUNT IV
## (TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS)

77.     Ageless repeats and re-alleges the allegations of paragraphs 1-76 of this Counterclaim as if fully set forth herein.

78.     Ageless has valuable business relations with third parties who have purchased Ageless' products, which have led to economic benefit to Ageless and the probability of future economic benefit to Ageless.

79.     At all times relevant hereto, Ageless is informed and believes, that Edge has been aware of some or all of these valuable business relationships.  In fact, as alleged above, Edge and its representatives have communicated with several of Ageless' customers to deter them from continuing to do business with Ageless.

80.     By its actions (including under the terms of its Trademark License Agreement and Authenticity Campaign), Ageless is informed and believes, and on that basis alleges, that Edge has deliberately induced one or more of Ageless' customers-

licensees to terminate their business relations with Ageless.

81.    There is not and has never been legal justification or right for Edge to have engaged in such unfair, illegal actions.

82.    Because of Edge's unlawful and unfair conduct as alleged herein (including because of its antitrust violations, unfair competition, and defamation), Ageless has lost customers and profits, revenue, and other benefits it might otherwise have obtained.

83.    Edge's acts complained of herein have caused Ageless to suffer substantial monetary loss and irreparable injury.  Ageless will continue to suffer substantial loss and irreparable injury unless and until Edge is enjoined from continuing to interfere with Ageless' ability to sell its serums to customers-licensees.

84.    Edge's acts complained of herein have been willful and deliberate, thereby entitling Ageless to exemplary damages.

## **PRAYER FOR RELIEF**

Wherefore, Ageless prays for entry of judgment as follows:

1.    dismissing Edge's complaint with prejudice;

2.    declaring that Ageless has not infringed or induced infringement of any of Edge's asserted trademarks;

3.    declaring that Edge has no legal right in any of the asserted Marks, or the right to stop Ageless or anyone else from using such Marks in internet advertising or otherwise;

4.    declaring that Edge has not caused anyone to breach any of Edge's contracts, including any of the terms of Edge's Trademark License Agreements;

5.    declaring that Ageless has not engaged in any act of unfair competition, false advertising, or receipt of stolen goods;

6.    declaring that Edge has suffered no injury, including injury to its business reputation or loss of potential customers-licensees, as a result of Ageless' use of the Asserted Marks;

7.    enjoining Counter Defendants, as well as their agents, servants, employees,

AGELESS SERUMS' THIRD AMENDED ANSWER TO
EDGE'S COMPLAINT AND COUNTERCLAIMS

123709225.1

and attorneys, and all persons in active concert or participation with them, from continuing to make false statements about Ageless or any of its products and from or disparaging Ageless or any of its products, directly or indirectly charging infringement, or instituting any further action for infringement of the Asserted Marks or any similar marks against Ageless, its officers, directors, principals, agents, employees, or its customers-licensees;

8.    enjoining Counter Defendants as well as their agents, servants, employees, and attorneys and all persons in active concert or participation with them from interfering with Ageless' existing or potential business relations or from engaging in any conduct that is based upon the claims Ageless has asserted in its Counterclaims in this action;

9.    finding each Counter Defendant liable for Ageless' damages and trebled damages requested by Ageless and requiring them to pay Ageless' damages in a sum to be proven at trial;

10.    awarding Ageless treble damages, including pursuant to 15 U.S.C. Section 15 and State law, for Counter Defendants' misconduct, including but not limited to, Counter Defendants' illegal tying in violation of federal and State antitrust laws;

11.    awarding Ageless punitive and exemplary damages against all Counter Defendants;

12.    awarding Ageless its reasonable attorneys' fees and costs; and

13.    awarding Ageless such other and further relief as the Court deems just and proper.

Dated:  June 25, 2021                    FOX ROTHSCHILD LLP


                                   By:       /s/James E. Doroshow
                                         James E. Doroshow
                                         Attorneys for Defendant & Counterclaim
                                         Plaintiff, AGELESS SERUMS LLC

AGELESS SERUMS' THIRD AMENDED ANSWER TO
EDGE'S COMPLAINT AND COUNTERCLAIMS

123709225.1

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Defendant and Counterclaimant Ageless hereby demands a trial by jury as to all issues properly so tried.

Dated:  June 25, 2021                    FOX ROTHSCHILD LLP

By:          */s/James E. Doroshow*
James E. Doroshow
Attorneys for Defendant & Counterclaim
Plaintiff, AGELESS SERUMS LLC

45

# EXHIBIT A

✉ Newsletter

Order online or email us sales@dentalmedicalsupplier.com (mailto:sales@dentalmedicalsupplier.com)

👤 Sign In Or Create An Account(Https://Dentalmedicalsupplier.Com/My-Account/)

 KL MEDICAL (https://dentalmedicalsupplier.com/)
MEDICAL DENTAL SUPPLIER

🔍🛒⁰ $0.00(https://dentalmedicalsupplier.com/cart/)

≡

DENTAL PRODUCTS (/)     MEDICAL PRODUCTS     SHOP (HTTPS://DENTALMEDICALSUPPLIER.COM/SHOP/)

CART (HTTPS://DENTALMEDICALSUPPLIER.COM/CART/)

CONTACT US (HTTPS://DENTALMEDICALSUPPLIER.COM/CONTACT-US/)

SALE



t/edge-
-wave/)





(https:/.
lasers-s
laser-ha

(https://dentalmedicalsupplier.com/wp-content/uploads/2014/08/...

We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it.

This website uses cookies to deliver its services, to analyze traffic. Infomation about your use of this site is shared public. By using this site, you agree to its use of cookie. (http://livetrafficfeed.com/gdpr)

**Got it!**

# EXHIBIT B



2014 Edge Systems
Hydrafacial MD

LEARN MORE

Product categories +

☐ Lasers (101)

Product manufacturer +

☐ Aesthetics Biomedical (2)

☐ Alma (3)

☐ Altair (0)

☐ Altair Instruments (1)

☐ AngioDynamics (1)

☐ Arion (0)

☐ BTL (3)

☐ Buffalo Filter (1)

☐ Candela (7)

☐ Chromogenex (0)

☐ Cutera (4)

# EXHIBIT C



Home    About Us    Services ▾    Offers ▾    Appointment    Blog

DRSMMC Loyalty Card    Contact Us    العربية



## Who can get the Treatment?

Hydrafacial treatment can be availed by women of all ages, complexion and skin concerns.
Previous allergies from popular chemicals such as salicylic acid or fragrances, if any, must b

# EXHIBIT D

Case 2:20-cv-09669-FLA-PVC   Document 41   Filed 06/25/21   Page 53 of 380   Page ID #:661



Hydrafacial                                  Ageless Serums

Side by Side Product Comparison

Hydration
## Ageless Serums Puts the Hydra in Hydra Facials

No Product                                   Pure Aqua Plus HA
                                             $30.00  $1.87 per oz

### Cleansing Serums

| ACTIV-4 8oz | | | Skin Deep Prep 16 oz | |
|---|---|---|---|---|
| 2-2019 | $80.00 | $10.00 per oz | 1-2014 | $36.00 $2.25 per oz |
| 2- 2018 | $74.00 | $9.25 per oz | 1-2020 | $40.00 |
| 1-2017 | $63.00 | $7.88 per oz | | |
| 8-2011 | $48.00 | $6.00 per oz | | |

Purified Water,glucosamine HCL, Algae,          Pure Aqua, Butylenne Glycol, Urea, Glocosamine
( laminaria digitata ) extract , yeast extract ,   HCL, Algae Extract, Saccharomyces Cerevisiae
urea, lactic acid and other propriety             ( Yeast ) Extract, Lauryl Lactate Acid, Sodium
ingredients.                                      Benzoate, Phenoxyethanol plus other proprietary
                                                  ingredients.

# EXHIBIT E

COPY

FILED

2011 JUN 13 PM 3: 02

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY _____

Brenton R. Babcock (SBN 162,120)
bbabcock@kmob.com
Kent Shum (SBN 259,189)
kent.shum@kmob.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street
Fourteenth Floor
Irvine, CA 92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

Attorneys for Plaintiffs
EDGE SYSTEMS CORPORATION
AXIA MEDSCIENCES, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDGE SYSTEMS CORPORATION, a California corporation, and AXIA MEDSCIENCES, LLC,, a Delaware limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> BIO-THERAPEUTIC, INC., a Washington corporation, <br><br> Defendant. | Civil Action No. <br><br> CV 11-04993 JFW (AGRx) <br><br> COMPLAINT FOR PATENT INFRINGEMENT <br><br> DEMAND FOR JURY TRIAL |

Plaintiffs Edge Systems Corporation ("Edge") and Axia MedSciences, LLC ("Axia"), for their Complaint against Defendant Bio-Therapeutic, Inc. ("BT"), allege as follows:

## PARTIES

1.      Plaintiff Edge is a California corporation having a principal place of business at 2277 Redondo Avenue, Signal Hill, California, 90755.

2.      Edge manufactures spa and skin treatment products, including Edge's Hydrafacial and Delphia microdermabrasion systems, and sells and distributes them throughout the United States, including in this Judicial District.

3.      Plaintiff Axia is a Delaware limited liability company having a principal place of business at 23 Hallmark Circle, Menlo Park, California, 94025.

4.      Upon information and belief, Defendant BT is a corporation organized and existing under the laws of the state of Washington, having a principal place of business at 2244 1st Avenue South, Seattle, Washington, 98134.

## JURISDICTION AND VENUE

5.      This action arises under the Patent Laws of the United States, 35 U.S.C. §§ 100, *et seq*.

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

7.      Upon information and belief, BT conducts business throughout the United States, including in this Judicial District, and has committed the acts complained of in this Judicial District and elsewhere.

8.      This Court has personal jurisdiction over BT by virtue of its systematic and continuous contacts with California and by virtue of its actions in California, including in this Judicial District, constituting infringement of the patents in suit.

9.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), (c) and 1400(b), and by Plaintiffs' choice of venue.

## **FIRST CLAIM FOR RELIEF**

## **INFRINGEMENT OF U.S. PATENT NO. 6,641,591**

10.      Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-9 above.

11.      On November 4, 2003, U.S. Patent No. 6,641,591 ("the '591 Patent"), entitled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS," was duly and legally issued by the United States Patent and Trademark Office.  Axia is the owner by assignment of all right and title, both legal and equitable, to the '591 Patent.  A copy of the '591 Patent is attached hereto as Exhibit 1.

12.      Edge is the exclusive licensee of the '591 Patent.

13.      Edge has provided proper and sufficient notice to the public that its products are patented under the '591 Patent by marking its products with the patent number.

14.      Upon information and belief, BT manufactures, distributes, imports, offers to sell, and/or sells in the United States certain spa and skin treatment products that infringe the '591 Patent, including but not limited to, the BT Bio-Hydroderm microdermabrasion system and accessories, the BT Bio-Hydrotip microdermabrasion system and accessories, and the BT AQUAFUSE microdermabrasion system and accessories.

15.      Upon information and belief, BT has contributed to the infringement of the '591 Patent by others, through BT's activities relating to its spa and skin treatment products, including but not limited to, the BT Bio-Hydroderm microdermabrasion system and accessories, the BT Bio-Hydrotip microdermabrasion system and accessories, and the BT AQUAFUSE microdermabrasion system and accessories.

16. Upon information and belief, BT has induced infringement of the '591 Patent by others, through BT's activities relating to its spa and skin treatment products, including but not limited to, the BT Bio-Hydroderm microdermabrasion system and accessories, the BT Bio-Hydrotip microdermabrasion system and accessories, and the BT AQUAFUSE microdermabrasion system and accessories.

17. Each of BT's infringing activities is without the consent of, authority of, or license from Plaintiffs.

18. On April 15, 2011, Edge's attorney sent a cease and desist letter to David Suzuki, President of BT, informing him of Edge's rights to the '591 Patent and that BT's activities relating to the BT Bio-Hydroderm microdermabrasion system and accessories, the BT Bio-Hydrotip microdermabrasion system and accessories, and the BT AQUAFUSE microdermabrasion system and accessories, infringed the '591 Patent. A copy of that letter is attached hereto as Exhibit 4.

19. On May 19, 2011, after receiving no substantive response, Edge's attorney sent a follow-up letter, again warning BT of patent infringement. A copy of that letter is attached hereto as Exhibit 5.

20. To date, Edge has not received any substantive response from BT concerning infringement of the '591 Patent.

21. BT's acts of infringement have caused damage to Plaintiffs in an amount to be determined at trial.

22. BT's infringement of the '591 Patent is causing irreparable harm to Plaintiffs, for which there is no adequate remedy at law. BT's infringement will continue, and will continue to cause irreparable harm to Plaintiffs, unless BT's infringement is enjoined by this Court.

/ / /

/ / /

23.     Upon information and belief, BT's infringement of the '591 Patent was and is willful and deliberate, entitling Plaintiffs to enhanced damages under 35 U.S.C. § 284 and attorneys' fees and non-taxable costs under 35 U.S.C. § 285.

**SECOND CLAIM FOR RELIEF**

**INFRINGEMENT OF U.S. PATENT NO. 7,678,120**

24.     Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-23 above.

25.     On March 16, 2010, U.S. Patent No. 7,678,120 ("the '120 Patent"), entitled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS," was duly and legally issued by the United States Patent and Trademark Office.  Axia is the owner by assignment of all right and title, both legal and equitable, to the '120 Patent.  A copy of the '120 Patent is attached hereto as Exhibit 2.

26.     Edge is the exclusive licensee of the '120 Patent.

27.     Upon information and belief, BT manufactures, distributes, imports, offers to sell, and/or sells in the United States certain spa and skin treatment products that infringe the '120 Patent, including but not limited to, the BT Bio-Hydroderm microdermabrasion system and accessories, the BT Bio-Hydrotip microdermabrasion system and accessories, and the BT AQUAFUSE microdermabrasion system and accessories.

28.     Upon information and belief, BT has contributed to the infringement of the '120 Patent by others, through BT's activities relating to its spa and skin treatment products, including but not limited to, the BT Bio-Hydroderm microdermabrasion system and accessories, the BT Bio-Hydrotip microdermabrasion system and accessories, and the BT AQUAFUSE microdermabrasion system and accessories.

/ / /

29.     Upon information and belief, BT has induced infringement of the '120 Patent by others, through BT's activities relating to its spa and skin treatment products, including but not limited to, the BT Bio-Hydroderm microdermabrasion system and accessories, the BT Bio-Hydrotip microdermabrasion system and accessories, and the BT AQUAFUSE microdermabrasion system and accessories.

30.     Each of BT's infringing activities is without the consent of, authority of, or license from Plaintiffs.

31.     On April 15, 2011, Edge's attorney sent a cease and desist letter to David Suzuki, President of BT, informing him of Edge's rights to the '120 Patent and that BT's activities relating to the BT Bio-Hydroderm microdermabrasion system and accessories, the BT Bio-Hydrotip microdermabrasion system and accessories, and the BT AQUAFUSE microdermabrasion system and accessories, infringed the '120 Patent. A copy of that letter is attached hereto as Exhibit 4.

32.     On May 19, 2011, after receiving no substantive response, Edge's attorney sent a follow-up letter, again warning BT of patent infringement. A copy of that letter is attached hereto as Exhibit 5.

33.     To date, Edge has not received any substantive response from BT concerning infringement of the '120 Patent.

34.     BT's acts of infringement have caused damage to Plaintiffs in an amount to be determined at trial.

35.     BT's infringement of the '120 Patent is causing irreparable harm to Plaintiffs, for which there is no adequate remedy at law. BT's infringement will continue, and will continue to cause irreparable harm to Plaintiffs, unless BT's infringement is enjoined by this Court.

/ / /

/ / /

36.     Upon information and belief, BT's infringement of the '120 Patent was and is willful and deliberate, entitling Plaintiffs to enhanced damages under 35 U.S.C. § 284 and attorneys' fees and non-taxable costs under 35 U.S.C. § 285.

### THIRD CLAIM FOR RELIEF
### INFRINGEMENT OF U.S. PATENT NO. 7,789,886

37.     Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-36 above.

38.     On March 16, 2010, U.S. Patent No. 7,789,886 ("the '886 Patent"), entitled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS," was duly and legally issued by the United States Patent and Trademark Office.  Axia is the owner by assignment of all right and title, both legal and equitable, to the '886 Patent.  A copy of the '886 Patent is attached hereto as Exhibit 3.

39.     Edge is the exclusive licensee of the '886 Patent.

40.     Upon information and belief, BT manufactures, distributes, imports, offers to sell, and/or sells in the United States certain spa and skin treatment products that infringe the '886 Patent, including but not limited to, the BT Bio-Hydroderm microdermabrasion system and accessories, the BT Bio-Hydrotip microdermabrasion system and accessories, and the BT AQUAFUSE microdermabrasion system and accessories.

41.     Upon information and belief, BT has contributed to the infringement of the '886 Patent by others, through BT's activities relating to its spa and skin treatment products, including but not limited to, the BT Bio-Hydroderm microdermabrasion system and accessories, the BT Bio-Hydrotip microdermabrasion system and accessories, and the BT AQUAFUSE microdermabrasion system and accessories.

/ / /

42.     Upon information and belief, BT has induced infringement of the '886 Patent by others, through BT's activities relating to its spa and skin treatment products, including but not limited to, the BT Bio-Hydroderm microdermabrasion system and accessories, the BT Bio-Hydrotip microdermabrasion system and accessories, and the BT AQUAFUSE microdermabrasion system and accessories.

43.     Each of BT's infringing activities is without the consent of, authority of, or license from Plaintiffs.

44.     On April 15, 2011, Edge's attorney sent a cease and desist letter to David Suzuki, President of BT, informing him of Edge's rights to the '886 Patent and that BT's activities relating to the BT Bio-Hydroderm microdermabrasion system and accessories, the BT Bio-Hydrotip microdermabrasion system and accessories, and the BT AQUAFUSE microdermabrasion system and accessories, infringed the '886 Patent. A copy of that letter is attached hereto as Exhibit 4.

45.     On May 19, 2011, after receiving no substantive response, Edge's attorney sent a follow-up letter, again warning BT of patent infringement. A copy of that letter is attached hereto as Exhibit 5.

46.     To date, Edge has not received any substantive response from BT concerning infringement of the '886 Patent.

47.     BT's acts of infringement have caused damage to Plaintiffs in an amount to be determined at trial.

48.     BT's infringement of the '886 Patent is causing irreparable harm to Plaintiffs, for which there is no adequate remedy at law. BT's infringement will continue, and will continue to cause irreparable harm to Plaintiffs, unless BT's infringement is enjoined by this Court.

/ / /

/ / /

49. Upon information and belief, BT's infringement of the '886 Patent was and is willful and deliberate, entitling Plaintiffs to enhanced damages under 35 U.S.C. § 284 and attorneys' fees and non-taxable costs under 35 U.S.C. § 285.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment and seek relief as follows:

A. A judgment that BT has infringed U.S. Patent Nos. 6,641,591, 7,678,120, and 7,789,886;

B. Preliminary and permanent injunctions against further infringement by BT of U.S. Patent Nos. 6,641,591, 7,678,120, and 7,789,886, including injunctions against direct infringement, contributory infringement, and induced infringement;

C. An award of damages for BT's infringement of U.S. Patent Nos. 6,641,591, 7,678,120, and 7,789,886;

D. A declaration that BT's infringement of U.S. Patent Nos. 6,641,591, 7,678,120, and 7,789,886 was and is willful, and that this is an exceptional case under 35 U.S.C. § 285;

E. A trebling of the award of damages under 35 U.S.C. § 284, or such other enhancement of the award of damages that the Court deems appropriate;

F. An award of attorneys' fees and non-taxable costs under 35 U.S.C. § 285 on account of BT's willful infringement;

G. An award of taxable costs; and

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

H.     Such other and further relief as this Court may deem just and proper.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: June 10, 2011     By: _____
                         Brenton R. Babcock
                         Kent Shum
                         Attorneys for Plaintiffs
                         EDGE SYSTEMS CORPORATION
                         AXIA MEDSCIENCES, LLC

-10-

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs Edge Systems Corporation and Axia MedSciences, LLC demand a trial by jury of all issues raised by the pleadings which are triable by jury.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: June 10, 2011    By: _____

Brenton R. Babcock
Kent Shum
Attorneys for Plaintiffs
EDGE SYSTEMS CORPORATION
AXIA MEDSCIENCES, LLC

11404974

-11-

# EXHIBIT 1

Case 2:01-cv-09669-FJW-VBK Document 41 Filed 06/05/06 Page 67 of 380 Page ID #:675
Case 2:01-cv-04993-FJW-VBK Document 11



US006641591B1

## (12) United States Patent
Shadduck

(10) Patent No.: **US 6,641,591 B1**
(45) Date of Patent: **Nov. 4, 2003**

(54) **INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS**

(76) Inventor: **John H. Shadduck**, 1490 Vistazo West, Tiburon, CA (US) 94920

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/648,025**

(22) Filed: **Aug. 25, 2000**

### Related U.S. Application Data

(60) Provisional application No. 60/150,782, filed on Aug. 26, 1999.

(51) Int. Cl.[7] .............................................. **A61B 17/50**
(52) U.S. Cl. .................................................... **606/131**
(58) Field of Search ........................... 606/1, 137, 133, 606/131, 132, 79, 170, 171, 180; 604/289, 290, 313, 315; 608/133, 53, 80

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,759,185 A | * | 6/1998 | Grinberg .................... 606/180 |
| 6,139,554 A | * | 10/2000 | Karkar et al. ............... 606/131 |
| 6,162,232 A | * | 12/2000 | Shadduck .................. 604/289 |
| 6,183,483 B1 | * | 2/2001 | Chang ...................... 606/131 |
| 6,241,739 B1 | * | 6/2001 | Waldron .................... 606/131 |

* cited by examiner

*Primary Examiner*—Michael J. Milano
*Assistant Examiner*—Vy Q. Bui

(57) **ABSTRACT**

An instrument and technique for the removal of epidermal layers in a controlled manner utilizing a hand-held instrument with a working end that (i) a vacuum aspiration system, (ii) a source for delivery of a sterile fluids or pharmacological agents to the skin; and (iii) a skin interface surface in the working end that has specially shape structure for abrading surface layers of the patient's epidermis as the working end is moved over the patient's skin while at the same time causing rapid penetration of the fluids into the skin for therapeutic purposes. Movement of the working end across the skin causes abrasion of the surface layers in a path over the patient's skin. The method of the invention may be used in a periodic treatment for the removal of superficial skin layers that enhances the synthesis of dermal collagen aggregates by inducing the body's natural wound healing response. The method of the invention creates more normal dermal architectures in skin with limited depths of skin removal by the series of superficial treatments that may be comparable to the extent of neocollagenesis caused by a deep skin removal treatment (e.g., $CO_2$ laser skin removal).

**17 Claims, 9 Drawing Sheets**



Ex. 1
Page 1 of 15

**U.S. Patent**     Nov. 4, 2003     Sheet 1 of 9     US 6,641,591 B1



wrinkle

hair

thin layer
of collagen in
epidermis

diminished
collagen
aggregates
in papillary
dermis

reticular
dermis

nerve

## FIG. 1A



thick
collagen layer

collagen
aggregates

epidermis

papillary
dermis

reticular
dermis

## FIG. 1B



*FIG. 2*

Case 2:21-cv-09669-FLA-PVC Document 41 Filed 06/25/24 Page 70 of 380 Page ID #:678



*FIG. 3*

Ex. 1
Page 4 of 15

Case 2:20-cv-09669-FLA-PVC Document 41 Filed 06/25/24 Page 71 of 380 Page ID #:679
Case 2:21-cv-09993-JFW-AGR Document 41 Filed 06/13/11 Page 17 of 369 Page ID #:219



*FIG. 4*

Case 2:20-cv-09669-FLA-PVC Document 41 Filed 06/25/24 Page 72 of 380 Page ID #:680
Case 2:21-cv-04993-JFW-AGR Document 1 Filed 06/13/11 Page 28 of 69 Page ID #:22



*FIG. 5*

Ex. 1
Page 6 of 15

U.S. Patent     Nov. 4, 2003     Sheet 6 of 9     US 6,641,591 B1



FIG. 6



*FIG. 7*

Case 2:01-cv-09669-FJAP-VCRD Document 41   Filed 06/25/14   Page 75 of 380   Page ID #:683
Case 2:01-cv-04993-JFW-VGR Document 41   Filed 06/13/11   Page 2 of 80   Page ID #:25



# FIG. 8

Ex. 1
Page 9 of 15



225
250
255a
255b
240
260

# FIG. 9

US 6,641,591 B1

**1**

## INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims priority from Provisional U.S. patent application Ser. No. 60/150,782 filed Aug. 26, 1999.

This application is also related to the following U.S. patent applications: Ser. No. 09/294,254 filed Apr. 19, 1999 now U.S. Pat. No. 6,162,232 titled Instruments and Epidermal Layers with Skin Cooling; and Ser. No. 09/271,610 filed Mar. 17, 1999 titled Technique and System for Controlled Chemically-Mediated Removal of Skin Layers. All of the above listed applications are incorporated herein in their entirety by these references.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to devices for dermatology and more particularly to a hand-held instrument with a working end that carries (i) a negative pressure aspiration system, (ii) a source for delivery of a sterile fluids to the skin; and (iii) a skin interface surface in the working end that has specially shape structure for abrading surface layers of the patient's epidermis as the working end is moved over the patient's skin while at the same time causing rapid penetration of the fluids into the skin for therapeutic purposes.

2. Description of Background Art

Dermatologists and plastic surgeons have used various methods for removing superficial skin layers to cause the growth of new skin layers (i.e., commonly described as skin resurfacing techniques) since the early 1900's. Early skin resurfacing treatments used an acid such as phenol to etch away surface layers of a patient's skin that contained damage to thereafter be replaced by new skin. (The term damage when referring to a skin disorder is herein defined as any cutaneous defect, e.g., including but not limited to rhytides, hyperpigmentation, acne scars, solar elastosis, other dyschromias, stria distensae, seborrheic dermatitus).

Following the removal of surface skin layers at a particular depth, no matter the method of skin removal, the body's natural wound-healing response begins to regenerate the epidermis and underlying wounded skin layers. The new skin layer will then cytologically and architecturally resemble a younger and more normal skin. The range of resurfacing treatments can be divided generally into three categories based on the depth of the skin removal and wound: (i) superficial exfoliations or peels extending into the epidermis, (ii) medium-depth resurfacing treatments extending into the papillary dermis, and (iii) deep resurfacing treatments that remove tissue to the depth of the reticular dermis (see FIGS. 1A–1B).

Modern techniques for skin layer removal include: $CO_2$ laser resurfacing which falls into the category of a deep resurfacing treatment; Erbium laser resurfacing which generally is considered a medium-depth treatment; mechanical dermabrasion using high-speed abrasive wheels which results in a medium-depth or deep resurfacing treatment; and chemical peels which may range from a superficial to a deep resurfacing treatment, depending on the treatment parameters. A recent treatment, generally called micro-dermabrasion, has been developed that uses an air-pressure source to deliver abrasive particles directly against a patient's skin at high-velocities to abrade away skin layers.

**2**

Such a micnabrasion modality may be likened to sandblasting albeit at velocities that do no cause excess pain and discomfort to the patient. Micro-dermabrasion as currently practiced falls into the category of a superficial resurfacing treatment.

A superficial exfoliation, peel or abrasion removes some or all of the epidermis (see FIGS. 1A–1B) and thus is suited for treating very light rhytides. Such a superficial exfoliation is not effective in treating many forms of damage to skin. A medium-depth resurfacing treatment that extends into the papillary dermis (see FIG. 1B) can treat many types of damage to skin. Deep resurfacing treatments, such as $CO_2$ laser treatments, that extend well into the reticular dermis (see FIG. 1B) causes the most significant growth of new skin layers but carry the risk of scarring unless carefully controlled.

It is useful to briefly explain the body's mechanism of actually resurfacing skin in response to the removal of a significant depth of dermal layers. Each of the above-listed depths of treatment disrupts the epidermal barrier, or a deeper dermal barrier (papillary or reticular), which initiates varied levels of the body's wound-healing response. A superficial skin layer removal typically causes a limited wound-healing response, including a transient inflammatory response and limited collagen synthesis within the dermis. In a mediumdepth or a deep treatment, the initial inflammatory stage leads to hemostasis through an activated coagulation cascade. Chemotactic factors and fibrin lysis products cause neutrophils and monocytes to appear at the site of the wound The neutrophils sterilize the wound site and the monocytes convert to macrophages and elaborate growth factors which initiate the next phase of the body's wound-healing response involving granular tissue formation. In this phase, fibroblasts generate a new extracellular matrix, particularly in the papillary and reticular dernis, which is sustained by angiogenesis and protected anteriorly by the reforming epithelial layer. The new extracellular matrix is largely composed of collagen fibers (particularly Types I and III) which are laid down in compact parallel arrays (see FIG. 1B). It is largely the collagen fibers that provide the structural integrity of the new skin—and contribute to the appearance of youthful skin.

All of the prevalent types of skin damage (rhytides, solar elastosis effects, hyperpigmentation, acne scars, dyschromias, melasma, stria distensae) manifest common histologic and ultrastructural characteristics, which in particular include disorganized and thinner collagen aggregates, abnormalities in elastic fibers, and abnormal fibroblasts, melanocytes and keratinocytes that disrupt the normal architecture of the dermal layers. It is well recognized that there will be a clinical improvement in the condition and appearance of a patients's skin when a more normal architecture is regenerated by the body's wound-healing response. Of most significance to a clinical improvement is skin is the creation of more dense parallel collagen aggregates with decreased periodicity (spacing between fibrils). The body's wound-healing response is responsible for synthesis of these collagen aggregates. In addition to the body's natural wound healing response, adjunct pharmaceutical treatments that are administered concurrent with, or following, a skin exfoliations can enhance the development of collagen aggregates to provide a more normal dermal architectrre in the skin—the result being a more youthful appearing skin.

The deeper skin resurfacing treatments, such as laser ablation, chemical peels and mechanical dermabrasion have drawbacks. The treatments are best used for treatments of a patient's face and may not be suited for treating other

Ex. 1
Page 11 of 15

## US 6,641,591 B1

**3**

portions of a patient's body. For example, laser resurfacing of a patient's neck or decolletage may result in post-treatment pigmentation disorders. All the deep resurfacing treatments are expensive, require anesthetics, and must be performed in a clinical setting. Perhaps, the most significant disadvantage to deep resurfacing treatments relates to the post-treatment recovery period. It may require up to several weeks or even months to fully recover and to allow the skin the form a new epidermal layer. During a period ranging from a few weeks to several weeks after a deep resurfacing treatment, the patient typically must wear heavy make-up to cover redness thus making the treatment acceptable only to women.

The superficial treatment offered by microdermabrasion has the advantages of being performed without anesthetics and requiing no extended post-treatment recovery period. However, micro-dermabrasion as currently practices also has several disadvantages. First, a micro-dermabrasion treatment is adapted only for a superficial exfoliation of a patient's epidermis which does not treat many forms of damage to skin. Further, the current micro-dermabrasion devices cause abrasive effects in a focused area of the skin that is very small, for example a few mm.[2], since all current devices use a single pin-hole orifice that jets air and abrasives to strike the skin in a highly focused area. Such a focused treatment area is suitable for superficial exfoliations when the working end of the device is passed over the skin in overlapping paths. Further, such focused energy delivery is not well suited for deeper skin removal where repeated passes may be necessary. Still further, current micro-dermabrasion devices are not suited for deeper skin removal due to the pain associated with deep abrasions. Other disadvantages of the current micro-dermabrasion devices relate to the aluminum oxide abrasive particles that are typically used Aluminum oxide can contaminate the working environment and create a health hazard for operators and patients alike. Inhalation of aluminum oxide particles over time can result in serious respiratory disorders.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1A–1B are sectional illustrations of a patient's skin showing dermal layers.

FIG. 2 is a view of a Type "A" body and working end of the instrument of the invention.

FIG. 3 is an enlarged view of the working end of the instrument of FIG. 2.

FIG. 4 is a sectional view of working end of FIG. 3.

FIG. 5 is a view showing the manner of using the working end of the invention of FIGS. 3–4 in performing a method of the invention.

FIG. 6 is a view of a Type "B" body, working end and handle in an exploded view.

FIG. 7 is a view of the working end of the instrument of FIG. 6 and a housing.

FIG. 8 is an enlarged view of the skin interface of the working end of FIG. 7.

FIG. 9 is a sectional view of the skin interface of FIG. 8.

### DETAILED DESCRIPTION OF THE INVENTION

1. Type "A" Skin Resurfacing System. Referring to FIGS. 2–3, an exemplary instrument system 5 is shown for removing superficial skin layers. The instrument system 5 includes: (i) a hand-held body 18 with a working end 20 that defines a skin interface surface portion indicated at 25 in

**4**

FIGS. 2–3. An opening portion 26 transitions into an interior passageway 28 that extends through the body to communicate with a negative (−) pressure source (or aspiration source) indicated at 30 that operates as vacuum means for aspirating skin debris from a targeted skin surface treatment site TS.

Of particular interest, FIGS. 3–4 show views of the working end 20 with the skin interface 25 being configured with a particular irregular or ridged surface structure indicated at 32. The ridged surface structure 32 further has a particular minimum width dimension W to accommodate from the ridge shape with as many as about 25 ridges on each side of opening 26 depending on the overall dimensions of the working end 20. More particular aspects of the irregular or ridged surface structure 32 will be described below.

In this preferred embodiment, the working end 20 is of any suitable material, such as a transparent medical grade plastic. The transparency of the working end will assist the operator in localizing treatment in a particular targeted skin treatment area. The overall transverse dimension of the working end 20 of FIGS. 2–3 may be from around about 5.0 mm. to about 50.0 mm. with a larger dimensioned end being adapted for treating a larger skin area (e.g., arms, back, legs and decolletage). A typical dimension is from about 5.0 mm. to 15.0 mm. for a skin treatment site area TS around a patient's face.

The invention allows the area (eg., in mm.[2]) of opening 26 be in any selected shape but preferably is an elongate shape in the center of the working end 25. The open distal end 26 comprises the distal termination of passageway 28 and the proximal end of the passageway in handle 18 is connected to a flexible aspiration tube 33 that extends to a remote collection reservoir 35 intermediate to the actual aspiration source 30. The aspiration source 30 thus is adapted to draw the working end 20 and more particularly the skin interface 25 against the skin treatment site TS to perform the method of the invention as will be described below. The aspiration source or negative (−) pressurization source 30 may be any suitable vacuum source known in the art. Between the aspiration source 30 and remote collection reservoir 35 may be a filter 38 subsystem that is known in the art for collecting asprted skin detritus and spent crystalline agents CA that are captued in the open distal end of passageway chamber 28. The collection reservoir 35 and filter 38 are preferably of inexpensive plastic and other materials that are disposable.

The aspiration source 30 may be provided with an adjustable valve means 40 for adjusting the pressure level setting to any suitable range. The physician will learn from experience how to balance the pressure level to attain the desired level of suction against the patient's skin. A trigger or switch component 42 is provided as a foot-switch (FIG. 2) but any suitable finger switch in the body 18 also may be used.

The working end 20 also carries means for introducing abrasive crystals into the working end or distalmost end of passageway 28 to allow individual loose crystalline agents CA to thereafter be captured between the skin interface 25 and the patient's skin. In this embodiment, two channels 44a–44b are provided together with flexible tubes 46a–46b to introduce the loose crystalline agents CA into the working end (see FIGS. 2–4). Each distal portion 47 (collectively) of the channels 44a–44b may comprise a small dimension aperture to limit the rate of flow of crystalline agents CA into the working end. The number of such channels (i.e., 44a–44n) may range from one to about ten and fall within the scope of the invention. Any singular or plural number of

Ex. 1
Page 12 of 15

## US 6,641,591 B1

**5**

channels can serve the purpose of slowly introducing crystal into the working end,

Referring to FIGS. 2–3, the crystalline agent CA delivery source **50** comprises a reservoir **55** that holds a suitable volume of abrasive crystals for a single treatment or a number of treatments. A flexible supply tube **56** extends between a remote the reservoir **55**, and in this embodiment the tube is split to connect to the two channels **44a–44b**. Preferably, the remote reservoir **55** that carries the crystalline agent CA is unpressurized but carries air intake relief valve **58** such that any slight negative pressure created by the aspiration source **30** when the skin interface is in contact with a patient's skin will draw crystals to the working end. It should be appreciated that reservoir **55** may be built into handle body **18** and fall within the scope of the invention. The crystal delivery source **50** may carry crystals ranging in size from about 1 μm to about 50 μm in maximum cross-sectional dimension, (for example, aluminum oxide crystals). Preferably, the crystals are from about 5 μm to about 30 μm in maximum cross-sectional dimension to allow a very fine abrasion of the epidermis.

It has been found that by a slight negative pressure environment the open end **26** and passageway **28**, the crystalline agent will be caused to dribble into, or be sucked into, the passageway **28** in the working end **20**. Thereafter, the movement of the working end **20** in a sideways movement over the skin causes a portion of the crystalline agent CA volume to be captured temporarily in the irregular or corrugated surface structure of the skin interface **25**. In this process of moving the skin interface **25** over the targeted treatment site TS, it has been found that the sharp edged crystalline agents are rolled over and over while being pressed into the surface of the skin and thereby abrade and remove the skin surface in a controllably gentle manner that is below any threshold of significant pain.

After the spent crystals are rolled over and over by the skin interface when moving in a first lateral direction across the skin, and after the working end is then is reversed in directional movement across the skin, a portion of the spent crystals and abraded skin debris necessarily roll into the central opening portion **26** wherein the negative pressure environment captures and aspirates the abraded materials to the remote collection reservoir **35**.

To facilitate the process described above, the invention is provided with novel aspects that relate to the irregular or ridged surface structure **32** mentioned above. The entire skin interface **25** may be of any suitable plan form (e.g., round, oval, rectangular etc.) and fall within the scope of the invention. More in particular, the interface **25** defines a 1st outer periphery **25A** a 2nd inner periphery **25B** that generally are in apposition to one another and are spaced apart by width W with the inner periphery about the edge of opening **26** (see FIG. 3).

In a preferred embodiment shown in FIGS. 3–4, the concept of 1st and 2nd peripheries **25A** and **25B** in apposition thus comprise peripheries that are dual and side-by-side as shown in FIG. 4 and are thus adapted for side-to-side lateral or sideways movement while performing the technique of the invention, for example which is a natural movement of a human hand over a patient's skin. Thus, the direction of the ridges **60** extend generally transverse relative to a line drawn that indicates the direction of movement of the working end **20** in performing the method of the invention. That is, in the exemplary working end of FIG. 4, the working end is generally optimized for side-to-side or lateral movement. Thus, the ridge alignment is generally transverse to the

**6**

direction of movement in operations indicated by arrow A. (In a circular working end that is adapted generally for movement is any direction, the direction of the ridges **60** may be generally transverse to any direction of movement by being concentric relative to a central opening **26** (not shown)).

The terms irregular or ridged shape structure **32** as used herein mean that a series of at least one projecting edge portion **62a** projects distally as a ridge within the skin interface portion **25**. The irregular shape structure **32** further typically carries recessed portions or valley portions **62b** that are recessed in the proximal direction intermediate to any plurality of projecting edge portions **62a**. These surface configurations for convenience are herein termed the primary shape structure (or ridge and valley elements). The width of the skin interface **25** containing shape structure **32** may be from about 2.0 mm. to 25.0 mm. or more and preferably is from about 3.0 mm. to 10.0 mm. The number of ridges preferably are from about 1 ridge to 25 ridges on each side of the opening **26**. The height H of any ridge from the apex of the projecting portion **62a** to the depth of the valley portion **62b** may be from about 0.25 mm. to about 5.0 mm. and is preferably from about 0.5 mm. to about 2.0 m. It has been found that various ridge height dimensions are optimal depending on the patient's skin type. Further, but optionally, it has been found that secondary shape structure of notches or recessed grooves **66** configured across the primary shape structure of ridge and valley elements may help introduce loose crystals to regions of the skin interface **25** in contact with the skin which is desirable. Such secondary grooves **66** are shown in FIG. 4 and are preferably somewhat in alignment with an axis of channels **44a14 44b** that introduce crystals into the working end **20** thus allowing the crystals to be suctioned into the valleys **62b** of the primary shape structure.

While the series of primary ridge and valley elements together the secondary grooves seems to be optimal for the method described below, it should be appreciated that the method also may be performed with a skin interface that has (i) only primary ridge and valley elements; (ii) or only a particular surface roughness that is appropriate for partially capturing loose crystals as will be described below—as long as the skin interface has a minimum width of about 3.0 mm. which was described as a preferred width dimension previously.

FIG. 4 further shows that at least some of the crests or apexes of some of the ridge portions **62a** together with the outermost periphery of the skin interface **25** define an overall tissue-receiving shape **64** that may range from flat to concave and is shown in a preferred concave configuration. The alternative shapes **64a–64b** are intended to indicate an approximate range of shapes that are suitable. The apexes of ridges **62a** need not all be at the same height to define shape **64**. The purpose of the concave shape is to cause the outer periphery of the working end to be in firm contact with the tissue surface while the negative pressure from aspiration source **30** draws the skin into firm contact with tissue interface **25**.

2. Practice of the Method of the Invention. Now tuning to FIG. 5, a sectional view of working end **20** shows the technique of the present invention in exfoliating or removing skin surface layers. FIG. 5 shows the working end **20** after actuation of the negative (−) pressure source **30** with the skin surface **70** initially being drawn into the concave shape **64**. The operating negative pressures may be in any suitable range that is determined by investigation. It has been found by experimentation that optimal pressure levels vary greatly

Ex. 1
Page 13 of 15

7

depending on (i) the type of skin targeted for treatment, (ii) the dimensions across the working end, and (iii) the dimensions of opening **26**.

Next, the operator moves the skin interface **25** across a treatment site TS which is a path on the patient's skin while still actuating moves the trigger **42** thereby maintaining the negative pressure environment in the passageway **26**. The negative pressure environment within the working end causes crystalline particles and entrained in air to be drawn into passageway **28** proximate to the skin surface and into the shape structure **32** of the skin interface **25**. The sideways or lateral movement of the skin interface **25** captures a portion of the crystals between the interface and the skin surface, in part by over-rotting them. The continued rolling of the sharp-edged crystals trapped between the instrument and the skin surface **70** causes an abrasion and removal of the skin surface in a controllable manner.

As working end is moved in a reverse direction, the negative pressure environment in the passageway **28** captures and aspirates the spent crystals and skin debris to the remote collection reservoir **35**. At the end of a particular lateral movement of the working end, the operator may release the trigger **42** which terminates the crystal agent delivery and further allows the operator to easily lift the working end from the patient's skin. The treated path can be easily seen and the operator then can exfoliate another slightly overlapping or adjacent path by repeating the above steps until surface removal is completed over the targeted treatment area.

3. Type "B" Skin Resurfacing System. Referring to FIGS. **6–9**, another exemplary instrument system and treatment device **205** is shown for removing superficial skin layers. This system differs greatly from the Type "A" embodiment in the mechanism of action that abrades the skin since the Type "B" system uses a fluid media plus an abrading structure on the skin interface. Still several features of the Type "B" embodiment are similar to the Type "A" embodiment and the two modalities of treatment may be used to complement one another.

FIG. **6** shows that a hand-held instrument **208** has a removable working end **220** that defines a skin interface surface portion indicated at **225**. Handle portion **227a** mates with housing **227b**. A flexible tube **228** extends to a vacuum source **230**. A fluid reservoir **235** carrying a fluid skin treatment media is housed in the handle although it could also be a remote reservoir.

Referring now to FIGS. **7–9**, a first aperture arrangement consisting of at least one port or opening portion **240** of skin interface **225** that communicates with an interior passageway **242** that extends through housing **227b** to hose **228** and the vacuum or fluid (–) pressure source.

FIGS. **7–9** further show a second aperture arrangement in the skin interface consisting of at least one port or openings **250** that extend around an outer periphery of the skin interface **225**. These opening(s) of the second aperture arrangement are in fluid communication with the reservoir **235** and the treatment media therein. The skin interface has a series of primary ridge elements **255a** and valley elements **255b** together the secondary notches or grooves **260** as defined above with similar dimensional parameters. This embodiment differs however in that the apexes of ridge elements **255a** are substantially a sharp edge as are the edged of the notches **260**. Thus, these primary surface elements **255a** and secondary surface elements thereby define teeth therebetween that seem well suited to abrading skin layers particularly after being hydrated by the fluid source of the

8

system. Experimentation has shown that the vacuum source and fluid source may be reversed between the first and second aperture arrangements **240** and **250** with the method of skin removal still working well. The vacuum system aspirates away skin debris and spent fluids as described previously. Of particular interest, the method of the invention appears to work well because the suction on the skin treatment site very quickly hydrated, or puffs up, the skin which in turn make the surface layer susceptible to painless abrasion. The ability of the system to rapidly deliver fluids to subsurface tissues allows the use of any pharmacological agent known in the art for enhancing skin rejuvenation as a part of the skin treatment. The system can use sterile water or saline solution for a treatment to remove dermal tissue with the abrasive surface of the treatment device. The system can also use a fluid carrying a chemical agent of a suitable concentration be selected from a group of acids including TCA (trichloroacetic acid), a glycolic acid including an alphahydroxy acid (AHA), a lactic acid, a citric acid, or phenol as disclosed in co-pending U.S. patent application Ser. No. 09/524,731 filed Mar. 14, 2000 which is incorporated herein by this reference.

Specific features of the invention may be shown in some figures and not in others, and this is for convenience only and any feature may be combined with another in accordance with the invention. While the principles of the invention have been made clear in the exemplary embodiments, it will be obvious to those skilled in the art that modifications of the structure, arrangement, proportions, elements, and materials may be utilized in the practice of the invention, and otherwise, which are particularly adapted to specific environments and operative requirements without departing from the principles of the invention. The appended claims are intended to cover and embrace any and all such modifications, with the limits only of the true purview, spirit and scope of the invention.

What is claimed is:

1. A system for treating the skin surface of a patient, comprising:

(a) an instrument body with a distal working end that defines a skin interface portion for contacting the skin;

(b) a first aperture arrangement in said skin interface consisting of at least one port in communimcation with a treatment media source;

(c) a second aperture arrangement in said skin interface consisting of at least one port in communication with a vacuum source for removing treatment media and removed tissue from the skin interface; and

(d) wherein the skin interface comprises an abrading structure with substantially sharp edges for abrading tissue.

2. The system of claim **1** wherein said skin interface defines a plurality of projecting ridges having a minimum width of about 2.0 mm.

3. The system of claim **2** wherein said skin interface and plurality of projecting ridges extends at least partially around the first aperture arrangement.

4. The system of claim **1** wherein said skin interface portion has shape irregularities comprising distally projecting apices and recessed portions therebetween.

5. The system of claim **4** wherein said skin interface portion has a primary surface structure of distally projecting apices and recessed portions therebetween together with a secondary surface structure of recessed grooves extending across the primary surface structure.

6. The system of claim **1** wherein said treatment media source carries a fluid.

Ex. 1
Page 14 of 15

US 6,641,591 B1

9

**7**. The system of claim **6** wherein the fluid is sterile water or saline solution.

**8**. The system of claim **6** wherein the fluid carries an agent selected from the class comprising TCA (trichloroacetic acid), glycolic acid, alphahydroxy acid (AHA), lactic acid, and citric acid.

**9**. The system of claim **1** wherein said treatment media source carries a crystalline agent.

**10**. A method for treating the skin surface of a patient, comprising:

positioning a treatment device against a patient's skin creating a treatment region at a skin treatment site, the treatment device comprising at least one media entrance port;

directing at least one flowable treatment medium through said at least one entrance port;

wherein the treatment medium is sterile water or a saline solution;

translating the treatment device over the skin treatment site whereby the combination of an abrasive structure carried by the treatment device and the flowable treatment medium removes dermal tissue; and

aspirating dermal treatment media and any removed dermal tissue from the treatment region.

**11**. The method of claim **10** wherein the treatment media further comprises an agent selected from the class comprising TCA (trichloroacetic acid), glycolic acid, alphahydroxy acid (AHA), lactic acid, and citric acid.

**12**. A method for treating the skin surface of a patient, comprising:

positioning a treatment device against a patient's skin creating a treatment region at a skin treatment site, the treatment device comprising at least one media entrance port;

directing at least one flowable treatment medium through said at least one entrance port;

wherein the treatment medium comprises a crystalline agent;

translating the treatment device over the skin treatment site whereby surface irregularities of the treatment device partially capture the crystalline agents to remove dermal tissue; and

aspirating dermal treatment media and any removed dermal tissue from the treatment region.

**13**. The method of claim **12** wherein said crystalline agents range in size from about 1 $\mu m$ to about 50 $\mu m$ in crosstional dimension.

**14**. The method of claim **12** wherein said surface irregularities comprise a surface roughness that cooperates with crystalline agents ranging in size from about 1 $\mu m$ to about 50 $\mu m$ in cross-sectional dimension.

**15**. A system for treating the skin surface of a patient, comprising:

10

an instrument body with a distal working surface that carries an abrading structure for engaging and abrading the skin;

an interior channel in the instrument body extending between a first end and a distal open termination in the working surface;

a vacuum source coupled to said first end of the interior channel for suctioning the skin against the working surface and for removing abraded skin;

wherein the abrading structure defines a plurality of sharp apices and is carried about a plurality of grooves in the working surface; and

at least one media inflow port in the working surface for delivering a flowable media to the skin during treatment.

**16**. A system for treating the skin surface of a patient, comprising:

an instrument body with a distal working surface that carries an abrading structure for engaging and abrading the skin;

an interior channel in the instrument body extending between a first end and a distal open termination in the working surface;

a vacuum source coupled to said first end of the interior channel for suctioning the skin against the working surface and for removing abraded skin;

wherein the abrading structure defines a plurality of sharp apices and is carried about a plurality of grooves in the working surface; and

at least one media inflow port in the working surface that communicates with a fluid media source.

**17**. A system for treating the skin surface of a patient, comprising:

an instrument body with a distal working surface that carries an abrading structure for engaging and abrading the skin;

an interior channel in the instrument body extending between a first end and a distal open termination in the working surface;

a vacuum source coupled to said first end of the interior channel for suctioning the skin against the working surface and for removing abraded skin;

wherein the abrading structure defines a plurality of sharp apices and is carried about a plurality of grooves in the working surface; and

at least one media inflow port in the working surface that communicates with a fluid media source wherein the fluid media source carries a fluid agent selected from the class of skin rejuvenation fluid agents carrying a pharmacologically-active agent or an acid for etching the skin surface.

\* \* \* \* \*

# EXHIBIT 2

US007678120B2

(12) **United States Patent**

Shadduck

(10) **Patent No.:** **US 7,678,120 B2**

(45) **Date of Patent:** *****Mar. 16, 2010**

(54) **INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS**

(75) Inventor: **John H. Shadduck**, Tiburon, CA (US)

(73) Assignee: **Axia MedSciences, LLC**, Tiburon, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 104 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/417,396**

(22) Filed: **May 3, 2006**

(65) **Prior Publication Data**

US 2006/0200172 A1     Sep. 7, 2006

**Related U.S. Application Data**

(63) Continuation of application No. 10/699,747, filed on Nov. 3, 2003, which is a continuation of application No. 09/648,025, filed on Aug. 25, 2000, now Pat. No. 6,641,591.

(60) Provisional application No. 60/150,782, filed on Aug. 26, 1999.

(51) **Int. Cl.**
*A61B 17/50*     (2006.01)
*A61M 35/00*     (2006.01)

(52) **U.S. Cl.** ........................ **606/131**; 606/132; 604/289

(58) **Field of Classification Search** ................ 606/131, 606/132, 133; 604/289, 313, 315
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,608,032 A     8/1952 Garver

| | | |
|---|---|---|
| 2,701,559 A | 2/1955 | Cooper |
| 2,712,823 A | 7/1955 | Kurtin |
| 2,867,214 A | 1/1959 | Wilson |
| 2,881,763 A | 4/1959 | Robbins |

(Continued)

FOREIGN PATENT DOCUMENTS

| EP | 0258901 | 9/1987 |
|---|---|---|
| EP | 0564392 | 3/1993 |
| EP | 0 564 392 A2 | 10/1993 |

OTHER PUBLICATIONS

File History of Reissue U.S. Appl. No. 11/027,590, filed Dec. 29, 2004 (Reissue of U.S. Patent No. 6,500,183, issued Dec. 31, 2002).

(Continued)

*Primary Examiner*—Vy Q Bui
(74) *Attorney, Agent, or Firm*—Knobbe Martens Olson & Bear, LLP

(57) **ABSTRACT**

An instrument and technique for the removal of epidermal layers in a controlled manner utilizing a hand-held instrument with a working end that (i) a vacuum aspiration system, (ii) a source for delivery of a sterile fluids or pharmacological agents to the skin; and (iii) a skin interface surface in the working end that has specially shape structure for abrading surface layers of the patient's epidermis as the working end is moved over the patient's skin while at the same time causing rapid penetration of the fluids into the skin for therapeutic purposes. Movement of the working end across the skin causes abrasion of the surface layers in a path over the patient's skin. The method of the invention may be used in a periodic treatment for the removal of superficial skin layers that enhances the synthesis of dermal collagen aggregates by inducing the body's natural wound healing response. The method of the invention creates more normal dermal architectures in skin with limited depths of skin removal by the series of superficial treatments that may be comparable to the extent of neocollagenesis caused by a deep skin removal treatment (e.g., $CO^2$ laser skin removal).

**9 Claims, 9 Drawing Sheets**



# US 7,678,120 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,921,585 | A | 1/1960 | Schumann |
| 3,085,573 | A | 4/1963 | Meyer et al. |
| 3,214,869 | A | 11/1965 | Stryker |
| 3,476,112 | A | 11/1969 | Elstein |
| 3,574,239 | A | 4/1971 | Sollerud |
| 3,715,838 | A | 2/1973 | Young et al. |
| 3,964,212 | A | 6/1976 | Karden |
| 4,121,388 | A | 10/1978 | Wilson |
| 4,155,721 | A | 5/1979 | Fletcher |
| 4,182,329 | A | 1/1980 | Smith et al. |
| 4,203,431 | A | 5/1980 | Abura et al. |
| 4,216,233 | A | 8/1980 | Stein |
| 4,378,804 | A | 4/1983 | Cortese |
| 4,560,373 | A | 12/1985 | Sugino et al. |
| 4,646,480 | A | 3/1987 | Williams |
| 4,646,482 | A | 3/1987 | Chitjian |
| 4,676,749 | A | 6/1987 | Mabille |
| 4,706,676 | A | 11/1987 | Peck |
| 4,754,756 | A | 7/1988 | Shelanski |
| 4,757,814 | A | 7/1988 | Wang et al. |
| 4,900,316 | A | 2/1990 | Yamamoto |
| 4,917,086 | A | 4/1990 | Feltovich et al. |
| 4,957,747 | A | 9/1990 | Stiefel |
| 5,012,797 | A | * 5/1991 | Liang et al. ................. 606/131 |
| 5,035,089 | A | 7/1991 | Tillman et al. |
| 5,037,431 | A | 8/1991 | Summers et al. |
| 5,037,432 | A | * 8/1991 | Molinari ..................... 606/131 |
| 5,100,412 | A | 3/1992 | Rosso |
| 5,122,153 | A | 6/1992 | Harrel |
| 5,207,234 | A | 5/1993 | Rosso |
| 5,612,797 | A | 3/1997 | Clarke |
| 5,674,235 | A | * 10/1997 | Parisi .......................... 606/169 |
| 5,759,185 | A | 6/1998 | Grinberg |
| 5,800,446 | A | 9/1998 | Banuchi |
| 5,810,842 | A | 9/1998 | Di Fiore et al. |
| 5,873,881 | A | 2/1999 | McEwen et al. |
| 5,882,201 | A | 3/1999 | Salem |
| 5,971,999 | A | 10/1999 | Naldoni |
| 6,019,749 | A | 2/2000 | Fields et al. |
| 6,024,733 | A | 2/2000 | Eggers et al. |
| 6,039,745 | A | 3/2000 | Di Fiore et al. |
| 6,042,552 | A | 3/2000 | Cornier |
| 6,080,165 | A | * 6/2000 | DeJacma .................... 606/131 |
| 6,080,166 | A | 6/2000 | McEwen et al. |
| 6,090,085 | A | 7/2000 | Mehl, Sr. et al. |
| 6,136,008 | A | 10/2000 | Becker et al. |
| 6,139,553 | A | 10/2000 | Dotan |
| 6,139,554 | A | 10/2000 | Karkar et al. |
| 6,149,634 | A | 11/2000 | Bernabei |
| 6,162,232 | A | * 12/2000 | Shadduck .................... 606/131 |
| 6,183,483 | B1 | 2/2001 | Chang |
| 6,238,275 | B1 | 5/2001 | Metcalf et al. |
| 6,241,739 | B1 | 6/2001 | Waldron |
| 6,283,978 | B1 | 9/2001 | Cheski et al. |
| 6,299,620 | B1 | 10/2001 | Shadduck et al. |
| 6,306,119 | B1 | 10/2001 | Weber et al. |
| 6,387,103 | B2 | 5/2002 | Shadduck |
| 6,423,078 | B1 | * 7/2002 | Bays et al. .................. 606/131 |
| 6,471,712 | B2 | 10/2002 | Burres |
| 6,500,183 | B1 | 12/2002 | Waldron |
| 6,629,983 | B1 | 10/2003 | Ignon |
| 6,641,591 | B1 | 11/2003 | Shadduck |
| 6,695,853 | B2 | * 2/2004 | Karasiuk .................... 606/131 |
| 6,869,611 | B1 | * 3/2005 | Kligman et al. ............. 424/401 |
| 7,087,063 | B2 | 8/2006 | Carson et al. |
| 2002/0107527 | A1 | 8/2002 | Burres |
| 2003/0212415 | A1 | 11/2003 | Karasiuk |
| 2006/0200172 | A1 | 9/2006 | Shadduck |
| 2006/0200173 | A1 | 9/2006 | Shadduck |

## OTHER PUBLICATIONS

File History of Reexamination U.S. Appl. No. 90/007,683 (Reexamination of U.S. Patent No. 6,241,739, issued Jun. 5, 2001).

Ex Parte Reexamination Certificate US 6,241,739 C1, Microdermabrasion Device and Method of Treating the Skin Surface, Inventor Stephen H. Waldron, Dec. 11, 2007, and file history through Aug. 8, 2006.

\* cited by examiner



*FIG. 1A*



*FIG. 1B*

Ex. 2
Page 3 of 15

Case 2:20-cv-09693-FLA-PVC Document 41   Filed 06/25/21   Page 32 of 80   Page ID #:361

**U.S. Patent**     Mar. 16, 2010     Sheet 2 of 9     US 7,678,120 B2



*FIG. 2*

Case 2:01-cv-09669-FJP-VCR Document 41  Filed 06/25/11  Page 87 of 380  Page ID #:695



*FIG. 3*



*FIG. 4*



*FIG. 5*

Case 2:20-cv-09693-FLA-PVC Document 41-1 Filed 06/25/24 Page 90 of 380 Page ID #:698



*FIG. 6*

Case 2:20-cv-09693-FLA-PVC Document 41-1 Filed 06/25/21 Page 91 of 380 Page ID #:699



*FIG. 7*

Case 2:20-cv-09693-FLA-PVC Document 41-1 Filed 06/25/24 Page 92 of 380 Page ID #:720



*FIG. 8*



225
250
255a
255b
240
260

## FIG. 9

US 7,678,120 B2

1

## INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS

### PRIORITY INFORMATION

This application is a continuation of U.S. patent application. Ser. No. 10/699,747, filed Nov. 3, 2003, which is a continuation of U.S. patent application Ser. No. 09/648,025 filed Aug. 25, 2000, now U.S. Pat. No. 6,641,591, which claims the priority benefit under 35 U.S.C. §119(e) of Provisional U.S. Patent Application Ser. No. 60/150,782, filed Aug. 26, 1999, the entire contents of these applications being hereby incorporated by reference herein.

### BACKGROUND OF THE INVENTION

#### 1. Field of the Invention

The present invention relates to devices for dermatology and more particularly to a hand-held instrument with a working end that carries (i) a negative pressure aspiration system, (ii) a source for delivery of a sterile fluids to the skin; and (iii) a skin interface surface in the working end that has specially shape structure for abrading surface layers of the patient's epidermis as the working end is moved over the patient's skin while at the same time causing rapid penetration of the fluids into the skin for therapeutic purposes.

#### 2. Description of the Related Art

Dermatologists and plastic surgeons have used various methods for removing superficial skin layers to cause the growth of new skin layers (i.e., commonly described as skin resurfacing techniques) since the early 1900's. Early skin resurfacing treatments used an acid such as phenol to etch away surface layers of a patient's skin that contained damage to thereafter be replaced by new skin. (The term damage when referring to a skin disorder is herein defined as any cutaneous defect, e.g., including but not limited to rhytides, hyperpigmentation, acne scars, solar elastosis, other dyschromias, stria distensae, seborrheic dermatitus).

Following the removal of surface skin layers at a particular depth, no matter the method of skin removal, the body's natural wound-healing response begins to regenerate the epidermis and underlying wounded skin layers. The new skin layer will then cytologically and architecturally resemble a younger and more normal skin. The range of resurfacing treatments can be divided generally into three categories based on the depth of the skin removal and wound: (i) superficial exfoliations or peels extending into the epidermis, (ii) medium-depth resurfacing treatments extending into the papillary dermis, and (iii) deep resurfacing treatments that remove tissue to the depth of the reticular dermis (see FIGS. 1A-1B).

Modem techniques for skin layer removal include: $CO_2$ laser resurfacing which falls into the category of a deep resurfacing treatment; Erbium laser resurfacing which generally is considered a medium-depth treatment; mechanical dermabrasion using high-speed abrasive wheels which results in a medium-depth or deep resurfacing treatment; and chemical peels which may range from a superficial to a deep resurfacing treatment, depending on the treatment parameters. A recent treatment, generally called micro-dermabrasion, has been developed that uses an air-pressure source to deliver abrasive particles directly against a patient's skin at high-velocities to abrade away skin layers. Such a micro-dermabrasion modality may be likened to sandblasting albeit at velocities that do no cause excess pain and discomfort to the

2

patient. Micro-dermabrasion as currently practiced falls into the category of a superficial resurfacing treatment.

A superficial exfoliation, peel or abrasion removes some or all of the epidermis (see FIGS. 1A-1B) and thus is suited for treating very light rhytides. Such a superficial exfoliation is not effective in treating many forms of damage to skin. A medium-depth resurfacing treatment that extends into the papillary dermis (see FIG. 1B) can treat many types of damage to skin. Deep resurfacing treatments, such as $CO_2$ laser treatments, that extend well into the reticular dermis (see FIG. 1B) causes the most significant growth of new skin layers but carry the risk of scarring unless carefully controlled.

It is useful to briefly explain the body's mechanism of actually resurfacing skin in response to the removal of a significant depth of dermal layers. Each of the above-listed depths of treatment disrupts the epidermal barrier, or a deeper dermal barrier (papillary or reticular), which initiates varied levels of the body's wound-healing response. A superficial skin layer removal typically causes a limited wound-healing response, including a transient inflammatory response and limited collagen synthesis within the dermis. In a medium-depth or a deep treatment, the initial inflammatory stage leads to hemostasis through an activated coagulation cascade. Chemotactic factors and fibrin lysis products cause neutrophils and monocytes to appear at the site of the wound. The neutrophils sterilize the wound site and the monocytes convert to macrophages and elaborate growth factors which initiate the next phase of the body's wound-healing response involving granular tissue formation. In this phase, fibroblasts generate a new extracellular matrix, particularly in the papillary and reticular dermis, which is sustained by angiogenesis and protected anteriorly by the reforming epithelial layer. The new extracellular matrix is largely composed of collagen fibers (particularly Types I and III) which are laid down in compact parallel arrays (see FIG. 1B). It is largely the collagen fibers that provide the structural integrity of the new skin—and contribute to the appearance of youthful skin.

All of the prevalent types of skin damage (rhytides, solar elastosis effects, hyperpigmentation, acne scars, dyschromias, melasma, stria distensae) manifest common histologic and ultrastructural characteristics, which in particular include disorganized and thinner collagen aggregates, abnormalities in elastic fibers, and abnormal fibroblasts, melanocytes and keratinocytes that disrupt the normal architecture of the dermal layers. It is well recognized that there will be a clinical improvement in the condition and appearance of a patient's skin when a more normal architecture is regenerated by the body's wound-healing response. Of most significance to a clinical improvement is skin is the creation of more dense parallel collagen aggregates with decreased periodicity (spacing between fibrils). The body's wound-healing response is responsible for synthesis of these collagen aggregates. In addition to the body's natural wound healing response, adjunct pharmaceutical treatments that are administered concurrent with, or following, a skin exfoliations can enhance the development of collagen aggregates to provide a more normal dermal architecture in the skin—the result being a more youthful appearing skin.

The deeper skin resurfacing treatments, such as laser ablation, chemical peels and mechanical dermabrasion have drawbacks. The treatments are best used for treatments of a patient's face and may not be suited for treating other portions of a patient's body. For example, laser resurfacing of a patient's neck or decolletage may result in post-treatment pigmentation disorders. All the deep resurfacing treatments are expensive, require anesthetics, and must be performed in

Ex. 2
Page 12 of 15

US 7,678,120 B2

3

a clinical setting. Perhaps, the most significant disadvantage to deep resurfacing treatments relates to the post-treatment recovery period. It may require up to several weeks or even months to fully recover and to allow the skin the form a new epidermal layer. During a period ranging from a few weeks to several weeks after a deep resurfacing treatment, the patient typically must wear heavy make-up to cover redness thus making the treatment acceptable only to women.

The superficial treatment offered by micro-dermabrasion has the advantages of being performed without anesthetics and requiring no extended post-treatment recovery period. However, micro-dermabrasion as currently practices also has several disadvantages. First, a micro-dermabrasion treatment is adapted only for a superficial exfoliation of a patient's epidermis which does not treat many forms of damage to skin. Further, the current micro-dermabrasion devices cause abrasive effects in a focused area of the skin that is very small, for example a few mm.sup.2, since all current devices use a single pin-hole orifice that jets air and abrasives to strike the skin in a highly focused area. Such a focused treatment area is suitable for superficial exfoliations when the working end of the device is passed over the skin in overlapping paths. Further, such focused energy delivery is not well suited for deeper skin removal where repeated passes may be necessary. Still further, current micro-dermabrasion devices are not suited for deeper skin removal due to the pain associated with deep abrasions. Other disadvantages of the current micro-dermabrasion devices relate to the aluminum oxide abrasive particles that are typically used. Aluminum oxide can contaminate the working environment and create a health hazard for operators and patients alike. Inhalation of aluminum oxide particles over time can result in serious respiratory disorders.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. **1**A-**1**B are sectional illustrations of a patient's skin showing dermal layers.

FIG. **2** is a view of a Type "A" body and working end of the instrument of the invention.

FIG. **3** is an enlarged view of the working end of the instrument of FIG. **2**.

FIG. **4** is a sectional view of working end of FIG. **3**.

FIG. **5** is a view showing the manner of using the working end of the invention of FIGS. **3**-**4** in performing a method of the invention.

FIG. **6** is a view of a Type "B" body, working end and handle in an exploded view.

FIG. **7** is a view of the working end of the instrument of FIG. **6** and a housing.

FIG. **8** is an enlarged view of the skin interface of the working end of FIG. **7**.

FIG. **9** is a sectional view of the skin interface of FIG. **8**.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

1. Type "A" Skin Resurfacing System. Referring to FIGS. **2**-**3**, an exemplary instrument system **5** is shown for removing superficial skin layers. The instrument system **5** includes: (i) a hand-held body **18** with a working end **20** that defines a skin interface surface portion indicated at **25** in FIGS. **2**-**3**. An opening portion **26** transitions into an interior passageway **28** that extends through the body to communicate with a negative (−) pressure source (or aspiration source) indicated at **30** that operates as vacuum means for aspirating skin debris from a targeted skin surface treatment site TS.

4

Of particular interest, FIGS. **3**-**4** show views of the working end **20** with the skin interface **25** being configured with a particular irregular or ridged surface structure indicated at **32**. The ridged surface structure **32** further has a particular minimum width dimension W to accommodate from the ridge shape with as many as about **25** ridges on each side of opening **26** depending on the overall dimensions of the working end **20**. More particular aspects of the irregular or ridged surface structure **32** will be described below.

In this preferred embodiment, the working end **20** is of any suitable material, such as a transparent medical grade plastic. The transparency of the working end will assist the operator in localizing treatment in a particular targeted skin treatment area. The overall transverse dimension of the working end **20** of FIGS. **2**-**3** may be from around about 5.0 mm. to about 50.0 mm. with a larger dimensioned end being adapted for treating a larger skin area (e.g., arms, back legs and decolletage). A typical dimension is from about 5.0 mm. to 15.0 mm. for a skin treatment site area TS around a patient's face.

The invention allows the area (e.g., in mm$^2$) of opening **26** to be in any selected shape but preferably is an elongate shape in the center of the working end **25**. The open distal end **26** comprises the distal termination of passageway **28** and the proximal end of the passageway in handle **18** is connected to a flexible aspiration tube **33** that extends to a remote collection reservoir **35** intermediate to the actual aspiration source **30**. The aspiration source **30** thus is adapted to draw the working end **20** and more particularly the skin interface **25** against the skin treatment site TS to perform the method of the invention as will be described below. The aspiration source or negative (−) pressurization source **30** may be any suitable vacuum source known in the art. Between the aspiration source **30** and remote collection reservoir **35** may be a filter **38** subsystem that is known in the art for collecting aspirated skin detritus and spent crystalline agents CA that are captured in the open distal end of passageway chamber **28**. The collection reservoir **35** and filter **38** are preferably of inexpensive plastic and other materials that are disposable.

The aspiration source **30** may be provided with an adjustable valve means **40** for adjusting the pressure level setting to any suitable range. The physician will learn from experience how to balance the pressure level to attain the desired level of suction against the patient's skin. A trigger or switch component **42** is provided as a foot-switch (FIG. **2**) but any suitable finger switch in the body **18** also may be used.

The working end **20** also carries means for introducing abrasive crystals into the working end or distalmost end of passageway **28** to allow individual loose crystalline agents CA to thereafter be captured between the skin interface **25** and the patient's skin. In this embodiment, two channels **44**a-**44**b are provided together with flexible tubes **46**a-**46**b to introduce the loose crystalline agents CA into the working end (see FIGS. **2**-**4**). Each distal portion **47** (collectively) of the channels **44**a-**44**b may comprise a small dimension aperture to limit the rate of flow of crystalline agents CA into the working end. The number of such channels (i.e., **44**a-**44**n) may range from one to about ten and fall within the scope of the invention. Any singular or plural number of channels can serve the purpose of slowly introducing crystal into the working end. Referring to FIGS. **2**-**3**, the crystalline agent CA delivery source **50** comprises a reservoir **55** that holds a suitable volume of abrasive crystals for a single treatment or a number of treatments. A flexible supply tube **56** extends between a remote the reservoir **55**, and in this embodiment the tube is split to connect to the two channels **44**a-**44**b. Preferably, the remote reservoir **55** that carries the crystalline agent CA is unpressurized but carries air intake relief valve **58** such

Ex. 2
Page 13 of 15

US 7,678,120 B2

5

that any slight negative pressure created by the aspiration source **30** when the skin interface is in contact with a patient's skin will draw crystals to the working end. It should be appreciated that reservoir **55** may be built into handle body **18** and fall within the scope of the invention. The crystal delivery source **50** may carry crystals ranging in size from about 1 μm to about 50 μm in maximum cross-sectional dimension, (for example, aluminum oxide crystals). Preferably, the crystals are from about 5 μm to about 30 μm in maximum cross-sectional dimension to allow a very fine abrasion of the epidermis.

It has been found that by a slight negative pressure environment the open end **26** and passageway **28**, the crystalline agent will be caused to dribble into, or be sucked into, the passageway **28** in the working end **20**. Thereafter, the movement of the working end **20** in a sideways movement over the skin causes a portion of the crystalline agent CA volume to be captured temporarily in the irregular or corrugated surface structure of the skin interface **25**. In this process of moving the skin interface **25** over the targeted treatment site TS, it has been found that the sharp-edged crystalline agents are rolled over and over while being pressed into the surface of the skin and thereby abrade and remove the skin surface in a controllably gentle manner that is below any threshold of significant pain.

After the spent crystals are rolled over and over by the skin interface when moving in a first lateral direction across the skin, and after the working end is then is reversed in directional movement across the skin, a portion of the spent crystals and abraded skin debris necessarily roll into the central opening portion **26** wherein the negative pressure environment captures and aspirates the abraded materials to the remote collection reservoir **35**.

To facilitate the process described above, the invention is provided with novel aspects that relate to the irregular or ridged surface structure **32** mentioned above. The entire skin interface **25** may be of any suitable plan form (e.g., round, oval, rectangular etc.) and fall within the scope of the invention. More in particular, the interface **25** defines a 1st outer periphery **25**A and a 2nd inner periphery **25**B that generally are in apposition to one another and are spaced apart by width W with the inner periphery about the edge of opening **26** (see FIG. **3**).

In a preferred embodiment shown in FIGS. **3-4**, the concept of 1st and 2nd peripheries **25**A and **25**B in apposition thus comprise peripheries that are dual and side-by-side as shown in FIG. **4** and are thus adapted for side-to-side lateral or sideways movement while performing the technique of the invention, for example which is a natural movement of a human hand over a patient's skin. Thus, the direction of the ridges **60** extend generally transverse relative to a line drawn that indicates the direction of movement of the working end **20** in performing the method of the invention. That is, in the exemplary working end of FIG. **4**, the working end is generally optimized for side-to-side or lateral movement. Thus, the ridge alignment is generally transverse to the direction of movement in operations indicated by arrow A. (In a circular working end that is adapted generally for movement is any direction, the direction of the ridges **60** may be generally transverse to any direction of movement by being concentric relative to a central opening **26** (not shown)).

The terms irregular or ridged shape structure **32** as used herein mean that a series of at least one projecting edge portion **62***a* projects distally as a ridge within the skin interface **25**. The irregular shape structure **32** further typically carries recessed portions or valley portions **62***b* that are recessed in the proximal direction intermediate to any plural-

6

ity of projecting edge portions **62***a*. These surface configurations for convenience are herein termed the primary shape structure (or ridge and valley elements). The width of the skin interface **25** containing shape structure **32** may be from about 2.0 mm. to 25.0 mm. or more and preferably is from about 3.0 mm. to 10.0 mm. The number of ridges preferably are from about 1 ridge to 25 ridges on each side of the opening **26**. The height H of any ridge from the apex of the projecting portion **62***a* to the depth of the valley portion **62***b* may be from about 0.25 mm. to about 5.0 mm. and is preferably from about 0.5 mm. to about 2.0 m. It has been found that various ridge height dimensions are optimal depending on the patient's skin type. Further, but optionally, it has been found that secondary shape structure of notches or recessed grooves **66** configured across the primary shape structure of ridge and valley elements may help introduce loose crystals to regions of the skin interface **25** in contact with the skin which is desirable. Such secondary grooves **66** are shown in FIG. **4** and are preferably somewhat in alignment with an axis of channels **44***a*-**44***b* that introduce crystals into the working end **20** thus allowing the crystals to be suctioned into the valleys **62***b* of the primary shape structure.

While the series of primary ridge and valley elements together the secondary grooves seems to be optimal for the method described below, it should be appreciated that the method also may be performed with a skin interface that has (i) only primary ridge and valley elements; (ii) or only a particular surface roughness that is appropriate for partially capturing loose crystals as will be described below-as long as the skin interface has a minimum width of about 3.0 mm. which was described as a preferred width dimension previously.

FIG. **4** further shows that at least some of the crests or apexes of some of the ridge portions **62***a* together with the outermost periphery of the skin interface **25** define an overall tissue-receiving shape **64** that may range from flat to concave and is shown in a preferred concave configuration. The alternative shapes **64***a*-**44***b* are intended to indicate an approximate range of shapes that are suitable. The apexes of ridges **62***a* need not all be at the same height to define shape **64**. The purpose of the concave shape is to cause the outer periphery of the working end to be in firm contact with the tissue surface while the negative pressure from aspiration source **30** draws the skin into firm contact with tissue interface **25**.

2. Practice of the Method of the Invention. Now turning to FIG. **5**, a sectional view of working end **20** shows the technique of the present invention in exfoliating or removing skin surface layers. FIG. **5** shows the working end **20** after actuation of the negative (−) pressure source **30** with the skin surface **70** initially being drawn into the shape **64**. The operating negative pressures may be in any suitable range that is determined by investigation. It has been found by experimentation that optimal pressure levels vary greatly depending on (i) the type of skin targeted for treatment, (ii) the dimensions across the working end, and (iii) the dimensions of opening **26**.

Next, the operator moves the skin interface **25** across a treatment site TS which is a path on the patient's skin while still actuating moves the trigger **42** thereby maintaining the negative pressure environment in the passageway **26**. The negative pressure environment within the working end causes crystalline particles and entrained in air to be drawn into passageway **28** proximate to the skin surface and into the shape structure **32** of the skin interface **25**. The sideways or lateral movement of the skin interface **25** captures a portion of the crystals between the interface and the skin surface, in part by over-rolling them. The continued rolling of the sharp-

Ex. 2
Page 14 of 15

US 7,678,120 B2

7

edged crystals trapped between the instrument and the skin surface **70** causes an abrasion and removal of the skin surface in a controllable manner.

As working end is moved in a reverse direction, the negative pressure environment in the passageway **28** captures and aspirates the spent crystals and skin debris to the remote collection reservoir **35**. At the end of a particular lateral movement of the working end, the operator may release the trigger **42** which terminates the crystal agent delivery and further allows the operator to easily lift the working end from the patient's skin. The treated path can be easily seen and the operator then can exfoliate another slightly overlapping or adjacent path by repeating the above steps until surface removal is completed over the targeted treatment area.

3. Type "B" Skin Resurfacing System. Referring to FIGS. **6-9**, another exemplary instrument system and treatment device **205** is shown for removing superficial skin layers. This system differs greatly from the Type "A" embodiment in the mechanism of action that abrades the skin since the Type "B" system uses a fluid media plus an abrading structure on the skin interface. Still several features of the Type "B" embodiment are similar to the Type "A" embodiment and the two modalities of treatment may be used to complement one another.

FIG. **6** shows that a hand-held instrument **208** has a removable working end **220** that defines a skin interface surface portion indicated at **225**. Handle portion **227**a mates with housing **227**b. A flexible tube **228** extends to a vacuum source **230**. A fluid reservoir **235** carrying a fluid skin treatment media is housed in the handle although it could also be a remote reservoir.

Referring now to FIGS. **7-9**, a first aperture arrangement consisting of at least one port or opening portion **240** of skin interface **225** that communicates with an interior passageway **242** that extends through housing **227**b to hose **228** and the vacuum or negative (−) pressure source.

FIGS. **7-9** further show a second aperture arrangement in the skin interface consisting of at least one port or openings **250** that extend around an outer periphery of the skin interface **225**. These opening(s) of the second aperture arrangement are in fluid communication with the reservoir **235** and the treatment media therein. The skin interface has a series of primary ridge elements **255**a and valley elements **255**b together the secondary notches or grooves **260** as defined above with similar dimensional parameters. This embodiment differs however in that the apexes of ridge elements **255**a are substantially a sharp edge as are the edged of the notches **260**. Thus, these primary surface elements **255**a and secondary surface elements thereby define teeth therebetween that seem well suited to abrading skin layers particularly after being hydrated by the fluid source of the system. Experimentation has shown that the vacuum source and fluid source may be reversed between the first and second aperture arrangements **240** and **250** with the method of skin removal still working well. The vacuum system aspirates away skin debris and spent fluids as described previously. Of particular interest, the method of the invention appears to work well because the suction on the skin treatment site very quickly hydrated, or puffs up, the skin which in turn make the surface layer susceptible to painless abrasion. The ability of the system to rapidly deliver fluids to subsurface tissues allows the use of any pharmacological agent known in the art for enhancing

8

skin rejuvenation as a part of the skin treatment. The system can use sterile water or saline solution for a treatment to remove dermal tissue with the abrasive surface of the treatment device. The system can also use a fluid carrying a chemical agent of a suitable concentration be selected from a group of acids including TCA (trichloroacetic acid), a glycolic acid including an alphahydroxy acid (AHA), a lactic acid, a citric acid, or phenol as disclosed in co-pending U.S. patent application Ser. No. 09/524,731 filed Mar. 14, 2000 which is incorporated herein by this reference.

Specific features of the invention may be shown in some figures and not in others, and this is for convenience only and any feature may be combined with another in accordance with the invention. While the principles of the invention have been made clear in the exemplary embodiments, it will be obvious to those skilled in the art that modifications of the structure, arrangement, proportions, elements, and materials may be utilized in the practice of the invention, and otherwise, which are particularly adapted to specific environments and operative requirements without departing from the principles of the invention. The appended claims are intended to cover and embrace any and all such modifications, with the limits only of the true purview, spirit and scope of the invention.

What is claimed is:

**1**. A method for abrading skin of a patient, comprising:

(a) placing a working end of a skin treatment device against the skin of the patient;

(b) drawing the skin against an abrading surface on a skin interface on the working end of the skin treatment device by applying suction to the skin through an aspiration opening in the working end, the abrading surface comprising apexes extending upwardly from the abrading surface and the apexes having sharp edges;

(c) moving the treatment device across the skin while the sharp edge of the apexes remain stationary with respect to the working end of the skin treatment device;

(d) abrading the skin drawn against the sharp edge of the apexes while continuously applying suction through the aspiration opening; and

(e) removing skin debris through the aspiration opening in the working end of the skin treatment device.

**2**. The method of claim **1**, further comprising providing a fluid to the skin.

**3**. The method of claim **2**, wherein the fluid is provided with a crystalline abrasive.

**4**. The method of claim **2**, wherein the fluid hydrates the skin.

**5**. The method of claim **2**, wherein the fluid is provided with a pharmacologically-active agent for treating skin.

**6**. The method of claim **2**, wherein the fluid is provided with an agent selected from the class consisting of citric acid and lactic acid.

**7**. The method of claim **2**, wherein the fluid is provided with an agent selected from the class comprising TCA (trichloroacetic acid), glycolic acid, alphahydroxy acid (AHA).

**8**. The method of claim **3**, wherein providing a fluid to the skin the fluid further comprises providing through a fluid opening provided in the working end of the skin treatment device.

**9**. The method of claim **2**, further comprising providing sterile water or saline solution to the skin.

* * * * *

# EXHIBIT 3

US007789886B2

(12) **United States Patent**

Shadduck

(10) Patent No.: **US 7,789,886 B2**

(45) Date of Patent: *Sep. 7, 2010

(54) **INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS**

(75) Inventor: **John H. Shadduck**, Tiburon, CA (US)

(73) Assignee: **Axia MedSciences, LLC**, Tiburon, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1656 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/699,747**

(22) Filed: **Nov. 3, 2003**

(65) **Prior Publication Data**

US 2004/0143274 A1    Jul. 22, 2004

**Related U.S. Application Data**

(63) Continuation of application No. 09/648,025, filed on Aug. 25, 2000, now Pat. No. 6,641,591.

(60) Provisional application No. 60/150,782, filed on Aug. 26, 1999.

(51) **Int. Cl.**
*A61B 17/50*    (2006.01)
*A61B 17/06*    (2006.01)

(52) **U.S. Cl.** .................................................... **606/131**

(58) **Field of Classification Search** ................. 606/131, 606/132, 133; 604/289
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,608,032 A    8/1952  Garver

(Continued)

FOREIGN PATENT DOCUMENTS

EP        0564392      3/1993

(Continued)

OTHER PUBLICATIONS

File History of Reissue U.S. Appl. No. 11/027,590, filed Dec. 29, 2004 (Reissue of U.S. Patent No. 6,500,183, issued Dec. 31, 2002).

(Continued)

*Primary Examiner*—Vy Q Bui
(74) *Attorney, Agent, or Firm*—Knobbe Martens Olson & Bear, LLP

(57)    **ABSTRACT**

An instrument and technique for the removal of epidermal layers in a controlled manner utilizing a hand-held instrument with a working end that (i) a vacuum aspiration system, (ii) a source for delivery of a sterile fluids or pharmacological agents to the skin; and (iii) a skin interface surface in the working end that has specially shape structure for abrading surface layers of the patient's epidermis as the working end is moved over the patient's skin while at the same time causing rapid penetration of the fluids into the skin for therapeutic purposes. Movement of the working end across the skin causes abrasion of the surface layers in a path over the patient's skin. The method of the invention may be used in a periodic treatment for the removal of superficial skin layers that enhances the synthesis of dermal collagen aggregates by inducing the body's natural wound healing response. The method of the invention creates more normal dermal architectures in skin with limited depths of skin removal by the series of superficial treatments that may be comparable to the extent of neocollagenesis caused by a deep skin removal treatment (e.g., $CO_2$ laser skin removal).

**16 Claims, 9 Drawing Sheets**



Ex. 3
Page 1 of 16

**US 7,789,886 B2**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,701,559 | A | 2/1955 | Cooper |
| 2,712,823 | A | 7/1955 | Kurtin |
| 2,867,214 | A | 1/1959 | Wilson |
| 2,881,763 | A | 4/1959 | Robbins |
| 2,921,585 | A | 1/1960 | Schumann |
| 3,085,573 | A | 4/1963 | Meyer et al. |
| 3,214,869 | A | 11/1965 | Stryker |
| 3,476,112 | A | 11/1969 | Elstein |
| 3,574,239 | A | 4/1971 | Sollerud |
| 3,715,838 | A | 2/1973 | Young et al. |
| 3,964,212 | A | 6/1976 | Karden |
| 4,121,388 | A | 10/1978 | Wilson |
| 4,155,721 | A | 5/1979 | Fletcher |
| 4,182,329 | A | 1/1980 | Smith et al. |
| 4,203,431 | A | 5/1980 | Abura et al. |
| 4,216,233 | A | 8/1980 | Stein |
| 4,378,804 | A | 4/1983 | Cortese |
| 4,560,373 | A | 12/1985 | Sugino et al. |
| 4,646,480 | A | 3/1987 | Williams |
| 4,646,482 | A | 3/1987 | Chitjian |
| 4,676,749 | A | 6/1987 | Mabille |
| 4,706,676 | A | 11/1987 | Peck |
| 4,754,756 | A | 7/1988 | Shelanski |
| 4,757,814 | A | 7/1988 | Wang et al. |
| 4,900,316 | A | 2/1990 | Yamamoto |
| 4,917,086 | A | 4/1990 | Feltovich et al. |
| 4,957,747 | A | 9/1990 | Stiefel |
| 5,012,797 | A * | 5/1991 | Liang et al. ..................... 601/2 |
| 5,035,089 | A | 7/1991 | Tillman et al. |
| 5,037,431 | A | 8/1991 | Summers et al. |
| 5,037,432 | A * | 8/1991 | Molinari ...................... 606/131 |
| 5,100,412 | A | 3/1992 | Rosso |
| 5,122,153 | A | 6/1992 | Harrel |
| 5,207,234 | A | 5/1993 | Rosso |
| 5,612,797 | A | 3/1997 | Clarke |
| 5,674,235 | A | 10/1997 | Parisi |
| 5,759,185 | A | 6/1998 | Grinberg |
| 5,800,446 | A | 9/1998 | Banuchi |
| 5,810,842 | A | 9/1998 | Di Fiore et al. |
| 5,873,881 | A | 2/1999 | McEwen et al. |
| 5,882,201 | A | 3/1999 | Salem |
| 5,971,999 | A | 10/1999 | Naldoni |
| 6,019,749 | A | 2/2000 | Fields et al. |
| 6,024,733 | A | 2/2000 | Eggers et al. |
| 6,039,745 | A | 3/2000 | Di Fiore et al. |
| 6,042,552 | A | 3/2000 | Cornier |
| 6,080,165 | A | 6/2000 | DeJacma |
| 6,080,166 | A | 6/2000 | McEwen et al. |
| 6,090,085 | A | 7/2000 | Mehl, Sr. et al. |
| 6,136,008 | A | 10/2000 | Becker et al. |
| 6,139,553 | A | 10/2000 | Dotan |
| 6,139,554 | A | 10/2000 | Karkar et al. |
| 6,149,634 | A | 11/2000 | Bernabei |
| 6,162,232 | A | 12/2000 | Shadduck |
| 6,183,483 | B1 | 2/2001 | Chang |
| 6,238,275 | B1 | 5/2001 | Metcalf et al. |
| 6,241,739 | B1 | 6/2001 | Waldron |
| 6,283,978 | B1 * | 9/2001 | Cheski et al. ............... 606/131 |
| 6,299,620 | B1 | 10/2001 | Shadduck et al. |
| 6,306,119 | B1 | 10/2001 | Weber et al. |
| 6,387,103 | B2 | 5/2002 | Shadduck |
| 6,423,078 | B1 * | 7/2002 | Bays et al. ................... 606/131 |
| 6,471,712 | B2 * | 10/2002 | Burres ......................... 606/131 |
| 6,500,183 | B1 | 12/2002 | Waldron |
| 6,629,983 | B1 | 10/2003 | Ignon |
| 6,641,591 | B1 | 11/2003 | Shadduck |
| 6,685,853 | B1 * | 2/2004 | Angelopoulos et al. ..... 252/500 |
| 6,695,853 | B2 | 2/2004 | Karasiuk |
| 6,869,611 | B1 * | 3/2005 | Kligman et al. ............ 424/401 |
| 7,087,063 | B2 * | 8/2006 | Carson et al. ............... 606/131 |
| 2002/0107527 | A1 | 8/2002 | Burres |
| 2003/0212415 | A1 | 11/2003 | Karasiuk |
| 2006/0200172 | A1 | 9/2006 | Shadduck |
| 2006/0200173 | A1 | 9/2006 | Shadduck |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 564 392 A2 | 10/1993 |

### OTHER PUBLICATIONS

File History of Reexamination U.S. Appl. No. 90/007,683 (Reexamination of U.S. Patent No. 6,241,739, issued Jun. 5, 2001).

Ex Parte Reexamination Certificate US 6,241,739 C1, Microdermabrasion Device and Method of Treating the Skin Surface, Inventor Stephen H. Waldron, Dec. 11, 2007, and file history through Aug. 8, 2006.

* cited by examiner

Case 2:20-cv-09669-FLA-PVC   Document 41   Filed 06/25/21   Page 101 of 380   Page ID
Case 2:11-cv-04399-FLA-AGR   Document 41   Filed 06/25/21   Page 470 of 69   Page ID #:51
#:709

**U.S. Patent**          Sep. 7, 2010          Sheet 1 of 9          US 7,789,886 B2



*FIG. 1A*



*FIG. 1B*

U.S. Patent          Sep. 7, 2010          Sheet 2 of 9          US 7,789,886 B2



NEGATIVE (-) PRESSURE SOURCE 30

FILTER 38

COLLECTION RESERVOIR 35

33

18

CRYSTAL SOURCE 50

RESERVOIR 55

28

20

44a

47

*FIG. 2*

Ex. 3
Page 4 of 16

Case 2:20-cv-09669-FLA-PVC   Document 41   Filed 06/25/21   Page 103 of 380   Page ID
#:711
Case 2:11-cv-04996-JFW-AGR   Document 1   Filed 06/13/11   Page 49 of 69   Page ID #:53



*FIG. 3*

Case 2:20-cv-09669-FLA-PVC Document 41 Filed 06/25/21 Page 104 of 380 Page ID #:712
Case 2:11-cv-04959-JFW-AGR Document 41 Filed 06/13/11 Page 5 of 9 Page ID #:54



FIG. 4

Ex. 3
Page 6 of 16



# FIG. 5

Case 2:20-cv-09669-FLA-PVC   Document 41   Filed 06/25/21   Page 106 of 380   Page ID
#:714
Case 2:1-cv-04999-FWA-AGR   Document 41   Filed 06/25/21   Page 52 of 69   Page ID #:56



Ex. 3
Page 8 of 16

Case 2:20-cv-09669-FLA-PVC   Document 41   Filed 06/25/21   Page 107 of 380   Page ID
Case 2:14-cv-04995-JFW-AGR   Document 1   Filed 06/13/14   Page 59 of 69   Page ID #:57
#:715





*FIG. 8*



*FIG. 9*

US 7,789,886 B2

**1**

## INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 09/648,025 filed Aug. 25, 2000 now U.S. Pat. No. 6,641,591, which claims benefit of Provisional U.S. Patent Application Ser. No. 60/150,782 filed Aug. 26, 1999.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to devices for dermatology and more particularly to a hand-held instrument with a working end that carries (i) a negative pressure aspiration system, (ii) a source for delivery of a sterile fluids to the skin; and (iii) a skin interface surface in the working end that has specially shape structure for abrading surface layers of the patient's epidermis as the working end is moved over the patient's skin while at the same time causing rapid penetration of the fluids into the skin for therapeutic purposes.

2. Description of Background Art

Dermatologists and plastic surgeons have used various methods for removing superficial skin layers to cause the growth of new skin layers (i.e., commonly described as skin resurfacing techniques) since the early 1900's. Early skin resurfacing treatments used an acid such as phenol to etch away surface layers of a patient's skin that contained damage to thereafter be replaced by new skin. (The term damage when referring to a skin disorder is herein defined as any cutaneous defect, e.g., including but not limited to rhytides, hyperpigmentation, acne scars, solar elastosis, other dyschromias, stria distensae, seborrheic dermatitus).

Following the removal of surface skin layers at a particular depth, no matter the method of skin removal, the body's natural wound-healing response begins to regenerate the epidermis and underlying wounded skin layers. The new skin layer will then cytologically and architecturally resemble a younger and more normal skin. The range of resurfacing treatments can be divided generally into three categories based on the depth of the skin removal and wound: (i) superficial exfoliations or peels extending into the epidermis, (ii) medium-depth resurfacing treatments extending into the papillary dermis, and (iii) deep resurfacing treatments that remove tissue to the depth of the reticular dermis (see FIGS. 1A-1B).

Modern techniques for skin layer removal include: $CO_2$ laser resurfacing which falls into the category of a deep resurfacing treatment; Erbium laser resurfacing which generally is considered a medium-depth treatment; mechanical dermabrasion using high-speed abrasive wheels which results in a medium-depth or deep resurfacing treatment; and chemical peels which may range from a superficial to a deep resurfacing treatment, depending on the treatment parameters. A recent treatment, generally called micro-dermabrasion, has been developed that uses an air-pressure source to deliver abrasive particles directly against a patient's skin at high-velocities to abrade away skin layers. Such a micro-dermabrasion modality may be likened to sandblasting albeit at velocities that do no cause excess pain and discomfort to the patient. Micro-dermabrasion as currently practiced falls into the category of a superficial resurfacing treatment.

A superficial exfoliation, peel or abrasion removes some or all of the epidermis (see FIGS. 1A-1B) and thus is suited for

**2**

treating very light rhytides. Such a superficial exfoliation is not effective in treating many forms of damage to skin. A medium-depth resurfacing treatment that extends into the papillary dermis (see FIG. 1B) can treat many types of damage to skin. Deep resurfacing treatments, such as $CO_2$ laser treatments, that extend well into the reticular dermis (see FIG. 1B) causes the most significant growth of new skin layers but carry the risk of scarring unless carefully controlled.

It is useful to briefly explain the body's mechanism of actually resurfacing skin in response to the removal of a significant depth of dermal layers. Each of the above-listed depths of treatment disrupts the epidermal barrier, or a deeper dermal barrier (papillary or reticular), which initiates varied levels of the body's wound-healing response. A superficial skin layer removal typically causes a limited wound-healing response, including a transient inflammatory response and limited collagen synthesis within the dermis. In a medium-depth or a deep treatment, the initial inflammatory stage leads to hemostasis through an activated coagulation cascade. Chemotactic factors and fibrin lysis products cause neutrophils and monocytes to appear at the site of the wound. The neutrophils sterilize the wound site and the monocytes convert to macrophages and elaborate growth factors which initiate the next phase of the body's wound-healing response involving granular tissue formation. In this phase, fibroblasts generate a new extracellular matrix, particularly in the papillary and reticular dermis, which is sustained by angiogenesis and protected anteriorly by the reforming epithelial layer. The new extracellular matrix is largely composed of collagen fibers (particularly Types I and III) which are laid down in compact parallel arrays (see FIG. 1B). It is largely the collagen fibers that provide the structural integrity of the new skin—and contribute to the appearance of youthful skin.

All of the prevalent types of skin damage (rhytides, solar elastosis effects, hyperpigmentation, acne scars, dyschromias, melasma, stria distensae) manifest common histologic and ultrastructural characteristics, which in particular include disorganized and thinner collagen aggregates, abnormalities in elastic fibers, and abnormal fibroblasts, melanocytes and keratinocytes that disrupt the normal architecture of the dermal layers. It is well recognized that there will be a clinical improvement in the condition and appearance of a patient's skin when a more normal architecture is regenerated by the body's wound-healing response. Of most significance to a clinical improvement is skin is the creation of more dense parallel collagen aggregates with decreased periodicity (spacing between fibrils). The body's wound-healing response is responsible for synthesis of these collagen aggregates. In addition to the body's natural wound healing response, adjunct pharmaceutical treatments that are administered concurrent with, or following, a skin exfoliations can enhance the development of collagen aggregates to provide a more normal dermal architecture in the skin—the result being a more youthful appearing skin.

The deeper skin resurfacing treatments, such as laser ablation, chemical peels and mechanical dermabrasion have drawbacks. The treatments are best used for treatments of a patient's face and may not be suited for treating other portions of a patient's body. For example, laser resurfacing of a patient's neck or decolletage may result in post-treatment pigmentation disorders. All the deep resurfacing treatments are expensive, require anesthetics, and must be performed in a clinical setting. Perhaps, the most significant disadvantage to deep resurfacing treatments relates to the post-treatment recovery period. It may require up to several weeks or even months to fully recover and to allow the skin the form a new epidermal layer. During a period ranging from a few weeks to

**3**

several weeks after a deep resurfacing treatment, the patient typically must wear heavy make-up to cover redness thus making the treatment acceptable only to women.

The superficial treatment offered by micro-dermabrasion has the advantages of being performed without anesthetics and requiring no extended post-treatment recovery period. However, micro-dermabrasion as currently practices also has several disadvantages. First, a micro-dermabrasion treatment is adapted only for a superficial exfoliation of a patient's epidermis which does not treat many forms of damage to skin. Further, the current micro-dermabrasion devices cause abrasive effects in a focused area of the skin that is very small, for example a few mm.$^2$, since all current devices use a single pin-hole orifice that jets air and abrasives to strike the skin in a highly focused area. Such a focused treatment area is suitable for superficial exfoliations when the working end of the device is passed over the skin in overlapping paths. Further, such focused energy delivery is not well suited for deeper skin removal where repeated passes may be necessary. Still further, current micro-dermabrasion devices are not suited for deeper skin removal due to the pain associated with deep abrasions. Other disadvantages of the current micro-dermabrasion devices relate to the aluminum oxide abrasive particles that are typically used. Aluminum oxide can contaminate the working environment and create a health hazard for operators and patients alike. Inhalation of aluminum oxide particles over time can result in serious respiratory disorders.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. **1**A-**1**B are sectional illustrations of a patient's skin showing dermal layers.

FIG. **2** is a view of a Type "A" body and working end of the instrument of the invention.

FIG. **3** is an enlarged view of the working end of the instrument of FIG. **2**.

FIG. **4** is a sectional view of working end of FIG. **3**.

FIG. **5** is a view showing the manner of using the working end of the invention of FIGS. **3**-**4** in performing a method of the invention.

FIG. **6** is a view of a Type "B" body, working end and handle in an exploded view.

FIG. **7** is a view of the working end of the instrument of FIG. **6** and a housing.

FIG. **8** is an enlarged view of the skin interface of the working end of FIG. **7**.

FIG. **9** is a sectional view of the skin interface of FIG. **8**.

## DETAILED DESCRIPTION OF THE INVENTION

1. Type "A" Skin Resurfacing System. Referring to FIGS. **2**-**3**, an exemplary instrument system **5** is shown for removing superficial skin layers. The instrument system **5** includes: (i) a hand-held body **18** with a working end **20** that defines a skin interface surface portion indicated at **25** in FIGS. **2**-**3**. An opening portion **26** transitions into an interior passageway **28** that extends through the body to communicate with a negative (−) pressure source (or aspiration source) indicated at **30** that operates as vacuum means for aspirating skin debris from a targeted skin surface treatment site TS.

Of particular interest, FIGS. **3**-**4** show views of the working end **20** with the skin interface **25** being configured with a particular irregular or ridged surface structure indicated at **32**. The ridged surface structure **32** further has a particular minimum width dimension W to accommodate from the ridge shape with as many as about 25 ridges on each side of opening **26** depending on the overall dimensions of the working end

**4**

**20**. More particular aspects of the irregular or ridged surface structure **32** will be described below.

In this preferred embodiment, the working end **20** is of any suitable material, such as a transparent medical grade plastic. The transparency of the working end will assist the practitioner in localizing treatment in a particular targeted skin treatment area. The overall transverse dimension of the working end **20** of FIGS. **2**-**3** may be from around about 5.0 mm. to about 50.0 mm. with a larger dimensioned end being adapted for treating a larger skin area (e.g., arms, back legs and decolletage). A typical dimension is from about 5.0 mm. to 15.0 mm. for a skin treatment site area TS around a patient's face.

The invention allows the area (e.g., in mm.$^2$) of opening **26** be in any selected shape but preferably is an elongate shape in the center of the working end **25**. The open distal end **26** comprises the distal termination of passageway **28** and the proximal end of the passageway in handle **18** is connected to a flexible aspiration tube **33** that extends to a remote collection reservoir **35** intermediate to the actual aspiration source **30**. The aspiration source **30** thus is adapted to draw the working end **20** and more particularly the skin interface **25** against the skin treatment site TS to perform the method of the invention as will be described below. The aspiration source or negative (−) pressurization source **30** may be any suitable vacuum source known in the art. Between the aspiration source **30** and remote collection reservoir **35** may be a filter **38** subsystem that is known in the art for collecting aspirated skin detritus and spent crystalline agents CA that are captured in the open distal end of passageway chamber **28**. The collection reservoir **35** and filter **38** are preferably of inexpensive plastic and other materials that are disposable.

The aspiration source **30** may be provided with an adjustable valve means **40** for adjusting the pressure level setting to any suitable range. The physician will learn from experience how to balance the pressure level to attain the desired level of suction against the patient's skin. A trigger or switch component **42** is provided as a foot-switch (FIG. **2**) but any suitable finger switch in the body **18** also may be used.

The working end **20** also carries means for introducing abrasive crystals into the working end or distalmost end of passageway **28** to allow individual loose crystalline agents CA to thereafter be captured between the skin interface **25** and the patient's skin. In this embodiment, two channels **44**a-**44**b are provided together with flexible tubes **46**a-**46**b to introduce the loose crystalline agents CA into the working end (see FIGS. **2**-**4**). Each distal portion **47** (collectively) of the channels **44**a-**44**b may comprise a small dimension aperture to limit the rate of flow of crystalline agents CA into the working end. The number of such channels (i.e., **44**a-**44**n) may range from one to about ten and fall within the scope of the invention. Any singular or plural number of channels can serve the purpose of slowly introducing crystal into the working end, Referring to FIGS. **2**-**3**, the crystalline agent CA delivery source **50** comprises a reservoir **55** that holds a suitable volume of abrasive crystals for a single treatment or a number of treatments. A flexible supply tube **56** extends between a remote the reservoir **55**, and in this embodiment the tube is split to connect to the two channels **44**a-**44**b. Preferably, the remote reservoir **55** that carries the crystalline agent CA is unpressurized but carries air intake relief valve **58** such that any slight negative pressure created by the aspiration source **30** when the skin interface is in contact with a patient's skin will draw crystals to the working end. It should be appreciated that reservoir **55** may be built into handle body **18** and fall within the scope of the invention. The crystal delivery source **50** may carry crystals ranging in size from about 1 μm to about 50 μm in maximum cross-sectional dimension, (for

US 7,789,886 B2

5

example, aluminum oxide crystals). Preferably, the crystals are from about 5 μm to about 30 μm in maximum cross-sectional dimension to allow a very fine abrasion of the epidermis.

It has been found that by a slight negative pressure environment the open end 26 and passageway 28, the crystalline agent will be caused to dribble into, or be sucked into, the passageway 28 in the working end 20. Thereafter, the movement of the working end 20 in a sideways movement over the skin causes a portion of the crystalline agent CA volume to be captured temporarily in the irregular or corrugated surface structure of the skin interface 25. In this process of moving the skin interface 25 over the targeted treatment site TS, it has been found that the sharp-edged crystalline agents are rolled over and over while being pressed into the surface of the skin and thereby abrade and remove the skin surface in a controllably gentle manner that is below any threshold of significant pain.

After the spent crystals are rolled over and over by the skin interface when moving in a first lateral direction across the skin, and after the working end is then is reversed in directional movement across the skin, a portion of the spent crystals and abraded skin debris necessarily roll into the central opening portion 26 wherein the negative pressure environment captures and aspirates the abraded materials to the remote collection reservoir 35.

To facilitate the process described above, the invention is provided with novel aspects that relate to the irregular or ridged surface structure 32 mentioned above. The entire skin interface 25 may be of any suitable plan form (e.g., round, oval, rectangular etc.) and fall within the scope of the invention. More in particular, the interface 25 defines a 1st outer periphery 25A and a 2nd inner periphery 25B that generally are in apposition to one another and are spaced apart by width W with the inner periphery about the edge of opening 26 (see FIG. 3).

In a preferred embodiment shown in FIGS. 3-4, the concept of 1st and 2nd peripheries 25A and 25B in apposition thus comprise peripheries that are dual and side-by-side as shown in FIG. 4 and are thus adapted for side-to-side lateral or sideways movement while performing the technique of the invention, for example which is a natural movement of a human hand over a patient's skin. Thus, the direction of the ridges 60 extend generally transverse relative to a line drawn that indicates the direction of movement of the working end 20 in performing the method of the invention. That is, in the exemplary working end of FIG. 4, the working end is generally optimized for side-to-side or lateral movement. Thus, the ridge alignment is generally transverse to the direction of movement in operations indicated by arrow A. (In a circular working end that is adapted generally for movement is any direction, the direction of the ridges 60 may be generally transverse to any direction of movement by being concentric relative to a central opening 26 (not shown)).

The terms irregular or ridged shape structure 32 as used herein mean that a series of at least one projecting edge portion 62a projects distally as a ridge within the skin interface portion 25. The irregular shape structure 32 further typically carries recessed portions or valley portions 62b that are recessed in the proximal direction intermediate to any plurality of projecting edge portions 62a. These surface configurations for convenience are herein termed the primary shape structure (or ridge and valley elements). The width of the skin interface 25 containing shape structure 32 may be from about 2.0 mm. to 25.0 mm. or more and preferably is from about 3.0 mm. to 10.0 mm. The number of ridges preferably are from about 1 ridge to 25 ridges on each side of the opening 26. The

6

height H of any ridge from the apex of the projecting portion 62a to the depth of the valley portion 62b may be from about 0.25 mm. to about 5.0 mm. and is preferably from about 0.5 mm. to about 2.0 m. It has been found that various ridge height dimensions are optimal depending on the patient's skin type. Further, but optionally, it has been found that secondary shape structure of notches or recessed grooves 66 configured across the primary shape structure of ridge and valley elements may help introduce loose crystals to regions of the skin interface 25 in contact with the skin which is desirable. Such secondary grooves 66 are shown in FIG. 4 and are preferably somewhat in alignment with an axis of channels 44a-44b that introduce crystals into the working end 20 thus allowing the crystals to be suctioned into the valleys 62b of the primary shape structure.

While the series of primary ridge and valley elements together the secondary grooves seems to be optimal for the method described below, it should be appreciated that the method also may be performed with a skin interface that has (i) only primary ridge and valley elements; (ii) or only a particular surface roughness that is appropriate for partially capturing loose crystals as will be described below-as long as the skin interface has a minimum width of about 3.0 mm. which was described as a preferred width dimension previously.

FIG. 4 further shows that at least some of the crests or apexes of some of the ridge portions 62a together with the outermost periphery of the skin interface 25 define an overall tissue-receiving shape 64 that may range from flat to concave and is shown in a preferred concave configuration. The alternative shapes 64a-44b are intended to indicate an approximate range of shapes that are suitable. The apexes of ridges 62a need not all be at the same height to define shape 64. The purpose of the concave shape is to cause the outer periphery of the working end to be in firm contact with the tissue surface while the negative pressure from aspiration source 30 draws the skin into firm contact with tissue interface 25.

2. Practice of the Method of the Invention. Now turning to FIG. 5, a sectional view of working end 20 shows the technique of the present invention in exfoliating or removing skin surface layers. FIG. 5 shows the working end 20 after actuation of the negative (−) pressure source 30 with the skin surface 70 initially being drawn into the concave shape 64. The operating negative pressures may be in any suitable range that is determined by investigation. It has been found by experimentation that optimal pressure levels vary greatly depending on (i) the type of skin targeted for treatment, (ii) the dimensions across the working end, and (iii) the dimensions of opening 26.

Next, the operator moves the skin interface 25 across a treatment site TS which is a path on the patient's skin while still actuating moves the trigger 42 thereby maintaining the negative pressure environment in the passageway 26. The negative pressure environment within the working end causes crystalline particles and entrained in air to be drawn into passageway 28 proximate to the skin surface and into the shape structure 32 of the skin interface 25. The sideways or lateral movement of the skin interface 25 captures a portion of the crystals between the interface and the skin surface, in part by over-rolling them. The continued rolling of the sharp-edged crystals trapped between the instrument and the skin surface 70 causes an abrasion and removal of the skin surface in a controllable manner.

As working end is moved in a reverse direction, the negative pressure environment in the passageway 28 captures and aspirates the spent crystals and skin debris to the remote collection reservoir 35. At the end of a particular lateral move-

US 7,789,886 B2

7

ment of the working end, the operator may release the trigger **42** which terminates the crystal agent delivery and further allows the operator to easily lift the working end from the patient's skin. The treated path can be easily seen and the operator then can exfoliate another slightly overlapping or adjacent path by repeating the above steps until surface removal is completed over the targeted treatment area.

3. Type "B" Skin Resurfacing System. Referring to FIGS. **6-9**, another exemplary instrument system and treatment device **205** is shown for removing superficial skin layers. This system differs greatly from the Type "A" embodiment in the mechanism of action that abrades the skin since the Type "B" system uses a fluid media plus an abrading structure on the skin interface. Still several features of the Type "B" embodiment are similar to the Type "A" embodiment and the two modalities of treatment may be used to complement one another.

FIG. **6** shows that a hand-held instrument **208** has a removable working end **220** that defines a skin interface surface portion indicated at **225**. Handle portion **227***a* mates with housing **227***b*. A flexible tube **228** extends to a vacuum source **230**. A fluid reservoir **235** carrying a fluid skin treatment media is housed in the handle although it could also be a remote reservoir.

Referring now to FIGS. **7-9**, a first aperture arrangement consisting of at least one port or opening portion **240** of skin interface **225** that communicates with an interior passageway **242** that extends through housing **227***b* to hose **228** and the vacuum or negative (−) pressure source.

FIGS. **7-9** further show a second aperture arrangement in the skin interface consisting of at least one port or openings **250** that extend around an outer periphery of the skin interface **225**. These opening(s) of the second aperture arrangement are in fluid communication with the reservoir **235** and the treatment media therein. The skin interface has a series of primary ridge elements **255***a* and valley elements **255***b* together the secondary notches or grooves **260** as defined above with similar dimensional parameters. This embodiment differs however in that the apexes of ridge elements **255***a* are substantially a sharp edge as are the edged of the notches **260**. Thus, these primary surface elements **255***a* and secondary surface elements thereby define teeth therebetween that seem well suited to abrading skin layers particularly after being hydrated by the fluid source of the system. Experimentation has shown that the vacuum source and fluid source may be reversed between the first and second aperture arrangements **240** and **250** with the method of skin removal still working well. The vacuum system aspirates away skin debris and spent fluids as described previously. Of particular interest, the method of the invention appears to work well because the suction on the skin treatment site very quickly hydrated, or puffs up, the skin which in turn make the surface layer susceptible to painless abrasion. The ability of the system to rapidly deliver fluids to subsurface tissues allows the use of any pharmacological agent known in the art for enhancing skin rejuvenation as a part of the skin treatment. The system can use sterile water or saline solution for a treatment to remove dermal tissue with the abrasive surface of the treatment device. The system can also use a fluid carrying a chemical agent of a suitable concentration be selected from a group of acids including TCA (trichloroacetic acid), a glycolic acid including an alphahydroxy acid (AHA), a lactic acid, a citric acid, or phenol as disclosed in co-pending U.S. patent application Ser. No. 09/524,731 filed Mar. 14, 2000 which is incorporated herein by this reference.

Specific features of the invention may be shown in some figures and not in others, and this is for convenience only and

8

any feature may be combined with another in accordance with the invention. While the principles of the invention have been made clear in the exemplary embodiments, it will be obvious to those skilled in the art that modifications of the structure, arrangement, proportions, elements, and materials may be utilized in the practice of the invention, and otherwise, which are particularly adapted to specific environments and operative requirements without departing from the principles of the invention. The appended claims are intended to cover and embrace any and all such modifications, with the limits only of the true purview, spirit and scope of the invention.

What is claimed is:

**1**. A method for treating a skin surface of a patient, comprising:

(a) applying against the skin surface of a patient an instrument body with a longitudinal axis and a distal working end, said distal working end comprising a working surface that carries an abrading structure comprising a plurality of sharp elements for engaging and abrading the skin surface together with a vacuum source coupled to at least one aperture about said working surface, the abrading structure and the at least one aperture positioned within a raised outer periphery that completely circumscribes the abrading structure and the at least one aperture;

(b) translating the working surface over the skin surface to thereby abrade the skin surface; and

(c) contemporaneously actuating the vacuum source to thereby cause suction engagement of the skin surface against the raised outer periphery and the plurality of sharp elements of the working surface and to aspirate skin debris through the at least one aperture.

**2**. The method as in claim **1** further comprising the step of providing a fluid to the skin to enhance suction engagement of the skin against the working surface.

**3**. The method as in claim **2** wherein the fluid is provided from a fluid source to a distal region of the instrument body.

**4**. The method as in claim **3** wherein the fluid is provided from a fluid source to at least one outflow port in the working surface.

**5**. The method as in claim **2** wherein the fluid is provided with a pharmacologically-active agent for treating skin.

**6**. The method as in claim **2** wherein the fluid is provided with an agent selected from the class consisting of citric acid and lactic acid.

**7**. The method as in claim **2** wherein the fluid is provided with an agent selected from the class comprising TCA (trichloroacetic acid), glycolic acid, alphahydroxy acid (AHA).

**8**. The method as in claim **2** wherein the fluid is provided with an acid for etching the skin surface.

**9**. The method as in claim **2** wherein the fluid is provided with a crystalline abrasive.

**10**. The method as in claim **1** wherein step (a) provides a working surface with undulations for increasing the area of the working surface for engaging skin.

**11**. A method for treating a skin surface of a patient, comprising:

translating a working surface of a handheld device relative to the skin surface, said working surface comprising an abrasive structure configured to abrade the skin surface, an aperture in the working surface, an outer periphery that encircles the abrasive structure and the aperture, at least a portion of the abrasive structure spaced from the aperture; and

continuously applying a vacuum through the aperture formed in the working surface in order to draw the skin

US 7,789,886 B2

<table>
<tr><td>9</td><td>10</td></tr>
</table>

against the outer periphery and the abrasive structure
and aspirate debris away from the working surface while
abrading the skin surface.

**12**. The method as in claim **11**, further comprising the step
of providing a fluid to the skin, said providing a fluid occur- 5
ring while the skin surface is being abraded.

**13**. The method as in claim **12**, wherein providing a fluid to
the skin surface comprises supplying at least one fluid
through a fluid opening located at or near the working surface
of the handheld device.                                         10

**14**. The method as in claim **12** wherein the fluid comprises
a pharmacologically-active agent.

**15**. A method for treating human skin, comprising:
translating a handheld device relative to a skin surface to
abrade said skin surface, said handheld device compris- 15
ing a working surface with an abrasive structure at a

distal end of said handheld device and at least one aper-
ture at or near the working surface, said abrasive struc-
ture and said at least one aperture being circumscribed
by an outer periphery of the working surface, and the at
least one aperture being positioned radially closer to the
outer periphery than said abrasive structure, said aper-
ture being in fluid communication with a vacuum source
to remove debris away from the working surface;

abrading the skin surface by translating the abrading struc-
ture over the skin surface; and

continuously aspirating debris through the at least one
aperture while the skin surface is being abraded.

**16**. The method as in claim **15**, further comprising the step
of providing a fluid toward the working surface.

\*    \*    \*    \*    \*

# EXHIBIT 4

# Knobbe Martens Olson & Bear LLP
### Intellectual Property Law

2040 Main Street
Fourteenth Floor
Irvine, CA 92614
Tel 949-760-0404
Fax 949-760-9502
www.kmob.com

Rabinder N. Narula
rnarula@kmob.com

April 15, 2011
**VIA FEDERAL EXPRESS**

David Suzuki
President
Bio-Therapeutic, Inc.
2244 1st Ave. S.
Seattle, WA 98134

Re: **Edge Systems' Intellectual Property**
Our Reference: EDGE.064IS

Dear Mr. Suzuki:

We represent Edge Systems, Inc. in connection with certain intellectual property law matters. Edge Systems has expended considerable time, effort and money to develop its proprietary skin resurfacing instrumentation and methodology. This includes its Hydrafacial™ and Delphia™ Microdermabrasion systems, as well as products still in the development process.

To protect its substantial investment, Edge Systems has the rights to various patents and patent applications throughout the world. These include United States Patent No. 6,299,620 and 6,641,591, as well as recently-issued U.S. Patent Nos. 7,678,120 and 7,789,886. Copies of these patents are enclosed as *Exhibit A* to this letter. In addition, please note that Edge Systems has rights in additional pending patent applications, both within and outside the U.S., that are generally directed to skin resurfacing technologies.

As you can appreciate, the patents discussed above provide Edge Systems with exclusive rights to, *inter alia*, systems and methods of treating skin that comprise an instrument with a working surface for abrading the skin and an opening in the working surface that is coupled to a vacuum source.

It is our understanding that Bio-Therapeutic, Inc. currently sells microdermabrasion systems, marketed under the trade names "Bio-Hydroderm™," "Bio-Hydrotip™," and "AQUAFUSE." Based on our review of the publicly available information describing these systems, we conclude that, at a minimum, the patents listed above warrant your immediate attention.

| San Diego | San Francisco | Los Angeles | Riverside | Seattle | Washington, DC |
|---|---|---|---|---|---|
| 858-836-9000 | 415-954-4114 | 310-551-3450 | 951-781-9231 | 206-405-2000 | 202-640-6400 |

Ex. 4
Page 1 of 2

**Knobbe Martens Olson & Bear LLP**

Mr. Suzuki
April 15, 2011
Page -2-

   In light of the above, we are certain that you can appreciate the need to evaluate whether it is in the best interest of Bio-Therapeutic, Inc. to immediately cease the manufacture and supply of the afore-mentioned microdermabrasion systems. We look forward to hearing from you within three (2) weeks.

       Best regards,

       Rabinder N. Narula

Enclosures

11073320
041511

# EXHIBIT 5

# Knobbe Martens Olson & Bear LLP

### Intellectual Property Law

2040 Main Street
Fourteenth Floor
Irvine, CA 92614
Tel 949-760-0404
Fax 949-760-9502
www.kmob.com

Rabinder N. Narula
rnarula@kmob.com

May 19, 2011
**VIA FEDERAL EXPRESS**

David Suzuki
President
Bio-Therapeutic, Inc.
2244 1st Ave. S.
Seattle, WA 98134

Re: **Edge Systems' Intellectual Property**
Our Reference: EDGE.064IS

Dear Mr. Suzuki:

I am writing to follow-up on my letter of April 15, 2011 (enclosed). In my letter, I indentified several United States Patents that relate, *inter alia*, to systems and methods of treating skin that comprise an instrument with a working surface for abrading the skin and an opening in the working surface that is coupled to a vacuum source.

As you are probably aware, there can be significant risk to Genesis Bio-Therapeutic and its customers if it chooses to ignore the patent rights of others. For example, under the United States Patent Laws, an infringer is liable for damages in the amount of the patent owner's lost profits, and, in any event, no less than a reasonable royalty. *See* 35 U.S.C. §284. Bio-Therapeutic and/or its customers may also be permanently enjoined from making, using, offering to sell or selling devices covered by the enclosed patent. *See* 35 U.S.C. §283. In patent litigation, the court may additionally require an infringer to pay the attorneys fees expended by the patent owner. *See* 35 U.S.C. §285. These attorneys fees can even exceed the total damages awarded. Bio-Therapeutic may further face the additional risk of enhanced liability and "treble damages" if it knowingly chooses to ignore the patent rights of others.

Accordingly, this matter warrants your immediate attention. If you have forwarded this matter to your patent attorney, please send me his contact information so that I can contact him directly. We look forward to hearing from you within one (1) week.

Best regards,

Rabinder N. Narula

Enclosures

11262421 051811

| San Diego | San Francisco | Los Angeles | Riverside | Seattle | Washington, DC |
|---|---|---|---|---|---|
| 858-707-4000 | 415-954-4114 | 310-551-3450 | 951-781-9231 | 206-405-2000 | 202-640-6400 |

Ex. 5
Page 1 of 1

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA


**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**


This case has been assigned to District Judge John F. Walter and the assigned discovery Magistrate Judge is Alicia G. Rosenberg.

The case number on all documents filed with the Court should read as follows:

## CV11- 4993 JFW (AGRx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.



All discovery related motions should be noticed on the calendar of the Magistrate Judge


=========================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [X] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |


Failure to file at the proper location will result in your documents being returned to you.

Case 2:11-cv-04993-JFW-AGR Document 1 Filed 06/13/11 Page 67 of 69 Page ID #:71

AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

## for the

Central District of California

EDGE SYSTEMS CORPORTION, a
California corporation, and AXIA MEDSCIENCES, LLC,
a Delaware limited liability company,

)
)
)
)
)

*Plaintiff*

v.

BIO-THERAPEUTIC, INC., a Washington
corporation,

*Defendant*

)
)
)
)
)
)

Civil Action No. **CV 11-04993 JFW (AGRx)**

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   BIO-THERAPEUTIC, INC.
2244 1st Avenue S.
Seattle, Washington 98134

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Brenton R. Babcock
2040 Main Street, Suite 1400
Irvine, CA 92614

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date:   JUN 1 3 2011

NANCY

*Signature of Clerk or Deputy Clerk*

1191

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| EDGE SYSTEMS CORPORATION, a California corporation, AXIA MEDSCIENCES, LLC, a Delaware limited liability company, | BIO-THERAPEUTIC, INC., a Washington corporation. |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Brenton R. Babcock (Bar No. 162,120); Kent N. Shum (Bar No. 259,189 ) KNOBBE, MARTENS, OLSON & BEAR, LLP 2040 Main Street, 14th Floor, Irvine, CA 92614; (949) 760-0404 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes   ☑ No   ☐ **MONEY DEMANDED IN COMPLAINT: $** To be determined at trial

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☑ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | REAL PROPERTY | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 210 Land Condemnation | IMMIGRATION | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 462 Naturalization Application | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | ☐ 463 Habeas Corpus-Alien Detainee | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 465 Other Immigration Actions | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | ☐ 290 All Other Real Property | | | |

**FOR OFFICE USE ONLY:** Case Number: _____ **CV 11-04993 JFW (AGRx)**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

| CV-71 (05/08) | CIVIL COVER SHEET | Page 1 of 2 |
|---|---|---|

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| King County | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

* **Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____ Date ___6/13/11___

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# EXHIBIT F

Case 2:20-cv-09669-FLA-PVC   Document 41   Filed 06/25/21   Page 125 of 380   Page ID
#:733
Case 2:14-cv-04428   Document 1   Filed 06/09/14   Page 1 of 13   Page ID #:1

Brenton R. Babcock (SBN 162,120)
brent.babcock@knobbe.com
Rustin Mangum (SBN 280,109)
rustin.mangum@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA  92614
Telephone:  949-760-0404
Facsimile:  949-760-9502

Attorneys for Plaintiffs
EDGE SYSTEMS LLC and
AXIA MEDSCIENCES, LLC

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| EDGE SYSTEMS LLC, a California limited liability company, and AXIA MEDSCIENCES, LLC, a Delaware limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>IMAGEMICRODERM, INC., a Nevada corporation,<br><br>Defendant. | ) Case No.: 2:14-CV-04428<br>)<br>)<br>)<br>)<br>) **COMPLAINT FOR PATENT**<br>) **INFRINGEMENT**<br>)<br>)<br>) **DEMAND FOR JURY TRIAL**<br>)<br>)<br>)<br>)<br>) |

Plaintiffs Edge Systems LLC ("Edge") and Axia MedSciences, LLC ("Axia"), for their Complaint against Defendant Image MicroDerm, Inc. ("IMD"), hereby allege as follows:

## PARTIES

1. Edge is a California limited liability company having a principal place of business at 2277 Redondo Avenue, Signal Hill, California, 90755.

2. Edge manufactures spa and skin treatment products, including Edge's HydraFacial™ hydradermabrasion systems and Delphia™ microdermabrasion systems, and sells and distributes them throughout the United States, including in this Judicial District.

3. Axia is a Delaware limited liability company having a principal place of business at 23 Hallmark Circle, Menlo Park, California, 94025.

4. Axia is the owner of the patents at issue in this case, and Edge is the exclusive licensee of those patents.

5. Upon information and belief, IMD is a Nevada corporation having a principal place of business at 632 W. Elk Ave. Glendale, California, 91204.

## JURISDICTION AND VENUE

6. This action arises under the Patent Laws of the United States, 35 U.S.C. §§ 100, *et seq.*

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

8. Upon information and belief, IMD conducts business throughout the United States, including in this Judicial District, and has committed the acts complained of in this Judicial District and elsewhere.

9. This Court has personal jurisdiction over IMD by virtue of its systematic and continuous contacts with California and by virtue of its actions

/ / /

-1-

in California, including in this Judicial District, constituting infringement of the patents in suit.

10.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), (c) and 1400(b), and by Plaintiffs' choice of venue.

## FIRST CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 6,299,620

11.     Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-10 above.

12.     On October 9, 2001, U.S. Patent No. 6,299,620 ("the '620 Patent"), entitled "INSTRUMENTS AND TECHNIQUES FOR INDUCING NEOCOLLAGENESIS IN SKIN TREATMENTS," was duly and legally issued by the United States Patent and Trademark Office.  A copy of the '620 Patent is attached hereto as Exhibit 1.

13.     Edge is the exclusive licensee of the '620 Patent.

14.     Edge has provided proper and sufficient notice to the public that its products are patented under the '620 Patent by marking its products with an Internet address that lists the patent number.

15.     Upon information and belief, IMD manufactures, distributes, imports, offers to sell, and/or sells in the United States certain products that infringe the '620 Patent, including but not limited to the HPF 3000 HydroFusion Portapeel MD product and/or system.

16.     Upon information and belief, IMD has contributed to the infringement of the '620 Patent by others, through IMD's activities relating to its HPF 3000 HydroFusion Portapeel MD product and/or system.

17.     Upon information and belief, IMD has induced infringement of the '620 Patent by others, through IMD's activities relating to its HPF 3000 HydroFusion Portapeel MD product and/or system.

/ / /

18.     Each of IMD's infringing activities is without the consent of, authority of, or license from Edge.

19.     On April 8, 2014 Edge's President sent a cease and desist letter to IMD informing them of Edge's rights to the '620 Patent and that IMD's activities relating to the HPF 3000 HydroFusion Portapeel MD product infringed the '620 Patent. A copy of that letter is attached hereto as Exhibit 7.

20.     On April 14, 2014, Edge received a response from IMD, through counsel, which requested additional information regarding the infringement of Edge's patents. A copy of that letter is attached hereto as Exhibit 8.

21.     Edge's attorney sent a letter, dated April 25, to IMD providing the requested information regarding infringement of the '620 Patent. IMD did not respond to this letter. A copy of that letter is attached hereto as Exhibit 9.

22.     IMD's acts of infringement have caused damage to Edge in an amount to be determined at trial.

23.     IMD's infringement of the '620 Patent is causing irreparable harm to Edge, for which there is no adequate remedy at law. IMD's infringement will continue, and will continue to cause irreparable harm to Edge, unless IMD's infringement is enjoined by this Court.

24.     Upon information and belief, IMD's infringement of the '620 Patent was and is willful and deliberate, entitling Plaintiffs to enhanced damages under 35 U.S.C. § 284 and attorneys' fees and non-taxable costs under 35 U.S.C. § 285.

## SECOND CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 6,641,591

25.     Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-24 above.

26.     On November 4, 2003, U.S. Patent No. 6,641,591 ("the '591 Patent"), entitled "INSTRUMENTS AND TECHNIQUES FOR

Case 2:20-cv-09669-FLA-PVC Document 41 Filed 06/25/21 Page 129 of 380 Page ID
Case 2:14-cv-05426-PVC Document 1 Filed 06/09/14 Page 5 of 13 Page ID #:5
#:737

CONTROLLED REMOVAL OF EPIDERMAL LAYERS," was duly and legally issued by the United States Patent and Trademark Office. A copy of the '591 Patent is attached hereto as Exhibit 2.

27. Edge is the exclusive licensee of the '591 Patent.

28. Edge has provided proper and sufficient notice to the public that its products are patented under the '591 Patent by marking its products with an Internet address that lists the patent number.

29. Upon information and belief, IMD manufactures, distributes, imports, offers to sell, and/or sells in the United States certain products that infringe the '591 Patent, including but not limited to the HPF 3000 HydroFusion Portapeel MD product and/or system.

30. Upon information and belief, IMD has contributed to the infringement of the '591 Patent by others, through IMD's activities relating to its HPF 3000 HydroFusion Portapeel MD product and/or system.

31. Upon information and belief, IMD has induced infringement of the '591 Patent by others, through IMD's activities relating to its HPF 3000 HydroFusion Portapeel MD product and/or system.

32. Each of IMD's infringing activities is without the consent of, authority of, or license from Edge.

33. On April 8, 2014 Edge's President sent a cease and desist letter to IMD informing them of Edge's rights to the '591 Patent and that IMD's activities relating to the HPF 3000 HydroFusion Portapeel MD product infringed the '591 Patent. A copy of that letter is attached hereto as Exhibit 7.

34. On April 14, 2014, Edge received a response from IMD, through counsel, which requested additional information regarding the infringement of Edge's patents. A copy of that letter is attached hereto as Exhibit 8.

/ / /

/ / /

Case 2:20-cv-09669-FLA-PVC Document 41 Filed 06/25/21 Page 130 of 380 Page ID
Case 2:14-cv-04428-PVC Document 1 Filed 06/09/14 Page 6 of 13 Page ID
#:738

35.     Edge's attorney sent a letter, dated April 25, to IMD providing the requested information regarding infringement of the '591 Patent. IMD did not respond to this letter. A copy of that letter is attached hereto as Exhibit 9.

36.     IMD's acts of infringement have caused damage to Edge in an amount to be determined at trial.

37.     IMD's infringement of the '591 Patent is causing irreparable harm to Edge, for which there is no adequate remedy at law. IMD's infringement will continue, and will continue to cause irreparable harm to Edge, unless IMD's infringement is enjoined by this Court.

38.     Upon information and belief, IMD's infringement of the '591 Patent was and is willful and deliberate, entitling Plaintiffs to enhanced damages under 35 U.S.C. § 284 and attorneys' fees and non-taxable costs under 35 U.S.C. § 285.

## **THIRD CLAIM FOR RELIEF**
## **INFRINGEMENT OF U.S. PATENT NO. 7,678,120**

39.     Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-38 above.

40.     On March 16, 2010, U.S. Patent No. 7,678,120 ("the '120 Patent"), entitled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS," was duly and legally issued by the United States Patent and Trademark Office. A copy of the '120 Patent is attached hereto as Exhibit 3.

41.     Edge is the exclusive licensee of the '120 Patent.

42.     Edge has provided proper and sufficient notice to the public that its products are patented under the '120 Patent by marking its products with an Internet address that lists the patent number.

43.     Upon information and belief, IMD manufactures, distributes, imports, offers to sell, and/or sells in the United States certain products that

infringe the '120 Patent, including but not limited to the HPF 3000 HydroFusion Portapeel MD and the Imagederm Diamantech products and/or systems.

44.     Upon information and belief, IMD has contributed to the infringement of the '120 Patent by others, through IMD's activities relating to its HPF 3000 HydroFusion Portapeel MD and Imagederm Diamantech products and/or systems.

45.     Upon information and belief, IMD has induced infringement of the '120 Patent by others, through IMD's activities relating to its HPF 3000 HydroFusion Portapeel MD and Imagederm Diamantech products and/or systems.

46.     Each of IMD's infringing activities is without the consent of, authority of, or license from Edge.

47.     On April 8, 2014 Edge's President sent a cease and desist letter to IMD informing them of Edge's rights to the '120 Patent and that IMD's activities relating to the HPF 3000 HydroFusion Portapeel MD product infringed the '120 Patent.  A copy of that letter is attached hereto as Exhibit 7.

48.     On April 14, 2014, Edge received a response from IMD, through counsel, which requested additional information regarding the infringement of Edge's patents.  A copy of that letter is attached hereto as Exhibit 8.

49.     Edge's attorney sent a letter, dated April 25, to IMD providing the requested information regarding infringement of the '120 Patent.  IMD did not respond to this letter.  A copy of that letter is attached hereto as Exhibit 9.

50.     IMD's acts of infringement have caused damage to Edge in an amount to be determined at trial.

51.     IMD's infringement of the '120 Patent is causing irreparable harm to Edge, for which there is no adequate remedy at law.  IMD's infringement will continue, and will continue to cause irreparable harm to Edge, unless IMD's infringement is enjoined by this Court.

52.     Upon information and belief, IMD's infringement of the '120 Patent was and is willful and deliberate, entitling Plaintiffs to enhanced damages under 35 U.S.C. § 284 and attorneys' fees and non-taxable costs under 35 U.S.C. § 285.

**FOURTH CLAIM FOR RELIEF**

**INFRINGEMENT OF U.S. PATENT NO. 7,789,886**

53.     Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-52 above.

54.     On September 7, 2010, U.S. Patent No. 7,789,886 ("the '886 Patent"), entitled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS," was duly and legally issued by the United States Patent and Trademark Office.  A copy of the '886 Patent is attached hereto as Exhibit 4.

55.     Edge is the exclusive licensee of the '886 Patent.

56.     Edge has provided proper and sufficient notice to the public that its products are patented under the '886 Patent by marking its products with an Internet address that lists the patent number.

57.     Upon information and belief, IMD manufactures, distributes, imports, offers to sell, and/or sells in the United States certain products that infringe the '886 Patent, including but not limited to the HPF 3000 HydroFusion Portapeel MD and the Imagederm Diamantech products and/or systems.

58.     Upon information and belief, IMD has contributed to the infringement of the '886 Patent by others, through IMD's activities relating to its HPF 3000 HydroFusion Portapeel MD and Imagederm Diamantech products and/or systems.

59.     Upon information and belief, IMD has induced infringement of the '886 Patent by others, through IMD's activities relating to its HPF 3000

/ / /

HydroFusion Portapeel MD and Imagederm Diamantech products and/or systems.

60.     Each of IMD's infringing activities is without the consent of, authority of, or license from Edge.

61.     On April 8, 2014 Edge's President sent a cease and desist letter to IMD informing them of Edge's rights to the '886 Patent and that IMD's activities relating to the HPF 3000 HydroFusion Portapeel MD product infringed the '886 Patent.  A copy of that letter is attached hereto as Exhibit 7.

62.     On April 14, 2014, Edge received a response from IMD, through counsel, which requested additional information regarding the infringement of Edge's patents.  A copy of that letter is attached hereto as Exhibit 8.

63.     Edge's attorney sent a letter, dated April 25, to IMD providing the requested information regarding infringement of the '886 Patent.  IMD did not respond to this letter.  A copy of that letter is attached hereto as Exhibit 9.

64.     IMD's acts of infringement have caused damage to Edge in an amount to be determined at trial.

65.     IMD's infringement of the '886 Patent is causing irreparable harm to Edge, for which there is no adequate remedy at law.  IMD's infringement will continue, and will continue to cause irreparable harm to Edge, unless IMD's infringement is enjoined by this Court.

66.     Upon information and belief, IMD's infringement of the '886 Patent was and is willful and deliberate, entitling Plaintiffs to enhanced damages under 35 U.S.C. § 284 and attorneys' fees and non-taxable costs under 35 U.S.C. § 285.

## FIFTH CLAIM FOR RELIEF
## INFRINGEMENT OF U.S. PATENT NO. 8,066,716

67.     Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-66 above.

68. On November 29, 2011, U.S. Patent No. 8,066,716 ("the '716 Patent"), entitled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS," was duly and legally issued by the United States Patent and Trademark Office. A copy of the '716 Patent is attached hereto as Exhibit 5.

69. Edge is the exclusive licensee of the '716 Patent.

70. Edge has provided proper and sufficient notice to the public that its products are patented under the '716 Patent by marking its products with an Internet address that lists the patent number.

71. Upon information and belief, IMD manufactures, distributes, imports, offers to sell, and/or sells in the United States certain products that infringe the '716 Patent, including but not limited to the HPF 3000 HydroFusion Portapeel MD and the Imagederm Diamantech products and/or systems.

72. Upon information and belief, IMD has contributed to the infringement of the '716 Patent by others, through IMD's activities relating to its HPF 3000 HydroFusion Portapeel MD and Imagederm Diamantech products and/or systems.

73. Upon information and belief, IMD has induced infringement of the '716 Patent by others, through IMD's activities relating to its HPF 3000 HydroFusion Portapeel MD and Imagederm Diamantech products and/or systems.

74. Each of IMD's infringing activities is without the consent of, authority of, or license from Edge.

75. On April 8, 2014 Edge's President sent a cease and desist letter to IMD informing them of Edge's rights to the '716 Patent and that IMD's activities relating to the HPF 3000 HydroFusion Portapeel MD product infringed the '716 Patent. A copy of that letter is attached hereto as Exhibit 7.

/ / /

76. On April 14, 2014, Edge received a response from IMD, through counsel, which requested additional information regarding the infringement of Edge's patents. A copy of that letter is attached hereto as Exhibit 8.

77. Edge's attorney sent a letter, dated April 25, to IMD providing the requested information regarding infringement of the '716 Patent. IMD did not respond to this letter. A copy of that letter is attached hereto as Exhibit 9.

78. IMD's acts of infringement have caused damage to Edge in an amount to be determined at trial.

79. IMD's infringement of the '716 Patent is causing irreparable harm to Edge, for which there is no adequate remedy at law. IMD's infringement will continue, and will continue to cause irreparable harm to Edge, unless IMD's infringement is enjoined by this Court.

80. Upon information and belief, IMD's infringement of the '716 Patent was and is willful and deliberate, entitling Plaintiffs to enhanced damages under 35 U.S.C. § 284 and attorneys' fees and non-taxable costs under 35 U.S.C. § 285.

## SIXTH CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 8,337,513

81. Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-80 above.

82. On December 25, 2012, U.S. Patent No. 8,337,513 ("the '513 Patent"), entitled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS," was duly and legally issued by the United States Patent and Trademark Office. A copy of the '513 Patent is attached hereto as Exhibit 6.

83. Edge is the exclusive licensee of the '513 Patent.

/ / /

/ / /

Case 2:20-cv-09669-FLA-PVC   Document 41   Filed 06/25/21   Page 136 of 380   Page ID
Case 2:14-cv-04428-FOS-PLA   Document 1   Filed 06/09/14   Page 12 of 13   Page ID #:22
#:744

84. Edge has provided proper and sufficient notice to the public that its products are patented under the '513 Patent by marking its products with an Internet address that lists the patent number.

85. Upon information and belief, IMD manufactures, distributes, imports, offers to sell, and/or sells in the United States certain products that infringe the '513 Patent, including but not limited to the HPF 3000 HydroFusion Portapeel MD and the Imagederm Diamantech products and/or systems.

86. Upon information and belief, IMD has contributed to the infringement of the '513 Patent by others, through IMD's activities relating to its HPF 3000 HydroFusion Portapeel MD and Imagederm Diamantech products and/or systems.

87. Upon information and belief, IMD has induced infringement of the '513 Patent by others, through IMD's activities relating to its HPF 3000 HydroFusion Portapeel MD and Imagederm Diamantech products and/or systems.

88. Each of IMD's infringing activities is without the consent of, authority of, or license from Edge.

89. On April 8, 2014 Edge's President sent a cease and desist letter to IMD informing them of Edge's rights to the '513 Patent and that IMD's activities relating to the HPF 3000 HydroFusion Portapeel MD product infringed the '513 Patent. A copy of that letter is attached hereto as Exhibit 7.

90. IMD's acts of infringement have caused damage to Edge in an amount to be determined at trial.

91. IMD's infringement of the '513 Patent is causing irreparable harm to Edge, for which there is no adequate remedy at law. IMD's infringement will continue, and will continue to cause irreparable harm to Edge, unless IMD's infringement is enjoined by this Court.

/ / /

92.     Upon information and belief, IMD's infringement of the '513 Patent was and is willful and deliberate, entitling Plaintiffs to enhanced damages under 35 U.S.C. § 284 and attorneys' fees and non-taxable costs under 35 U.S.C. § 285.

### DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs pray for judgment and seek relief as follows:

A.     That the Court enter judgment in favor of Plaintiffs and against IMD on all claims for relief alleged herein;

B.     A judgment that IMD has infringed U.S. Patent Nos. 6,299,620, 6,641,591, 7,678,120, 7,789,886, 8,066,716 and 8,337,513;

C.     Preliminary and permanent injunctions against further infringement by IMD of U.S. Patent Nos. 6,299,620, 6,641,591, 7,678,120, 7,789,886, 8,066,716, and 8,337,513 including injunctions against direct infringement, contributory infringement, and induced infringement;

D.     An award of damages for IMD's infringement of U.S. Patent Nos. 6,299,620, 6,641,591, 7,678,120, 7,789,886, 8,066,716 and 8,337,513;

E.     A declaration that IMD's infringement of U.S. Patent Nos. 6,299,620, 6,641,591, 7,678,120, 7,789,886, 8,066,716 and 8,337,513 was and is willful, and that this is an exceptional case under 35 U.S.C. § 285;

F.     A trebling of the award of damages under 35 U.S.C. § 284, or such other enhancement of the award of damages that the Court deems appropriate;

G.     An award of attorneys' fees and non-taxable costs under 35 U.S.C. § 285 on account of IMD's willful infringement;

/ / /

/ / /

/ / /

/ / /

/ / /

H.     An award of taxable costs; and

I.     Such other and further relief as this Court may deem just and proper.

Respectfully Submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: June 9, 2014          By: _/s/ Brenton R. Babcock_____
Brenton R. Babcock
Rustin Mangum
Attorneys for Plaintiffs
EDGE SYSTEMS LLC and
AXIA MEDSCIENCES, LLC

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury on all issues so triable.


Respectfully Submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP


Dated: June 9, 2014                    By: _/s/ Brenton R. Babcock_
Brenton R. Babcock
Rustin Mangum
Attorneys for Plaintiffs
EDGE SYSTEMS LLC and
AXIA MEDSCIENCES, LLC

# EXHIBIT G

Case 2:20-cv-09669-FLA-PVC Document 41 Filed 06/25/21 Page 141 of 380 Page ID
Case 2:14-cv-04663-PVC Document 1 Filed 06/17/14 Page 1 of 20 Page ID #:1
#:749

Brenton R. Babcock (SBN 162,120)
brent.babcock@knobbe.com
Ali S. Razai (SBN 246,922)
ali.razai@knobbe.com
Rustin Mangum (SBN 280,109)
rustin.mangum@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA 92614
Telephone: 949-760-0404
Facsimile: 949-760-9502

Attorneys for Plaintiffs
EDGE SYSTEMS LLC and
AXIA MEDSCIENCES, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| EDGE SYSTEMS LLC, a California limited liability company, and AXIA MEDSCIENCES, LLC, a Delaware limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>NAUMKEAG SPA & MEDICAL SUPPLIES, LLC, a Massachusetts limited liability company,<br><br>Defendant. | ) Case No.: 2:14-CV-04663<br>)<br>)<br>)<br>)<br>)<br>)<br>) **COMPLAINT FOR PATENT**<br>) **INFRINGEMENT, TRADEMARK**<br>) **INFRINGEMENT, FALSE**<br>) **DESIGNATION OF ORIGIN AND**<br>) **UNFAIR COMPETITION**<br>)<br>)<br>) **DEMAND FOR JURY TRIAL**<br>)<br>)<br>) |

Case 2:20-cv-09669-FLA-PVC Document 1 Filed 06/25/21 Page 142 of 380 Page ID
Case 2:14-cv-04663-PVC Document 1 Filed 06/17/14 Page 2 of 42 Page ID #:2
#:750

Plaintiffs Edge Systems LLC ("Edge") and Axia MedSciences, LLC ("Axia") (collectively, "Plaintiffs"), for their Complaint against Defendant Naumkeag Spa & Medical Supplies, LLC ("Naumkeag"), hereby allege as follows:

## **PARTIES**

1.      Edge is a California limited liability company having a principal place of business at 2277 Redondo Avenue, Signal Hill, California, 90755.

2.      Edge manufactures spa and skin treatment products, including Edge's *HYDRAFACIAL*® hydradermabrasion systems, and sells and distributes them throughout the United States, including in this Judicial District.

3.      Axia is a Delaware limited liability company having a principal place of business at 23 Hallmark Circle, Menlo Park, California, 94025.

4.      Axia is the owner of the patents at issue in this case, and Edge is the exclusive licensee of those patents.

5.      Upon information and belief, Naumkeag is a Massachusetts limited liability company having a principal place of business at 22 Tower Park Drive, Woburn, Massachusetts 01801.

## **JURISDICTION AND VENUE**

6.      This Court has original subject matter jurisdiction over the claims in this action that relate to patent infringement, trademark infringement, false designation of origin, trademark dilution, and unfair competition pursuant to 35 U.S.C. § 271, 15 U.S.C. §§ 1114 and 1125, 15 U.S.C. §§ 1116(a) and 1121(a), and 28 U.S.C. §§ 1331 and 1338, as Plaintiffs' claims arises under the laws of the United States.

7.      Upon information and belief, Naumkeag conducts business throughout the United States, including in this Judicial District.

8.      This Court has personal jurisdiction over Naumkeag because Naumkeag has a continuous, systematic, and substantial presence within this

judicial district including by selling and offering for sale products for sale in this judicial district and selling into the stream of commerce knowing such products would be sold in this state and this district.

9. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391 and 1400(b), and by Plaintiffs' choice of venue.

## FIRST CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 6,299,620

(35 U.S.C. § 271)

10. Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-9 above.

11. This is a claim for patent infringement under 35 U.S.C. § 271.

12. On October 9, 2001, U.S. Patent No. 6,299,620 ("the '620 Patent"), entitled "INSTRUMENTS AND TECHNIQUES FOR INDUCING NEOCOLLAGENESIS IN SKIN TREATMENTS," was duly and legally issued by the United States Patent and Trademark Office. A copy of the '620 Patent is attached hereto as Exhibit 1.

13. Edge is the exclusive licensee of the '620 Patent.

14. Edge has provided proper and sufficient notice to the public that its products are patented under the '620 Patent by marking its products with an Internet address that lists the patent number.

15. Upon information and belief, Naumkeag owns and operates the website www.gotoessentials.com and manufactures, distributes, imports, offers to sell, and/or sells in the United States certain products that infringe the '620 Patent, including but not limited to the Essentials Hydro-Facial Machine product and/or system.

16. Upon information and belief, Naumkeag has contributed to the infringement of the '620 Patent by others, through Naumkeag's activities relating to its Essentials Hydro-Facial Machine product and/or system.

17. Upon information and belief, Naumkeag has induced infringement of the '620 Patent by others, through Naumkeag's activities relating to its Essentials Hydro-Facial Machine product and/or system.

18. Each of Naumkeag's infringing activities is without the consent of, authority of, or license from Edge or Axia.

19. Naumkeag's acts of infringement have caused damage to Plaintiffs in an amount to be determined at trial. Pursuant to 35 U.S.C. § 284, Plaintiffs are entitled to damages for Naumkeag's infringing acts.

20. Naumkeag's infringement of the '620 Patent is causing irreparable harm to Plaintiffs, for which there is no adequate remedy at law. Naumkeag's infringement will continue, and will continue to cause irreparable harm to Edge, unless Naumkeag's infringement is enjoined by this Court.

21. At least one member of Naumkeag was a past distributor of Edge's products and, upon information and belief, Naumkeag is intimately familiar with Edge's product line, trademarks, and patents at issue in this litigation.

22. Upon information and belief, Naumkeag's infringement of the '620 Patent was and is willful and deliberate, entitling Plaintiffs to enhanced damages under 35 U.S.C. § 284 and attorneys' fees and non-taxable costs under 35 U.S.C. § 285. Naumkeag had knowledge of the '620 Patent and infringed the '620 Patent with reckless disregard of Plaintiffs' patent rights. Naumkeag knew, or it was so obvious that Naumkeag should have known, that its actions constituted infringement of the '620 Patent. Naumkeag's acts of infringement of the '620 Patent were not consistent with the standards for its industry.

/ / /

/ / /

/ / /

/ / /

Case 2:20-cv-08669-FLA-PVC Document 41 Filed 06/25/21 Page 145 of 380 Page ID
Case 2:14-cv-04603-PVC Document 1 Filed 06/17/14 Page 5 of 20 Page ID #:5
#:753

## SECOND CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 6,641,591

(35 U.S.C. § 271)

23.     Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-22 above.

24.     This is a claim for patent infringement under 35 U.S.C. § 271.

25.     On November 4, 2003, U.S. Patent No. 6,641,591 ("the '591 Patent"), entitled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS," was duly and legally issued by the United States Patent and Trademark Office.  A copy of the '591 Patent is attached hereto as Exhibit 2.

26.     Edge is the exclusive licensee of the '591 Patent.

27.     Edge has provided proper and sufficient notice to the public that its products are patented under the '591 Patent by marking its products with an Internet address that lists the patent number.

28.     Upon information and belief, Naumkeag manufactures, distributes, imports, offers to sell, and/or sells in the United States certain products that infringe the '591 Patent, including but not limited to the Essentials Hydro-Facial Machine product and/or system.

29.     Upon information and belief, Naumkeag has contributed to the infringement of the '591 Patent by others, through Naumkeag's activities relating to its Essentials Hydro-Facial Machine product and/or system.

30.     Upon information and belief, Naumkeag has induced infringement of the '591 Patent by others, through Naumkeag's activities relating to its Essentials Hydro-Facial Machine product and/or system.

31.     Each of Naumkeag's infringing activities is without the consent of, authority of, or license from Edge or Axia.

/ / /

32. Naumkeag's acts of infringement have caused damage to Plaintiffs in an amount to be determined at trial. Pursuant to 35 U.S.C. § 284, Plaintiffs are entitled to damages for Naumkeag's infringing acts.

33. Naumkeag's infringement of the '591 Patent is causing irreparable harm to Plaintiffs, for which there is no adequate remedy at law. Naumkeag's infringement will continue, and will continue to cause irreparable harm to Edge, unless Naumkeag's infringement is enjoined by this Court.

34. Upon information and belief, Naumkeag's infringement of the '591 Patent was and is willful and deliberate, entitling Plaintiffs to enhanced damages under 35 U.S.C. § 284 and attorneys' fees and non-taxable costs under 35 U.S.C. § 285. Naumkeag had knowledge of the '591 Patent and infringed the '591 Patent with reckless disregard of Plaintiffs' patent rights. Naumkeag knew, or it was so obvious that Naumkeag should have known, that its actions constituted infringement of the '591 Patent. Naumkeag's acts of infringement of the '591 Patent were not consistent with the standards for its industry.

## THIRD CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 7,678,120

(35 U.S.C. § 271)

35. Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-34 above.

36. This is a claim for patent infringement under 35 U.S.C. § 271.

37. On March 16, 2010, U.S. Patent No. 7,678,120 ("the '120 Patent"), entitled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS," was duly and legally issued by the United States Patent and Trademark Office. A copy of the '120 Patent is attached hereto as Exhibit 3.

38. Edge is the exclusive licensee of the '120 Patent.

/ / /

39.     Edge has provided proper and sufficient notice to the public that its products are patented under the '120 Patent by marking its products with an Internet address that lists the patent number.

40.     Upon information and belief, Naumkeag manufactures, distributes, imports, offers to sell, and/or sells in the United States certain products that infringe the '120 Patent, including but not limited to the Essentials Hydro-Facial Machine product and/or system.

41.     Upon information and belief, Naumkeag has contributed to the infringement of the '120 Patent by others, through Naumkeag's activities relating to its Essentials Hydro-Facial Machine product and/or system.

42.     Upon information and belief, Naumkeag has induced infringement of the '120 Patent by others, through Naumkeag's activities relating to its Essentials Hydro-Facial Machine product and/or system.

43.     Each of Naumkeag's infringing activities is without the consent of, authority of, or license from Edge or Axia.

44.     Naumkeag's acts of infringement have caused damage to Plaintiffs in an amount to be determined at trial.  Pursuant to 35 U.S.C. § 284, Plaintiffs are entitled to damages for Naumkeag's infringing acts.

45.     Naumkeag's infringement of the '120 Patent is causing irreparable harm to Plaintiffs, for which there is no adequate remedy at law. Naumkeag's infringement will continue, and will continue to cause irreparable harm to Edge, unless Naumkeag's infringement is enjoined by this Court.

46.     Upon information and belief, Naumkeag's infringement of the '120 Patent was and is willful and deliberate, entitling Plaintiffs to enhanced damages under 35 U.S.C. § 284 and attorneys' fees and non-taxable costs under 35 U.S.C. § 285.  Naumkeag had knowledge of the '120 Patent and infringed the '120 Patent with reckless disregard of Plaintiffs' patent rights.  Naumkeag knew, or it was so obvious that Naumkeag should have known, that its actions

constituted infringement of the '120 Patent. Naumkeag's acts of infringement of the '120 Patent were not consistent with the standards for its industry.

**FOURTH CLAIM FOR RELIEF**

**INFRINGEMENT OF U.S. PATENT NO. 7,789,886**

(35 U.S.C. § 271)

47.     Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-46 above.

48.     This is a claim for patent infringement under 35 U.S.C. § 271.

49.     On September 7, 2010, U.S. Patent No. 7,789,886 ("the '886 Patent"), entitled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS," was duly and legally issued by the United States Patent and Trademark Office. A copy of the '886 Patent is attached hereto as Exhibit 4.

50.     Edge is the exclusive licensee of the '886 Patent.

51.     Edge has provided proper and sufficient notice to the public that its products are patented under the '886 Patent by marking its products with an Internet address that lists the patent number.

52.     Upon information and belief, Naumkeag manufactures, distributes, imports, offers to sell, and/or sells in the United States certain products that infringe the '886 Patent, including but not limited to the Essentials Hydro-Facial Machine product and/or system.

53.     Upon information and belief, Naumkeag has contributed to the infringement of the '886 Patent by others, through Naumkeag's activities relating to its Essentials Hydro-Facial Machine product and/or system.

54.     Upon information and belief, Naumkeag has induced infringement of the '886 Patent by others, through Naumkeag's activities relating to its Essentials Hydro-Facial Machine product and/or system.

/ / /

55.     Each of Naumkeag's infringing activities is without the consent of, authority of, or license from Edge or Axia.

56.     Naumkeag's acts of infringement have caused damage to Plaintiffs in an amount to be determined at trial.  Pursuant to 35 U.S.C. § 284, Plaintiffs are entitled to damages for Naumkeag's infringing acts.

57.     Naumkeag's infringement of the '886 Patent is causing irreparable harm to Plaintiffs, for which there is no adequate remedy at law.  Naumkeag's infringement will continue, and will continue to cause irreparable harm to Edge, unless Naumkeag's infringement is enjoined by this Court.

58.     Upon information and belief, Naumkeag's infringement of the '886 Patent was and is willful and deliberate, entitling Plaintiffs to enhanced damages under 35 U.S.C. § 284 and attorneys' fees and non-taxable costs under 35 U.S.C. § 285.  Naumkeag had knowledge of the '886 Patent and infringed the '886 Patent with reckless disregard of Plaintiffs' patent rights.  Naumkeag knew, or it was so obvious that Naumkeag should have known, that its actions constituted infringement of the '886 Patent.  Naumkeag's acts of infringement of the '886 Patent were not consistent with the standards for its industry.

## FIFTH CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 8,066,716

59.     Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-58 above.

60.     This is a claim for patent infringement under 35 U.S.C. § 271.

61.     On November 29, 2011, U.S. Patent No. 8,066,716 ("the '716 Patent"), entitled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS," was duly and legally issued by the United States Patent and Trademark Office.  A copy of the '716 Patent is attached hereto as Exhibit 5.

62.     Edge is the exclusive licensee of the '716 Patent.

63.     Edge has provided proper and sufficient notice to the public that its products are patented under the '716 Patent by marking its products with an Internet address that lists the patent number.

64.     Upon information and belief, Naumkeag manufactures, distributes, imports, offers to sell, and/or sells in the United States certain products that infringe the '716 Patent, including but not limited to the Essentials Hydro-Facial Machine product and/or system.

65.     Upon information and belief, Naumkeag has contributed to the infringement of the '716 Patent by others, through Naumkeag's activities relating to its Essentials Hydro-Facial Machine product and/or system.

66.     Upon information and belief, Naumkeag has induced infringement of the '716 Patent by others, through Naumkeag's activities relating to its Essentials Hydro-Facial Machine product and/or system.

67.     Each of Naumkeag's infringing activities is without the consent of, authority of, or license from Edge or Axia.

68.     Naumkeag's acts of infringement have caused damage to Plaintiffs in an amount to be determined at trial.  Pursuant to 35 U.S.C. § 284, Plaintiffs are entitled to damages for Naumkeag's infringing acts.

69.     Naumkeag's infringement of the '716 Patent is causing irreparable harm to Plaintiffs, for which there is no adequate remedy at law. Naumkeag's infringement will continue, and will continue to cause irreparable harm to Edge, unless Naumkeag's infringement is enjoined by this Court.

70.     Upon information and belief, Naumkeag's infringement of the '716 Patent was and is willful and deliberate, entitling Plaintiffs to enhanced damages under 35 U.S.C. § 284 and attorneys' fees and non-taxable costs under 35 U.S.C. § 285.  Naumkeag had knowledge of the '716 Patent and infringed the '716 Patent with reckless disregard of Plaintiffs' patent rights.  Naumkeag knew, or it was so obvious that Naumkeag should have known, that its actions

constituted infringement of the '716 Patent. Naumkeag's acts of infringement of the '716 Patent were not consistent with the standards for its industry.

<u>**SIXTH CLAIM FOR RELIEF**</u>

<u>**INFRINGEMENT OF U.S. PATENT NO. 8,337,513**</u>

(35 U.S.C. § 271)

71.     Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-70 above.

72.     This is a claim for patent infringement under 35 U.S.C. § 271.

73.     On December 25, 2012, U.S. Patent No. 8,337,513 ("the '513 Patent"), entitled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS," was duly and legally issued by the United States Patent and Trademark Office. A copy of the '513 Patent is attached hereto as Exhibit 6.

74.     Edge is the exclusive licensee of the '513 Patent.

75.     Edge has provided proper and sufficient notice to the public that its products are patented under the '513 Patent by marking its products with an Internet address that lists the patent number.

76.     Upon information and belief, Naumkeag manufactures, distributes, imports, offers to sell, and/or sells in the United States certain products that infringe the '513 Patent, including but not limited to the Essentials Hydro-Facial Machine product and/or system.

77.     Upon information and belief, Naumkeag has contributed to the infringement of the '513 Patent by others, through Naumkeag's activities relating to its Essentials Hydro-Facial Machine product and/or system.

78.     Upon information and belief, Naumkeag has induced infringement of the '513 Patent by others, through Naumkeag's activities relating to its Essentials Hydro-Facial Machine product and/or system.

/ / /

79.     Each of Naumkeag's infringing activities is without the consent of, authority of, or license from Edge or Axia.

80.     Naumkeag's acts of infringement have caused damage to Plaintiffs in an amount to be determined at trial.  Pursuant to 35 U.S.C. § 284, Plaintiffs are entitled to damages for Naumkeag's infringing acts.

81.     Naumkeag's infringement of the '513 Patent is causing irreparable harm to Plaintiffs, for which there is no adequate remedy at law.  Naumkeag's infringement will continue, and will continue to cause irreparable harm to Edge, unless Naumkeag's infringement is enjoined by this Court.

82.     Upon information and belief, Naumkeag's infringement of the '513 Patent was and is willful and deliberate, entitling Plaintiffs to enhanced damages under 35 U.S.C. § 284 and attorneys' fees and non-taxable costs under 35 U.S.C. § 285.  Naumkeag had knowledge of the '513 Patent and infringed the '513 Patent with reckless disregard of Plaintiffs' patent rights.  Naumkeag knew, or it was so obvious that Naumkeag should have known, that its actions constituted infringement of the '513 Patent.  Naumkeag's acts of infringement of the '513 Patent were not consistent with the standards for its industry.

## **SEVENTH CLAIM FOR RELIEF**
## **TRADEMARK INFRINGEMENT**
### (15 U.S.C. § 1114)

83.     Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-82 above.

84.     This is a claim for trademark infringement arising under 15 U.S.C. § 1114.

85.     Since at least as early as 2005, Edge has marketed and sold its high quality aesthetic devices and services in connection with the mark *HYDRAFACIAL*® ("the Edge Mark").  Edge's use of the Edge Mark in

/ / /

connection with aesthetic devices and services has been continuous and exclusive since Edge began using the mark.

86.      Edge is the owner of Trademark Registration No. 4,317,059 for the Edge Mark.  Trademark Registration No. 4,317,059 was registered with the U.S.P.T.O. on April 9, 2013 on the Principal Register.  Trademark Registration No. 4,317,059 is associated with the following goods and services: medical spa services, namely, minimally and non-invasive cosmetic and body fitness therapies.  A copy of the certificate of registration of Trademark Registration No. 4,317,059 is attached hereto as Exhibit 7.

87.      Over the years Edge has invested a considerable amount of time and money in establishing the Edge Mark in the minds of consumers as a source of high quality aesthetic devices and services.  As a result of Edge's substantial use and promotion of the Edge Mark in connection with aesthetic and other products and services, the mark has acquired great value as a specific identifier of Edge's products and services and serves to distinguish Edge's products and services from that of others.  Customers in this Judicial District and elsewhere readily recognize the Edge Mark as a distinctive designation of origin of Edge's products and services.  The Edge Mark is an intellectual property asset that has great value as a symbol of Edge's quality products and services and goodwill.

88.      Naumkeag has used in commerce, without Edge's permission, reproductions, copies or colorable imitations of the Edge Mark in connection with distributing, selling, offering for sale, advertising, and/or promoting Naumkeag's products and/or services, including for example Naumkeag's Essentials Hydro-Facial Machine as well as Naumkeag's literature advertising "hydrating infusion 'Hydra Facial' technology."

89.      Without Edge's permission, Naumkeag is reproducing, copying, or colorably imitating the Edge Mark and applying such reproductions, copies or colorable imitations to merchandise, labels, signs, packages, receptacles or

advertisements intended to be used in commerce upon or in connection with the distributing, selling, offering for sale, advertising and/or promoting of goods and/or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

90.     Naumkeag did not begin using its infringing mark in connection with aesthetic products and/or services until long after Edge began using the Edge Mark.

91.     Upon information and belief, Naumkeag's use of its infringing mark is designed to cause confusion, mistake, or deception.

92.     By virtue of the acts complained of herein, Naumkeag has created a likelihood of injury to Edge's business reputation, caused a strong likelihood of consumer confusion, mistake, and deception as to the source of or origin or relationship of Edge and Naumkeag's goods, has caused actual confusion, and has otherwise competed unfairly with Edge by unlawfully trading on and using the Edge Mark without Edge permission or consent.

93.     At no time has Edge ever given Naumkeag license, permission or authority to use or display the Edge Mark.

94.     Upon information and belief, Naumkeag's activities complained of herein constitute willful and intentional infringements of the Edge Mark, and that Naumkeag did so with the intent to unfairly compete against Edge, to trade upon Edge's reputation and goodwill by causing confusion and mistake among customers and the public, and to deceive the public into believing that Naumkeag's products and/or services are associated with, sponsored by, originated from, or are approved by Edge, when in truth and fact they are not.

95.     Upon information and belief, Naumkeag had actual knowledge of Edge's ownership and prior use of the Edge Mark and without the consent of Edge has willfully infringed the Edge Mark in violation of 15 U.S.C. § 1114.

Case 2:20-cv-09669-FLA-PVC Document 41 Filed 06/25/21 Page 155 of 380 Page ID
Case 2:14-cv-04668-FLA-PVC Document 1 Filed 06/17/14 Page 15 of 25 Page ID #:15
#:763

96.     Upon information and belief, Naumkeag has derived and received, and will continue to derive and receive, gains, profits, and advantages from the use of the Edge Mark in an amount that is not presently known to Edge.  By reason of Naumkeag's actions, constituting unauthorized use of the Edge Mark, Edge has been damaged and is entitled to monetary relief in an amount to be determined at trial.

97.     Due to Naumkeag's actions, constituting unauthorized use of the Edge Mark, Edge has suffered and continues to suffer great and irreparable injury, for which Edge has no adequate remedy at law.  Edge will suffer substantial loss of goodwill and reputation unless and until Naumkeag is preliminarily and permanently enjoined from its wrongful actions complained of herein.

### EIGHTH CLAIM FOR RELIEF
### FEDERAL UNFAIR COMPETITION AND
### FALSE DESIGNATION OF ORIGIN

(15 U.S.C. § 1125(a))

98.     Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-97 above.

99.     This is a claim for unfair competition and false designation of origin arising under 15 U.S.C. § 1125(a).

100.     Without Edge's consent, Naumkeag has created and will create a false designation of origin by using in commerce the Edge Mark and/or other marks confusingly similar to the Edge Mark in connection with the distribution, sale, offering for sale, advertising, and/or promotion of Naumkeag's products and/or services, thereby causing a likelihood of confusion, mistake or deception as to an affiliation, connection or association with Edge or to suggest Edge as the origin of the goods and/or services, or that Edge has sponsored or approved Naumkeag's commercial activities.

101.    Upon information and belief, Naumkeag acted with the intent to unfairly compete against Edge, to trade upon Edge's reputation and goodwill by causing confusion and mistake among customers and the public, and to deceive the public into believing that Naumkeag's aesthetic products and/or services are associated with, sponsored by or approved by Edge, when they are not.

102.    Upon information and belief, Naumkeag had knowledge of Edge's ownership and prior use of the Edge Mark, and without the consent of Edge, has willfully committed acts of unfair competition and false designation of origin in violation of 15 U.S.C. § 1125(a).

103.    Upon information and belief, Naumkeag has derived and received, and will continue to derive and receive, gains, profits, and advantages from Naumkeag's false designation of origin, false or misleading statements, descriptions of fact, or false or misleading representations of fact in an amount that is not presently known to Edge.  By reason of Naumkeag's actions, constituting false designation of origin, false or misleading statements, false or misleading descriptions of fact, or false or misleading representations of fact, Edge has been damaged and is entitled to monetary relief in an amount to be determined at trial.

104.    Due to Naumkeag's actions, constituting false designation of origin, false or misleading statements, false or misleading description of fact, or false or misleading representations of fact, Edge has suffered and continues to suffer great and irreparable injury, for which Edge has no adequate remedy at law.

## **DEMAND FOR JUDGMENT**

WHEREFORE, Plaintiffs pray for judgment and seek relief as follows:

A.    That the Court enter judgment in favor of Plaintiffs and against Naumkeag on all claims for relief alleged herein;

/ / /

B. A judgment that Naumkeag has infringed U.S. Patent Nos. 6,299,620, 6,641,591, 7,678,120, 7,789,886, 8,066,716 and 8,337,513;

C. Preliminary and permanent injunctions against further infringement by Naumkeag of U.S. Patent Nos. 6,299,620, 6,641,591, 7,678,120, 7,789,886, 8,066,716, and 8,337,513 including injunctions against direct infringement, contributory infringement, and induced infringement;

D. An award of damages for Naumkeag's infringement of U.S. Patent Nos. 6,299,620, 6,641,591, 7,678,120, 7,789,886, 8,066,716 and 8,337,513;

E. A declaration that Naumkeag's infringement of U.S. Patent Nos. 6,299,620, 6,641,591, 7,678,120, 7,789,886, 8,066,716 and 8,337,513 was and is willful, and that this is an exceptional case under 35 U.S.C. § 285;

F. A trebling of the award of damages under 35 U.S.C. § 284, or such other enhancement of the award of damages that the Court deems appropriate;

G. An award of attorneys' fees and non-taxable costs under 35 U.S.C. § 285 on account of Naumkeag's willful infringement;

H. That the Edge Mark be deemed valid and willfully infringed by Naumkeag in violation of 15 U.S.C. § 1114, *et seq.*;

I. A preliminary and permanent injunction against Naumkeag, its officers, agents, servants, employees, representatives, successors, and assigns, and all persons, firms, or corporations in active concert or participation with Naumkeag, enjoining them from engaging in the following activities and from assisting or inducing, directly or indirectly, others to engage in the following activities:

    1. using to market, advertise, promote, sell, offer for sale, and/or identify Naumkeag's goods and/or services with the Edge Mark or any mark that is confusingly similar to the Edge Mark or is likely to create the erroneous impression

that Naumkeag's goods or services originate from Edge, are endorsed by Edge, or are connected in any way with Edge;

2.   manufacturing, distributing, shipping, importing, reproducing, displaying, advertising, marketing, promoting, transferring, selling, and/or offering to sell any products or services that use the Edge Mark and/or any confusingly similar marks;

3.   otherwise infringing the Edge Mark;

4.   falsely designating the origin of Naumkeag's goods;

5.   unfairly competing with Edge in any manner; or

6.   causing a likelihood of confusion or injuries to Edge's business reputation;

J.   That Naumkeag be directed to file with this Court and serve on Edge within thirty (30) days after the service of the injunction, a report, in writing, under oath, setting forth in detail the manner and form in which Naumkeag has complied with the injunction pursuant to 15 U.S.C. § 1116;

K.   That, because of the exceptional nature of this case resulting from Naumkeag's deliberate infringing actions, this Court award to Edge all reasonable attorneys' fees, costs and disbursements incurred as a result of this action, pursuant to 15 U.S.C. § 1117;

L.   That Naumkeag be required to account for any and all profits derived by its acts of trademark infringement, false designation of origin, and unfair competition complained of in this Complaint;

M.   That Edge be awarded damages for Naumkeag's trademark infringement pursuant to 15 U.S.C. § 1117 in the form of Naumkeag's profits, damages sustained by Edge and the costs of the action, together with prejudgment and post-judgment interest;

/ / /

N.     That Naumkeag's acts of trademark infringement, false designation of origin, and unfair competition complained of in this Complaint be deemed willful, and that Edge be entitled to enhanced damages;

O.     That Plaintiffs have and recover the costs of this civil action, including reasonable attorneys' fees;

P.     An award of pre-judgment and post-judgment interest and costs of this action against Naumkeag;

Q.     An award of taxable costs; and

R.     Such other and further relief as this Court may deem just and proper.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP


Dated: June 17, 2014          By: */s/ Ali S. Razai*
                                   Brenton R. Babcock
                                   Ali S. Razai
                                   Rustin Mangum
                              Attorneys for Plaintiffs
                              EDGE SYSTEMS LLC and
                              AXIA MEDSCIENCES, LLC

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: June 17, 2014    By: _/s/ Ali S. Razai_
                          Brenton R. Babcock
                          Ali S. Razai
                          Rustin Mangum
                          Attorneys for Plaintiffs
                          EDGE SYSTEMS LLC and
                          AXIA MEDSCIENCES, LLC

18225453

# EXHIBIT H

Case 2:20-cv-09669-FLA-PVC Document 41 Filed 06/25/21 Page 162 of 380 Page ID
Case 1:14-cv-24507-KMM Document 1 Entered on FLSD Docket 12/26/2014 Page 1 of 21
#:770

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

## CASE NO. _____

EDGE SYSTEMS LLC,
a California limited liability company,
and AXIA MEDSCIENCES, LLC,
a Delaware limited liability company,

        Plaintiffs,

    v.

Rafael Newton Aguila, a/k/a Ralph Aguila,
an individual, d/b/a Hydradermabrasion Systems,

        Defendant.

_____/

## COMPLAINT

    Plaintiffs Edge Systems LLC ("Edge") and Axia MedSciences, LLC ("Axia")
(collectively, "Plaintiffs"), for their Complaint against Defendant Rafael Newton Aguila, a/k/a
Ralph Aguila, d/b/a Hydradermabrasion Systems ("Aguila"), hereby allege as follows:

## THE PARTIES

    1.    Edge is a California limited liability company organized and existing under the
laws of the state of California, having a principal place of business at 2277 Redondo Avenue,
Signal Hill, California, 90755, which owns rights in the trademarks, service marks and trade
names at issue in this lawsuit ("Edge's MARKS").

    2.    Edge manufactures spa and skin treatment products, and hydradermabrasion
systems, and sells and distributes them throughout the United States, including in this Judicial
District.

    3.    Axia is a Delaware limited liability company having a principal place of business
at 23 Hallmark Circle, Menlo Park, California, 94025.

    4.    Axia is the owner of the patents at issue in this case, and Edge is the exclusive
licensee of those patents.

Case 2:20-cv-09669-FLA-PVC Document 41 Filed 06/25/21 Page 163 of 380 Page ID
Case 1:14-cv-24527-KMM Document 1 Entered on FLSD Docket 12/06/2014 Page 2 of 21
#:771

5.      Upon information and belief, Aguila is an individual residing in this Judicial District, having an address of 5338 SW 57th Avenue South Miami, Florida 33155.

## JURISDICTION AND VENUE

6.      Upon information and belief, Defendant conducts business throughout the United States, including in this Judicial District.

7.      This Court has personal jurisdiction over Defendant because Defendant has a continuous, systematic, and substantial presence within this judicial district including by selling and offering for sale infringing products in this Judicial District and selling into the stream of commerce knowing that such products would be sold in this state and Judicial District.

8.      Venue is proper in this Judicial District pursuant to 28 U.S.C. §§ 1391(b) and (c), and 1400(b), and by Plaintiffs' choice of venue.

9.      This Court has original subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. §§ 1331 and 1338 because Plaintiffs' claims for trademark infringement, false designation of origin, unfair competition and patent infringement pursuant to 15 U.S.C. §§ 1114 and 1125(a), and 35 U.S.C. § 271 arise under the laws of the United States. This Court has supplemental jurisdiction over the claims in this Complaint which arise under state statutory and common law pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

## GENERAL ALLEGATIONS

### Plaintiff Edge's Products and Associated Intellectual Property Rights

10.      Edge designs and sells skin health devices, including spa and skin treatment products and hydradermabrasion systems.

11.      Edge is at the forefront of the aesthetic industry and has worked continuously to bring new technology and breakthrough processes to the market.  Edge has grown to become an iconic brand and is now widely recognized throughout the United States.

12.      Edge's premier product is its revolutionary HydraFacial MD® hydradermabrasion system (the "Edge Machine"), an innovative non-ablative facial rejuvenation system.  The Edge Machine bears unique and distinctive trade dress which consists of the overall design and configuration of the product, as shown in the photograph below (the "Edge Trade Dress").

Case 2:20-cv-09669-FLA-PVC   Document 41   Filed 06/25/21   Page 164 of 380   Page ID
#:772
Case 1:14-cv-24507-KMM   Document 1   Entered on FLSD Docket 12/26/2014   Page 3 of 21



*THE EDGE MACHINE*

13.     As a result of its highly acclaimed, innovative skin health devices and technology, Edge has grown at an impressive pace.

14.     Edge diligently protects its intellectual property rights in its products and technology by obtaining patents in the U.S. and around the world.  Edge also filed and registered numerous federal trademarks in the United States that are used in connection with its products and services.

15.     Edge is the owner of U.S. Trademark Registration No. 2,992,734, which is registered with the United States Patent and Trademark Office ("U.S.P.T.O") on September 6, 2005 on the Principal Register for the mark THE EDGE SYSTEM.  Trademark Registration No. 2,992,734 is associated with the following goods: Medical apparatus, namely, systems comprised primarily of a vacuum source and hand piece used for medical body care treatments, microdermabrasion, and massage therapy.   A true and correct copy of the certificate of registration of Trademark Registration 2,992,734 is attached hereto as Exhibit 1.

-3-

Case 2:20-cv-09669-FLA-PVC   Document 41   Filed 06/25/21   Page 165 of 380   Page ID
#:773
Case 1:14-cv-24529-KMM   Document 1   Entered on FLSD Docket 12/26/2014   Page 4 of 21

16.     Edge is the owner of U.S. Trademark Registration No. 3,500,086, which was registered with the U.S.P.T.O on September 9, 2008 on the Principal Register for the mark HYDROPEEL.  Trademark Registration No. 3,500,086 is associated with the following goods: Medical apparatus and instruments for resurfacing and nourishing tissue.  A true and correct copy of the certificate of registration of Trademark Registration 3,500,086 is attached hereto as Exhibit 2.

17.     Edge is the owner of U.S. Trademark Registration No. 4,114,466, which was registered with the U.S.P.T.O on March 20, 2012 on the Principal Register for the mark VORTEX-FUSION.  Trademark Registration No. 4,114,466 is associated with the following goods: Microdermabrasion apparatus.  A true and correct copy of the certificate of registration of Trademark Registration 4,114,466 is attached hereto as Exhibit 3.  The marks registered in U.S. Trademark Registration Nos. 2,992,734, 3,500,086, and 4,114,466 shall hereinafter be referred to collectively as the Edge Registered Marks.

18.     All of the Edge Registered Marks have been continuously used in U.S. commerce and registered on the Principal Register of the U.S.P.T.O.  Trademark Registration Nos. 2,992,734 and 3,500,086 have been registered on the Principal Register of the U.S.P.T.O. for more than five years from the issuance of the registrations and are the subject of Declaration filings with the U.S.P.T.O. under Section 15 of the Lanham Act, 15 U.S.C. § 1065, and are therefore deemed to be incontestable.

19.     Since at least as early as 1999, Edge has continuously used variations of its chevron-styled "E" logo formed by three triangles ("Chevron E-Logo").

              

*1999-2011*                                    *2011-PRESENT*

20.     Edge has continuously used its Chevron E-Logo in interstate commerce in connection with the advertisement, promotion and sale of the Edge's spa and skin treatment products, including the Edge Machine.

21.     Edge is the owner of common law rights in the marks EDGE SYSTEMS, ACTIV-4, ANTIOX+, ANTIOX-6, BETA-HD, DERMABUILDER, and GLYSAL.

Case 2:20-cv-09669-FLA-PVC Document 41 Filed 06/25/21 Page 166 of 380 Page ID
Case 1:14-cv-24531-KMM Document 1 Entered on FLSD Docket 12/06/2014 Page 5 of 21
#:774

22. Since its founding in 1997, Edge has continuously used the EDGE SYSTEMS mark in interstate commerce to identify itself and in connection with the advertisement, promotion and sale of its spa and skin treatment products, including the Edge Machine.

23. Edge has continuously used the marks ACTIV-4, ANTIOX-6, and BETA-HD since at least as early as 2006 in connection with the advertisement, promotion and sale of its spa and skin treatment products.

24. Edge has continuously used the marks DERMABUILDER and GLYSAL since at least as early as 2010 in connection with the advertisement, promotion and sale of its spa and skin treatment products.

25. Edge has continuously used the mark ANTIOX+ since at least as early as 2013 in connection with the advertisement, promotion and sale of its spa and skin treatment products. The Chevron E-Logo and the marks, EDGE SYSTEMS, ACTIV-4, ANTIOX+, ANTIOX-6, BETA-HD, DERMABUILDER, and GLYSAL marks shall hereinafter be collectively referred to as the "EDGE$^{TM}$ Marks."

26. Edge uses its EDGE$^{TM}$ Marks on its products, letterhead, envelopes, business cards, company banners, website, email signatures, pens, mugs, t-shirts, collared shirts, and windbreakers.

27. Edge advertises its products and services at trade shows, seminars, and through trade publications, social media, search engine optimization, emails, and webinars. In the past five years alone, Edge has spent approximately $4 million advertising its products and services in connection with the Edge Registered Mark, the EDGE$^{TM}$ Marks and the Edge Trade Dress.

28. In addition to Edge's own advertising, important national media outlets have featured Edge and its products and reinforced the public's association between Edge and Edge's Registered Marks, the EDGE$^{TM}$ Marks and the Edge Trade Dress. A sample of such media includes: *People Magazine, Allure*, *The Hollywood Reporter, Tampa Bay Times*, *New Beauty*, *OK! Magazine*, *Star Magazine*, *Elle Beauty Book*, *Harper's Bazaar Magazine*, *Essence*, *Simply Her*, *Examiner.com*, and *In Style*.

29. Edge's products have also been shown on *Good Day L.A., The Doctors, KLBK News, Great Day Houston,* and *Real Housewives of Beverly Hills*.

30. Edge's products have received widespread public attention and acclaim, including being awarded the "Best Equipment for the Face" by LNE & Spa in 2011 and 2012.

Case 2:20-cv-09669-FLA-PVC   Document 41   Filed 06/25/21   Page 167 of 380   Page ID
Case 1:14-cv-24507-KMM   Document 1   Entered on FLSD Docket 12/26/2014   Page 6 of 21
#:775

31.     Promotional materials and advertisements of Edge's products that include Edge's Registered Marks and EDGE<sup>TM</sup> Marks and prominently display the Edge Trade Dress have been distributed and are recognized by consumers and are famous throughout the United States.  As a result of Edge's substantial efforts, Edge's Registered Marks, EDGE<sup>TM</sup> Marks and the Edge Trade Dress have become extremely valuable to Edge as an identifier of the company, its products, and the substantial goodwill Edge has earned in the market.  Edge's Registered Marks, EDGE<sup>TM</sup> Marks and the Edge Trade Dress have become synonymous in the consumer's mind with Edge.

32.     Edge sells its products to many consumers, including dermatologists, plastic surgeons, and health spas.

33.     Edge products and services are offered at more than 2,500 locations throughout the United States, including all 50 states.

34.     Edge has continuously operated a website since 1999, displaying Edge's trademarks in connection with the sales and promotion of its product, and Edge's website has reached over 56,000 individual users since July 2013.

35.     Edge has a sales force of over 60 employees in the United States covering each of the 50 states.  Edge has been selling products in the state of Florida since 2000, and has sold products bearing the Edge Trade Dress in Florida since at least as early as 2010.  Over the last five years, Edge has generated over $93 million in revenue, including over $48 million in revenue from sales of the Edge Machine, which bears the Edge Trade Dress.

36.     By virtue of the extensive usage, advertising, promotion, and media exposure of the Edge Registered Marks, EDGE<sup>TM</sup> Marks and the Edge Trade Dress, these marks and trade dress have become famous and well-known among the trade, the public, and consumers in the United States, have acquired significant goodwill and public recognition, and have become strong source identifiers of Edge's goods and services and are entitled to a wide scope of protection.

37.     Edge has promoted its goods and services under the Edge Registered Marks,  the EDGE<sup>TM</sup> Marks, and the Edge Trade Dress, and Edge's innovative technology in its products are also protected by utility patents, including United States Patent Nos. 6,299,620, 6,641,591, 7,678,120, 7,789,886, 8,066,716, and 8,337,513 (collectively, the "patents-in-suit").

38.     On October 9, 2001, U.S. Patent No. 6,299,620 ("the '620 Patent"), entitled "INSTRUMENTS AND TECHNIQUES FOR INDUCING NEOCOLLAGENESIS IN SKIN TREATMENTS," was duly and legally issued by the United States Patent and Trademark Office.  A copy of the '620 Patent is attached hereto as Exhibit 6.  Edge is the exclusive licensee of the '620 Patent.

39.     On November 4, 2003, U.S. Patent No. 6,641,591 ("the '591 Patent"), entitled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS," was duly and legally issued by the United States Patent and Trademark Office.  A copy of the '591 Patent is attached hereto as Exhibit 7.  Edge is the exclusive licensee of the '591 Patent.

40.     On March 16, 2010, U.S. Patent No. 7,678,120 ("the '120 Patent"), entitled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS," was duly and legally issued by the United States Patent and Trademark Office.  A copy of the '120 Patent is attached hereto as Exhibit 8.  Edge is the exclusive licensee of the '120 Patent.

41.     On September 7, 2010, U.S. Patent No. 7,789,886 ("the '886 Patent"), entitled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS," was duly and legally issued by the United States Patent and Trademark Office.  A copy of the '886 Patent is attached hereto as Exhibit 9.  Edge is the exclusive licensee of the '886 Patent.

42.     On November 29, 2011, U.S. Patent No. 8,066,716 ("the '716 Patent"), entitled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS," was duly and legally issued by the United States Patent and Trademark Office.  A copy of the '716 Patent is attached hereto as Exhibit 10.  Edge is the exclusive licensee of the '716 Patent.

43.     On December 25, 2012, U.S. Patent No. 8,337,513 ("the '513 Patent"), entitled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS," was duly and legally issued by the United States Patent and Trademark Office.  A copy of the '513 Patent is attached hereto as Exhibit 11.  Edge is the exclusive licensee of the '513 Patent.

44. Edge has provided proper and sufficient notice to the public that its products are patented under each of the patents-in-suit by marking its products pursuant to 35 U.S.C. § 287.

**Defendant's Infringing Activities**

45. In October, 2014, Edge was surprised to learn that one of its main competitors, Lumenis, was offering what appeared to be a copycat version of the Edge Machine on the website www.hydradermabrasion.com (the "Website"). When Edge contacted Lumenis, it learned that Lumenis was just as surprised by the Website. After further evaluation, Edge and Lumenis both learned that the Website was actually registered to the Defendant. Upon information and belief, Defendant was using Lumenis' trade name and trademarks to advertise its Hydradermabrasion MD machine (the "Accused Product").

46. On or about October 27, 2014, Edge sent the Defendant a cease and desist letter and asked that it stop infringing the patents-in-suit.

47. Upon information and belief, Lumenis separately asked that Defendant stop using its trade name and trademarks.

48. Soon thereafter, Defendant changed its Website. Defendant now uses the Website to blatantly pass itself off as Edge. The Website adopts Edge's name and misappropriates the Edge Marks to sell the Accused Product. Defendant has gone to great lengths to assume Edge's identity, including filing its own trademark applications for the mark EDGE SYSTEMS.

49. On November 1, 2014, Defendant filed a Trademark/Service Mark Application with the United States Patent & Trademark Office for the mark "Edge Systems (stylized and/or with design)." The application was assigned Serial No. 86442086 (the "'086 Application"). The '086 Application claims a date of First Use in Commerce of March 21, 1996. The '086 Application was filed with a declaration pursuant to 15 U.S.C. § 1051(a) signed by Rafael N. Aguila (Defendant), affirming the truth of all statements made in the application. Upon information and belief, Defendant's declaration is fraudulent.

50. Upon information and belief, Defendant has also started using the website www.edge-systems.com (the "Website II")—which incorporates Edge's trade name in the domain name—to advertise the same infringing material. Shown below is a screen shot of Defendant's new homepage, which appears on both the Website and the Website II.

-8-

Case 2:20-cv-09669-FLA-PVC Document 41 Filed 06/25/21 Page 170 of 380 Page ID
Case 1:14-cv-24517-KMM Document 1 Entered on FLSD Docket 12/26/2014 Page 9 of 21
#:778





*DEFENDANT'S WEBSITE*

51.     Upon information and belief, at least one of Defendant's "Regional Sales Managers" passes himself off as being affiliated with Edge and even includes "Edge Systems" in the signature lines of his emails.

52.     Upon information and belief, Defendant's receptionist greets callers as having called "Edge Systems."

53.     Defendant's actions have had a profound and confusing effect on the market.  A customer that purchased one of Defendant's knock-off machines even approached Edge seeking training for what she believed was an authentic Edge product.

54.     Defendant has even confused some of Edge's seasoned employees as to its affiliation with Edge.

55.     Defendant's Accused Product, as advertised on the Website and Website II, copies every aspect of the Edge Machine, including the Edge Trade Dress.

Case 2:20-cv-89668-FLA-BVC Document 41 Filed 06/25/21 Page 171 of 380 Page ID
Case 1:42-cv-24917-RMM Document 1 Entered on FLSD Docket 11/26/2014 Page 10 of 21
#:779

 

**THE EDGE MACHINE**          **ACCUSED PRODUCT**

56.     Defendant is providing Defendant's products and services under trademarks, trade names, and/or service marks, including the ![EDGE] mark, which is confusingly similar to Edge's Chevron E-Logo.

57.     Defendant is providing Defendant's products and services under trademarks, trade names, and/or services marks, including the mark EDGE SYSTEMS.

58.     Defendant's EDGE SYSTEMS mark copies Edge's trade name and is virtually identical to Edge's federally registered mark THE EDGE SYSTEM.

59.     Defendant is providing Defendant's products and services under trademarks, trade names, and/or services marks, including the mark HYDRAPEEL.

60.     Defendant's HYDRAPEEL mark is virtually identical to Edge's federally registered mark HYDROPEEL.

61.     Defendant is providing Defendant's products and services under trademarks, trade names, and/or services marks, including the mark CYCLONIC-FUSION.

62.     Defendant's CYCLONIC-FUSION mark is confusingly similar to Edge's federally registered VORTEX-FUSION mark.

63.     Defendant's ACTIV-4 mark is identical to Edge's common law mark ACTIV-4.

64.     Defendant's ANTIOX-PLUS mark is virtually identical to Edge's common law mark ANTIOX+.

65.     Defendant's ANTIOX-6 mark is identical to Edge's common law mark ANTIOX-6.

66.     Defendant's BETA-HD mark is identical to Edge's common law mark BETA-HD.

Case 2:20-cv-89662-FMA-BVC Document 41 Filed 06/25/21 Page 172 of 380 Page ID
Case 1:14-cv-24917-RMM Document 41 Entered on FLSD Docket 11/26/2014 Page 11 of 21
#:780

67. Defendant's DERMABUILDER mark is identical to Edge's common law mark DERMABUILDER.

68. Defendant's GLYSAL mark is identical to Edge's common law mark GLYSAL.

69. Defendant infringes the Edge Registered Marks, EDGE$^{TM}$ Marks and Edge Trade Dress in an attempt to falsely associate its products and services with Edge or to otherwise trade upon Edge's valuable reputation and customer goodwill in Edge's Registered Marks, EDGE$^{TM}$ Marks and Edge Trade Dress and high quality products sold in connection with these trademarks.

70. Edge did not consent to Defendant's use of the Edge Registered Marks, EDGE$^{TM}$ Marks and Edge Trade Dress, or any other feature of Edge's products or services that help identify it to consumers.

71. Defendant's use of the Edge Registered Marks, EDGE$^{TM}$ Marks, and Edge Trade Dress is designed and intended to cause confusion, mistake or deception as to the source of Defendant's products and services, and has caused actual confusion and mistake, which has deceived consumers into believing that Defendant's products and services are Edge's products and services.

72. Edge is informed and believes, and thereon alleges, that it is Defendant's purpose to cause consumers and potential customers to believe that Defendant's products and services are associated with Edge when in truth and fact they are not.

73. As a direct and proximate result of Defendant's actions, Defendant has created a likelihood of injury to Edge's business reputation and goodwill, caused a likelihood of consumer confusion, mistake and deception as to the source of origin or relationship of Edge's and Defendant's goods and services, and has otherwise competed unfairly with Edge by unlawfully trading on and using Edge's Registered Marks, EDGE$^{TM}$ Marks and Edge Trade Dress without Edge's permission or consent.

74. Edge is informed and believes, and thereon alleges, that Defendant's wrongful acts alleged in this Complaint are willful and deliberate.

75. Edge's wrongful acts alleged in this Complaint have caused damage to Edge in an amount to be determined at trial, and such damages will continue to increase unless Edge is enjoined from its wrongful actions and infringement.

Case 2:20-cv-89668-FLA-BVC Document 41 Filed 06/25/21 Page 173 of 380 Page ID
Case 1:14-cv-24916-RMW Document 4 Entered on FLSD Docket 11/26/2014 Page 12 of 21
#:781

76.    Edge's wrongful acts alleged in this Complaint have caused Edge to suffer irreparable injury to its business. Edge will suffer substantial loss of goodwill and reputation unless and until Defendant is enjoined from its wrongful actions complained of herein.

## FIRST CLAIM FOR RELIEF

## INFRINGEMENT OF THE PATENTS-IN-SUIT

(35 U.S.C. § 271)

77.    Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-76 above.

78.    This is a claim for patent infringement under 35 U.S.C. § 271.

79.    Defendant, through its agents, employees, and servants, has and continues to knowingly, intentionally, and willfully infringe the '620 Patent by making, using, selling, offering for sale, and/or importing into the United States products that are covered by at least claim 1 of the '620 Patent, including, for example, the Accused Product.

80.    Defendant, through its agents, employees, and servants, has and continues to knowingly, intentionally, and willfully infringe the '591 Patent by making, using, selling, offering for sale, and/or importing into the United States products that are covered by at least claim 1 of the '591 Patent, including, for example, the Accused Product.

81.    Defendant, through its agents, employees, and servants, has and continues to knowingly, intentionally, and willfully infringe the '120 Patent by making, using, selling, offering for sale, and/or importing into the United States products that are covered by at least claim 1 of the '120 Patent, including, for example, the Accused Product.

82.    Defendant, through its agents, employees, and servants, has and continues to knowingly, intentionally, and willfully infringe the '886 Patent by making, using, selling, offering for sale, and/or importing into the United States products that are covered by at least claim 1 of the '886 Patent, including, for example, the Accused Product.

83.    Defendant, through its agents, employees, and servants, has and continues to knowingly, intentionally, and willfully infringe the '716 Patent by making, using, selling, offering for sale, and/or importing into the United States products that are covered by at least claim 1 of the '716 Patent, including, for example, the Accused Product.

84.    Defendant, through its agents, employees, and servants, has and continues to knowingly, intentionally, and willfully infringe the '513 Patent by making, using, selling,

offering for sale, and/or importing into the United States products that are covered by at least claim 1 of the '513 Patent, including, for example, the Accused Product.

85.     Defendant had actual knowledge of the patents-in-suit through correspondence with Edge, including, for example, the October 27, 2014 cease and desist letter.

86.     Defendants' customers also infringe each of the patents-in-suit by using, selling, offering for sale, and/or importing into the United States the Accused Product.

87.     Upon information and believe, Defendant knew that its customers would infringe each of the patents-in-suit by using, selling, offering to sell, and/or importing into the United States infringing products, including, for example, the Accused Product.

88.     Upon information and believe, Defendant had the specific intent to induce its customers to infringe the patents-in-suit by using, selling, offering to sell, and/or importing into the United States infringing products, including, for example, the Accused Product.

89.     Upon information and believe, Defendant induced infringement of the patents-in-suit.

90.     Defendant's actions constitute infringement of the patents-in-suit in violation of 35 U.S.C. § 271(a) and (b).

91.     Each of Defendant's infringing activities is without the consent of, authority of, or license from Edge or Axia.

92.     Upon information and belief, Defendant's infringement of each of the patents-in-suit was and is willful and deliberate.  Defendant infringed the patents-in-suit with reckless disregard of Plaintiffs' patent rights.  Defendant knew, or it was so obvious that Defendant should have known, that its actions constituted infringement of each of the patents-in-suit. Defendant's acts of infringement of the patents-in-suit were not consistent with the standards for the industry.

93.     Defendant's acts of infringement have caused damage to Plaintiffs in an amount to be determined at trial.  Pursuant to 35 U.S.C. § 284, Plaintiffs are entitled to damages for Defendant's infringing acts.  Pursuant to 35 U.S.C. § 285, Plaintiffs are entitled to reasonable attorneys' fees for the necessity of bringing its claims of patent infringement.

94.     Defendant's infringement of the patents-in-suit is causing irreparable harm to Plaintiffs, for which there is no adequate remedy at law.  Defendant's infringement will continue,

Case 2:20-cv-09668-FLA-PVC Document 41 Filed 06/25/21 Page 175 of 380 Page ID
#:783
Case 1:24-cv-24917-RMM Document 1 Entered on FLSD Docket 11/26/2024 Page 14 of 21

and will continue to cause irreparable harm to Edge, unless Defendant's infringement is enjoined by this Court.

## SECOND CLAIM FOR RELIEF
## TRADEMARK INFRINGEMENT
### (15 U.S.C. § 1114)

95.     Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-76 above.

96.     This is a claim for trademark infringement under 15 U.S.C. § 1114.

97.     Without Edge's permission, Defendant has used in commerce reproductions, copies or colorable imitations of the Edge Registered Marks in connection with the sale, offering for sale, distribution, advertising, and/or promotion of Defendant's products and services.

98.     Without Edge's permission, Defendant is reproducing, copying, or colorably imitating the Edge Marks and applying such reproductions, copies, or colorable imitations to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, advertising, and/or promotion of Defendant's products and services.

99.     Defendant's use of these copies or colorable imitations of the Edge Registered Marks is likely to cause confusion, or to cause mistake, or to deceive.

100.    Defendant's wrongful acts as alleged in its Complaint constitute willful and intentional infringement of the Edge Registered Marks.  Defendant engaged in such activities with the intent to unfairly compete against Edge, to trade upon Edge's reputation and goodwill by causing confusion and mistake among customers and the public, and to deceive the public into believing that Defendant's products and services are associated with, sponsored by, originated from, or are approved by Edge, when in truth and fact they are not.

101.    Edge is informed and believes, and thereon alleges, that Defendant had actual knowledge of Edge's ownership and prior use of the Edge Registered Marks and willfully and maliciously violated Edge's trademark rights under 15 U.S.C. § 1114 without Edge's consent.

102.    Edge is informed and believes, and thereon alleges, that Defendant's infringement has been willful and deliberate, which renders this an exceptional case within the meaning of 15 U.S.C. § 1117.

Case 2:20-cv-89668-FLA-BVC Document 41 Filed 06/25/21 Page 176 of 380 Page ID
Case 1:24-cv-24917-RMM Document 1 entered FLSD Docket 11/26/2024 Page 15 of 21
#:784

103.    As a direct and proximate result of Defendant's actions, Edge has been damaged and is entitled to monetary relief in an amount to be determined at trial.

104.    As a direct and proximate result of Defendant's actions, Edge has suffered and continues to suffer great and irreparable injury, for which Edge has no adequate remedy at law.

105.    Defendant will continue its actions, constituting trademark infringement, unless enjoined by this Court.

## THIRD CLAIM FOR RELIEF
## FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION
### (15 U.S.C. § 1125(a))

106.    Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-76 above.

107.    This is a claim for false designation of origin, false or misleading description of fact or false or misleading representation of fact, and unfair competition under 15 U.S.C. § 1125(a).

108.    Defendant's use of marks, trade names and logos that are confusingly similar to the Edge Registered Marks and the EDGE$^{TM}$ Marks without Edge's consent in connection with the sale, offering for sale, distribution, advertising, and/or promotion of Defendant's products and services constitutes a false designation of origin, a false or misleading description or representation of goods and services, tending wrongfully and falsely to describe or represent a connection between Edge's and Defendant's goods and services.

109.    Edge is informed and believes, and thereon alleges, that Defendant had actual knowledge of Edge's ownership and prior use of the Edge Marks and the EDGE$^{TM}$ Marks prior to its infringing acts and has acted knowingly, willfully and maliciously with intent to trade upon Edge's goodwill and to injure Edge.

110.    Defendant's use of trade dress that is confusingly similar to the Edge Trade Dress without Edge's consent in connection with the sale, offering for sale, distribution, advertising, and/or promotion of the Accused Product constitutes a false designation of origin, a false or misleading description or representation of goods and services, tending wrongfully and falsely to describe or represent a connection between Edge's and Defendant's products.

Case 2:20-cv-08068-FLA-PVC Document 41 Filed 06/25/21 Page 177 of 380 Page ID
Case 1:24-cv-24917-RMM-DBS Document 1 Entered on FLSD Docket 11/26/2024 Page 16 of 21
#:785

111.    Edge is informed and believes, and thereon alleges, that Defendant had actual knowledge of Edge's ownership and prior use of the Edge Trade Dress prior to its infringing acts and has acted knowingly, willfully and maliciously with intent to trade upon Edge's goodwill and to injure Edge.

112.    Defendant's wrongful acts as alleged in this Complaint constitute false designation of origin, false or misleading description of fact or false or misleading representation of fact, and unfair competition under 15 U.S.C. § 1125(a).

113.    As a direct and proximate result of Defendant's actions, constituting false designation of origin, false or misleading description of fact or false or misleading representation of fact, and unfair competition, Edge has been damaged and is entitled to monetary relief in an amount to be determined at trial.

114.    As a direct and proximate result of Defendant's actions, constituting false designation of origin, false or misleading description of fact or false or misleading representation of fact, and unfair competition, Edge has suffered and continues to suffer great and irreparable injury, for which Edge has no adequate remedy at law.

115.    Defendant will continue its actions, constituting false designation of origin, false or misleading description of fact or false or misleading representation of fact, and unfair competition, unless enjoined by this Court.

## FOURTH CLAIM FOR RELIEF
## FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION
(Florida Common Law Unfair Competition)

116.    Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-76 above.

117.    This is a claim for unfair competition, arising under the common law of the State of Florida.

118.    By reason of all of the foregoing, Defendant is engaged in unfair competition with Edge by using the trade names, trademarks, trade dress and service marks of Edge in connection with the rendering, advertising and promotion of the sale of products and rendering of services, which has actually deceived or is likely to deceive and confuse the public into believe that Defendant's products and services and business are those of Edge, or are sponsored by, licensed by, endorsed by, or otherwise associated with Edge and by misappropriating or attempting to

Case 2:20-cv-89660-FLM-BVC Document 41 Filed 06/25/21 Page 172 of 380 Page ID
Case 1:14-cv-24916-RMM Document 1 Entered on FLSD Docket 19/26/2014 Page 17 of 21
#:786

misappropriate the Edge Registered Marks, the EDGE$^{TM}$ Marks and the Edge Trade Dress and the goodwill and reputation which are associated therewith.

119.     By reason of all of the foregoing, Edge is being irreparably damaged by Defendant's activities in the manner set forth above and will continue to be irreparably damaged unless Defendant is enjoined from continuing to commit the aforesaid acts.  Edge has no adequate remedy at law.

**FIFTH CLAIM FOR RELIEF**

**FRAUD ON THE U.S.P.T.O.**

120.     Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-76 above.

121.     In the '086 Application, Defendant was required to identify the "date of the applicant's first use of the mark in commerce," pursuant to 15 U.S.C. § 1051(a)(2).

122.     Defendant knowingly misrepresented the date of "applicant's first use in commerce" in the '086 application as March 21, 1996.

123.     Defendant knew that it did not use the mark EDGE SYSTEMS in commerce on March 21, 1996, or any time before, but misrepresented to the U.S.P.T.O. that it used the mark prior to Edge's first use in 1997.

124.     Defendant intends to decive the U.S.P.T.O. with its false representations.

125.     Defendant has used its trademark application as evidence of its alleged ownership in the mark EDGE SYSTEMS and has made infringing use of the mark, as described above. Defendant's actions have threatened Edge's business reputation and the goodwill it has built in its marks.

126.     Because of Edge's prior rights in the mark EDGE SYSTEMS and because of Defendant's fraud on the U.S.P.T.O., the Court should order that the U.S.P.T.O. abandon the '086 application.

**SIXTH CLAIM FOR RELIEF**

**FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION**

(Florida Deceptive and Unfair Trade Practices Act)

127.     Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-76 above.

Case 2:20-cv-89662-FLM-BVG Document 41 Filed 06/25/21 Page 172 of 380 Page ID
Case 1:14-cv-24917-RMM Document 41 Entered on FLSD Docket 11/26/2014 Page 18 of 21
#:787

128.    This is a claim for violation of the Florida Deceptive and Unfair Trade Practices Act under Chapter 501 of the Florida Statutes.

129.    By reason of all of the foregoing, Defendant's actions actually deceive or are likely to deceive and mislead the public into believing that Defendant is Edge or a licensee of Edge or is authorized, endorsed, sponsored or approved by Edge or that Defendant's products and services or business activities originate with or are connected or associated with Edge, when they are not.

130.    By reason of all of the foregoing, Defendant's actions constitute willfully unfair and deceptive conduct in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*. and unfair competition under Florida common law.

131.    By reason of all the foregoing, Edge is being irreparably damaged by Defendant's activities in the manner set forth above and will continue to be irreparably damaged unless Defendant is enjoined from the aforesaid acts.  Edge has no adequate remedy at law.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs pray for judgment and seek relief as follows:

A.    That the Court enter judgment in favor of Plaintiffs and against Defendant on all claims for relief alleged herein;

B.    A judgment that Defendant has infringed U.S. Patent Nos. 6,299,620, 6,641,591, 7,678,120, 7,789,886, 8,066,716 and 8,337,513;

C.    Preliminary and permanent injunctions against further infringement by Defendant of U.S. Patent Nos. 6,299,620, 6,641,591, 7,678,120, 7,789,886, 8,066,716, and 8,337,513;

D.    An award of damages for Defendant's infringement of U.S. Patent Nos. 6,299,620, 6,641,591, 7,678,120, 7,789,886, 8,066,716 and 8,337,513;

E.    A declaration that Defendant's infringement of U.S. Patent Nos. 6,299,620, 6,641,591, 7,678,120, 7,789,886, 8,066,716 and 8,337,513 was and is willful, and that this is an exceptional case under 35 U.S.C. § 285;

F.    A trebling of the award of damages under 35 U.S.C. § 284, or such other enhancement of the award of damages that the Court deems appropriate;

G.    An award of attorneys' fees and non-taxable costs under 35 U.S.C. § 285 on account of Defendant's willful infringement;

Case 2:20-cv-08962-FLA-PVC Document 41 Filed 06/25/21 Page 180 of 380 Page ID
Case 1:14-cv-24917-RMM Document 1 Entered on FLSD Docket 11/26/2014 Page 19 of 21
#:788

H.      That Defendant and its agents, servants, employees, representatives, successors, and assigns, and all persons, firms, or corporations in active concert or participation with Defendant, be temporarily, preliminarily, and permanently enjoined and restrained from engaging in, and assisting or inducing, directly or indirectly, others to engage in the following activities:

1.   infringing Edge's trademark rights in its federally registered Edge Registered Marks;

2.   using any of the Edge Registered Marks, or any other mark, symbol, or logo that is confusingly similar to any of the Edge Registered Marks, on or in connection with any goods or services;

3.   manufacturing, using, displaying, distributing, or selling any goods or services that infringe any of the Edge Registered Marks;

I.       That the court issue an *Ex Parte* Order under 15 U.S.C. § 1114(1)(a) authorizing and requiring the immediate seizure of all infringing materials and business records in the care, custody or control of Defendant;

J.       That Defendant be required to deliver all labels, signs, prints, packages, wrappers, receptacles, advertisements and other materials bearing any of the Edge Registered Marks pursuant to 15 U.S.C. §1118;

K.      That Defendant be required to account to Edge for any and all profits derived by its acts of trademark infringement complained of in this Complaint;

L.       That, because of the exceptional nature of this case resulting from Defendant's deliberate infringing actions, this Court award to Edge all reasonable attorneys' fees, costs and disbursements incurred as a result of this action, pursuant to 15 U.S.C. § 1117;

M.      That Edge be awarded damages for Defendant's trademark infringement pursuant to 15 U.S.C. § 1117 in the form of Defendant's profits, damages sustained by Edge, and the costs of the action, together with prejudgment and post-judgment interest;

N.      That Defendant and its agents, servants, employees, representatives, successors, and assigns, and all persons, firms, or corporations in active concert or participation with Defendant, be temporarily, preliminarily, and permanently enjoined and restrained from engaging in, and assisting or inducing, directly or indirectly, others to engage in the following activities:

1. Using any of the Edge Registered Marks, the EDGE™ Marks, the Edge Trade Dress, or any other mark or trade dress that is confusingly similar thereto;

2. falsely designating the origin of Defendant's goods;

3. unfairly competing with Edge in any manner whatsoever;

4. falsely advertising Defendant's products;

5. causing a likelihood of confusion or injuries to Edge's business reputation; and

6. manufacturing, using, displaying, distributing, or selling any products or services that use marks, trade dress, trade names or logos that are confusingly similar to the Edge Registered Marks, the EDGE™ Marks, the Edge Trade Dress, or any other mark or trade dress that is confusingly similar thereto;

O.      That Defendant be required to account to Edge for any and all profits derived by its acts of false designation of origin, false or misleading description of fact or false or misleading representation of fact, and unfair competition complained of in this Complaint;

P.      An Order directing the United States Patent & Trademark Office to abandon with prejudice Application No. 86442086 for the mark EDGE SYSTEMS.

Q.      That Defendant be adjudged to have willfully and maliciously infringed the Edge Registered Marks, the EDGE™ Marks, and the Edge Trade Dress in violation of Edge's common law rights under Florida common law;

R.      That Defendant be adjudged to have willfully and maliciously infringed the Edge Registered Marks, the EDGE™ Marks, and the Edge Trade Dress in violation of Florida Deceptive and Unfair Trade Practices Act under Chapter 501 of the Florida Statutes;

S.      An award to Edge against Defendant of such punitive damages as are appropriate in view of Defendant's willful conduct and bad faith;

T.      An award to Edge of the costs in this action including Edge's reasonable attorneys' fees;

U.      That Plaintiffs have and recover the costs of this civil action, including reasonable attorneys' fees;

V.      An award of pre-judgment and post-judgment interest and costs of this action against Defendant;

W.      An award of taxable costs

X.      Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all issues so triable.

Respectfully submitted,

Dated:   November 26, 2014      By: _s/ Richard Guerra_
                                       James A. Gale, Esq. (FBN371726)
                                       Email:  jgale@feldmangale.com
                                       Richard Guerra (FBN 689521)
                                       Email : rguerra@feldmangale.com
                                       **FELDMAN GALE**
                                       One Biscayne Tower, 30th Floor
                                       2 South Biscayne Blvd.
                                       Miami, FL 33131
                                       Telephone:  (305) 358-5001
                                       Facsimile:  (305) 358-3309

                                       Brenton R. Babock, Esq. (_pro hac vice pending_)
                                       Email:  brent.babock@knobbe.com
                                       Ali S. Razai, Esq. (_pro hac vice pending_)
                                       Email:  ali.razai@knobbe.com
                                       **KNOBBE, MARTENS, OLSON & BEAR, LLP**
                                       2040 Main Street, Fourteenth Floor
                                       Irvine, CA  92614
                                       Telephone: (949) 760-0404
                                       Facsimile: (949) 760-9502

                                       _Attorneys for Plaintiffs,_
                                       EDGE SYSTEMS LLC and
                                       AXIA MEDSCIENCES, LLC

# EXHIBIT I

Case 2:20-cv-09669-FLA-PVC Document 41 Filed 06/25/21 Page 184 of 380 Page ID
#:792
Case 2:17-cv-02720 Document 1 Filed 04/10/17 Page 1 of 21 Page ID #:1

Brenton R. Babcock (SBN 162,120)
brent.babcock@knobbe.com
Ali S. Razai (SBN 246,922)
ali.razai@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone: (949) 760-0404
Facsimile: (949) 760-9502

Attorneys for Plaintiffs
EDGE SYSTEMS LLC and
AXIA MEDSCIENCES, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| EDGE SYSTEMS LLC, a California limited liability company, and AXIA MEDSCIENCES, LLC, a Delaware limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>AGELESS SERUMS LLC, a Texas limited liability company,<br><br>Defendant. | Civil Action No. 17-cv-2720<br><br>**COMPLAINT FOR PATENT INFRINGEMENT, TRADEMARK INFRINGEMENT, FALSE DESIGNATION OF ORIGIN, AND UNFAIR COMPETITION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Edge Systems LLC, ("Edge") and Axia Medsciences, LLC ("Axia") (collectively, "Plaintiffs") hereby complain of Ageless Serums LLC ("Defendant") and allege as follows:

## I. JURISDICTION AND VENUE

1. This Court has original subject matter jurisdiction over the patent and trademark infringement claims in this action pursuant to 28 U.S.C. §§ 1331 and 1338(a). This Court has original subject matter jurisdiction over the unfair competition claims in this action pursuant to 28 U.S.C. § 1338(b).

2. This Court has personal jurisdiction over Defendant because Defendant has a continuous, systematic, and substantial presence within this judicial district including by selling and offering for sale infringing products in this judicial district, and by committing acts of infringement in this judicial district, including but not limited to selling infringing products directly to consumers and/or retailers in this district and selling infringing products into the stream of commerce knowing such products would be sold in California and this district, which acts form a substantial part of the events or omissions giving rise to Plaintiffs' claim.

3. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), 1391(d), and 1400(b).

## II. THE PARTIES

4. Plaintiff Edge is a California corporation having its principal place of business at 2277 Redondo Ave., Signal Hill, CA 90755.

5. Plaintiff Axia is a Delaware limited liability company having its principal place of business at 23 Hallmark Circle, Menlo Park, California, 94025.

/ / /

/ / /

/ / /

- 1 -

6. Plaintiffs are informed and believe and, based thereon, allege that Ageless Serums LLC is a Texas limited liability company having its principal place of business at 4101 W Green Oaks, Suite 305406, Arlington, Texas 76016.

7. Plaintiffs are informed and believe and, based thereon, allege that Defendant has committed the acts alleged herein within this judicial district.

### III. **GENERAL ALLEGATIONS**

8. Edge is a worldwide leader in microdermabrasion and hydradermabrasion systems. Edge has spent considerable time, effort and money to develop its proprietary technology including the HydraFacial MD® hydradermabrasion system.

9. To protect its substantial investment, Edge has obtained the rights to various patents and patent applications throughout the world.

10. On October 9, 2001, the United States Patent and Trademark Office ("USPTO") duly and lawfully issued U.S. Patent No. 6,299,620 ("the '620 Patent"), titled "INSTRUMENTS AND TECHNIQUES FOR INDUCING NEOCOLLAGENESIS IN SKIN TREATMENTS." A true and correct copy of the '620 Patent is attached hereto as Exhibit 1.

11. On November 4, 2003, the USPTO duly and lawfully issued U.S. Patent No. 6,641,591 ("the '591 Patent"), titled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS." A true and correct copy of the '591 Patent is attached hereto as Exhibit 2.

12. On November 29, 2011, the USPTO duly and lawfully issued U.S. Patent No. 8,066,716 ("the '716 Patent"), titled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS." A true and correct copy of the '716 Patent is attached hereto as Exhibit 3.

- 2 -

13.     On December 25, 2012, the USPTO duly and lawfully issued U.S. Patent No. 8,337,513 ("the '513 Patent"), titled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS." A true and correct copy of the '513 Patent is attached hereto as Exhibit 4.

14.     Axia is the owner of all right, title, and interest in the '620 Patent, the '591 Patent, the '716 Patent, and the '513 Patent (collectively, "the Asserted Patents"), which are each exclusively licensed to Edge.

15.     Edge has provided proper and sufficient notice to the public that its products are patented under each of the Asserted Patents by marking its products pursuant to 35 U.S.C. § 287.

16.     Edge is the owner of U.S. Trademark Registration No. 4,317,059 for the mark HydraFacial ("HydraFacial Mark").  Trademark Registration No. 4,317,059 for the HydraFacial Mark was registered with the USPTO on April 9, 2013, on the Principal Register.  Trademark Registration No. 4,317,059 is associated the following goods: medical apparatus and instruments for peeling and resurfacing tissue.  Trademark Registration No. 4,317,059 is also associated with the following services:  medical spa services, namely, minimally and non-invasive cosmetic and body fitness therapies.  A true and correct copy of the certificate of registration of Trademark Registration 4,317,059 is attached hereto as Exhibit 5.

17.     Edge is the owner of U.S. Trademark Registration No. 5,020,133 for the mark  ("Chevron-E Logo").  Trademark Registration No. 5,020,133 for the Chevron-E Logo was registered with the USPTO on August 16, 2016, on the Principal Register.  Trademark Registration No. 5,020,133 is associated the following goods and services: cleaning preparations for microdermabrasion machines; non-medicated skin care preparations, namely, lotions and serums; medical apparatus and instruments for use in peeling and resurfacing tissue

- 3 -

procedures; and, medical spa services, namely, minimally and non-invasive cosmetic and body fitness therapies. A true and correct copy of the certificate of registration of Trademark Registration 5,020,133 is attached hereto as Exhibit 6.

18. The HydraFacial Mark and the Chevron-E Logo shall collectively be referred to as the "Edge Registered Marks." The Edge Registered Marks have not been abandoned, cancelled or revoked.

19. Edge is the owner of common law rights in the mark ANTIOX-6.

20. Edge has continuously used the mark ANTIOX-6 since at least as early as 2005 in connection with the advertisement, promotion and sale of its spa and skin treatment products.

21. Edge advertises its products and services at trade shows, seminars, and through trade publications, social media, search engine optimization, emails, and webinars. Edge has spent millions of dollars advertising its products and services in connection with the Edge Registered Marks and the ANTIOX-6 mark (collectively, "Edge Marks").

22. In addition to Edge's own advertising, important national media outlets have featured Edge and its products and reinforced the public's association between Edge and the Edge Marks. A sample of such media includes: *People Magazine, Allure*, *The Hollywood Reporter, Tampa Bay Times*, *New Beauty*, *OK! Magazine*, *Star Magazine*, *Elle Beauty Book*, *Harper's Bazaar Magazine*, *Essence*, *Simply Her*, *Examiner.com*, and *In Style*.

23. Edge's products have also been shown on *Good Day L.A., The Doctors, KLBK News, Great Day Houston,* and *Real Housewives of Beverly Hills*.

24. Edge's products have received widespread public attention and acclaim, including being awarded the "Best Equipment for the Face" by LNE & Spa numerous times.

/ / /

- 4 -

25.     Promotional materials and advertisements of Edge's products that include the Edge Marks have been distributed and are recognized by consumers and are famous throughout the United States.  As a result of Edge's substantial efforts, the Edge Marks have become extremely valuable to Edge as an identifier of the company, its products, and the substantial goodwill Edge has earned in the market.  The Edge Marks have become synonymous in consumers' minds with Edge.

26.     Edge sells its products to many consumers, including dermatologists, plastic surgeons, and health spas. Edge's products and services are offered at thousands of locations throughout the United States, including in all 50 states.

27.     As a result of the widespread use, advertising, promotion, media exposure and display of each of the Edge Marks, (a) the public has come to recognize and identify products bearing any of the Edge Marks as emanating from Edge, (b) the public recognizes that products bearing any of the Edge Marks constitute high quality products that conform to the specifications created by Edge, and (c) each of the Edge Marks has established strong secondary meaning and extensive goodwill.

28.     Edge has provided the public with notice of its rights in the Edge Registered Marks by using the symbol "®" in connection with those marks. Similarly, Edge has provided the public with notice of its rights in the ANTIOX-6 mark by using the symbol "™" in connection with that mark.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

# IV.  COUNT I

## PATENT INFRINGEMENT (35 U.S.C. § 271)

29.    Plaintiffs repeat and re-allege the allegations of paragraphs 1-28 of this Complaint as if set forth fully herein.

30.    This is a claim for patent infringement under 35 U.S.C. § 271.

31.    Plaintiffs are informed and believe and, based thereon, allege that Defendant has knowingly and intentionally infringed and continues to infringe the '591 Patent, either literally or under the doctrine of equivalents, through the manufacture, use, sale, offer for sale, and/or import into the United States of its Ageless Glow MD product.  As an example, the claim chart below demonstrates that Defendant's Ageless Glow MD product infringes Claim 1 of the '591 Patent.

| Claim 1 of US 6,641,591 | Exemplary Disclosure of Accused Product |
|---|---|
| A system for treating the skin surface of a patient, comprising: | The Ageless Glow MD is a system for treating a patient's skin.  Ageless's website labels the Ageless Glow MD as "the first portable or stationary non-diamond fluid based facial INFUSION unit of it's [sic] kind."  http://agelessserums.com/ageless-Glow-md-device-handpiece-ageless-nanopen.html    (last visited April 7, 2017) ("Ageless Website") |

| | (a) an instrument body with a distal working end that defines a skin interface portion for contacting the skin; | The Ageless Glow MD is sold with, for example, the Ageless Glow Handpiece ("Ageless Glow Handpiece") shown below. |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | |  |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | *See* Ageless Website |
| 9 | | The Ageless Glow Handpiece includes an instrument body with a distal working end that defines a skin interface portion for contacting skin; |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | |  |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |

| | |
|---|---|
| (b) a first aperture arrangement in said skin interface consisting of at least one port in communication with a treatment media source; | The Ageless Glow Handpiece includes an aperture or opening in the skin interface portion that is in communication with a treatment media source.<br><br><br>port in communication with a treatment media source<br><br> output for treatment media<br> treatment media |
| (c) a second aperture arrangement in said skin interface consisting of at least one port in communication with a vacuum source for removing treatment media and removed tissue from the skin interface; and | The Ageless Glow Handpiece includes a second aperture or opening in the skin interface portion that is in communication with a vacuum source for removing treatment media and removed tissue from the skin interface:<br><br><br>port in communication with a vacuum source<br><br><br>vacuum source |

Case 2:20-cv-09669-FLA-PVC Document 41 Filed 06/25/21 Page 193 of 380 Page ID
#:801
Case 2:17-cv-02720-FLA-PVC Document 1 Filed 04/10/17 Page 10 of 21 Page ID #:10

| | | When in use, the Ageless Glow Handpiece dispenses treatment media onto the skin, and the vacuum source of the Ageless Glow MD suctions dead skin and used treatment media into a waste compartment. |
|---|---|---|
| | (d) wherein the skin interface comprises an abrading structure with substantially sharp edges for abrading tissue. | As shown below, the skin interface portion of the Ageless Glow Handpiece includes several abrading structures with substantially sharp edges that are used to abrade the skin:  |

32.    Plaintiffs are informed and believe and, based thereon, allege that Defendant has knowingly and intentionally infringed and continues to infringe the '620 Patent, either literally or under the doctrine of equivalents, through the manufacture, use, sale, offer for sale, and/or import into the United States of its Ageless Glow Handpiece.

33.    As an example, the Ageless Glow Handpiece infringes at least claim 21 of the '620 Patent because: the Ageless Glow Handpiece is an instrument for treating surface layers of a patient's skin; the body of the Ageless Glow Handpiece has a working end; this working end has (1) a suction port that can be coupled to a negative pressurization source (i.e., a vacuum source), (2) a fluid port that can be coupled to a fluid source, as shown in the claim chart above, and (3) a skin interface portion, which is also shown above; the skin interface surface of the Ageless Glow Handpiece includes abrading structures, as shown above, that form a skin-abrading surface; and, skin debris created by

movement of the abrading structures of the Ageless Glow Handpiece across the skin—as well as any fluid deposited on the skin by the fluid port—can be removed from the surface of the skin through the suction port.

34.     Plaintiffs are informed and believe and, based thereon, allege that Defendant has knowingly and intentionally infringed and continues to infringe the '716 Patent, either literally or under the doctrine of equivalents, through the manufacture, use, sale, offer for sale, and/or import into the United States of its Ageless Glow MD.

35.     As an example, the Ageless Glow MD infringes at least claim 1 of the '716 Patent.  The Ageless Glow MD is a system for treating a skin surface of a patient.  As shown below, the Ageless Glow Handpiece of the Ageless Glow MD is an instrument body that has a main body and a working end.  The working end has an outer periphery and a skin interface that has an abrading structure that is comprised of several ridge elements, where each ridge element is configured to abrade skin.



*AGELESS GLOW HANDPIECE*

As shown in the claim chart above, the skin interface of the Ageless Glow Handpiece includes an opening at the skin interface portion that is configured to aspirate skin and/or fluid.  This opening is coupled to a remote vacuum source that is used to apply negative pressure (i.e., suction) to the skin surface.  As shown in the photograph above, the outer periphery of the Ageless Glow

1  Handpiece completely surrounds or circumscribes the plurality of ridge
2  elements and the aspiration opening.

3      36.    Plaintiffs are informed and believe and, based thereon, allege that
4  Defendant has knowingly and intentionally infringed and continues to infringe
5  the '513 Patent, either literally or under the doctrine of equivalents, through the
6  manufacture, use, sale, offer for sale, and/or import into the United States of its
7  Ageless Glow Handpiece.

8      37.    As an example, the Ageless Glow Handpiece infringes at least
9  claim 1 of the '513 Patent.  The Ageless Glow Handpiece is a system for
10 treating skin.  The Ageless Glow Handpiece is a handheld device that has a
11 main body, with a working end on the distal end of that main body.  The
12 Ageless Glow Handpiece has an outer periphery that extends along its distal
13 end.  As shown below, the Ageless Glow Handpiece has several surface
14 elements that extend distally from the working end of the device.



surface elements that
extend distally from
the working end

23 As shown above, these surface elements are positioned within an interior area
24 that is circumscribed by the outer periphery.  Each of these surface elements
25 includes at least one sharp edge that is configured to abrade skin when the
26 Ageless Glow Handpiece is moved relative to a skin surface.  As shown in the
27 claim chart above, the Ageless Glow Handpiece has an opening on the working
28 end that is configured to be placed in fluid communication with a vacuum

source via a passageway, where the passageway is configured to remove debris away from the working end when the vacuum source is activated.  As shown in the photographs above, the entire circumference of the Ageless Glow Handpiece's outer periphery is configured to contact a skin surface during a treatment procedure.

38.     Plaintiffs are informed and believe and, based thereon, allege that Defendant had actual knowledge of each of the Asserted Patents.

39.     Defendant's acts of infringement of each of the Asserted Patents were undertaken without permission or license from Plaintiffs.

40.     Defendant's actions constitute willful and intentional infringement of each of the Asserted Patents.  Defendant infringed each of the Asserted Patents with reckless disregard of Plaintiffs' patent rights.  Defendant knew, or it was so obvious that Defendant should have known, that its actions constituted infringement of each of the Asserted Patents.  Defendant's acts of infringement of each of the Asserted Patents were not consistent with the standards of commerce for its industry.

41.     As a direct and proximate result of Defendant's acts of infringement, Defendant has derived and received gains, profits, and advantages in an amount that are not presently known to Plaintiffs.

42.     Pursuant to 35 U.S.C. § 284, Plaintiffs are entitled to damages for Defendant's infringing acts and treble damages together with interests and costs as fixed by this Court.

43.     Pursuant to 35 U.S.C. § 285, Plaintiffs are entitled to reasonable attorneys' fees for the necessity of bringing this claim.

44.     Due to the aforesaid infringing acts, Plaintiffs have suffered great and irreparable injury, for which Plaintiffs have no adequate remedy at law.

45.     Defendant will continue to infringe Plaintiffs' patent rights to the great and irreparable injury of Plaintiffs, unless enjoined by this Court.

# V. <u>COUNT II</u>

## <u>TRADEMARK INFRINGEMENT (15 U.S.C. § 1114)</u>

46.     Edge repeats and re-alleges the allegations of paragraphs 1-45 of this Complaint as if set forth fully herein.

47.     This is a claim for trademark infringement arising under 15 U.S.C. § 1114.

48.     Defendant operates the website agelessserums.com.

49.     On various places throughout Defendant's website, Defendant uses Edge's registered Hydrafacial® trademark.

50.     This use of Edge's Hydrafacial® trademark has occurred and is occurring without Edge's consent.

51.     Defendant's use of the Hydrafacial® trademark occurs without use of the "®" symbol and without any acknowledgement that Edge is the owner of the Hydrafacial® trademark.

52.     Defendant's use of the Hydrafacial® trademark is likely to cause consumer confusion in that consumers are likely to believe there is some association or connection between Edge and Defendant or Defendant's products.

53.     Defendant's website also includes a photograph of an Edge bottle that clearly and prominently displays Edge's registered Chevron-E logo.

54.     This use of Edge's Chevron-E logo has occurred and is occurring without Edge's consent.

55.     Defendant's use of the Chevron-E occurs without any acknowledgement that Edge is the owner of the Chevron-E logo.

56.     Defendant's use of the Chevron-E logo is likely to cause consumer confusion in that consumers are likely to believe there is some association or connection between Edge and Defendant or Defendant's products.

/ / /

57.     Defendant's unauthorized use of the Edge Registered Marks has occurred in commerce in connection with Defendant's sale of its own competing products.

58.     Edge is informed and believes, and thereon alleges, that Defendant's use of the Edge Registered Marks occurred with the intent to unfairly compete with Edge, to trade upon Edge's reputation and goodwill by causing confusion and mistake among customers and the public, and to deceive the public into believing that Defendant's products are associated with, sponsored by, originate from, or are approved by Edge, when they are not.

59.     Defendant's activities constitute willful and intentional infringement of the Edge Registered Marks in total disregard of Edge's proprietary rights, and were done despite Defendant's knowledge that the use of the Edge Registered Marks was and is in direct contravention of Edge's rights.

60.     Edge is informed and believes, and thereon alleges, that Defendant has derived and received, and will continue to derive and receive, gains, profits, and advantages from the use of the Edge Registered Marks in an amount that is not presently known to Edge.  By reason of Defendant's unauthorized and improper use of the Edge Registered Marks, Edge has been damaged and is entitled to monetary relief in an amount to be determined at trial.

61.     Pursuant to 15 U.S.C. § 1117, Edge is entitled to damages for Defendant's acts complained of herein, up to three times Defendant's unlawful profits and Edge's actual damages as fixed by this Court, and its reasonable attorneys' fees for the necessity of bringing this claim.

62.     Due to Defendant's unauthorized and improper use of the Edge Registered Marks, Oakley has suffered and continues to suffer great and irreparable injury, for which Edge has no adequate remedy at law.  Edge is entitled to injunctive relief pursuant to 15 U.S.C. §§ 1116(a) and 1125(c) that requires Defendant to stop use of Edge's Registered Marks.

# VI.  COUNT III

## FEDERAL UNFAIR COMPETITION & FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a)

63.    Edge repeats and re-alleges the allegations of paragraphs 1-62 of this Complaint as if set forth fully herein.

64.    This is a claim for unfair competition and false designation of origin under 15 U.S.C. § 1125(a), arising from Defendant's unauthorized use of Edge's ANTIOX-6™ trademark, as well as Defendant's unauthorized use of the Edge Registered Marks.

65.    The Edge bottle depicted on Defendant's website prominently displays Edge's ANTIOX-6™ trademark.

66.    This use of Edge's ANTIOX-6™ trademark has occurred and is occurring without Edge's consent.

67.    Defendant's use of the ANTIOX-6™ trademark occurs without any acknowledgement that Edge is the owner of the ANTIOX-6™ trademark.

68.    Defendant's use of the ANTIOX-6™ trademark is likely to cause consumer confusion in that consumers are likely to believe there is some association or connection between Edge and Defendant or Defendant's products.

69.    Defendant's unauthorized use of the ANTIOX-6™ trademark has occurred in commerce in connection with Defendant's sale of its own competing products.

70.    Defendant's use of the ANTIOX-6™ trademark without Edge's consent constitutes a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendant with Edge, or as to the origin, sponsorship, or approval

/ / /

of Defendant's goods and/or commercial activities by Edge in violation of 15 U.S.C. § 1125(a), and constitutes unfair competition with Edge.

71.     Similarly, Defendant's use of the Edge Registered Marks without Edge's consent constitutes a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendant with Edge, or as to the origin, sponsorship, or approval of Defendant's goods and/or commercial activities by Edge in violation of 15 U.S.C. § 1125(a), and constitutes unfair competition with Edge.

72.     Edge is informed and believes, and thereon alleges, that Defendant's actions were undertaken willfully with full knowledge of the falsity of such designation of origin and false descriptions or representations.

73.     Edge is informed and believes, and thereon alleges, that Defendant has derived and received, and will continue to derive and receive, gains, profits, and advantages from Defendant's false designation of origin, false or misleading statements, descriptions of fact, false or misleading representations of fact, and/or unfair competition in an amount that is not presently known to Edge.  By reason of Defendant's actions, constituting false designation of origin, false or misleading statements, false or misleading descriptions of fact, false or misleading representations of fact, and/or unfair competition, Edge has been damaged and is entitled to monetary relief in an amount to be determined at trial.

74.     Pursuant to 15 U.S.C. § 1117, Edge is entitled to damages for Defendant's acts constituting false designation of origin, false or misleading statements, false or misleading descriptions of fact, false or misleading representations of fact, and/or unfair competition, up to three times Defendant's

/ / /

1   unlawful profits and Edge's actual damages as fixed by this Court, and its
2   reasonable attorneys' fees for the necessity of bringing this claim.

3       75.    Due to Defendant's actions, constituting false designation of origin,
4   false or misleading statements, false or misleading description of fact, false or
5   misleading representations of fact, and/or unfair competition, Edge has suffered
6   and continues to suffer great and irreparable injury, for which Edge has no
7   adequate remedy at law.  Edge is entitled to injunctive relief pursuant to 15
8   U.S.C. §§ 1116(a) and 1125(c) that requires Defendant to stop use of Edge's
9   ANTIOX-6™ trademark.

## VII.  COUNT IV
### CALIFORNIA UNFAIR COMPETITION

12      76.    Edge repeats and re-alleges the allegations of paragraphs 1-75 of
13  this Complaint as if set forth fully herein.

14      77.    This is a claim for unfair competition, arising under California
15  Business & Professions Code § 17200, *et seq.* and California common law.

16      78.    Defendant's acts of trademark infringement and false designation
17  of origin complained of herein constitute unfair competition with Edge under
18  the common law and statutory laws of the State of California, particularly
19  California Business & Professions Code § 17200 *et seq.*

20      79.    Edge is informed and believes, and thereon alleges, that Defendant
21  has derived and received, and will continue to derive and receive, gains, profits,
22  and advantages from Defendant's unfair competition in an amount that is not
23  presently known to Edge.  By reason of Defendant's wrongful acts as alleged in
24  this Complaint, Edge has been damaged and is entitled to monetary relief in an
25  amount to be determined at trial.

26      80.    By its actions, Defendant has injured and violated the rights of
27  Edge and has irreparably injured Edge, and such irreparable injury will continue
28  unless Defendant is enjoined by this Court.

81. Edge is informed and believes that Defendant's unfair competition has been willful, wanton, and oppressive, entitling Edge to punitive damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs pray for judgment in their favor against Defendant for the following relief:

A. An Order adjudging Defendant to have infringed the Asserted Patents under 35 U.S.C. § 271;

B. A preliminary and permanent injunction enjoining Defendant, its officers, directors, agents, servants, employees, and attorneys, and those persons in active concert or participation with Defendant, from (1) making, using, selling, offering to sell, and/or importing Defendant's Ageless Glow MD Device and Ageless Glow Handpiece, and (2) infringing the Asserted Patents in violation of 35 U.S.C. § 271, either directly or indirectly;

C. An accounting for all of Defendant's gains, profits, and advantages derived by Defendant's infringement of the Asserted Patents in violation of 35 U.S.C. § 271, and an Order that Defendant pay to Plaintiffs actual damages in the form of lost profits, or in the alternative, other damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the patented inventions by Defendant, in accordance with 35 U.S.C. § 284;

D. An Order for a trebling of damages and/or exemplary damages because of Defendant's willful conduct pursuant to 35 U.S.C. § 284;

E. An Order adjudging that this case is exceptional under 35 U.S.C. § 285 and ordering Defendant to pay to Plaintiffs their reasonable attorney fees incurred in this action;

F. An Order adjudging Defendant to have infringed the Edge Marks, to have falsely designated the origin of Defendant's goods and services; and to have competed unfairly with Edge;

G.    A preliminary and permanent injunction enjoining Defendant, its officers, directors, agents, servants, employees, and attorneys, and those persons in active concert or participation with Defendant, from using the Edge Marks or any confusingly similar marks;

H.    An accounting to determine Defendant's profits resulting from its trademark infringement, false designation of origin, and unfair competition, and an award monetary relief to Edge in an amount to be fixed by the Court in its discretion as it finds just, including:

1.  all profits received by Defendant from sales and revenues of any kind made as a result of its infringing actions; and

2.  all damages sustained by Edge as a result of Defendant's acts of trademark infringement, false designation of origin, and unfair competition.

I.    An Order that such profits and damages be trebled and awarded to Edge pursuant to 15 U.S.C. § 1117;

J.    An Order adjudging this to be an exceptional case under 15 U.S.C. § 1117 and ordering Defendant to pay to Edge its reasonable attorney fees incurred in this action;

K.    An Order awarding Edge punitive damages under California law;

L.    An Order awarding pre-judgment and post-judgement interest and costs as fixed by the Court; and

M.    Such other and further relief as this Court may deem just and proper.

/ / /

/ / /

/ / /

/ / /

/ / /

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: April 10, 2017      By: */s/ Ali S. Razai*
                           Brenton R. Babcock
                           brent.babcock@knobbe.com
                           Ali S. Razai
                           ali.razai@knobbe.com

                           Attorneys for Plaintiffs
                           EDGE SYSTEMS LLC and
                           AXIA MEDSCIENCES, LLC

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: April 10, 2017          By: /s/Ali S. Razai
                                    Brenton R. Babcock
                                    brent.babcock@knobbe.com
                                    Ali S. Razai
                                    ali.razai@knobbe.com

                                    Attorneys for Plaintiffs
                                    EDGE SYSTEMS LLC and
                                    AXIA MEDSCIENCES, LLC

25676819

# EXHIBIT J

Brenton R. Babcock (SBN 162,120)
brent.babcock@knobbe.com
Ali S. Razai (SBN 246,922)
ali.razai@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone: (949) 760-0404
Facsimile: (949) 760-9502

Attorneys for Plaintiffs
EDGE SYSTEMS LLC and
AXIA MEDSCIENCES, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| EDGE SYSTEMS LLC, a California limited liability company, and AXIA MEDSCIENCES, LLC, a Delaware limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>AESTHETIC SKIN SYSTEMS LLC, a California limited liability company,<br><br>Defendant. | Civil Action No. 2:17-cv-04597<br><br>**COMPLAINT FOR PATENT INFRINGEMENT, TRADE DRESS INFRINGEMENT, AND UNFAIR COMPETITION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Edge Systems LLC, ("Edge") and Axia Medsciences, LLC ("Axia") (collectively, "Plaintiffs") hereby complain of Aesthetic Skin Systems LLC ("Defendant") and allege as follows:

## I. JURISDICTION AND VENUE

1.     This Court has original subject matter jurisdiction over the patent and trade dress infringement claims in this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).  This Court has original subject matter jurisdiction over the unfair competition claims in this action pursuant to 28 U.S.C. § 1338(b).

2.     This Court has personal jurisdiction over Defendant because Defendant has a continuous, systematic, and substantial presence within this judicial district including by selling and offering for sale infringing products in this judicial district, and by committing acts of infringement in this judicial district, including but not limited to selling infringing products directly to consumers and/or retailers in this district and selling infringing products into the stream of commerce knowing such products would be sold in California and this district, which acts form a substantial part of the events or omissions giving rise to Plaintiffs' claim.

3.     Plaintiffs are informed and believe and, based thereon, allege that Defendant has a regular and established place of business in this district at 2621 Manhattan Beach Blvd., Redondo Beach, California 90278.

4.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and 1400(b).  Defendant is a company organized and existing under the laws of the state of California.

## II. THE PARTIES

5.     Plaintiff Edge is a California corporation having its principal place of business at 2277 Redondo Ave., Signal Hill, CA 90755.

6.     Plaintiff Axia is a Delaware limited liability company having its principal place of business at 23 Hallmark Circle, Menlo Park, California,

- 1 -

94025.

7.     Plaintiffs are informed and believe and, based thereon, allege that Aesthetic Skin Systems LLC is a California limited liability company having its principal place of business at 2621 Manhattan Beach Blvd., Redondo Beach, California 90278.

### III.  GENERAL ALLEGATIONS

8.     Edge is a worldwide leader in microdermabrasion and hydradermabrasion systems.  Edge has spent considerable time, effort and money to develop its proprietary technology, including the HydraFacial MD® hydradermabrasion system.

9.     To protect its substantial investment, Edge has obtained the rights to various patents and patent applications throughout the world.

10.    On November 4, 2003, the United States Patent and Trademark Office ("USPTO") duly and lawfully issued U.S. Patent No. 6,641,591 ("the '591 Patent"), titled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS."  A true and correct copy of the '591 Patent is attached hereto as Exhibit 1.

11.    On March 16, 2010, the USPTO duly and lawfully issued U.S. Patent No. 7,678,120 ("the '120 Patent"), titled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS." A true and correct copy of the '120 Patent is attached hereto as Exhibit 2.

12.    On September 7, 2010, the USPTO duly and lawfully issued U.S. Patent No. 7,789,886 ("the '886 Patent"), titled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS." A true and correct copy of the '886 Patent is attached hereto as Exhibit 3.

- 2 -

13.    On November 29, 2011, the USPTO duly and lawfully issued U.S. Patent No. 8,066,716 ("the '716 Patent"), titled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS." A true and correct copy of the '716 Patent is attached hereto as Exhibit 4.

14.    On December 25, 2012, the USPTO duly and lawfully issued U.S. Patent No. 8,337,513 ("the '513 Patent"), titled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS." A true and correct copy of the '513 Patent is attached hereto as Exhibit 5.

15.    On October 18, 2016, the USPTO duly and lawfully issued U.S. Patent No. 9,468,464 ("the '464 Patent"), titled "METHODS FOR TREATING THE SKIN USING VACUUM." A true and correct copy of the '464 Patent is attached hereto as Exhibit 6.

16.    Axia is the owner of all right, title, and interest in the '591 Patent, the '120 Patent, the '886 Patent, the '716 Patent, the '513 Patent, and the '464 Patent (collectively, "the Asserted Patents"), which are each exclusively licensed to Edge.

17.    Edge's premier product is its revolutionary HydraFacial MD® hydradermabrasion system, which bears unique and distinctive trade dress that consists of the overall design and configuration of the product, as shown in the photograph below (the "Edge Trade Dress").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**THE EDGE MACHINE**

18.     Edge advertises its products bearing the Edge Trade Dress at trade shows, seminars, and through trade publications, social media, search engine optimization, emails, and webinars.   Edge has spent millions of dollars advertising its products bearing the Edge Trade Dress.

19.     In addition to Edge's own advertising, important national media outlets have featured Edge's products bearing the Edge Trade Dress and reinforced the public's association between Edge and the Edge Trade Dress.  A sample of such media includes: *People Magazine, Allure*, *The Hollywood Reporter, Tampa Bay Times*, *New Beauty*, *OK! Magazine*, *Star Magazine*, *Elle Beauty Book*, *Harper's Bazaar Magazine*, *Essence*, *Simply Her*, *Examiner.com*, and *In Style*.

20.     Edge's products bearing the Edge Trade Dress have also been shown on *Good Day L.A., The Doctors, KLBK News, Great Day Houston,* and *Real Housewives of Beverly Hills*.

21. Edge's products bearing the Edge Trade Dress have received widespread public attention and acclaim, including being awarded the "Best Equipment for the Face" by LNE & Spa numerous times.

22. Promotional materials and advertisements of Edge's products that bear the Edge Trade Dress have been distributed and are recognized by consumers throughout the United States. As a result of Edge's substantial efforts, the Edge Trade Dress has become extremely valuable to Edge as an identifier of the company, and the substantial goodwill Edge has earned in the market. The Edge Trade Dress has become synonymous in consumers' minds with Edge.

23. Edge sells its products bearing the Edge Trade Dress to many consumers, including dermatologists, plastic surgeons, and health spas. Edge's products bearing the Edge Trade Dress are offered at thousands of locations throughout the United States, including in all 50 states.

24. As a result of the widespread use, advertising, promotion, media exposure and display of the Edge Trade Dress, (a) the public has come to recognize and identify products bearing the Edge Trade Dress as emanating from Edge, (b) the public recognizes that products bearing the Edge Trade Dress constitute high quality products that conform to the specifications created by Edge, and (c) the Edge Trade Dress has established strong secondary meaning and extensive goodwill.

25. The Edge Trade Dress is not functional. The design features embodied by the Edge Trade Dress are not essential to the function of the product, do not make the product cheaper or easier to manufacture, and do not affect the quality of the product. The design of the Edge Trade Dress is not a competitive necessity.

26. Subsequent to Edge's use and adoption of the Edge Trade Dress, Defendant has developed, manufactured, imported, advertised, and/or sold

Case 2:20-cv-09669-FLA-PVC   Document 41   Filed 06/25/21   Page 213 of 380   Page ID
#:821
Case 2:17-cv-04699-PSG-AFM   Document 1   Filed 06/22/17   Page 7 of 21   Page ID #:7

products that use trade dress that is confusingly similar to the Edge Trade Dress.

27.     Defendant makes, uses, sells, offers to sell, and/or imports into the United States the Aqua Skin Facial product ("Accused Product").  A photograph of the Accused Product is shown below.



28.     The Accused Product infringes each of the Asserted Patents and the Edge Trade Dress.

29.     The Accused Product is a system for treating the skin surface of a patient.   The Accused Product includes a handpiece and a variety of tips, examples of which are shown in the photograph below.



30.     The handpiece of the Accused Product has (1) a port that can be attached to a vacuum source that is housed in the Accused Product, and (2) a port that can attach to at least one fluid source that is housed in the Accused Product.  The handpiece, in combination with one of the tips that can be used with the Accused Product, defines a skin interface portion.

31.     At least some of the tips that can be used with the handpiece of the Accused Product have abrading structures with substantially sharp edges to abrade the skin.  When the Accused Product is in use, the vacuum creates a seal between the skin interface portion of the handpiece and the patient's skin.  The Accused Product deposits fluid, for example a skin treatment media that may be housed in the Accused Product, on the patient's skin through the port in the handpiece.  The vacuum source at least aids in depositing the fluid onto the patient's skin.  If the handpiece is used with a tip that has an abrading structure, the handpiece abrades the patient's skin, which can result in skin cells and/or debris.  The suction from the vacuum source can carry away skin cells, debris, and/or fluid from the patient's skin through the skin interface portion of the handpiece and into a waste container.

32.     Plaintiffs are informed and believe and, based thereon, allege that Defendant sells its infringing products, including the Accused Product, to its customers, including, for example, Asim Medical Center.

33.     Defendant's customers also infringed each of the Asserted Patents by using infringing product that they acquired from the Defendant.

34.     Defendant had actual knowledge of each of the Asserted Patents as early as February 1, 2017, when Plaintiffs sent Defendant a letter demanding that Defendant stop infringing the Asserted Patents.

35.     Plaintiffs are informed and believe and, based thereon, allege that Defendant knew that its customers would infringe each of the Asserted Patents by, for example, using its infringing products, including, for example, the

- 7 -

Accused Product, during the respective terms of the Asserted Patents.

36.     Plaintiffs are informed and believe and, based thereon, allege that Defendant had the specific intent to induce its customers to infringe each of the Asserted Patents by, for example, using products that infringe the Asserted Patents, including, for example, the Accused Product, during the respective term of the Asserted Patents.

## IV.  COUNT I
## PATENT INFRINGEMENT (35 U.S.C. § 271)

37.     Plaintiffs repeat and re-allege the allegations of paragraphs 1-36 of this Complaint as if set forth fully herein.

38.     This is a claim for patent infringement under 35 U.S.C. § 271.

39.     Plaintiffs are informed and believe and, based thereon, allege that Defendant has knowingly and intentionally infringed and continues to infringe the '591 Patent, either literally or under the doctrine of equivalents, though, for example, the manufacture, use, sale, offer for sale, and/or importation into the United States of the Accused Product.

40.     For example, the Accused Product infringes at least Claim 1 of the '591 Patent because it is a system for treating the skin surface of a patient.  The Accused Product includes a handpiece that, when used with one of the tips, forms a working end that defines a skin interface portion for contacting skin. The handpiece has one port that is communication with a treatment media source, and a second port that is in communication with a vacuum source.  The vacuum source is able to remove tissue (e.g., exfoliated skin) and treatment media that may have been deposited on the patient's skin, through the skin interface portion of the handpiece.  The Accused Product can be used with tips that include substantially sharp edge for abrading skin.

41.     Plaintiffs are informed and believe and, based thereon, allege that Defendant's customers (e.g., Asim Medical Center) that purchased infringing

- 8 -

product (e.g., the Accused Product) from the Defendant have also infringed the '591 Patent by, for example, using those infringing products.

42.     Plaintiffs are informed and believe and, based thereon, allege that Defendant knew that its customers (e.g., Asim Medical Center) would infringe the '591 Patent by, for example, using those infringing products during the term of the '591 Patent.

43.     Plaintiffs are informed and believe and, based thereon, allege that Defendant had the specific intent to induce its customers to infringe the '591 Patent by, for example, using products that infringe the '591 Patent.

44.     Defendant has knowingly and intentionally infringed and continues to infringe the '120 Patent, either literally or under the doctrine of equivalents, though, for example, the manufacture, use, sale, offer for sale, and/or importation into the United States of the Accused Product.

45.     For example, use of the Accused Product infringes at least Claim 1 of the '120 Patent.  The Accused Product includes a handpiece that, when used with one of the tips, forms a working end that defines a skin interface portion for contacting skin.  The Accused Product includes, for example, tips that include apexes that extend upwardly from an abrading surface, where the apexes have sharp edges. The handpiece includes a port that is in communication with a vacuum source.

46.     When in use, the working end of the handpiece is placed against a patient's skin, and the skin is drawn against the tip of the handpiece by the negative pressure of the vacuum source.  The handpiece is moved across the patient's skin, while the tip remains stationary on the handpiece.  As a result, the edge on each of the apexes on the tip remains stationary relative to the handpiece.  The continuous suction of the vacuum source keeps the skin drawn against the sharp edge of the apexes of the tip, which abrades the skin as the handpiece is moved across the surface of the skin.  Any skin debris that results

from the skin abrasion is drawn through the aperture in the working end of the handpiece by the vacuum source and removed from the surface of the patient's skin.

47.  Plaintiffs are informed and believe and, based thereon, allege that Defendant's customers (e.g., Asim Medical Center) that purchased infringing product (e.g., the Accused Product) from the Defendant have also infringed the '120 Patent by, for example, using those infringing products.

48.  Plaintiffs are informed and believe and, based thereon, allege that Defendant knew that its customers (e.g., Asim Medical Center) would infringe the '120 Patent by, for example, using those infringing products during the term of the '120 Patent.

49.  Plaintiffs are informed and believe and, based thereon, allege that Defendant had the specific intent to induce its customers to infringe the '120 Patent by, for example, using products that infringe the '120 Patent.

50.  Defendant has knowingly and intentionally infringed and continues to infringe the '886 Patent, either literally or under the doctrine of equivalents, though, for example, the manufacture, use, sale, offer for sale, and/or importation into the United States of the Accused Product.

51.  For example, the Accused Product infringes at least Claim 1 of the '886 Patent.  The Accused Product includes a handpiece that, when used with one of the tips of the Accused Product, forms a working end that defines a skin interface portion for contacting skin.  The handpiece, which has a longitudinal axis, includes a port that is in communication with a vacuum source.  The Accused Product includes, for example, tips that have a plurality of sharp elements for abrading skin that is positioned in a raised periphery that completely surrounds the abrading structure.  The tip includes an aperture that is also within the raised periphery; the aperture leads to the port that is in communication with the vacuum source of the Accused Product.



52.   When in use, the working end of the handpiece is placed against a patient's skin, and the skin is drawn against the outer periphery of the tip of the handpiece by the negative pressure of the vacuum source.  The continuous suction of the vacuum source keeps the skin drawn against the outer periphery of the tip and against the sharp elements of the abrading structures, which abrades the skin as the handpiece is moved across the surface of the skin.  Any skin debris that results from the skin abrasion is drawn through the aperture in the working end of the handpiece by the vacuum source and removed from the surface of the patient's skin.

53.   Plaintiffs are informed and believe and, based thereon, allege that Defendant's customers (e.g., Asim Medical Center) that purchased infringing product (e.g., the Accused Product) from the Defendant have also infringed the '886 Patent by, for example, using those infringing products.

54.     Plaintiffs are informed and believe and, based thereon, allege that Defendant knew that its customers (e.g., Asim Medical Center) would infringe the '886 Patent by, for example, using those infringing products during the term of the '886 Patent.

55.     Plaintiffs are informed and believe and, based thereon, allege that Defendant had the specific intent to induce its customers to infringe the '886 Patent by, for example, using products that infringe the '886 Patent.

56.     Defendant has knowingly and intentionally infringed and continues to infringe the '716 Patent, either literally or under the doctrine of equivalents, though, for example, the manufacture, use, sale, offer for sale, and/or importation into the United States of the Accused Product.

57.     For example, the Accused Product infringes at least Claim 1 of the '716 Patent.  The Accused Product is a system for treating a skin surface of the patient.  The handpiece of the Accused Product has a main body and a working end that includes one of the tips of the Accused Product.  The Accused Product includes, for example, tips that have abrading structures, which are made up of a plurality of ridge elements that are configured to abrade skin.  The handpiece includes an aperture or opening at or near the working end that is coupled to the vacuum source in the Accused Product, which is configured to apply suction to the skin surface.  In at least some of the tips that can be used with the Accused Product, the plurality of ridge elements and the aperture leading to the vacuum source are entirely surrounded by an outer periphery.

58.     Plaintiffs are informed and believe and, based thereon, allege that Defendant's customers (e.g., Asim Medical Center) that purchased infringing product (e.g., the Accused Product) from the Defendant have also infringed the '716 Patent by, for example, using those infringing products.

59.     Plaintiffs are informed and believe and, based thereon, allege that Defendant knew that its customers (e.g., Asim Medical Center) would infringe

the '716 Patent by, for example, using those infringing products during the term of the '716 Patent.

60.    Plaintiffs are informed and believe and, based thereon, allege that Defendant had the specific intent to induce its customers to infringe the '716 Patent by, for example, using products that infringe the '716 Patent.

61.    Defendant has knowingly and intentionally infringed and continues to infringe the '464 Patent, either literally or under the doctrine of equivalents, though, for example, the manufacture, use, sale, offer for sale, and/or importation into the United States of the Accused Product.

62.    For example, use of the Accused Product infringes at least Claim 1 of the '464 Patent.  When in use, the Accused Product embodies a method of treating a patient's skin surface.

63.    The handpiece of the Accused Product has a main body, which has a housing and a working end that includes one of the tips of the Accused Product.  The working end of the handpiece is configured to contact the patient's skin, and can be used with a tip that comprises a perimeter along the distal end of the handpiece.  The handpiece has a first aperture or opening arrangement that includes a port near the working end that is in fluid communication with a vacuum source in the Accused Product through a passageway in the distal end of the handpiece, and a second aperture or opening arrangement that includes a second port near the working end that is in fluid communication with a treatment media source in the Accused Product.  When in use, the vacuum source facilitates the delivery of a liquid treatment media to the surface of the patient's skin through the second port.  The used liquid treatment media is aspirated away from the surface of the patient's skin through the first port and the passageway at the distal end of the handpiece.  The negative pressure of the vacuum facilitates the delivery of the treatment media to subsurface skin tissue and the delivery of the treatment media hydrates or puffs

up the skin at the treatment site and facilitates the treatment method.

64.     Plaintiffs are informed and believe and, based thereon, allege that Defendant's customers (e.g., Asim Medical Center) that purchased infringing product (e.g., the Accused Product) from the Defendant have also infringed the '464 Patent by, for example, using those infringing products.

65.     Plaintiffs are informed and believe and, based thereon, allege that Defendant knew that its customers (e.g., Asim Medical Center) would infringe the '464 Patent by, for example, using those infringing products during the term of the '464 Patent.

66.     Plaintiffs are informed and believe and, based thereon, allege that Defendant had the specific intent to induce its customers to infringe the '464 Patent by, for example, using products that infringe the '464 Patent.

67.     Defendant's acts of infringement of each of the Asserted Patents were undertaken without permission or license from Plaintiffs.

68.     Defendant's actions constitute willful and intentional infringement of each of the Asserted Patents.  Defendant infringed each of the Asserted Patents with reckless disregard of Plaintiffs' patent rights.  Defendant knew, or it was so obvious that Defendant should have known, that its actions constituted infringement of each of the Asserted Patents.  Defendant's acts of infringement of each of the Asserted Patents were not consistent with the standards of commerce for its industry.

69.     As a direct and proximate result of Defendant's acts of infringement, Defendant has derived and received gains, profits, and advantages in an amount that are not presently known to Plaintiffs.

70.     Pursuant to 35 U.S.C. § 284, Plaintiffs are entitled to damages for Defendant's infringing acts and treble damages together with interests and costs as fixed by this Court.

71.     Pursuant to 35 U.S.C. § 285, Plaintiffs are entitled to reasonable

attorneys' fees for the necessity of bringing this claim.

72.   Due to the aforesaid infringing acts, Plaintiffs have suffered great and irreparable injury, for which Plaintiffs have no adequate remedy at law.

73.   Defendant will continue to infringe Plaintiffs' patent rights to the great and irreparable injury of Plaintiffs, unless enjoined by this Court.

## V.   COUNT II

### FEDERAL TRADE DRESS INFRINGEMENT &
### UNFAIR COMPETITION (15 U.S.C. § 1125(a))

74.   Edge repeats and re-alleges the allegations of paragraphs 1-73 of this Complaint as if set forth fully herein.

75.   This is a claim for trade dress infringement and unfair competition arising under 15 U.S.C. § 1125.

76.   Subsequent to Edge's use and adoption of the Edge Trade Dress, Defendant has developed, manufactured, imported, advertised, and/or sold products that use trade dress that is confusingly similar to the Edge Trade Dress. For example, Defendant's Accused Product, which were sold and/or offered for sale on Defendant's website http://aestheticskinsystems.com/, are confusingly similar to the Edge Trade Dress.

77.   Defendant's use of a trade dress that is confusingly similar to the Edge Trade Dress in connection with its products is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendant with Edge.

78.   Defendant's use of a trade dress that is confusingly similar to the Edge Trade Dress without Edge's consent constitutes a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods

1    or commercial activities by another person in violation of 15 U.S.C. § 1125(a).

2        79.    Such conduct by Defendant is likely to confuse, mislead, and

3    deceive Defendant's customers, purchasers, and members of the public as to the

4    origin of the Defendant's products or cause said persons to believe that

5    Defendant and/or its products have been sponsored, approved, authorized, or

6    licensed by Edge or are in some way affiliated or connected with Edge, all in

7    violation of 15 U.S.C. § 1125(a) and constitutes unfair competition with Edge.

8        80.    Plaintiffs are informed and believe and, based thereon, allege that

9    Defendant's acts of trade dress infringement and unfair competition were

10   undertaken willfully with the express intent to cause confusion, and to mislead

11   and deceive the purchasing public.

12       81.    Plaintiffs are informed and believe and, based thereon, allege that

13   Defendant has derived and received, and will continue to derive and receive,

14   gains, profits, and advantages from Defendant's trade dress infringement and

15   unfair competition in an amount that is not presently known to Edge.  By reason

16   of Defendant's actions constituting trade dress infringement, Edge has been

17   damaged and is entitled to monetary relief in an amount to be determined at

18   trial.

19       82.    Due to Defendant's actions constituting trade dress infringement

20   and unfair competition, Edge has suffered and continues to suffer great and

21   irreparable injury, for which Edge has no adequate remedy at law.

22       83.    Pursuant to 15 U.S.C. § 1117, Edge is entitled to damages for

23   Defendant's infringing acts, up to three times actual damages as fixed by this

24   Court, and its reasonable attorneys' fees for the necessity of bringing this claim.

25                        **VI.  COUNT IV**

26                  **CALIFORNIA UNFAIR COMPETITION**

27       84.    Edge repeats and re-alleges the allegations of paragraphs 1-83 of

28   this Complaint as if set forth fully herein.

85.     This is a claim for unfair competition, arising under California Business & Professions Code § 17200, *et seq.* and California common law.

86.     Defendant's acts of trade dress infringement complained of herein constitute unfair competition with Edge under the common law and statutory laws of the State of California, particularly California Business & Professions Code § 17200 *et seq.*

87.     Edge is informed and believes, and thereon alleges, that Defendant has derived and received, and will continue to derive and receive, gains, profits, and advantages from Defendant's unfair competition in an amount that is not presently known to Edge.  By reason of Defendant's wrongful acts as alleged in this Complaint, Edge has been damaged and is entitled to monetary relief in an amount to be determined at trial.

88.     By its actions, Defendant has injured and violated the rights of Edge and has irreparably injured Edge, and such irreparable injury will continue unless Defendant is enjoined by this Court.

89.     Edge is informed and believes that Defendant's unfair competition has been willful, wanton, and oppressive, entitling Edge to punitive damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs pray for judgment in their favor against Defendant for the following relief:

A.     An Order adjudging Defendant to have directly infringed, induced the infringement of, and contributorily infringed the Asserted Patents under 35 U.S.C. § 271;

B.     A preliminary and permanent injunction enjoining Defendant, its officers, directors, agents, servants, employees, and attorneys, and those persons in active concert or participation with Defendant, from (1) making, using, selling, offering to sell, and/or importing the Accused Product, and (2)

infringing the Asserted Patents in violation of 35 U.S.C. § 271, either directly or indirectly;

C.     An accounting for all of Defendant's gains, profits, and advantages derived by Defendant's infringement of the Asserted Patents in violation of 35 U.S.C. § 271, and an Order that Defendant pay to Plaintiffs actual damages in the form of lost profits, or in the alternative, other damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the patented inventions by Defendant, in accordance with 35 U.S.C. § 284;

D.     An Order for a trebling of damages and/or exemplary damages because of Defendant's willful conduct pursuant to 35 U.S.C. § 284;

E.     An Order adjudging that this case is exceptional under 35 U.S.C. § 285 and ordering Defendant to pay to Plaintiffs their reasonable attorney fees incurred in this action;

F.     An Order adjudging Defendant to have infringed the Edge Trade Dress and to have competed unfairly with Edge;

G.     A preliminary and permanent injunction enjoining Defendant, its officers, directors, agents, servants, employees, and attorneys, and those persons in active concert or participation with Defendant, from using the Edge Trade Dress or any trade dress that is confusingly similar thereto;

H.     An accounting to determine Defendant's profits resulting from its trade dress infringement and unfair competition, and an award monetary relief to Edge in an amount to be fixed by the Court in its discretion as it finds just, including:

    1.  all profits received by Defendant from sales and revenues of any kind made as a result of its infringing actions; and

    2.  all damages sustained by Edge as a result of Defendant's acts of trade dress infringement and unfair competition.

I. An Order that such profits and damages be trebled and awarded to Edge pursuant to 15 U.S.C. § 1117;

J. An Order adjudging this to be an exceptional case under 15 U.S.C. § 1117 and ordering Defendant to pay to Edge its reasonable attorney fees incurred in this action;

K. An Order awarding Edge punitive damages under California law;

L. An Order awarding pre-judgment and post-judgement interest and costs as fixed by the Court; and

M. Such other and further relief as this Court may deem just and proper.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: June 22, 2017      By: */s/ Ali S. Razai*
                              Brenton R. Babcock
                              brent.babcock@knobbe.com
                              Ali S. Razai
                              ali.razai@knobbe.com

                              Attorneys for Plaintiffs
                              EDGE SYSTEMS LLC and
                              AXIA MEDSCIENCES, LLC

# **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: June 22, 2017          By: */s/Ali S. Razai*
                                   Brenton R. Babcock
                                   brent.babcock@knobbe.com
                                   Ali S. Razai
                                   ali.razai@knobbe.com

                              Attorneys for Plaintiffs
                              EDGE SYSTEMS LLC and
                              AXIA MEDSCIENCES, LLC

25676819

# EXHIBIT K

Case 2:20-cv-09669-FLA-PVC Document 41 Filed 06/25/21 Page 229 of 380 Page ID
Case 2:17-cv-08699 Document 1 Filed 12/01/17 Page 1 of 28 Page ID #:1
#:837

1  Brenton R. Babcock (SBN 162,120)
   brent.babcock@knobbe.com
2  Paul A. Stewart (SBN 153,467)
   paul.stewart@knobbe.com
3  Ali S. Razai (SBN 246,922)
   ali.razai@knobbe.com
4  KNOBBE, MARTENS, OLSON & BEAR, LLP
   2040 Main Street, 14th Floor
5  Irvine, CA 92614
   Telephone: 949-760-0404
6  Facsimile: 949-760-9502

7  Attorneys for Plaintiffs
   EDGE SYSTEMS LLC and
8  AXIA MEDSCIENCES, LLC

9

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                       WESTERN DIVISION

13

14  EDGE SYSTEMS LLC, a California       ) Case No.: 2:17-cv-8699
    limited liability company, and AXIA  )
15  MEDSCIENCES, LLC, a Delaware         )
    limited liability company,           ) **COMPLAINT FOR PATENT**
16                                        ) **INFRINGEMENT**
                                          )
17              Plaintiffs,               )
                                          ) **DEMAND FOR JURY TRIAL**
18          v.                            )
                                          )
19  IMAGE MICRODERM INC., a              )
    Nevada corporation,                   )
20                                        )
                Defendant.                )
21                                        )

22

23

24

25

26

27

28

Plaintiffs Edge Systems LLC ("Edge") and Axia MedSciences, LLC ("Axia") (collectively, "Plaintiffs") hereby complain of Image MicroDerm Inc. ("IMD") and allege as follows:

## I. **THE PARTIES**

1.      Edge is a California limited liability company having a principal place of business at 2277 Redondo Avenue, Signal Hill, California, 90755.

2.      Edge manufactures spa and skin treatment products, including Edge's HydraFacial™ hydradermabrasion systems and Delphia™ microdermabrasion systems, and sells and distributes them throughout the United States, including in this Judicial District.

3.      Axia is a Delaware limited liability company having a principal place of business at 23 Hallmark Circle, Menlo Park, California, 94025.

4.      Plaintiffs are informed and believe and, based thereon, allege that IMD is a Nevada corporation that has a regular and established place of business in this district at 632 W. Elk Ave., Glendale, California, 91204.

## II. **JURISDICTION AND VENUE**

5.      This action arises under the Patent Laws of the United States, 35 U.S.C. §§ 100, *et seq*.  Accordingly, this Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6.      Because IMD has a regular and established place of business in this district at 632 W. Elk Ave., Glendale, California, 91204, this Court has personal jurisdiction over IMD due to IMD's continuous, systematic, and substantial presence within this judicial district.

7.      In addition, this Court has personal jurisdiction over IMD because IMD is selling and offering for sale infringing products in this judicial district, and by committing acts of infringement in this judicial district, including but not limited to selling infringing products directly to consumers and/or retailers in this district and selling infringing products into the stream of commerce

knowing such products would be sold in this district, which acts form a substantial part of the events or omissions giving rise to Plaintiffs' claim.

8.　　Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1400(b).  IMD has a regular and established place of business in this district at 632 W. Elk Ave., Glendale, California, 91204, and has committed acts of infringement in this district.

### III.　GENERAL ALLEGATIONS

9.　　Edge is a worldwide leader in microdermabrasion and hydradermabrasion systems.  Edge has spent considerable time, effort and money to develop its proprietary technology, including the HydraFacial MD® hydradermabrasion system.

10.　　To protect its substantial investment, Edge has obtained the rights to various patents and patent applications throughout the world.

11.　　On November 4, 2003, the United States Patent and Trademark Office ("USPTO") duly and lawfully issued U.S. Patent No. 6,641,591 ("the '591 Patent"), titled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS."  A true and correct copy of the '591 Patent is attached hereto as Exhibit 1.

12.　　On September 7, 2010, the USPTO duly and lawfully issued U.S. Patent No. 7,789,886 ("the '886 Patent"), titled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS." A true and correct copy of the '886 Patent is attached hereto as Exhibit 2.

13.　　On November 29, 2011, the USPTO duly and lawfully issued U.S. Patent No. 8,066,716 ("the '716 Patent"), titled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS." A true and correct copy of the '716 Patent is attached hereto as Exhibit 3.

14.     On December 25, 2012, the USPTO duly and lawfully issued U.S. Patent No. 8,337,513 ("the '513 Patent"), titled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS." A true and correct copy of the '513 Patent is attached hereto as Exhibit 4.

15.     On October 18, 2016, the USPTO duly and lawfully issued U.S. Patent No. 9,468,464 ("the '464 Patent"), titled "METHODS FOR TREATING THE SKIN USING VACUUM." A true and correct copy of the '464 Patent is attached hereto as Exhibit 5.

16.     On January 24, 2017, the USPTO duly and lawfully issued U.S. Patent No. 9,550,052 ("the '052 Patent"), titled "CONSOLE SYSTEM FOR THE TREATMENT OF SKIN."  A true and correct copy of the '052 Patent is attached hereto as Exhibit 6.

17.     On October 3, 2017, the USPTO duly and lawfully issued U.S. Patent No. 9,775,646 ("the '646 Patent"), titled "DEVICES AND SYSTEMS FOR TREATING THE SKIN USING VACUUM."  A true and correct copy of the '646 Patent is attached hereto as Exhibit 7.

18.     Axia is the owner of all right, title, and interest in the '591 Patent, the '886 Patent, the '716 Patent, the '513 Patent, the '464 Patent, and the '646 Patent which are each exclusively licensed to Edge.

19.     Edge is the owner of all right, title, and interest in the '052 Patent.

20.     IMD makes, uses, sells, offers to sell, and/or imports into the United States the BioXFusion MD ("Accused MD Product") and the smaller BioXFusion Mini ("Accused Mini Product").  The Accused MD Product and Accused Mini Product shall hereinafter be collectively referred to as the Accused Products.

/ / /

/ / /

Case 2:20-cv-09669-FLA-PVC Document 41 Filed 06/25/21 Page 233 of 380 Page ID
Case 2:1-cv-08699 Document 1 Filed 12/01/17 Page 5 of 26 Page ID #:5
#:841

1
2
3
4
5
6
7
8
9
10
11
12



13     21.     The Accused MD Product, shown above, infringes each of the
14  '591 Patent, the '886 Patent, the '716 Patent, the '513 Patent, the '464 Patent,
15  the '052 Patent, and the '646 Patent (collectively, the "Asserted Patents").

16
17
18
19
20
21
22
23
24
25
26
27
28





22. The Accused Mini Product, shown above, infringes each of the '591 Patent, the '886 Patent, the '716 Patent, the '513 Patent, the '464 Patent, and the '646 Patent.

23. Each of the Accused Products is a system for treating the skin surface of a patient. The Accused Products each include a handpiece and a variety of tips, examples of which are shown in the photograph below.



24. The handpiece (i.e., handheld device) in each of the Accused Products has (1) a port that can be attached to a vacuum source that is housed in the Accused Product, and (2) a port that can attach to at least one fluid source that is housed in the Accused Product. The handpiece in each of the Accused Products defines a skin interface portion.

25. For each of the Accused Products, at least some of the tips that are used with the handpiece of the Accused Product have abrading structures with substantially sharp edges to abrade the skin. When the Accused Products are in use, the vacuum creates a seal between the skin interface portion of the handpiece and the patient's skin. The Accused Products deposit fluid, for example a skin treatment media that may be housed in each respective product,

on the patient's skin through the port in the handpiece.  The vacuum source at least aids in depositing the fluid onto the patient's skin.  When the handpiece is used with a tip that has an abrading structure, such as those shown above, the handpiece abrades the patient's skin, which can result in skin cells and/or debris. The suction from the vacuum source can carry away skin cells, debris, and/or fluid from the patient's skin through the skin interface portion of the handpiece and into a waste container.

26.     Plaintiffs are informed and believe and, based thereon, allege that IMD sells its infringing products, including the Accused Products, to its customers.

27.     IMD's customers also infringed each of the Asserted Patents by using infringing product that they acquired from IMD.

28.     IMD had actual knowledge of each of the '591 Patent, the '886 Patent, the '716 Patent, and the '513 Patent no later than April 8, 2014, when Plaintiffs sent IMD a letter demanding that IMD stop infringing those patents and other patents.  Plaintiffs are informed and believe and, based thereon, allege that IMD had actual knowledge of the '052 Patent because it researched Edge's patent portfolio after receiving Edge's cease and desist letter, but at least through the filing of this Complaint.  IMD had actual knowledge of the '464 Patent no later than July 19, 2017, when Plaintiffs sent IMD a letter demanding that IMD stop infringing that patent and other patents. IMD has actual knowledge of the '646 Patent at least through the filing of this Complaint.

29.     Plaintiffs are informed and believe and, based thereon, allege that IMD knew that its customers would infringe each of the Asserted Patents by, for example, using its infringing products, including, for example, the Accused Products, during the respective terms of the Asserted Patents.

30.     Plaintiffs are informed and believe and, based thereon, allege that IMD had the specific intent to induce and did induce its customers to infringe

-6-

each of the Asserted Patents by, for example, using products that infringe the Asserted Patents, including, for example, the Accused Products, during the respective term of the Asserted Patents.

31.     IMD's acts of infringement of the Asserted Patents were undertaken without permission or license from Plaintiffs.

32.     IMD's actions constitute willful and intentional infringement of each of the Asserted Patents.  IMD infringed each of the Asserted Patents with reckless disregard of Plaintiffs' patent rights.  IMD knew, or it was so obvious that IMD should have known, that its actions constituted infringement of the Asserted Patents.  Further, IMD's acts of infringement of the Asserted Patents were not consistent with the standards of commerce for its industry.

33.     As a direct and proximate result of IMD's acts of infringement, IMD has derived and received gains, profits, and advantages in an amount that are not presently known to Plaintiffs.

34.     Pursuant to 35 U.S.C. § 284, Plaintiffs are entitled to damages for IMD's infringing acts and treble damages together with interests and costs as fixed by this Court.

35.     Pursuant to 35 U.S.C. § 285, Plaintiffs are entitled to reasonable attorneys' fees for the necessity of bringing this action.

36.     Due to the aforesaid infringing acts, Plaintiffs have suffered great and irreparable injury, for which Plaintiffs have no adequate remedy at law.

37.     IMD will continue to infringe Plaintiffs' patent rights to the great and irreparable injury of Plaintiffs, unless enjoined by this Court.

## IV.     FIRST CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 6,641,591

38.     Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-37 above.

39.     This is a claim for patent infringement under 35 U.S.C. § 271.

40.     Plaintiffs are informed and believe and, based thereon, allege that IMD has knowingly and intentionally infringed and continues to infringe the '591 Patent, either literally or under the doctrine of equivalents, through, for example, the manufacture, use, sale, offer for sale, and/or importation into the United States of the Accused Products.

41.     For example, each of the Accused Products infringes at least Claim 1 of the '591 Patent because it is a system for treating the skin surface of a patient.  Each of the Accused Products includes a handpiece that, when used with one of the tips, forms a working end that defines a skin interface portion for contacting skin.  The handpiece has one port that is in communication with a treatment media source, and a second port that is in communication with a vacuum source.  The vacuum source is able to remove tissue (e.g., exfoliated skin) and treatment media that may have been deposited on the patient's skin through the skin interface portion of the handpiece.  Each of the Accused Products can be used with tips that include a substantially sharp edge for abrading skin.

42.     Plaintiffs are informed and believe and, based thereon, allege that IMD's customers that purchased infringing products (e.g., the Accused Products) from IMD have also infringed the '591 Patent by, for example, using those infringing products.

43.     Plaintiffs are informed and believe and, based thereon, allege that IMD knew that its customers would infringe the '591 Patent by, for example, using those infringing products during the term of the '591 Patent.

44.     Plaintiffs are informed and believe and, based thereon, allege that IMD had the specific intent to induce and did induce its customers to infringe the '591 Patent by, for example, using products that infringe the '591 Patent. Plaintiffs are informed and believe that this inducement continues to this day.

45.     IMD's acts of infringement of the '591 Patent were undertaken without permission or license from Plaintiffs.

46.     IMD's actions constitute willful and intentional infringement of the '591 Patent.  IMD infringed the '591 Patent with reckless disregard of Plaintiffs' patent rights.  IMD knew, or it was so obvious that IMD should have known, that its actions constituted infringement of the '591 Patent.  Further, IMD's acts of infringement of the '591 Patent were not consistent with the standards of commerce for its industry.

47.     As a direct and proximate result of IMD's acts of infringement, IMD has derived and received gains, profits, and advantages in an amount that is not presently known to Plaintiffs.

48.     Pursuant to 35 U.S.C. § 284, Plaintiffs are entitled to damages for IMD's infringing acts and treble damages together with interests and costs as fixed by this Court.

49.     Pursuant to 35 U.S.C. § 285, Plaintiffs are entitled to reasonable attorneys' fees for the necessity of bringing this claim.

50.     Due to the aforesaid infringing acts, Plaintiffs have suffered great and irreparable injury, for which Plaintiffs have no adequate remedy at law.

51.     IMD will continue to infringe and induce infringement of Plaintiffs' patent rights to the great and irreparable injury of Plaintiffs, unless enjoined by this Court.

## V.     SECOND CLAIM FOR RELIEF
### INFRINGEMENT OF U.S. PATENT NO. 7,789,886

52.     Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-511 above.

53.     This is a claim for patent infringement under 35 U.S.C. § 271.

54.     Plaintiffs are informed and believe and, based thereon, allege that IMD has knowingly and intentionally infringed and continues to infringe the

Case 3:20-cv-09669-FLA-PVC   Document 41   Filed 06/25/21   Page 239 of 380   Page ID
#:847
Case 2:17-cv-08599-FLA   Document 1   Filed 12/01/16   Page 11 of 28   Page ID #:11

'886 Patent, either literally or under the doctrine of equivalents, through, for example, the manufacture, use, sale, offer for sale, and/or importation into the United States of the Accused Products.



55.     For example, each of the Accused Products infringes at least Claim 11 of the '886 Patent.   Each of the Accused Products includes a handpiece that forms a working surface.  This working surface of the handpiece includes an aperture that is spaced from numerous abrasive structures that are configured to abrade the skin surface.   An outer periphery of the handpiece encircles both the abrasive structures and the aperture.  The aperture in the tip of the handpiece is in communication with a vacuum.

56.     When in use, the working surface of the handpiece is translated relative to the patient's skin surface.  The continuous application of a vacuum through the aperture draws the patient's skin against the outer periphery and abrasive structures of the handpiece to abrade the patient's skin surface.  Debris that results from the skin abrasion is simultaneously aspirated away from the working surface by the vacuum while the patient's skin surface is being abraded.

57.     Plaintiffs are informed and believe and, based thereon, allege that IMD's customers that purchased infringing products (e.g., the Accused Product) from IMD have also infringed the '886 Patent by, for example, using those infringing products.

58.     Plaintiffs are informed and believe and, based thereon, allege that IMD knew that its customers would infringe the '886 Patent by, for example, using those infringing products during the term of the '886 Patent.

59.     Plaintiffs are informed and believe and, based thereon, allege that IMD had the specific intent to induce and did induce its customers to infringe the '886 Patent by, for example, using products that infringe the '886 Patent. Plaintiffs are informed and believe that this inducement continues to this day.

60.     IMD's acts of infringement of the '886 Patent were undertaken without permission or license from Plaintiffs.

61.     IMD's actions constitute willful and intentional infringement of the '886 Patent.  IMD infringed the '886 Patent with reckless disregard of Plaintiffs' patent rights.  IMD knew, or it was so obvious that IMD should have known, that its actions constituted infringement of the '886 Patent.  Further, IMD's acts of infringement of the '886 Patent were not consistent with the standards of commerce for its industry.

62.     As a direct and proximate result of IMD's acts of infringement, IMD has derived and received gains, profits, and advantages in an amount that is not presently known to Plaintiffs.

63.     Pursuant to 35 U.S.C. § 284, Plaintiffs are entitled to damages for IMD's infringing acts and treble damages together with interests and costs as fixed by this Court.

64.     Pursuant to 35 U.S.C. § 285, Plaintiffs are entitled to reasonable attorneys' fees for the necessity of bringing this claim.

65.     Due to the aforesaid infringing acts, Plaintiffs have suffered great and irreparable injury, for which Plaintiffs have no adequate remedy at law.

66.     IMD will continue to infringe and induce infringement of Plaintiffs' patent rights to the great and irreparable injury of Plaintiffs, unless enjoined by this Court.

## VI.     THIRD CLAIM FOR RELIEF
## INFRINGEMENT OF U.S. PATENT NO. 8,066,716

67.     Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-666 above.

68.     This is a claim for patent infringement under 35 U.S.C. § 271.

69.     Plaintiffs are informed and believe and, based thereon, allege that IMD has knowingly and intentionally infringed and continues to infringe the '716 Patent, either literally or under the doctrine of equivalents, through, for example, the manufacture, use, sale, offer for sale, and/or importation into the United States of the Accused Products.

70.     For example, each of the Accused Products infringes at least Claim 15 of the '716 Patent.  Each of the Accused Products is a system for treating the skin surface of a patient.  Each of the Accused Products includes a handpiece with a main body and a working end at the distal end of the main body.   The handpiece includes abrading structures that are configured to selectively abrade skin.  The handpiece also includes an aperture or opening at or near the working end that is in fluid communication with a vacuum source in each of the Accused Products.   The vacuum source in each of the Accused Products is adapted to apply suction to the aperture to draw debris away from the patient's skin surface.   Additionally, the working end of the handpiece includes an inflow port configured to deliver flowable media to the skin surface during treatment.   The working end of the handpiece also includes a non-abrasive outer periphery that generally circumscribes an interior area that

includes the abrading structures, the aperture, and the inflow port. The outer periphery of the handpiece is configured to contact the patient's skin surface during treatment. Further, the flowable media delivered through the inflow port is configured to pass through the abrading structures before being removed away from the working end via the aperture of the handpiece.

71.     Plaintiffs are informed and believe and, based thereon, allege that IMD's customers that purchased infringing products (e.g., the Accused Products) from IMD have also infringed the '716 Patent by, for example, using those infringing products.

72.     Plaintiffs are informed and believe and, based thereon, allege that IMD knew that its customers would infringe the '716 Patent by, for example, using those infringing products during the term of the '716 Patent.

73.     Plaintiffs are informed and believe and, based thereon, allege that IMD had the specific intent to induce and did induce its customers to infringe the '716 Patent by, for example, using products that infringe the '716 Patent. Plaintiffs are informed and believe that this inducement continues to this day.

74.     IMD's acts of infringement of the '716 Patent were undertaken without permission or license from Plaintiffs.

75.     IMD's actions constitute willful and intentional infringement of the '716 Patent. IMD infringed the '716 Patent with reckless disregard of Plaintiffs' patent rights. IMD knew, or it was so obvious that IMD should have known, that its actions constituted infringement of the '716 Patent. Further, IMD's acts of infringement of the '716 Patent were not consistent with the standards of commerce for its industry.

76.     As a direct and proximate result of IMD's acts of infringement, IMD has derived and received gains, profits, and advantages in an amount that is not presently known to Plaintiffs.

77.     Pursuant to 35 U.S.C. § 284, Plaintiffs are entitled to damages for IMD's infringing acts and treble damages together with interests and costs as fixed by this Court.

78.     Pursuant to 35 U.S.C. § 285, Plaintiffs are entitled to reasonable attorneys' fees for the necessity of bringing this claim.

79.     Due to the aforesaid infringing acts, Plaintiffs have suffered great and irreparable injury, for which Plaintiffs have no adequate remedy at law.

80.     IMD will continue to infringe and induce infringement of Plaintiffs' patent rights to the great and irreparable injury of Plaintiffs, unless enjoined by this Court.

## VII.   FOURTH CLAIM FOR RELIEF
## INFRINGEMENT OF U.S. PATENT NO. 8,337,513

81.     Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-80 above.

82.     This is a claim for patent infringement under 35 U.S.C. § 271.

83.     Plaintiffs are informed and believe and, based thereon, allege that IMD has knowingly and intentionally infringed and continues to infringe the '513 Patent, either literally or under the doctrine of equivalents, through, for example, the manufacture, use, sale, offer for sale, and/or importation into the United States of the Accused Products.

84.     For example, each of the Accused Products infringes at least Claim 1 of the '513 Patent.  Each of the Accused Products is a system for treating skin and includes a handpiece that has a main body and a working end along the distal end of the main body.  The handpiece includes an outer periphery extending along its distal end, and substantially the entire circumference of the outer periphery is configured to contact the patient's skin surface during treatment.  Further, the handpiece is configured to be used with tips that are supplied with each of the Accused Products.  When used with the

-14-

handheld device, at least some of the tips include the following features: a plurality of surface elements that extend distally from the working end of the handheld device and are positioned within the interior area circumscribed by the outer periphery; each surface element having at least one sharp edge that is configured to abrade skin when the handpiece is moved relative to the skin surface. The handheld device also includes an aperture or opening along the working end that is configured to be placed in fluid communication with a vacuum source via a passageway. When the vacuum source is activated, the passageway is configured to convey debris away from the working end.

85.     Plaintiffs are informed and believe and, based thereon, allege that IMD's customers that purchased infringing products (e.g., the Accused Products) from IMD have also infringed the '513 Patent by, for example, using those infringing products.

86.     Plaintiffs are informed and believe and, based thereon, allege that IMD knew that its customers would infringe the '513 Patent by, for example, using those infringing products during the term of the '513 Patent.

87.     Plaintiffs are informed and believe and, based thereon, allege that IMD had the specific intent to induce and did induce its customers to infringe the '513 Patent by, for example, using products that infringe the '513 Patent. Plaintiffs are informed and believe that this inducement continues to this day.

88.     IMD's acts of infringement of the '513 Patent were undertaken without permission or license from Plaintiffs.

89.     IMD's actions constitute willful and intentional infringement of the '513 Patent. IMD infringed the '513 Patent with reckless disregard of Plaintiffs' patent rights. IMD knew, or it was so obvious that IMD should have known, that its actions constituted infringement of the '513 Patent. Further, IMD's acts of infringement of the '513 Patent were not consistent with the standards of commerce for its industry.

90.     As a direct and proximate result of IMD's acts of infringement, IMD has derived and received gains, profits, and advantages in an amount that is not presently known to Plaintiffs.

91.     Pursuant to 35 U.S.C. § 284, Plaintiffs are entitled to damages for IMD's infringing acts and treble damages together with interests and costs as fixed by this Court.

92.     Pursuant to 35 U.S.C. § 285, Plaintiffs are entitled to reasonable attorneys' fees for the necessity of bringing this claim.

93.     Due to the aforesaid infringing acts, Plaintiffs have suffered great and irreparable injury, for which Plaintiffs have no adequate remedy at law.

94.     IMD will continue to infringe and induce infringement of Plaintiffs' patent rights to the great and irreparable injury of Plaintiffs, unless enjoined by this Court.

## VIII.  <u>FIFTH CLAIM FOR RELIEF</u>
## <u>INFRINGEMENT OF U.S. PATENT NO. 9,468,464</u>

95.     Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-94 above.

96.     This is a claim for patent infringement under 35 U.S.C. § 271.

97.     Plaintiffs are informed and believe and, based thereon, allege that IMD has knowingly and intentionally infringed and continues to infringe the '464 Patent, either literally or under the doctrine of equivalents, through, for example, the manufacture, use, sale, offer for sale, and/or importation into the United States of the Accused Products.

98.     For example, use of each of the Accused Product infringes at least Claim 1 of the '464 Patent.  Each of the Accused Products includes a handpiece with a main body, a housing, and a working end.  The working end of the handpiece is configured to contact the patient's skin surface, and can be used with a tip that comprises a perimeter along the distal end of the handpiece.  The

handpiece has a first aperture or opening arrangement that includes a port at or near the working end that is in fluid communication with a vacuum source that is housed in each of the Accused Products through a passageway in the distal end of the handpiece. The handpiece has a second aperture or opening arrangement that includes a second port at or near the working end that is in fluid communication with a treatment media source in each of the Accused Products.

99. Each of the Accused Product is specifically designed to treat a patient's skin surface. For example, when in use the handpiece in each of the Accused Products is positioned against the patient's skin surface. Activating the vacuum source in each of the Accused Products facilitates the delivery of a liquid treatment media to the patient's skin surface through the second port. The used liquid treatment media is aspirated away from the patient's skin surface through the first port and the passageway at the distal end of the handpiece. Simultaneously, activating the vacuum source facilitates the delivery of the treatment media to the patient's subsurface skin tissue and the delivery of the treatment media hydrates or puffs up the adjacent skin surface at the treatment site to facilitate the treatment method.

100. Plaintiffs are informed and believe and, based thereon, allege that IMD's customers that purchased infringing products (e.g., the Accused Products) from IMD have also infringed the '464 Patent by, for example, using those infringing products.

101. Plaintiffs are informed and believe and, based thereon, allege that IMD knew that its customers would infringe the '464 Patent by, for example, using those infringing products during the term of the '464 Patent.

102. Plaintiffs are informed and believe and, based thereon, allege that IMD had the specific intent to induce and did induce its customers to infringe

the '464 Patent by, for example, using products that infringe the '464 Patent. Plaintiffs are informed and believe that this inducement continues to this day.

103.   IMD's acts of infringement of the '464 Patent were undertaken without permission or license from Plaintiffs.

104.   IMD's actions constitute willful and intentional infringement of the '464 Patent.  IMD infringed the '464 Patent with reckless disregard of Plaintiffs' patent rights.  IMD knew, or it was so obvious that IMD should have known, that its actions constituted infringement of the '464 Patent.  Further, IMD's acts of infringement of the '464 Patent were not consistent with the standards of commerce for its industry.

105.   As a direct and proximate result of IMD's acts of infringement, IMD has derived and received gains, profits, and advantages in an amount that is not presently known to Plaintiffs.

106.   Pursuant to 35 U.S.C. § 284, Plaintiffs are entitled to damages for IMD's infringing acts and treble damages together with interests and costs as fixed by this Court.

107.   Pursuant to 35 U.S.C. § 285, Plaintiffs are entitled to reasonable attorneys' fees for the necessity of bringing this claim.

108.   Due to the aforesaid infringing acts, Plaintiffs have suffered great and irreparable injury, for which Plaintiffs have no adequate remedy at law.

109.   IMD will continue to infringe and induce infringement of Plaintiffs' patent rights to the great and irreparable injury of Plaintiffs, unless enjoined by this Court.

## IX.   SIXTH CLAIM FOR RELIEF
## INFRINGEMENT OF U.S. PATENT NO. 9,550,052

110.   Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-1099 above.

111.   This is a claim for patent infringement under 35 U.S.C. § 271.

112.     Plaintiffs are informed and believe and, based thereon, allege that IMD has knowingly and intentionally infringed and continues to infringe the '052 Patent, either literally or under the doctrine of equivalents, through, for example, the manufacture, use, sale, offer for sale, and/or importation into the United States of the Accused MD Product.

113.     For example, the Accused MD Product infringes at least Claim 11 of the '052 Patent.  The Accused MD Product is a system for performing a skin treatment procedure that includes a manifold, a handpiece assembly, and a variety of tips.  The Accused MD Product includes a manifold that is in fluid communication with at least two fluid containers that are configured to contain a liquid treatment material for a skin treatment procedure.  The Accused MD Product has a handpiece assembly that can be used with one of a variety of tips that are included with the Accused MD Product and are configured to contact a patient's skin surface during the treatment procedure.  The Accused MD Product includes a supply conduit that places the manifold in fluid communication with the handpiece assembly; the distal end of the supply conduit is configured to be attached to the handpiece assembly.  The manifold of the Accused MD Product is configured to control the flow of treatment material from the separate fluid containers through the supply conduit.  The Accused MD Product is configured to permit a user to select the treatment material from the separate fluid containers for delivery from the supply conduit.  The handpiece assembly is also in fluid communication with a waste conduit that is operatively coupled to a vacuum source of the Accused MD Product to remove waste away from the skin surface during the treatment procedure.

114.     Plaintiffs are informed and believe and, based thereon, allege that IMD's customers that purchased infringing products (e.g., the Accused MD Product) from IMD have also infringed the '052 Patent by, for example, using those infringing products.

115.     Plaintiffs are informed and believe and, based thereon, allege that IMD knew that its customers would infringe the '052 Patent by, for example, using those infringing products during the term of the '052 Patent.

116.     Plaintiffs are informed and believe and, based thereon, allege that IMD had the specific intent to induce and did induce its customers to infringe the '052 Patent by, for example, using products that infringe the '052 Patent. Plaintiffs are informed and believe that this inducement continues to this day.

117.     IMD's acts of infringement of the '052 Patent were undertaken without permission or license from Plaintiffs.

118.     IMD's actions constitute willful and intentional infringement of the '052 Patent. IMD infringed the '052 Patent with reckless disregard of Plaintiffs' patent rights. IMD knew, or it was so obvious that IMD should have known, that its actions constituted infringement of the '052 Patent. Further, IMD's acts of infringement of the '052 Patent were not consistent with the standards of commerce for its industry.

119.     As a direct and proximate result of IMD's acts of infringement, IMD has derived and received gains, profits, and advantages in an amount that is not presently known to Plaintiffs.

120.     Pursuant to 35 U.S.C. § 284, Plaintiffs are entitled to damages for IMD's infringing acts and treble damages together with interests and costs as fixed by this Court.

121.     Pursuant to 35 U.S.C. § 285, Plaintiffs are entitled to reasonable attorneys' fees for the necessity of bringing this claim.

122.     Due to the aforesaid infringing acts, Plaintiffs have suffered great and irreparable injury, for which Plaintiffs have no adequate remedy at law.

123.     IMD will continue to infringe and induce infringement of Plaintiffs' patent rights to the great and irreparable injury of Plaintiffs, unless enjoined by this Court.

Case 2:20-cv-09669-FLA-PVC   Document 41   Filed 06/25/21   Page 250 of 380   Page ID
#:858
Case 2:1-cv-08699-FLA-PVC   Document 1   Filed 12/01/21   Page 22 of 26   Page ID #:22
#:858

## X.   SEVENTH CLAIM FOR RELIEF
## INFRINGEMENT OF U.S. PATENT NO. 9,775,646

124.   Plaintiffs incorporate by reference and reallege each of the allegations set forth in Paragraphs 1-1233 above.

125.   This is a claim for patent infringement under 35 U.S.C. § 271.

126.   Plaintiffs are informed and believe and, based thereon, allege that IMD has knowingly and intentionally infringed and continues to infringe the '646 Patent, either literally or under the doctrine of equivalents, through, for example, the manufacture, use, sale, offer for sale, and/or importation into the United States of the Accused Products.

127.   For example, each of the Accused Products infringes at least Claim 13 of the '646 Patent.  Each of the Accused Products is a system for treating a patient's skin surface and includes a handpiece with a main body, a housing, and a working end.  The working end of the handpiece has a distal end that is configured to contact the patient's skin surface.  The perimeter along the distal end of the working end of the Accused Product is configured to contact the patient's skin surface.  When used with one of the tips supplied with each of the Accused Products, a skin interface is positioned within the perimeter of the handpiece and configured to contact the patient's skin surface during use.  In addition, the handpiece has a first aperture or opening arrangement that includes a first port at or near the working end that is in fluid communication through a passageway with a vacuum source, which is housed in each of the respective Accused Products through a passageway.  The handpiece also has a second aperture or opening arrangement that includes a second port at or near the working end that is in fluid communication with a treatment media source that is housed in each of the respective Accused Products.  In each of the Accused Products, when the handpiece is positioned along the patient's skin surface and the vacuum source is activated, a treatment media is delivered to the patient's

skin surface through the passageway and the second port. Simultaneously, the used treatment media is aspirated away from the working end of the handpiece through the first port.

128. Plaintiffs are informed and believe and, based thereon, allege that IMD's customers that purchased infringing products (e.g., the Accused Products) from IMD have also infringed the '646 Patent by, for example, using those infringing products.

129. Plaintiffs are informed and believe and, based thereon, allege that IMD knew that its customers would infringe the '646 Patent by, for example, using those infringing products during the term of the '646 Patent.

130. Plaintiffs are informed and believe and, based thereon, allege that IMD had the specific intent to induce and did induce its customers to infringe the '646 Patent by, for example, using products that infringe the '646 Patent. Plaintiffs are informed and believe that this inducement continues to this day.

131. IMD's acts of infringement of the '646 Patent were undertaken without permission or license from Plaintiffs.

132. IMD's actions constitute willful and intentional infringement of the '646 Patent. IMD infringed the '646 Patent with reckless disregard of Plaintiffs' patent rights. IMD knew, or it was so obvious that IMD should have known, that its actions constituted infringement of the '646 Patent. Further, IMD's acts of infringement of the '646 Patent were not consistent with the standards of commerce for its industry.

133. As a direct and proximate result of IMD's acts of infringement, IMD has derived and received gains, profits, and advantages in an amount that is not presently known to Plaintiffs.

134. Pursuant to 35 U.S.C. § 284, Plaintiffs are entitled to damages for IMD's infringing acts and treble damages together with interests and costs as fixed by this Court.

135.     Pursuant to 35 U.S.C. § 285, Plaintiffs are entitled to reasonable attorneys' fees for the necessity of bringing this claim.

136.     Due to the aforesaid infringing acts, Plaintiffs have suffered great and irreparable injury, for which Plaintiffs have no adequate remedy at law.

137.     IMD will continue to infringe and induce infringement of Plaintiffs' patent rights to the great and irreparable injury of Plaintiffs, unless enjoined by this Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment and seek relief as follows:

A.     That the Court enter judgment in favor of Plaintiffs and against IMD on all claims for relief alleged herein;

B.     An Order adjudging IMD to have infringed and induced infringement of the Asserted Patents under 35 U.S.C. § 271;

C.     A preliminary and permanent injunction enjoining IMD, its officers, directors, agents, servants, employees, and attorneys, and those persons in active concert or participation with IMD, from (1) making, using, selling, offering to sell, and/or importing any of the Accused Products, and (2) infringing the Asserted Patents in violation of 35 U.S.C. § 271, either directly or indirectly, including inducing or contributing to their infringement;

D.     An Order that IMD pay to Plaintiffs actual damages in the form of lost profits, or in the alternative, other damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the patented inventions by IMD, in accordance with 35 U.S.C. § 284;

E.     An Order for a trebling of damages and/or exemplary damages because of IMD's willful misconduct pursuant to 35 U.S.C. § 284;

F.     An Order adjudging that this case is exceptional under 35 U.S.C. § 285 and ordering IMD to pay to Plaintiffs their reasonable attorney fees incurred in this action;

G. An Order awarding pre-judgment and post-judgement interest and costs as fixed by the Court; and

H. Such other and further relief as this Court may deem just and proper.

Respectfully Submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: December 1, 2017     By: /s/ Ali S. Razai
                                Brenton R. Babcock
                                Paul A. Stewart
                                Ali S. Razai

                                Attorneys for Plaintiffs
                                EDGE SYSTEMS LLC and
                                AXIA MEDSCIENCES, LLC

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully Submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: December 1, 2017          By: /s/ *Ali S. Razai*
                                    Brenton R. Babcock
                                    Paul A. Stewart
                                    Ali S. Razai

                                    Attorneys for Plaintiffs
                                    EDGE SYSTEMS LLC and
                                    AXIA MEDSCIENCES, LLC

# EXHIBIT L

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO. _____

EDGE SYSTEMS LLC,
a California limited liability company,

       Plaintiff,

  v.

VENUS CONCEPT USA INC.,
a Delaware corporation,

       Defendant.

_____/

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Edge Systems LLC ("Edge") hereby complains of Venus Concept USA Inc. ("Defendant") and alleges as follows:

### I.      THE PARTIES

1.      Edge is a California limited liability company having a principal place of business at 2277 Redondo Avenue, Signal Hill, California, 90755.

2.      Edge manufactures spa and skin treatment products, including Edge's HydraFacial® hydradermabrasion systems and Delphia™ microdermabrasion systems, and sells and distributes them throughout the United States, including in this Judicial District.

3.      Plaintiff is informed and believes and, based thereon, alleges that Venus Concept USA Inc. is a Delaware corporation having a principal place of business at 4556 N. Hiatus Rd., Sunrise, Florida 33351.

Case 2:20-cv-09669-FLA-PVC Document 41 Filed 06/25/21 Page 257 of 380 Page ID
Case 0:19-cv-62859-UU Document 1 Entered on FLSD Docket 10/28/2019 Page 296 of 22
#:865

## II.   JURISDICTION AND VENUE

4.      This action arises under the Patent Laws of the United States, 35 U.S.C. §§ 100,

*et seq*.  Accordingly, this Court has original subject matter jurisdiction pursuant to 28 U.S.C.

§§ 1331 and 1338(a).

5.      This Court has personal jurisdiction over Defendant because Defendant has a

continuous, systematic, and substantial presence within Florida and this judicial district.  For

example, Defendant has a principal place of business in this judicial district at 4556 N. Hiatus

Rd., Sunrise, Florida 33351.  Plaintiff is informed and believes and, based thereon, alleges that

Defendant also sells and/or offers for sale infringing products in this district and/or sells into the

stream of commerce knowing such products would be sold in Florida and this district, and these

acts form a substantial part of the events or omissions giving rise to Edge's claims.

6.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1400(b) because

Defendant has committed acts of infringement by selling and/or offering to sell infringing

products in this judicial district and Defendant has a regular and established place of business in

this judicial district.

## III.   GENERAL ALLEGATIONS

7.      Edge is a worldwide leader in microdermabrasion and hydradermabrasion

systems.  Edge has spent considerable time, effort and money to develop its proprietary

technology, including the HydraFacial MD® hydradermabrasion system.

8.      To protect its substantial investment, Edge owns various patents throughout the

world.

9.      On September 7, 2010, the USPTO duly and lawfully issued U.S. Patent No.

7,789,886 ("the '886 Patent"), titled "INSTRUMENTS AND TECHNIQUES FOR

Case 2:20-cv-09669-FLA-PVC Document 41 Filed 06/25/21 Page 258 of 380 Page ID
Case 0:18-cv-62589-UU-A Document 1 Entered on FLSD Docket 10/26/2018 Page 3 of 22
#:866

CONTROLLED REMOVAL OF EPIDERMAL LAYERS." A true and correct copy of the '886 Patent is attached hereto as **Exhibit 1**.

10.     On November 29, 2011, the USPTO duly and lawfully issued U.S. Patent No. 8,066,716 ("the '716 Patent"), titled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS." A true and correct copy of the '716 Patent is attached hereto as **Exhibit 2**.

11.     On December 25, 2012, the USPTO duly and lawfully issued U.S. Patent No. 8,337,513 ("the '513 Patent"), titled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS." A true and correct copy of the '513 Patent is attached hereto as **Exhibit 3**.

12.     On October 18, 2016, the USPTO duly and lawfully issued U.S. Patent No. 9,468,464 ("the '464 Patent"), titled "METHODS FOR TREATING THE SKIN USING VACUUM." A true and correct copy of the '464 Patent is attached hereto as **Exhibit 4**.

13.     On October 3, 2017, the USPTO duly and lawfully issued U.S. Patent No. 9,775,646 ("the '646 Patent"), titled "DEVICES AND SYSTEMS FOR TREATING THE SKIN USING VACUUM." A true and correct copy of the '646 Patent is attached hereto as **Exhibit 5**.

14.     Edge is the owner of all right, title, and interest in the '886 Patent, the '716 Patent, the '513 Patent, the '464 Patent, and the '646 Patent.

15.     Defendant makes, uses, sells, offers to sell, and/or imports into the United States the Venus Glow ("Accused Product"). For example, as advertised in **Exhibit 6**, Defendant has offered its "Q4 Special Promo," shown below.

Case 0:18-cv-62589-UU Document 1 Entered on FLSD Docket 10/26/2018 Page 4 of 22

---

## Q4 SPECIAL PROMO



- List Price: $25,000
- Special Promo Price: $12,500 cash only.
  $5,000 down to reserve. They get 100 tips for free.
  For tip re-orders, $450 for 50 or $1,800 for 250.
- Delivery of device in mid-December
- It's a Class I device, no Medical Director/physician needed.
- No solutions/serums to offer in Q4. Our preliminary protocol
  will suggest use of distilled water.
- No demo units, so we're creating a demo video to show.

16.     The Accused Product, shown below, infringes each of the '886 Patent, the '716 Patent, the '513 Patent, the '464 Patent, and the '646 Patent (collectively, the "Asserted Patents").



17.     Defendant advertises that it has received "[g]lobal selling rights from Korean company Daonic."   Plaintiff is informed and believes, and based thereon, alleges that the Accused Product is the same product as Daonic's Clear-Z product.

18.     The Accused Product is a system for treating the skin surface of a patient.  The Accused Product includes a handpiece, an example of which is shown in the photograph below.



19.     The handpiece (i.e., handheld device) of the Accused Product has (1) a port that can be attached to a vacuum source that is housed in the Accused Product, and (2) a port that can attach to at least one fluid source that is housed in the Accused Product.  The handpiece in the Accused Product defines a skin interface portion.

20.     Plaintiff is informed and believes, and based thereon alleges, that the distal end of the handpiece of the Accused Product has an abrading structure with at least one substantially sharp edge for abrading skin.



21.     When the Accused Product is in use, the vacuum creates a seal between the skin interface portion of the handpiece and the patient's skin.



22.     The Accused Product deposits fluid, for example a skin treatment media that may be housed in the product, on the patient's skin through the port in the handpiece.



23.     Plaintiff is informed and believes, and based thereon alleges, that the vacuum source at least aids in depositing the fluid onto the patient's skin.

24.     Defendant's advertisement states that the Accused Product "[r]emoves impurities from the stratum corneum, exfoliates, extracts, and hydrates the skin."  Plaintiff is

informed and believes, and based thereon alleges, that the handpiece of the Accused Product exfoliates the stratum corneum (the outer layer of the skin) by abrading the patient's skin, which results in skin cells and/or debris that, along with fluid deposited on the patient's skin by the handpiece of the Accused Product, are carried away from the skin by the suction from the vacuum source into a waste container that is housed in the Accused Product.

25.     An end-user of the Accused Product directly infringes the Asserted Patents by using the product.  A distributor of the Accused Product directly infringes the Asserted Patents by selling and/or offering for sale the Accused Product.

26.     Plaintiff is informed and believes and, based thereon, alleges that Defendant actively induces end-users and distributors of the Accused Product to purchase the Accused Products and directly infringe the Asserted Patents.  Defendant had actual knowledge of the Asserted Patents at least by virtue of the filing of this Complaint and, despite this knowledge, it continues to provide manuals, assembly instructions, and/or marketing materials, for example the materials attached as **Exhibit 6**, to end-users of the Accused Product to use the product to infringe the Asserted Patents and also provides such materials to its distributors to infringe the Asserted Patents by selling and/or offering for sale the Accused Product.

27.     Plaintiff is informed and believes and, based thereon, alleges that Defendant is aware that end-users of the Accused Product would infringe the Asserted Patents by, for example, using the Accused Product during the term of the Asserted Patents, and that its distributors would infringe the Asserted Patents by, for example, selling and/or offering for sale the Accused Product during the term of the Asserted Patents.

28.     Plaintiff is informed and believes and, based thereon, alleges that Defendant has the specific intent to induce its customers to infringe the Asserted Patents by, for example, using,

selling, and/or offering for sale the Accused Product, which infringes each of the Asserted Patents.

29.    Defendant's acts of infringement of the Asserted Patents were undertaken without permission or license from Plaintiff.

30.    Defendant's actions constitute willful and intentional infringement of each of the Asserted Patents.  Defendant infringed each of the Asserted Patents with reckless disregard of Plaintiff's patent rights.  Defendant knew, or it was so obvious that Defendant should have known, that its actions constituted infringement of the Asserted Patents.  Further, Defendant's acts of infringement of the Asserted Patents were not consistent with the standards of commerce for its industry.

31.    As a direct and proximate result of Defendant's acts of infringement, Defendant has derived and received gains, profits, and advantages in an amount that is not presently known to Plaintiff.

32.    Pursuant to 35 U.S.C. § 284, Plaintiff is entitled to damages for Defendant's infringing acts and treble damages together with interest and costs as fixed by this Court.

33.    Pursuant to 35 U.S.C. § 285, Plaintiff is entitled to reasonable attorneys' fees for the necessity of bringing this action.

34.    Due to the aforesaid infringing acts, Plaintiff has suffered great and irreparable injury, for which Plaintiff has no adequate remedy at law.

35.    Defendant will continue to infringe Plaintiff's patent rights to the great and irreparable injury of Plaintiff, unless enjoined by this Court.

## IV.  CLAIM FOR RELIEF

## PATENT INFRINGEMENT

36.     Plaintiff incorporates by reference and realleges each of the allegations set forth in Paragraphs 1-35 above.

37.     This is a claim for patent infringement under 35 U.S.C. § 271.

38.     Plaintiff is informed and believes and, based thereon, alleges that Defendant has knowingly and intentionally infringed and continues to infringe the '886 Patent, either literally or under the doctrine of equivalents, through, for example, the manufacture, use, sale, offer for sale, and/or importation into the United States of the Accused Product.

39.     For example, the Accused Product infringes at least Claim 11 of the '886 Patent. When in use, the Accused Product embodies a method of treating a patient's skin.

40.      The Accused Product includes a handpiece that forms a working surface.  This working surface of the handpiece includes an abrasive structure that is configured to abrade the skin and an aperture that is in communication with a vacuum source.  The handpiece has an outer periphery that encircles both the abrasive structure and the aperture.



Case 2:20-cv-09669-FLA-RVC   Document 41   Filed 06/25/21   Page 265 of 380   Page ID
#:873
Case 0:18-cv-62988-UU   Document 1   Entered on FLSD Docket 12/06/2018   Page 10 of 22

41.     When in use, the working surface of the handpiece is translated relative to the patient's skin surface.  The continuous application of a vacuum through the aperture draws the patient's skin against the outer periphery and the abrasive structure of the handpiece to abrade the patient's outer layer of the patient's skin.  Plaintiff is informed and believe, and based thereon alleges, that debris that results from the skin abrasion is aspirated away from the working surface by the vacuum while the patient's skin surface is being abraded.

42.     An end-user of the Accused Product directly infringes the '886 Patent by using the product.  A distributor of the Accused Product directly infringes the '886 Patent by selling and/or offering for sale the Accused Product.

43.     Plaintiff is informed and believes and, based thereon, alleges that Defendant actively induces end-users and distributors of the Accused Product to purchase the Accused Product and directly infringe the '886 Patent.  Defendant had actual knowledge of the '886 Patent at least by virtue of the filing of this Complaint and, despite this knowledge, it continues to provide manuals, assembly instructions, and/or marketing materials, for example the materials attached as **Exhibit 6**, to end-users of the Accused Product to use the product to infringe the '886 Patent and also provides such materials to its distributors to infringe the '886 Patent by selling and/or offering for sale the Accused Product.

44.     Plaintiff is informed and believes and, based thereon, alleges that Defendant is aware that end-users of the Accused Product would infringe the '886 Patent by, for example, using the Accused Product during the term of the '886 Patent, and that its distributors would infringe the '886 Patent by, for example, selling and/or offering for sale the Accused Product during the term of the '886 Patent.

45.    Plaintiff is informed and believes and, based thereon, alleges that Defendant has the specific intent to induce its customers to infringe the '886 Patent by, for example, using, selling, and/or offering for sale the Accused Product, which infringes the '886 Patent.

46.    Plaintiff is informed and believes and, based thereon, alleges that Defendant has knowingly and intentionally infringed and continues to infringe the '716 Patent, either literally or under the doctrine of equivalents, through, for example, the manufacture, use, sale, offer for sale, and/or importation into the United States of the Accused Product.

47.    For example, the Accused Product infringes at least Claim 15 of the '716 Patent. The Accused Product is a system for treating the skin surface of a patient. The Accused Product includes a handpiece with a main body and a working end at the distal end of the main body. The handpiece includes an abrading structure that is configured to selectively exfoliate a patient's skin by abrading it. The handpiece also includes an aperture or opening at or near the working end that is in fluid communication with a vacuum source in the Accused Product. The vacuum source in the Accused Product is adapted to apply suction to the aperture to draw debris away from the patient's skin surface. Additionally, the working end of the handpiece includes an inflow port configured to deliver flowable media to the skin surface during treatment. The working end of the handpiece also includes a non-abrasive outer periphery that generally circumscribes an interior area that includes the abrading structures, the aperture, and the inflow port. The outer periphery of the handpiece is configured to contact the patient's skin surface during treatment. Further, the flowable media delivered through the inflow port is configured to pass through the abrading structures before being removed away from the working end via the aperture of the handpiece.

Case 2:20-cv-09669-FLA-PVC Document 41 Filed 06/25/21 Page 267 of 380 Page ID
#:875
Case 0:18-cv-62988-UU Document 1 Entered on FLSD Docket 12/26/2018 Page 12 of 22



Aperture in communication with vacuum

Outer periphery

Abrasive structure

Inflow port

The vacuum gently pulls the skin into the tip to open up the pores, exfoliates and extracts impurities from the stratum corneum.

While the skin is being pulled into the tip, the 360-degree rotating tip spreads the solution evenly on the skin.

48.     An end-user of the Accused Product directly infringes the '716 Patent by using the product.  A distributor of the Accused Product directly infringes the '716 Patent by selling and/or offering for sale the Accused Product.

49.     Plaintiff is informed and believes and, based thereon, alleges that Defendant actively induces end-users and distributors of the Accused Product to purchase the Accused Product and directly infringe the '716 Patent.  Defendant had actual knowledge of the '716 Patent at least by virtue of the filing of this Complaint and, despite this knowledge, it continues to provide manuals, assembly instructions, and/or marketing materials, for example the materials attached as **Exhibit 6**, to end-users of the Accused Product to use the product to infringe the '716 Patent and also provides such materials to its distributors to infringe the '716 Patent by selling and/or offering for sale the Accused Product.

50.     Plaintiff is informed and believes and, based thereon, alleges that Defendant is aware that end-users of the Accused Product would infringe the '716 Patent by, for example, using the Accused Product during the term of the '716 Patent, and that its distributors would

infringe the '716 Patent by, for example, selling and/or offering for sale the Accused Product during the term of the '716 Patent.

51.     Plaintiff is informed and believes and, based thereon, alleges that Defendant has the specific intent to induce its customers to infringe the '716 Patent by, for example, using, selling, and/or offering for sale the Accused Product, which infringes the '716 Patent.

52.     Plaintiff is informed and believes and, based thereon, alleges that Defendant has knowingly and intentionally infringed and continues to infringe the '513 Patent, either literally or under the doctrine of equivalents, through, for example, the manufacture, use, sale, offer for sale, and/or importation into the United States of the Accused Product.

53.     For example, the Accused Product infringes at least Claim 1 of the '513 Patent. The Accused Product is a system for treating skin and includes a handpiece that has a main body and a working end along the distal end of the main body.  The handpiece includes an outer periphery extending along its distal end, and substantially the entire circumference of the outer periphery is configured to contact the patient's skin surface during treatment.  The working end of the handpiece has at least one surface element that extends distally and is positioned within the interior area circumscribed by the outer periphery, the surface element having at least one sharp edge that is configured to abrade skin when the handpiece is moved relative to the skin surface.  The handpiece also includes an aperture or opening along the working end that is configured to be placed in fluid communication with a vacuum source via a passageway.  When the vacuum source is activated, the passageway is configured to convey debris away from the working end.



Opening in communication with vacuum source

Outer periphery

Surface element

The vacuum gently pulls the skin into the tip to open up the pores, exfoliates and extracts impurities from the stratum corneum.

While the skin is being pulled into the tip, the 360-degree rotating tip spreads the solution evenly on the skin.

54. An end-user of the Accused Product directly infringes the '513 Patent by using the product. A distributor of the Accused Product directly infringes the '513 Patent by selling and/or offering for sale the Accused Product.

55. Plaintiff is informed and believes and, based thereon, alleges that Defendant actively induces end-users and distributors of the Accused Product to purchase the Accused Product and directly infringe the '513 Patent. Defendant had actual knowledge of the '513 Patent at least by virtue of the filing of this Complaint and, despite this knowledge, it continues to provide manuals, assembly instructions, and/or marketing materials, for example the materials attached as **Exhibit 6**, to end-users of the Accused Product to use the product to infringe the '513 Patent and also provides such materials to its distributors to infringe the '513 Patent by selling and/or offering for sale the Accused Product.

56. Plaintiff is informed and believes and, based thereon, alleges that Defendant is aware that end-users of the Accused Product would infringe the '513 Patent by, for example, using the Accused Product during the term of the '513 Patent, and that its distributors would

infringe the '513 Patent by, for example, selling and/or offering for sale the Accused Product during the term of the '513 Patent.

57.     Plaintiff is informed and believes and, based thereon, alleges that Defendant has the specific intent to induce its customers to infringe the '513 Patent by, for example, using, selling, and/or offering for sale the Accused Product, which infringes the '513 Patent.

58.     Plaintiff is informed and believes and, based thereon, alleges that Defendant has knowingly and intentionally infringed and continues to infringe the '464 Patent, either literally or under the doctrine of equivalents, through, for example, the manufacture, use, sale, offer for sale, and/or importation into the United States of the Accused Product.

59.     For example, use of the Accused Product infringes at least Claim 1 of the '464 Patent.

60.     The Accused Product includes a handpiece with a body that has a housing with a working end positioned along a first end of the body.  The working end of the handpiece has a distal end that is configured to contact the patient's skin surface.  The working end of the handpiece includes a perimeter at its distal end.

61.     The handpiece has a first aperture or opening arrangement that includes a port at or near the working end that is in fluid communication through a passageway with a vacuum source that is housed in the Accused Product.  The handpiece has a second aperture or opening arrangement that includes a second port at or near the working end that is in fluid communication with a treatment media source that is housed in the Accused Product.



First port in communication with vacuum source

Perimeter

The vacuum gently pulls the skin into the tip to open up the pores, exfoliates and extracts impurities from the stratum corneum.

Second port in communication with treatment media source

While the skin is being pulled into the tip, the 360-degree rotating tip spreads the solution evenly on the skin.

62.     The Accused Product is specifically designed to treat a patient's skin surface. For example, when in use, the handpiece in the Accused Product is positioned against the patient's skin surface.

63.     Plaintiff is informed and believe, and based thereon alleges, that activating the vacuum source in the Accused Product simultaneously facilitates the delivery of a liquid treatment media to the patient's skin surface through the second port and aspirates away spent media from the patient's skin surface through the first port and the passageway at the distal end of the handpiece.

64.     Plaintiff is informed and believe, and based thereon alleges, that activating the vacuum source facilitates the delivery of the treatment media to the patient's subsurface skin tissue and causes adjacent skin to puff up to facilitate the treatment method.

65.     An end-user of the Accused Product directly infringes the '464 Patent by using the product. A distributor of the Accused Product directly infringes the '464 Patent by selling and/or offering for sale the Accused Product.

66.     Plaintiff is informed and believes and, based thereon, alleges that Defendant actively induces end-users and distributors of the Accused Product to purchase the Accused Product and directly infringe the '464 Patent.  Defendant had actual knowledge of the '464 Patent at least by virtue of the filing of this Complaint and, despite this knowledge, it continues to provide manuals, assembly instructions, and/or marketing materials, for example the materials attached as **Exhibit 6**, to end-users of the Accused Product to use the product to infringe the '464 Patent and also provides such materials to its distributors to infringe the '464 Patent by selling and/or offering for sale the Accused Product.

67.     Plaintiff is informed and believes and, based thereon, alleges that Defendant is aware that end-users of the Accused Product would infringe the '464 Patent by, for example, using the Accused Product during the term of the '464 Patent, and that its distributors would infringe the '464 Patent by, for example, selling and/or offering for sale the Accused Product during the term of the '464 Patent.

68.     Plaintiff is informed and believes and, based thereon, alleges that Defendant has the specific intent to induce its customers to infringe the '464 Patent by, for example, using, selling, and/or offering for sale the Accused Product, which infringes the '464 Patent.

69.     Plaintiff is informed and believes and, based thereon, alleges that Defendant has knowingly and intentionally infringed and continues to infringe the '646 Patent, either literally or under the doctrine of equivalents, through, for example, the manufacture, use, sale, offer for sale, and/or importation into the United States of the Accused Product.

70.     For example, the Accused Product infringes at least Claim 1 of the '646 Patent. The Accused Product includes a handpiece for treating a patient's skin surface.  The handpiece includes a body that has a housing and a working end at the distal end of the body.  The working

Case 2:20-cv-09669-FLA-PVC Document 41 Filed 06/25/21 Page 273 of 380 Page ID
Case 0:18-cv-62988-UU Document 1 Entered on FLSD Docket 12/26/2018 Page 18 of 22
#:881

end of the handpiece has a perimeter at its distal end that is configured to contact the patient's skin surface. The handpiece has a skin interface portion that is positioned within the perimeter of the handpiece and configured to contact the patient's skin surface during use.

71.     The handpiece has a first aperture having at least one first port that is located at or near the working end. The first port is in fluid communication through a passageway with a vacuum source that is housed in the Accused Product. The passageway ("waste passageway") in communication with the first port leads to a waste container that is also in the Accused Product.

72.     The handpiece also has a second aperture or opening arrangement that includes a second port along or near the working end. The second port is in fluid communication with a treatment media source that is housed in the Accused Product.

73.     Plaintiff is informed and believes and, based thereon, alleges that the vacuum source is configured to create a vacuum within the waste passageway and the working end, and the vacuum is configured to simultaneously deliver a treatment media from the treatment media source to the working end and remove used treatment media away from the working end via the passageway.

74.     Plaintiff is informed and believes and, based thereon, alleges that when the handpiece is positioned along the patient's skin surface and the vacuum source is activated, a treatment media is delivered to the patient's skin surface through the passageway and the second port because of the vacuum generated along the working end by the vacuum source, while used treatment media is aspirated away from the working end of the handpiece through the first port by the same suction force generated by the vacuum source.



First port in communication with vacuum source

Perimeter

Skin interface

Second port in communication with treatment media source

The vacuum gently pulls the skin into the tip to open up the pores, exfoliates and extracts impurities from the stratum corneum.

While the skin is being pulled into the tip, the 360-degree rotating tip spreads the solution evenly on the skin.

75.     An end-user of the Accused Product directly infringes the '646 Patent by using the product.  A distributor of the Accused Product directly infringes the '646 Patent by selling and/or offering for sale the Accused Product.

76.     Plaintiff is informed and believes and, based thereon, alleges that Defendant actively induces end-users and distributors of the Accused Product to purchase the Accused Product and directly infringe the '646 Patent.  Defendant had actual knowledge of the '646 Patent at least by virtue of the filing of this Complaint and, despite this knowledge, it continues to provide manuals, assembly instructions, and/or marketing materials, for example the materials attached as **Exhibit 6**, to end-users of the Accused Product to use the product to infringe the '646 Patent and also provides such materials to its distributors to infringe the '646 Patent by selling and/or offering for sale the Accused Product.

77.     Plaintiff is informed and believes and, based thereon, alleges that Defendant is aware that end-users of the Accused Product would infringe the '646 Patent by, for example, using the Accused Product during the term of the '646 Patent, and that its distributors would

infringe the '646 Patent by, for example, selling and/or offering for sale the Accused Product during the term of the '646 Patent.

78.      Plaintiff is informed and believes and, based thereon, alleges that Defendant has the specific intent to induce its customers to infringe the '646 Patent by, for example, using, selling, and/or offering for sale the Accused Product, which infringes the '646 Patent.

79.      Defendant's actions constitute willful and intentional infringement of the Asserted Patents.  Defendant infringed the Asserted Patents with reckless disregard of Plaintiff's patent rights.  Defendant knew, or it was so obvious that Defendant should have known, that its actions constituted infringement of the Asserted Patents.  Further, Defendant's acts of infringement of the Asserted Patents were not consistent with the standards of commerce for its industry.

80.      As a direct and proximate result of Defendant's acts of infringement, Defendant has derived and received gains, profits, and advantages in an amount that is not presently known to Plaintiff.

81.      Pursuant to 35 U.S.C. § 284, Plaintiff is entitled to damages for Defendant's infringing acts and treble damages together with interests and costs as fixed by this Court.

82.      Pursuant to 35 U.S.C. § 285, Plaintiff is entitled to reasonable attorneys' fees for the necessity of bringing this claim.

83.      Due to the aforesaid infringing acts, Plaintiff has suffered great and irreparable injury, for which Plaintiff has no adequate remedy at law.

84.      Defendant will continue to infringe and induce infringement of Plaintiff's patent rights to the great and irreparable injury of Plaintiff, unless enjoined by this Court.

Case 2:20-cv-09669-FLA-RVC Document 41 Filed 06/25/21 Page 276 of 380 Page ID
Case 0:18-cv-62989-JIC Document 1 Entered on FLSD Docket 12/26/2018 Page 21 of 22
#:884

## V.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and seek relief as follows:

A.     That the Court enter judgment in favor of Plaintiff and against Defendant on all claims for relief alleged herein;

B.     An Order adjudging Defendant to have infringed and induced infringement of the Asserted Patents under 35 U.S.C. § 271;

C.     A preliminary and permanent injunction enjoining Defendant, its officers, directors, agents, servants, employees, and attorneys, and those persons in active concert or participation with Defendant, from (1) making, using, selling, offering to sell, and/or importing the Accused Product, and (2) infringing the Asserted Patents in violation of 35 U.S.C. § 271, either directly or indirectly, including inducing or contributing to their infringement;

D.     An Order that Defendant pay to Plaintiff actual damages in the form of lost profits, or in the alternative, other damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the patented inventions by Defendant, in accordance with 35 U.S.C. § 284;

E.     An Order for a trebling of damages and/or otherwise increasing damages because of Defendant's willful misconduct pursuant to 35 U.S.C. § 284;

F.     An Order adjudging that this case is exceptional under 35 U.S.C. § 285 and ordering Defendant to pay to Plaintiff its reasonable attorney fees incurred in this action;

G.     An Order awarding pre-judgment and post-judgement interest and costs as fixed by the Court; and

H.     Such other and further relief as this Court may deem just and proper.

Case 2:20-cv-09669-FLA-PVC Document 41 Filed 06/25/21 Page 277 of 380 Page ID
Case 0:18-cv-62989-UU Document 1 Entered on FLSD Docket 12/26/2018 Page 22 of 22
#:885

# VI. **DEMAND FOR JURY TRIAL**

Plaintiff Edge Systems, LLC hereby demands a trial by jury of all issues so triable.

Respectfully submitted,

Dated:   October 26, 2018            By: _s/ Richard Guerra_

Richard Guerra, Esq.
Fla. Bar No. 689521
Email: rguerra@brickellip.com
Rafael Perez, Esq.
Fla. Bar No. 543101
Email: rperez@brickellip.com
The Brickell IP Group, PLLC
1101 Brickell Avenue
South Tower, Suite 800
Miami, Florida 33131

Paul A. Stewart, Esq. (*pro hac vice to be submitted*)
Email:  paul.stewart @knobbe.com
Ali S. Razai, Esq. (*pro hac vice to be submitted*)
Email:  ali.razai@knobbe.com
Josepher Li, Esq. (*pro hac vice to be submitted*)
Email: josepher.li@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone: (949) 760-0404
Facsimile: (949) 760-9502

*Attorneys for Plaintiff,*
EDGE SYSTEMS LLC

# EXHIBIT M

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

EDGE SYSTEMS LLC,

        Plaintiff,

        v.

CARTESSA AESTHETICS, LLC,

        Defendant.

_____

)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 1:20-cv-6082

**COMPLAINT FOR**
**PATENT INFRINGEMENT**

**DEMAND FOR JURY TRIAL**

Plaintiff Edge Systems LLC ("Edge" or "Plaintiff") hereby complains of Defendant Cartessa Aesthetics, LLC ("Defendant" or "Cartessa") and alleges as follows:

## I.   THE PARTIES

1.    Edge is a California limited liability company having a principal place of business at 2277 Redondo Avenue, Signal Hill, California, 90755.

2.    Plaintiff is informed and believes, and thereon alleges, that Defendant Cartessa Aesthetics, LLC is a New York limited liability company having a principal place of business at 175 Broadhollow Road, Suite 185 Melville, NY 11747.

## II.   JURISDICTION AND VENUE

3.    This is an action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. §§ 100, *et seq*.

4.    This Court has original subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5.    This Court has personal jurisdiction over Defendant because Defendant has a continuous, systematic, and substantial presence within New York and this judicial district. For example, Defendant has a principal place of business in this judicial district at 175 Broadhollow

Road, Melville, NY 11747. Plaintiff is informed and believes, and thereon alleges, that Defendant also sells and/or offers for sale infringing products in this judicial district and/or sells such products into the stream of commerce knowing they will be sold in New York and this judicial district.

6.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1400(b) because Defendant has a regular and established place of business in this judicial district and because Defendant has committed acts of infringement by selling and/or offering to sell infringing products in this judicial district. Venue is also proper because Defendant resides in this district.

### III. <u>GENERAL ALLEGATIONS</u>

**A.      <u>The Edge Patents and Technology</u>**

7.      Edge is a worldwide leader in the design, development, manufacture and sale of high-quality skin resurfacing and rejuvenation systems, including microdermabrasion and hydradermabrasion systems. These systems rejuvenate skin by cleaning and exfoliating the skin surface, extracting debris from pores, and nourishing the skin's surface with a therapeutic solution, called a "serum," that moisturizes and protects the treated skin surface. Edge markets and sells these systems throughout the United States to end users such as dermatologists, plastic surgeons, cosmetic physicians and aestheticians at medical spas.

8.      Edge's flagship system is its revolutionary HydraFacial MD® system, which is the premier hydradermabrasion system sold in the United States. Edge's revolutionary HydraFacial MD® system is protected by numerous United States patents. In addition to the HydraFacial MD® system, Edge designs, develops, manufactures and sells other patented hydradermabrasion systems, including the HydraFacial® Tower™, the HydraFacial® Allegro™, the HydraFacial® Wave™, the HydraFacial® Elite™, HydraFacial® Nectre™ and the

HydraFacial® Core™ systems.  These Edge hydradermabrasion systems are referred to herein collectively as "the HydraFacial® Systems."

9.        On November 4, 2003, the USPTO duly and lawfully issued U.S. Patent No. 6,641,591 ("the '591 Patent"), titled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS."  A true and correct copy of the '591 Patent is attached hereto as **Exhibit 1**.

10.        On November 29, 2011, the USPTO duly and lawfully issued U.S. Patent No. 8,066,716 ("the '716 Patent"), titled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS."  A true and correct copy of the '716 Patent is attached hereto as **Exhibit 2**.

11.        On December 25, 2012, the USPTO duly and lawfully issued U.S. Patent No. 8,337,513 ("the '513 Patent"), titled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS."  A true and correct copy of the '513 Patent is attached hereto as **Exhibit 3**.

12.        On January 24, 2017, the USPTO duly and lawfully issued U.S. Patent No. 9,550,052 ("the '052 Patent"), titled "CONSOLE SYSTEM FOR THE TREATMENT OF SKIN."  A true and correct copy of the '052 Patent is attached hereto as **Exhibit 4.**

13.        On October 3, 2017, the USPTO duly and lawfully issued U.S. Patent No. 9,775,646 ("the '646 Patent"), titled "DEVICES AND SYSTEMS FOR TREATING THE SKIN USING VACUUM."  A true and correct copy of the '646 Patent is attached hereto as **Exhibit 5**.

14.        Edge is the owner of all right, title, and interest in the '591 Patent, the '716 Patent, the '513 Patent, the '052 Patent and the '646 Patent (collectively, the "Asserted Patents").

15.     The '591 Patent, the '716 Patent, the '513 Patent and the '646 Patent (collectively "the Shadduck Patents") expired in August 2020.  Defendant introduced its infringing Skinwave system in 2019 and therefore infringed the Shadduck Patents while those patents were in effect.

**B.     Defendant's Infringing Skinwave System and Aqua Scaling Tips**

16.     Defendant is in the business of sourcing aesthetic medical devices manufactured by others, including hydradermabrasion devices that compete with Edge's HydraFacial® Systems.  Defendant markets and sells these medical devices throughout the United States to end users, such as dermatologists, plastic surgeons, cosmetic physicians and aestheticians at medical spas.

17.     One of the competing hydradermabrasion devices used, sold, offered for sale, and/or imported into the United States by Defendant is known as the Skinwave system. Defendant has offered the Skinwave system for sale on its website.  An example of one of Defendant's advertisements for the Skinwave system is attached hereto as **Exhibit 6**,

18.     Defendant promotes and offers to sell the Skinwave system on its website.  *See* https://www.cartessaaesthetics.com/skinwave (last visited December 11, 2020) (**Exhibit 6**). Defendant's website states that it "teamed up with Eunsung Global manufacturer to exclusively bring Skinwave to the US."  The Skinwave system sold by Defendant is manufactured by Eunsung Global ("Eunsung") and is structurally and functionally the same as a hydradermabrasion system sold by Eunsung under the name "Hydra Touch H2."  *See* http://esglobal.co.kr/en/products-intro/facial-care/hydra_touch_h2/ (last visited December 11, 2020) (**Exhibit 7**). Defendant's Skinwave system and the Hydra Touch H2 are collectively referred to as the "Skinwave System."

19.    The Skinwave System is a hydradermabrasion device for treating the skin surface of a patient.  The Skinwave System, shown in the image below, includes a handpiece that is configured to receive a replaceable tip at the end of the handpiece.  Defendants refer to this tip as the "Aqua Scaling Tip."



**Fig. 1**

20.    The Aqua Scaling Tip includes several openings.  Fluid may be delivered, and waste may be suctioned away, through these openings.



**Fig. 2:** Aqua Scaling Tip (small)

21.     The Aqua Scaling Tip is made of hard plastic and includes a working surface with a pattern of raised surfaces and ports.  The raised surfaces include edges that are sharp enough to abrade and exfoliate skin.  *See* **Exhibit 7** (the Skinwave System "exfoliat[es]").



Hard Plastic Structures

**Fig. 3:** Aqua Scaling Tip (small) (black highlights added).

22.     The Skinwave System includes a manifold and a console that allows a user to control the selection of solutions, flow of solutions and vacuum suction.  *See* **Exhibit 7** ("4 different solution selection," "Solution emission in 3 different levels," and "Level adjustable Vacuum.").  The Skinwave System also includes a vacuum source that creates suction for drawing the patient's skin against the Aqua Scaling Tip.  Eunsung's website explains that, "by sucking waste materials, it is possible to remove wastes from the pores without scratching or scratching [sic] the skin."  *Id*.



**Fig. 4:** Skinwave System (Exhibit 7).

-6-

23.     The Skinwave System delivers fluid from treatment media containers to the skin.  Defendants sells skin treatment media including "solutions rich in Alpha Hydroxy Acid (AHA), Beta Hydroxy Acid (BHA), Hyaluronic Acid and Hydrogen (H2)."  **Exhibit 6**.

24.     Defendant's Aqua Scaling Tips can be attached and detached to the handpiece of the Skinwave System.  Exemplary Aqua Scaling Tips are shown below.




**Fig. 6:** Skinwave Handpiece (Ex. 6) (left);  **Fig. 5** (Aqua Scaling Tip) (Ex. 6) (right).

25.     Defendant either had actual knowledge of the Asserted Patents (or their respective applications) when it began offering for sale and selling the infringing Eunsung-manufactured products, or it acted with willful blindness to its infringement.  Defendant's supplier Eunsung had actual knowledge of Plaintiff's patent portfolio – and the '591, '513, and '716 patents specifically – at least as early as April 25, 2014 and February 1, 2017, when Edge sent a letter and emails to Eunsung concerning sales of Eunsung hydradermabrasion products in the United States.  **Exhibits 8** and **9**.  Plaintiff is informed and believes, and thereon alleges, that when Defendant "teamed up with [Eunsung] to exclusively bring Skinwave to the US," it conducted due diligence concerning Eunsung and any allegations of patent infringement made against its hydradermabrasion products.  In conducting such due diligence, Defendant would

have been made aware of Edge's allegations concerning the '591, '513, and '716 patents. The applicability of these patents to the Skinwave System is apparent from the face of the patents.

26.     In addition, Defendant was a competitor in the aesthetic skin resurfacing equipment industry when it launched its Skinwave System. Defendant therefore knew that Plaintiff was an industry leader.

27.     Further, Plaintiff and Defendant are members of some of the same trade organizations and attend some of the same trade shows. For example, Plaintiff and Defendant both had booths at "The Aesthetic Show" held in Las Vegas July 11-14, 2019. *See* **Exhibit 10** at 46, 60. The conference program included a summary which identified Plaintiff as having 68 issued or pending patents and provided a link to Plaintiff's website. *Id*. at 60. The conference map indicates that Plaintiff's and Defendant's trade show booths were located within 100 feet of each other. *Id*. at 38.

28.     Defendant was therefore familiar with Plaintiff and its aesthetic skin-resurfacing products when it launched its Skinwave System for aesthetic skin resurfacing.

29.     Given this familiarity, Defendant necessarily would have researched Plaintiff and its patent portfolio before introducing the infringing Skinwave System. As part of that research, Defendant would have visited Plaintiff's website, where at least the '591,'513, and '716 Patents were, and remain, prominently listed. *See* https://hydrafacialco.com/patents/ (last visited December 14, 2020) (**Exhibit 11**).

30.     At a minimum, Defendant had actual knowledge of the Asserted Patents no later than about September 16, 2020, when it received a letter from Plaintiff informing Defendant of the Asserted Patents and its infringement thereof.

31.      Defendant has infringed and infringes the '052 Patent, and it infringed each of the Shadduck Patents before the patents expired.

32.      Plaintiff has never authorized Defendant's offer for sale, importation or sale of the Skinwave System, associated serums or associated tips.

33.      Defendant's acts of infringement were willful, intentional, and deliberate. Defendant has infringed each of the Asserted Patents with reckless disregard for Plaintiff's patent rights.  Defendant knew, or should have known, that its actions constituted infringement of the Asserted Patents.

## IV. COUNT I

## INFRINGEMENT OF THE '591 PATENT

34.      Plaintiff incorporates by reference and realleges each of the allegations set forth in Paragraphs 1-33 above.

35.      Defendant knowingly and intentionally infringed the '591 Patent through, for example, the use, sale, offer for sale, and/or importation into the United States of the Skinwave System during the term of the '591 Patent.

36.      For example, as set forth in the claim chart below, the Skinwave System infringed at least Claim 1 of the '591 Patent during the term of the patent.

| Claim Language | Accused Product |
|---|---|
| 1. A system for treating the skin surface of a patient, comprising: | The Skinwave System is a system for treating the skin surface of a patient.  For example, Defendant's website describes the Skinwave System as:<br><br>The Skinwave combines an aqua-delivery system, skin revitalizing solutions and Hydrogen therapy for a multi-dimensional skincare treatment. Solutions rich in Alpha Hydroxy Acid (AHA), Beta Hydroxy Acid (BHA), Hyaluronic Acid and Hydrogen (H2) are infused deep into the skin, while gentle extraction removes impurities. It's the ultimate compliment to brighten skin, improve vitality and tone. |
| (a) an instrument body with a distal working end that defines a skin interface portion for contacting the skin; | <br><br>**Fig. 6**<br><br>The Skinwave System has a handpiece that includes an instrument body and a distal working end with a tip (e.g., the Aqua Scaling Tip) that contacts the skin during use.  *See e.g.* https://www.facebook.com/cartessaaesthetics/videos/361807448055124/ https://www.facebook.com/cartessaaesthetics/videos/311527229734983/ and https://www.youtube.com/watch?v=nFwmtIaJ0U&feature=youtu.be (all last visited December 11, 2020) (collectively, "the Skinwave Videos"). |

(b) a first aperture arrangement in said skin interface consisting of at least one port in communication with a treatment media source;



**Fig. 3**

The Skinwave System has a first aperture arrangement that delivers treatment media from a treatment media source to the skin through a port (i.e. the port is "in communication" with the treatment media source).  *See* Figs. 1 & 3.



**Fig. 1**

(c) a second aperture arrangement in said skin interface consisting of at least one port in communication with a vacuum source for removing treatment media and removed tissue from the skin interface; and



**Fig. 3**

The Skinwave System has a second aperture arrangement with eight ports located near the periphery. These ports are connected to a vacuum source. *See* Figs. 1 & 3.

When activated, the vacuum source creates a vacuum that suctions used treatment media and abraded skin particles through the ports and deposits them in a debris receptacle located on the back of the device. *See* **Exhibit 6** & **Exhibit 7**. The vacuum source is located inside the device casing.



**Fig. 1**

| | |
|---|---|
| (d) wherein the skin interface comprises an abrading structure with substantially sharp edges for abrading tissue. | The tip is made of hard plastic and comprises a configuration with substantially sharp edges that abrade skin when the tip is translated across the skin. *See* Fig. 3.<br><br>Abrading Structures<br><br>**Fig. 3** |

37.     As a direct and proximate result of Defendant's acts of infringement, Defendant has derived and received gains, profits, and advantages. Plaintiff has been damaged by Defendant's activities, in an amount to be determined at trial, but in no event less than a reasonable royalty.

38.     Defendant's infringement was willful. Pursuant to 35 U.S.C. § 284, Plaintiff is entitled to damages for Defendant's infringing acts and treble damages together with interests and costs as fixed by this Court.

39.     This is an exceptional case. Pursuant to 35 U.S.C. § 285, Plaintiff is entitled to reasonable attorneys' fees for the necessity of bringing this claim.

## V.  COUNT II

### INFRINGEMENT OF THE '513 PATENT

40.      Plaintiff incorporates by reference and realleges each of the allegations set forth in Paragraphs 1-39 above.

41.      Defendant knowingly and intentionally infringed the '513 Patent through, for example, the use, sale, offer for sale, and/or importation into the United States of the Skinwave System during the term of the '513 Patent.

42.      For example, as set forth in the claim chart below, the Skinwave System infringed at least Claim 1 of the '513 Patent during the term of the patent.

| Claim Language | Accused Product |
|---|---|
| 1. A system for treating skin, comprising: | The Skinwave System is a system for treating the skin surface of a patient.  For example, Defendant's website describes the Skinwave System as:<br><br>The Skinwave combines an aqua-delivery system, skin revitalizing solutions and Hydrogen therapy for a multi-dimensional skincare treatment. Solutions rich in Alpha Hydroxy Acid (AHA), Beta Hydroxy Acid (BHA), Hyaluronic Acid and Hydrogen (H2) are infused deep into the skin, while gentle extraction removes impurities. It's the ultimate compliment to brighten skin, improve vitality and tone. |

| a handheld device comprising a main body and a working end along a distal end of the main body; | The Skinwave System includes a handheld device having a distal working end with a tip (e.g., the Aqua Scaling Tip). *See* **Exhibit 6**. |
|---|---|
| an outer periphery extending along the distal end of the handheld device; | |



| at least one surface element extending distally from the working end of the handheld device, said at least one surface element being positioned within an interior area circumscribed by the outer periphery; | <br>Surface Elements<br><br>**Fig. 3**<br><br>As shown, surface elements extend distally from the working end, and are positioned within the outer periphery.  *See* Fig. 3. |
| wherein the at least one surface element comprises at least one sharp edge configured to abrade skin when said handheld device is moved relative to a skin surface; and | The surface elements are made of hard plastic and comprise a configuration with sharp edges that abrade skin when the tip is translated across the skin surface.  *See* Fig. 3. |
| at least one opening along the working end of the handheld device; | The Skinwave System has eight openings located near the periphery of the working end of the handheld device.  *See* Fig. 3.<br><br>Exemplary Openings<br><br><br>**Fig. 3** |

wherein the at least one opening is configured to be placed in fluid communication with a vacuum source via a passageway, said passageway being configured to convey debris away from the working end when said vacuum source is activated; and

The Skinwave System includes a vacuum source. *See* **Exhibit 6** and **Exhibit 7**. When activated, the vacuum source creates a vacuum that suctions used treatment media and removed skin particles through the openings and deposits them in a debris receptacle located on the back of the device. *Id.* When in use the vacuum will draw the skin against the outer periphery.

Passageway



**Fig. 1**

Waste



**Fig. 4**

The vacuum source is located inside the device casing.

| | |
|---|---|
| wherein substantially an entire circumference of the outer periphery is configured to contact a skin surface during a treatment procedure. | As shown below, in **Fig. 7** (an imprint of the Aqua Scaling Tip (small) purchased from Cartessa) the entire outer periphery contacts the skin surface when used during a treatment procedure.<br><br><br><br>**Fig. 7**<br><br>The entire circumference of the outer periphery contacts the skin during use. *See e.g.,* Fig. 7, the Skinwave Videos**.** |

43.    As a direct and proximate result of Defendant's acts of infringement, Defendant has derived and received gains, profits, and advantages.  Plaintiff has been damaged by Defendant's activities, in an amount to be determined at trial, but in no event less than a reasonable royalty.

44.    Defendant's infringement was willful.  Pursuant to 35 U.S.C. § 284, Plaintiff is entitled to damages for Defendant's infringing acts and treble damages together with interests and costs as fixed by this Court.

45.    This is an exceptional case.  Pursuant to 35 U.S.C. § 285, Plaintiff is entitled to reasonable attorneys' fees for the necessity of bringing this claim.

## VI. COUNT III

### INFRINGEMENT OF THE '716 PATENT

46.     Plaintiff incorporates by reference and realleges each of the allegations set forth in Paragraphs 1-45 above.

47.     Defendant knowingly and intentionally infringed the '716 Patent through, for example, the use, sale, offer for sale, and/or importation into the United States of the Skinwave System during the term of the '716 Patent.

48.     For example, the Skinwave System infringed at least Claim 11 of the '716 Patent during the term of the patent.

| Claim Language | Accused Product |
|---|---|
| 11. A system for treating a skin surface of a patient, comprising: | The Skinwave System is a system for treating the skin surface of a patient.   For example, Defendant's website describes the Skinwave System as:<br><br>The Skinwave combines an aqua-delivery system, skin revitalizing solutions and Hydrogen therapy for a multi-dimensional skincare treatment. Solutions rich in Alpha Hydroxy Acid (AHA), Beta Hydroxy Acid (BHA), Hyaluronic Acid and Hydrogen (H2) are infused deep into the skin, while gentle extraction removes impurities. It's the ultimate compliment to brighten skin, improve vitality and tone. |

a handheld device comprising a main body and a working end attached to a distal end of the main body, said main body defining a longitudinal axis, said working end comprising an abrading structure, wherein said abrading structure comprises a plurality of abrading elements configured to abrade skin, wherein each abrading element comprises a sharp edge; and

The Skinwave System has a handheld device having a distal working end with a tip (e.g., the Aqua Scaling Tip) that contacts the skin during use. *See* **Exhibit 6**.



**Fig. 6**

The tip is made of hard plastic and comprises a configuration with a plurality of elements with sharp edges that abrade skin when the tip is translated across the skin surface (the abrading elements). *See* Fig. 3.



**Fig. 6**

**Fig. 3**

| at least one aperture along the working end, said at least one aperture being in fluid communication with a vacuum source adapted to apply suction to all of the at least one aperture in order to draw abraded skin away from the working end, | The Skinwave System has at least one aperture located along the working end. *See* Fig. 3. These apertures are connected to a vacuum source. *See* **Exhibit 6** and **Exhibit 7**.<br><br>Exemplary Apertures<br><br>**Fig. 3**<br><br>When activated, the vacuum source creates a vacuum that suctions used treatment media and abraded skin particles through the apertures and deposits them in a debris receptacle located on the back of the device.<br><br>Passageway<br><br>**Fig. 1** |



wherein the at least one aperture and the abrading elements are located completely within a raised outer periphery of the working end.

**Fig. 4**

The vacuum source is located inside the device casing.

**Fig. 3**

As can be seen in the image, an outer periphery encircles the abrading elements and apertures. *See* Fig. 3.

49.     As a direct and proximate result of Defendant's acts of infringement, Defendant has derived and received gains, profits, and advantages.  Plaintiff has been damaged by Defendant's activities, in an amount to be determined at trial, but in no event less than a reasonable royalty.

50.     Defendant's infringement was willful.  Pursuant to 35 U.S.C. § 284, Plaintiff is entitled to damages for Defendant's infringing acts and treble damages together with interests and costs as fixed by this Court.

51.     This is an exceptional case.  Pursuant to 35 U.S.C. § 285, Plaintiff is entitled to reasonable attorneys' fees for the necessity of bringing this claim.

### VII.COUNT IV

### INFRINGEMENT OF THE '646 PATENT

52.     Plaintiff incorporates by reference and realleges each of the allegations set forth in Paragraphs 1-51 above.

53.     Defendant infringed the '646 Patent through, for example, the use, sale, offer for sale, and/or importation into the United States of the Skinwave System during the term of the '646 Patent.

54.     For example, as set forth in the claim chart below, the Skinwave System infringed at least Claim 1 of the '646 Patent during the term of the patent.

| Claim Language | Accused Product |
| --- | --- |
| 1. A handheld device for treating a skin surface, comprising: | The Skinwave System is a system for treating the skin surface of a patient using a handheld device.  For example, Defendant's website describes the Skinwave System as: <br><br> The Skinwave combines an aqua-delivery system, skin revitalizing solutions and Hydrogen therapy for a multi-dimensional skincare treatment. Solutions rich in Alpha Hydroxy Acid (AHA), Beta Hydroxy Acid (BHA), Hyaluronic Acid and Hydrogen (H2) are infused deep into the skin, while gentle extraction removes impurities. It's the ultimate compliment to brighten skin, improve vitality and tone. |

| a body comprising a housing; |  |
|---|---|
| a working end portion positioned along a first end of the body, the working end portion comprising a distal end configured to contact a skin surface, wherein the working end portion comprises a perimeter along the distal end configured to contact the skin surface, a skin interface positioned along the interior of the perimeter, wherein the skin interface is configured to contact the skin surface during use; | The Skinwave System has a working end with a tip (e.g., the Aqua Scaling Tip) at the distal end. *See* **Exhibit 6**.The distal end of the working end (the tip) contacts the skin during use.   *See e.g.,* **Exhibit 6**, the Skinwave Videos**.**<br><br>As shown below, the tip has a perimeter encircling a skin interface. *See* Fig. 3. |



|  |  |
| **Fig. 6** | **Fig. 3** |

| a first aperture arrangement comprising at least one first port located along or near the working end portion, the at least one first port being in fluid communication with a vacuum source via at least one waste passageway extending through the housing; and | The Skinwave System has a first aperture arrangement with eight ports positioned near the perimeter along the working end portion. *See* Fig. 3. These ports are connected to a vacuum source. *See* **Exhibit 6** & **Exhibit 7**.<br><br><br>**Fig. 3**<br><br>When activated, the vacuum suctions used treatment media and abraded skin particles through the first ports and deposits them in a debris receptacle located on the back of the device. *See* **Exhibit 6** & **Exhibit 7**. The vacuum source is located inside the device casing. |

Passageway



**Fig. 1**

Waste



**Fig. 4**

| | |
|---|---|
| a second aperture arrangement comprising at least one second port located along or near the working end portion, the at least one second port being in fluid communication with a hydration treatment media source; | The Skinwave System has a second aperture arrangement that delivers treatment media from a treatment media source to the skin through a port positioned in the center of the working end (i.e. the port is "in fluid communication" with the treatment media source).  *See* Fig. 3, **Exhibit 6** & **Exhibit 7**. |



Second Port

**Fig. 3**

Treatment Media

**Fig. 4**

Passageway

Treatment Media Sources

**Fig. 1**

| | |
|---|---|
| wherein the vacuum source is configured to create a vacuum within the at least one waste passageway and the working end portion, and wherein the vacuum source is configured to simultaneously deliver a treatment media from the hydration treatment media source to the working end portion and remove spent treatment media away from the working end portion via the at least one waste passageway; | The vacuum source of the Skinwave System creates a vacuum within the waste passageway and the working end portion. This vacuum source delivers a treatment media from the hydration treatment media source (i.e., the solution bottle) to the working end portion. Simultaneously, the vacuum source also removes spent (i.e., used) treatment media away from the working end portion through the waste passageway. |
| wherein, when the vacuum source is activated and the working end portion of the device is positioned along a skin surface, hydration treatment media is delivered to the skin surface through the at least one passageway and the at least one second port due to the vacuum generated along the working end portion by the vacuum source, and spent treatment media is, at least partially, simultaneously aspirated away from the working end portion through the at least one first port by the same suction force generated by the vacuum source. | When the vacuum source is activated and the working end portion is positioned along a skin surface, treatment media is delivered to the skin surface through the second port due to the vacuum generated along the working end portion by the vacuum source. At the same time, spent (i.e., used) treatment media is aspirated away from the working end portion through the first ports by the same suction force generated by the vacuum source. |

55.     As a direct and proximate result of Defendant's acts of infringement, Defendant has derived and received gains, profits, and advantages.  Plaintiff has been damaged by Defendant's activities, in an amount to be determined at trial, but in no event less than a reasonable royalty.

56.     This is an exceptional case.  Pursuant to 35 U.S.C. § 285, Plaintiff is entitled to reasonable attorneys' fees for the necessity of bringing this claim.

## VIII.     COUNT V

## INFRINGEMENT OF THE '052 PATENT

57.     Plaintiff incorporates by reference and realleges each of the allegations set forth in Paragraphs 1-56 above.

58.     Defendant knowingly and intentionally infringes the '052 Patent through, for example, the use, sale, offer for sale, and/or importation into the United States of the Skinwave System.

59.     For example, as set forth in the claim chart below, the Skinwave System infringes at least Claim 1 of the '052 Patent.

| Claim Language | Accused Product |
|---|---|
| 1.   A   system   for performing   a   skin treatment procedure, the system comprising: | The Skinwave System is a system for treating the skin surface of a patient.  For example, Defendant's website describes the Skinwave System as:<br><br>The Skinwave combines an aqua-delivery system, skin revitalizing solutions and Hydrogen therapy for a multi-dimensional skincare treatment. Solutions rich in Alpha Hydroxy Acid (AHA), Beta Hydroxy Acid (BHA), Hyaluronic Acid and Hydrogen (H2) are infused deep into the skin, while gentle extraction removes impurities. It's the ultimate compliment to brighten skin, improve vitality and tone. |

| a console including a manifold, the manifold being in fluid communication with a first fluid container and at least a second fluid container, the first fluid container and the at least the second fluid container being configured to contain a treatment material for a skin treatment procedure, wherein the treatment material comprises a liquid; |  |
|---|---|
| | **Fig. 1** |
| | The Skinwave System includes a manifold to which at least a first and second fluid container are attached, placing them in fluid communication therewith. *See* **Exhibit 6** & **Exhibit 7**. The Skinwave System has a console which controls the manifold, allowing users to select "Solution emission in 3 different levels," and control "4 different solution selection[s]." *See* **Exhibit 7**. |
| a handpiece assembly comprising a tip, the tip being configured to contact a skin surface of a subject; | The Skinwave System has a handpiece with a tip (e.g., the Aqua Scaling Tip) that contacts the skin during use. *See e.g.,* **Exhibit 6**, the Skinwave Videos. |
| |  |
| | **Fig. 6** |

| | |
|---|---|
| a supply conduit placing the manifold of the console in fluid communication with the handpiece assembly, wherein a distal end of the supply conduit is configured to couple to the handpiece assembly; | <br><br>Supply Conduit<br><br>Distal End Coupled to Handpiece<br><br>**Fig. 1**<br><br>The Skinwave System has a supply conduit, coupled to the handpiece, which connects the handpiece to the manifold, placing the two in fluid communication. *See* **Exhibit 6** & **Exhibit 7**. |
| wherein the manifold is configured to control a flow of treatment material from the first fluid container and at least the second fluid container through the supply conduit; and | The Skinwave System has a manifold which is configured to control the flow of treatment material from the fluid containers through the supply conduit. *See* **Exhibit 6** & **Exhibit 7**.<br><br><br><br>Manifold<br><br>**Fig. 1** |
| a vacuum source; | The Skinwave System has a vacuum source. *See* **Exhibit 6** & **Exhibit 7**. The vacuum is located inside the device casing. |
| a waste conduit in fluid communication with the tip of the handpiece assembly to remove waste away from a skin surface of a subject | The Skinwave System has a waste conduit connected to the handpiece and a vacuum source. *See* **Exhibit 6** & **Exhibit 7**. When activated, the vaccum source suctions used treatment media and abraded skin particles (waste) through the waste conduit and deposits them in a waste receptacle located on the back of the device. *Id.* |

| | |
|---|---|
| during a skin treatment procedure, wherein the waste conduit is operatively coupled to the vacuum source; and | <br>Waste Conduit<br><br>**Fig. 1**<br><br><br>Waste<br><br>**Fig. 4** |
| wherein the system is configured to permit a user to select the treatment material from the first fluid container or the at least second fluid container to be delivered through the supply conduit to the handpiece assembly; and | The Skinwave System delivers treatment media from a fluid containers, through the supply conduit, to the skin. *See* **Exhibit 6** & **Exhibit 7**.<br><br><br>Supply Conduit<br>Treatment Selection<br>Fluid Containers<br><br>**Fig. 1** |

-32-



**Fig. 4**

The user can select fluids for delivery through the supply conduit. *Id*. For example Defendant's website explains:

> Three nutrient-rich solutions optimize skin revitalization. Skinwave infuses deep into the skin Alpha Hydroxy Acid (AHA), Beta Hydroxy Acid (BHA) and Hyaluronic Acid to address top skincare needs: exfoliating, oil control and moisturization. Dial-up the volume of one of these solutions to offer a more customizable treatment.

| | |
|---|---|
| wherein, when the vacuum source is activated and the tip contacts the skin surface, a suction force is created within the waste conduit and along the tip, thereby removing waste from the skin surface via the waste conduit while drawing treatment material from the first fluid container or the second fluid container to the tip via the supply conduit. | In use, the vacuum source of the Skinwave System creates a vacuum within the waste passageway and the tip. This vacuum source delivers a treatment media from the fluid containers to the tip. Simultaneously, the vacuum source also removes spent treatment media (i.e., waste) away from the working end portion through the waste passageway. |

60.     As a direct and proximate result of Defendant's acts of infringement, Defendant has derived and received gains, profits, and advantages.  Plaintiff has been damaged by Defendant's activities, in an amount to be determined at trial, but in no event less than a reasonable royalty.

61.     Defendant's infringement is willful.  Pursuant to 35 U.S.C. § 284, Edge is entitled to damages for Defendant's infringing acts and treble damages together with interests and costs as fixed by this Court.

62.     This is an exceptional case.  Pursuant to 35 U.S.C. § 285, Edge is entitled to reasonable attorneys' fees for the necessity of bringing this claim.

63.     Due to the aforesaid infringing acts, Plaintiff has suffered irreparable injury, for which Plaintiff has no adequate remedy at law.

64.     Unless enjoined by this Court, Defendant will continue to infringe Plaintiff's patent rights and cause Plaintiff further irreparable injury.

## IX. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

A.     A judgment in favor of Plaintiff and against Defendant on all claims alleged herein;

B.     A judgment that Defendant has infringed the Shadduck Patents under 35 U.S.C. § 271 during the term of the Shadduck Patents;

C.     A judgment that Defendant has infringed the '052 Patent under 35 U.S.C. § 271;

D.     A preliminary and permanent injunction enjoining Defendant, its officers, directors, agents, servants, employees, and attorneys, and those persons in active concert or participation with Defendant, from (1) making, using, selling, offering to sell, and/or importing into the

United States the Skinwave System, and (2) infringing the '052 Patent in violation of 35 U.S.C. § 271;

     E.    An accounting of all Defendant's gains, profits, and advantages derived from its infringement of the Asserted Patents in violation of 35 U.S.C. § 271, and an Order that Defendant pay to Plaintiff actual damages in the form of lost profits, or in the alternative, other damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the patented inventions by Defendant, in accordance with 35 U.S.C. § 284;

     F.    An order trebling or otherwise increasing damages pursuant to 35 U.S.C. § 284 because of Defendant's willful infringement;

     G.    An order finding this case exceptional under 35 U.S.C. § 285 and ordering Defendant to pay Plaintiff its reasonable attorney fees incurred in this action;

     H.    Pre-judgment and post-judgement interest and costs as fixed by the Court; and

     I.    Such other and further relief as this Court may deem just and proper.

## X.  <u>DEMAND FOR JURY TRIAL</u>

Plaintiff Edge Systems, LLC hereby demands a trial by jury of all issues so triable.


Dated:  <u>December 14, 2020</u>        By: <u>*/s/ Karen M. Cassidy*</u>

Craig S. Summers (*pro hac vice pending*)
Email: craig.summers@knobbe.com
Ali S. Razai (*pro hac vice pending*)
Email: ali.razai@knobbe.com
Sean M. Murray (*pro hac vice pending*)
Email: sean.murray@knobbe.com
Karen M. Cassidy (*pro hac vice pending*)
Email: karen.cassidy@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone: (949) 760-0404
Facsimile: (949) 760-9502


*Attorneys for Plaintiff*,
EDGE SYSTEMS LLC

# EXHIBIT N

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| EDGE SYSTEMS LLC, | ) |
| Plaintiff, | ) Civil Action No. _____ |
| | ) |
| v. | ) |
| | ) **JURY TRIAL DEMANDED** |
| AGELESS SERUMS LLC, | ) |
| Defendant. | ) |
| | ) |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Edge Systems LLC ("Edge") brings this complaint for patent infringement against Defendant Ageless Serums LLC ("Ageless") and alleges as follows:

## I. THE PARTIES

1.      Edge is a California corporation having its principal place of business at 2277 Redondo Ave., Signal Hill, CA 90755.

2.      Ageless Serums LLC is a Texas limited liability company having its principal place of business at 6140 Highway 6, Suite 226, Missouri City, Texas 77459.

## II. JURISDICTION AND VENUE

3.      This is an action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. §§ 100, *et seq*.

4.      This Court has original subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5.      This Court has personal jurisdiction over Ageless because Ageless has a continuous, systematic, and substantial presence within Texas and this judicial district.  For

- 1 -

example, Ageless is a business entity formed under the laws of Texas, and it has a principal place of business in this judicial district at 6140 Highway 6, Suite 226, Missouri City, Texas. Ageless also sells and offers for sale infringing products in this judicial district and/or sells such products into the stream of commerce knowing they will be sold in Texas and this judicial district.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1400(b) because Ageless has a regular and established place of business in this judicial district and because Ageless has committed acts of infringement by selling and/or offering to sell infringing products in this judicial district. Venue is also proper because Ageless resides in this district.

## III. GENERAL ALLEGATIONS

### A. The Edge Patents and Technology

7. Edge is a worldwide leader in the design, development, manufacture, and sale of high-quality skin resurfacing and rejuvenation systems, including microdermabrasion and hydradermabrasion systems. These systems rejuvenate skin by cleaning and exfoliating the skin surface, extracting debris from pores, and nourishing the skin's surface with a therapeutic solution, called a "serum," that moisturizes and protects the treated skin surface. Edge markets and sells these systems throughout the United States to end users such as dermatologists, plastic surgeons, cosmetic physicians and aestheticians at medical spas.

8. Edge's flagship skin resurfacing and rejuvenation system – the revolutionary HydraFacial MD® system – is the premier hydradermabrasion system sold in the United States. That system is shown below. In addition to the HydraFacial MD® system, Edge designs, develops, manufactures and sells other hydradermabrasion systems, including the HydraFacial® Tower™, the HydraFacial® Allegro™, the HydraFacial® Wave™, the HydraFacial® Elite™, HydraFacial® Nectre™, and the HydraFacial® Core™ systems. These Edge hydradermabrasion systems are referred to herein collectively as "the HydraFacial® Systems."



9.     Edge and its customers also offer hydradermabrasion treatments using the HydraFacial® Systems.  These treatments are offered under the HydraFacial® service mark. Both the HydraFacial® Systems themselves and the associated HydraFacial® treatment techniques are protected by numerous U.S. patents.

10.     On November 4, 2003, the USPTO duly and lawfully issued U.S. Patent No. 6,641,591 ("the '591 Patent"), titled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS."  A true and correct copy of the '591 Patent is attached hereto as Exhibit 1.

11.     On March 16, 2010, the USPTO duly and lawfully issued U.S. Patent No. 7,678,120 ("the '120 Patent"), titled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS."  A true and correct copy of the '120 Patent is attached hereto as Exhibit 2.

12.     On September 7, 2010, the USPTO duly and lawfully issued U.S. Patent No. 7,789,886 ("the '886 Patent"), titled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS."  A true and correct copy of the '886 Patent is attached hereto as Exhibit 3.

13.     On December 25, 2012, the USPTO duly and lawfully issued U.S. Patent No. 8,337,513 ("the '513 Patent"), titled "INSTRUMENTS AND TECHNIQUES FOR CONTROLLED REMOVAL OF EPIDERMAL LAYERS."  A true and correct copy of the '513 Patent is attached hereto as Exhibit 4.

14.     On October 18, 2016, the USPTO duly and lawfully issued U.S. Patent No. 9,468,464 ("the '464 Patent"), titled "METHODS FOR TREATING THE SKIN USING VACUUM."  A true and correct copy of the '464 Patent is attached hereto as Exhibit 5.

15.     On January 24, 2017, the USPTO duly and lawfully issued U.S. Patent No. 9,550,052 ("the '052 Patent"), titled "CONSOLE SYSTEM FOR THE TREATMENT OF SKIN."  A true and correct copy of the '052 Patent is attached hereto as Exhibit 6.

16.     Edge is the owner of all right, title, and interest in the '591 Patent, the '120 Patent, the '886 Patent, the '513 Patent, the '464 Patent and the '052 Patent (collectively, "the Asserted Patents").

17.     With the exception of the '052 Patent, the Asserted Patents expired in August 2020.  However, Ageless has been inducing end users to infringe the Asserted Patents since at least 2017 and therefore infringed the expired Asserted Patents while those patents were in effect.

## B.     Ageless and Its Infringing Serum Products

18.     Ageless is in the business of promoting and selling serums for use with hydradermabrasion machines manufactured by others, including machines that infringe Edge's patents.  For example, Ageless sells to customers who provide hydradermabrasion treatments using infringing machines such as the Ageless Glow MD, the BioXFusion MD, the BioXFusion Mini, the Aqua Skin Facial, and the Aqua Skin Facial Table Top.

19.     Ageless has infringed system claims in the Asserted Patents by selling serum products and inducing its customers to combine the serum with an infringing machine to form a patented system.  Ageless has infringed method claims in the Asserted Patents by selling serum products and inducing its customers to use those serums with infringing machines to perform a patented skin-treatment technique.

20.     The serums that Ageless sells for use in infringing systems and techniques include its Pure Aqua, Skin Deep Prep, Salicylic Wash, Ageless Antioxidant, Ageless Antioxidant Plus, and Peptide Infusion serums (the "Ageless Serums").

21.     Ageless instructs its customers on its website and elsewhere to use the Ageless Serums in a manner that infringes the Asserted Patents.

## C.     The Parties' History

22.     Ageless Managing Partner Rene Chlumecky was employed by Edge as an independent sales representative from February 28, 2011 to March 12, 2012.  Mr. Chlumecky founded Ageless shortly after leaving left Edge.

23.     Early in 2017, Edge learned that Ageless was selling an infringing hydradermabrasion device, the Ageless Glow MD ("Ageless Glow Device"), with the Ageless Glow Handpiece, as well as the Ageless Serums for use therewith.  On April 10, 2017, Edge filed a patent-infringement suit against Ageless in the Central District of California ("the 2017

Lawsuit"). Edge asserted a number of patents from its hydradermabrasion portfolio, including the '591 and '513 Patents at issue in this case. During the 2017 Lawsuit, Ageless revealed that it was merely a distributor for Image Microderm, Inc. ("IMD"), the manufacturer of the Ageless Glow Devices. Ageless agreed to cease sales of the Ageless Glow Device and Handpiece, and the 2017 Lawsuit was dismissed without prejudice.

24.     Although Ageless agreed to stop selling the Ageless Glow Device and Handpiece, it continued to sell Ageless Serums for use with that machine and another hydradermabrasion machine sold by IMD that was structurally and functionally the same as the Ageless Glow Device (the "BioXFusion MD"). Ageless also continued to sell Ageless Serums for use with a similar machine sold by IMD called the "BioXFusion Mini" (collectively the BioXFusion MD and BioXFusion Mini are the "IMD Devices"). In so doing, Ageless induced additional infringement of Edge's patents and has profited (and is profiting) from that infringement.

25.     On December 1, 2017, Edge filed suit for patent infringement against IMD. Edge's complaint alleged, *inter alia*, direct infringement for its sales of the IMD Devices and indirect infringement for inducing customers to infringe Edge's method patents ("the IMD Lawsuit"). Edge asserted a number of patents from its hydradermabrasion portfolio, including the '591, '886, '464, '513, and '052 Patents at issue in this case. IMD ultimately conceded that the IMD Devices, and the use thereof, infringed Edge's patents. *See* Exhibit 7 (Final Consent Judgement of Willful Infringement) at ¶¶ 7-8, 11, and 13.

26.     Ageless also sold Ageless Serums for use with the Aqua Skin Facial and Aqua Skin Facial Table Top hydradermabrasion machines (the "Aesthetic Devices") sold by Aesthetic Skin Systems LLC ("Aesthetic"). On June 22, 2017, Edge filed suit for patent infringement against Aesthetic, alleging direct and infringement of several patents in its hydradermabrasion

portfolio (the "Aesthetic Litigation"). The Aesthetic Litigation was resolved by a consent judgment in which Aesthetic agreed to discontinue selling the Aesthetic Devices.

27. Even after the termination of the Aesthetic Litigation, Ageless continued to sell Ageless Serums to end users who had already purchased the discontinued Aesthetic Devices, thereby inducing additional infringement of Edge's patents and profiting from that infringement.

**D.** **Ageless's Inducement of Infringement**

28. Ageless was aware that the use of the Ageless Serums with non-Edge hydradermabrasion machines – including the Ageless Device, the IMD Devices and the Aesthetic Devices – during the lifetime of the Asserted Patents would infringe those patents. Despite this knowledge, Ageless continued to sell Ageless Serums for use with those devices, and it expressly targeted purchasers of those infringing devices. It also provided instructions for using the Ageless Serums with any and all hydradermabrasion devices despite knowing that many of the devices on the market were infringing. Thus, Ageless intentionally induced end users to take actions that Ageless knew would infringe the Asserted Patents, or it was willfully blind to the risk that the actions it was inducing would infringe those patents.

29. Ageless knew of the Asserted Patents or was willfully blind to their existence. Ageless's managing partner, Rene Chlumecky, learned during his employment with Edge that Edge's products and services were protected by an extensive patent portfolio. Mr. Chlumecky was therefore familiar with the Asserted Patents that were in effect during his tenure at the company: the '591 Patent, the '120 Patent, and the '886 Patent.

30. In addition, Ageless had actual knowledge of the '591 and '513 Patents from the 2017 Litigation, in which the Ageless Device were accused of infringing those patents.

31. Further, Ageless had actual knowledge of the Asserted Patents in 2017 from its close relationship with IMD. Ageless was acting as a distributor for IMD in 2017, and it also

sold serums for use in IMD-manufactured machines.  Because all of the Asserted Patents except the '120 Patent were asserted in the IMD Lawsuit filed in that year, Ageless was aware of those patents.  Exhibit 7.  Ageless would have known or should have known about the '120 Patent because it is a continuation of the '591 Patent.

32.     Further, as a supplier of serums for use in Aesthetic Devices, Ageless would have been aware of the Aesthetic Litigation, which involved many of the Asserted Patents.

33.     In addition, Edge and Ageless were competitors in the aesthetic skin resurfacing industry when Ageless began selling the Ageless Serums.  Through Mr. Chlumecky's experience as a former Edge employee and an Edge competitor, Ageless knew that Edge was an industry leader.  Ageless's website repeatedly mentions Edge's HydraFacial technology.  *See e.g.*, https://agelessserums.com/compare-hydrafacial-to-ageless-serums.html (last visited December 14, 2020).  Given this familiarity, Ageless would have necessarily researched Edge and its patent portfolio.  As part of that research, Ageless would have visited Edge's website, where at least the '591, '513, '886, '120 and '052 Patents are prominently listed.  *See* https://hydrafacialco.com/patents/ (last visited December 14, 2020).

34.     Despite its knowledge of the Asserted Patents, Ageless intentionally induced owners of non-Edge hydradermabrasion machines to take actions Ageless knew would infringe the Asserted patents, namely, incorporating Ageless Serums into non-Edge machines to form infringing hydradermabrasion systems and provide infringing skin-treatment services.  At a minimum, Ageless was willfully blind to the risk that the actions it was inducing would infringe.

35.     Ageless has infringed and infringes the '052 Patent, and it infringed each of the other Asserted Patents before it expired.  Ageless's infringing actions were and are unauthorized, willful, intentional and deliberate.  Ageless has infringed the Asserted Patents with reckless disregard for Edge's patent rights.

## IV.  COUNT I: INDUCED INFRINGEMENT OF THE '591 PATENT

36.     Edge reiterates and re-alleges the allegations of paragraphs 1-35 of this Complaint as if set forth fully herein.

37.     Ageless knowingly and intentionally infringed the '591 Patent through, for example, intentionally selling Ageless Serums to owners of infringing hydradermabrasion machines for use in those machines, and by providing instructions that enabled owners of such machines to use Ageless Serums in their machines.  The foreseeable and intended result of these actions was that end users combined their machines with Ageless Serums to form hydradermabrasion systems which embodied patented systems of the '591 Patent and which, when used to perform skin-treatment services, practiced patented methods of the '591 Patent.

38.     Ageless had actual knowledge of the '591 Patent at least as early as 2017. Despite its knowledge of the '591 Patent, Ageless sold Ageless Serums and intentionally induced its customers to use those serums in a manner that infringed the '591 Patent, including customers who owned the Ageless Device, IMD Devices and Aesthetic Devices.  Ageless knew – or was willfully blind to the likelihood – that its actions would induce end users to infringe the '591 Patent during the lifetime of the patent.  Ageless intended that end users infringe so that it could profit from that infringement.

39.     As shown in the exemplary chart below, owners of IMD Devices that Ageless induced to infringe the '591 Patent practiced at least claim 10 of that patent.

| Claim Language | Induced Infringement |
|---|---|
| 10. A method for treating the skin surface of a patient, comprising: | Ageless induced customers to use Ageless Serums with IMD Devices as part of a method for treating the skin surface of a patient. *See* https://agelessserums.com/ageless-facial-protocols.html (last visited December 14, 2020).<br><br>IMD conceded that this limitation is satisfied when IMD Devices are used. Exhibit 7 at ¶¶ 7-8, 11, and 13. |
| positioning a treatment device against a patient's skin creating a treatment region at a skin treatment site, | During use, the handpiece of the IMD Devices is positioned against a patient's skin, creating a treatment region at a skin treatment site, as shown below:<br><br><br><br>IMD conceded that this limitation is satisfied when IMD Devices are used. Exhibit 7 at ¶¶ 7-8, 11, and 13. |
| the treatment device comprising at least one media entrance port; | The IMD Devices have at least one media entry port, as shown below:<br><br><br><br>IMD conceded that this limitation is satisfied when the IMD Devices are used. Exhibit 7 at ¶¶ 7-8, 11, and 13. |
| directing at least one flowable treatment medium through said at least one entrance port; | In use, the handpiece directs at least one flowable treatment medium (i.e., Ageless Serum) through the entrance port in the tip of the handpiece.<br><br>IMD conceded that this limitation is satisfied when the IMD Devices are used. Exhibit 7 at ¶¶ 7-8, 11, and 13.<br><br>In addition, Ageless instructs users to direct at least one flowable media through the handpiece. *See* |

- 10 -

| | |
|---|---|
| | https://agelessserums.com/ageless-facial-protocols.html (last visited December 14, 2020). |
| wherein the treatment medium is sterile water or a saline solution; | Ageless provides sterile water (Pure Aqua) and saline solutions for use with IMD Devices, and instructions for using these solutions with various hydradermabrasion devices. Each of the Ageless Serums includes sodium benzoate, a salt, and is therefore a saline solution. *See* https://agelessserums.com/products.html (last visited December 14, 2020). |
| translating the treatment device over the skin treatment site whereby the combination of an abrasive structure carried by the treatment device and the flowable treatment medium removes dermal tissue; and | During use, the IMD Devices are translated over the skin treatment site. The movement of the abrasive structure of the handpiece over the skin treatment site and the flow of the treatment medium abrades the skin, whereby dermal tissue is removed at the skin treatment site.  IMD conceded that this limitation is satisfied when the IMD Devices are used. Exhibit 7 at ¶¶ 7-8, 11, and 13. |
| aspirating dermal treatment media and any removed dermal tissue from the treatment region. | The IMD Devices include a vacuum source in communication with the tip of the handpiece. In use, the vacuum source applies suction to the tip of the handpiece to draw spent treatment media and removed skin from the treatment site.  IMD conceded that this limitation is satisfied when the IMD Devices are used. Exhibit 7 at ¶¶ 7-8, 11, and 13. |

40.     To take another example, the chart below demonstrates how use of an Ageless

Serum with an Aesthetic Device practices at least claim 10 of the '591 Patent.

| Claim Language | Induced Infringement |
|---|---|
| 10. A method for treating the skin surface of a patient, comprising: | Ageless induced customers to use Ageless Serums with Aesthetic Devices as part of a method for treating the skin surface of a patient. *See* https://agelessserums.com/ageless-facial-protocols.html (last visited December 14, 2020). |
| positioning a treatment device against a patient's skin creating a treatment region at a skin treatment site, | During use, the handpiece of the Aesthetic Devices is positioned against a patient's skin, creating a treatment region at a skin treatment site, as shown below:  |
| the treatment device comprising at least one media entrance port; | The Aesthetic Devices have at least one media entry port, as shown below:  |
| directing at least one flowable treatment medium through said at least one entrance port; | In use, the handpiece directs at least one flowable treatment medium (i.e., Ageless Serum) through the entrance port in the tip of the handpiece. Ageless instructs users to direct at least one flowable media through the handpiece. *See* https://agelessserums.com/ageless-facial-protocols.html (last visited December 14, 2020). |
| wherein the treatment medium is sterile water or a saline solution; | Ageless provides sterile water (Pure Aqua) and saline solutions for use with IMD Devices, and instructions for using these solutions with various hydradermabrasion devices. Each of the Ageless Serums includes sodium benzoate, a salt, and is therefore a saline solution. *See* https://agelessserums.com/products.html (last visited December 14, 2020). |

| | |
|---|---|
| translating the treatment device over the skin treatment site whereby the combination of an abrasive structure carried by the treatment device and the flowable treatment medium removes dermal tissue; and | During use, the Aesthetic Devices are translated over the skin treatment site. The movement of the abrasive structure of the handpiece over the skin treatment site and the flow of the treatment medium abrades the skin, whereby dermal tissue is removed at the skin treatment site.<br><br> |
| aspirating dermal treatment media and any removed dermal tissue from the treatment region. | The Aesthetic Devices include a vacuum source in communication with the tip of the handpiece. In use, the vacuum source applies suction to the tip of the handpiece to draw spent treatment media and removed skin from the treatment site.<br><br> |

41.     Thus, Ageless indirectly infringed at least claim 10 of the '591 Patent under 35 U.S.C. § 271(b).  As a direct and proximate result of its infringement, Ageless has derived and received gains, profits and advantages.  Edge has been damaged by Ageless's activities in an amount to be determined at trial, but in no event less than a reasonable royalty.

42.     Ageless's infringement was willful.  Pursuant to 35 U.S.C. § 284, Edge is entitled to augmented damages.  Because Ageless acted willfully, this is an exceptional case.  Edge is therefore entitled to recover its reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

## V.  COUNT II: INDUCED INFRINGEMENT OF THE '120 PATENT

43.     Edge reiterates and re-alleges the allegations of paragraphs 1-42 of this Complaint as if set forth fully herein.

44.     Ageless knowingly and intentionally infringed the '120 Patent through, for example, intentionally selling Ageless Serums to owners of infringing hydradermabrasion machines for use in those machines, and by providing instructions that enabled owners of such machines to use Ageless Serums in their machines.  The foreseeable and intended result of these actions was that end users combined their machines with Ageless Serums to form hydradermabrasion systems which, when used to perform skin-treatment services, practiced patented methods of the '120 Patent.

45.     Ageless had actual knowledge of the '120 Patent at least as early as 2017.  Despite its knowledge of the '120 Patent, Ageless sold Ageless Serums and intentionally induced its customers to use those serums in a manner that infringed the '120 Patent, including customers who owned Ageless Device, IMD Devices and Aesthetic Devices.  Ageless knew – or was willfully blind to the likelihood – that its actions would induce end users to infringe the '120 Patent during the lifetime of the patent.  Ageless intended that end users infringe so that it could profit from that infringement.

46.     As shown in the exemplary charts below, owners of Aesthetic Devices that Ageless induced to infringe the '120 Patent practiced at least claims 1 and 2 of that patent.

| Claim Language | Induced Infringement |
|---|---|
| 1. A method for abrading skin of a patient, comprising: | Ageless induced customers to use Ageless Serums with Aesthetic Devices as part of a method for treating the skin surface of a patient. *See* https://agelessserums.com/ageless-facial-protocols.html (last visited December 14, 2020). |
| (a) placing a working end of a skin treatment device against the skin of the patient; | During use, the handpiece of the Aesthetic Devices is positioned against a patient's skin, creating a treatment region at a skin treatment site, as shown below:  |
| (b) drawing the skin against an abrading surface on a skin interface on the working end of the skin treatment device by applying suction to the skin through an aspiration opening in the working end, the abrading surface comprising apexes extending upwardly from the abrading surface and the apexes having sharp edges; | The Aesthetic Devices include a vacuum source that communicates with the aspiration opening of the tip being used. In use, the suction generated by the vacuum source draws the patient's skin against the abrading surface of the tip.  |

| | |
|---|---|
| |  |
| (c) moving the treatment device across the skin while the sharp edge of the apexes remain stationary with respect to the working end of the skin treatment device; | In use, the user moves the handpiece across the patient's skin while the sharp edges of the abrading surface of tip remains stationary relative to the skin interface, as shown in the below exemplary tip.<br><br> |
| (d) abrading the skin drawn against the sharp edge of the apexes while continuously applying suction through the aspiration opening; and | In use, the vacuum source supplies continuous suction through the aspiration opening. The negative pressure keeps the patient's skin drawn against the sharp edges of the apexes of the tip being used. As shown in the below example, the skin is abraded against the sharp-edged apexes as the treatment device moves across the skin.<br><br> |

| (e) removing skin debris through the aspiration opening in the working end of the skin treatment device. | Debris that results from the skin abrasion is drawn through the aspiration opening in any of the tips of the Aesthetic Devices' handpiece, as shown in the below example.  VACUUM SOURCE DRAWS DEBRIS FROM SKIN INTERFACE THROUGH ASPIRATION OPENING |
| --- | --- |

| Claim Language | Induced Infringement |
| --- | --- |
| 2. The method of claim 1, further comprising providing a fluid to the skin. | In use, a fluid (i.e., Ageless Serum) is provided to the skin through the handpiece and tips. Ageless instructs users to provide fluid to the skin using the Aesthetic Devices. *See* https://agelessserums.com/ageless-facial-protocols.html (last visited December 14, 2020).<br><br>Ageless provides sterile water (Pure Aqua) and saline solutions for use with the Aesthetic Devices, and instructions for using these solutions with various hydradermabrasion devices. *See* https://agelessserums.com/products.html (last visited December 14, 2020). |



47.     Thus, Ageless indirectly infringed at least claims 1-2 of the '120 Patent under 35 U.S.C. § 271(b).  As a direct and proximate result of Ageless's acts of infringement, Ageless has derived and received gains, profits and advantages.  Edge has been damaged by Ageless's activities in an amount to be determined at trial, but in no event less than a reasonable royalty.

48.     Ageless's infringement was willful.  Pursuant to 35 U.S.C. § 284, Edge is entitled to augmented damages.  Because Ageless acted willfully, this is an exceptional case.  Edge is therefore entitled to recover its reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

## VI.  COUNT III: INDUCED INFRINGEMENT OF THE '886 PATENT

49.    Edge reiterates and re-alleges the allegations of paragraphs 1-48 of this Complaint as if set forth fully herein.

50.    Ageless knowingly and intentionally infringed the '886 Patent through, for example, intentionally selling Ageless Serums to owners of infringing hydradermabrasion machines for use in those machines, and by providing instructions that enabled owners of such machines to use Ageless Serums in their machines.  The foreseeable and intended result of these actions was that end users combined their machines with Ageless Serums to form hydradermabrasion systems which, when used to perform skin-treatment services, practiced patented methods of the '886 Patent.

51.    Ageless had actual knowledge of the '886 Patent at least as early as 2017. Despite its knowledge of the '886 Patent, Ageless sold Ageless Serums and intentionally induced its customers to use those serums in a manner that infringed the '886 Patent, including customers who owned Ageless Device, IMD Devices and Aesthetic Devices.  Ageless knew – or was willfully blind to the likelihood – that its actions would induce end users to infringe the '886 Patent during the lifetime of the patent.  Ageless intended that end users infringe so that it could profit from that infringement.

52.    As shown in the exemplary charts below, owners of IMD Devices that Ageless induced to infringe the '886 Patent practiced at least claims 1-3 of that patent.

| Claim Language | Induced Infringement |
|---|---|
| 1. A method for treating a skin surface of a patient, comprising: | Ageless induced customers to use Ageless Serums with IMD Devices as part of a method for treating the skin surface of a patient.  *See* https://agelessserums.com/ageless-facial-protocols.html (last visited December 14, 2020).<br><br>IMD conceded that this limitation is satisfied when the IMD Devices are used.  Exhibit 7 at ¶¶ 7-8, 11, and 13. |

| | |
|---|---|
| (a) applying against the skin surface of a patient an instrument body with a longitudinal axis and a distal working end, said distal working end comprising a working surface that carries an abrading structure comprising a plurality of sharp elements for engaging and abrading the skin surface together with a vacuum source coupled to at least one aperture about said working surface, the abrading structure and the at least one aperture positioned within a raised outer periphery that completely circumscribes the abrading structure and the at least one aperture; | During use, the handpiece of the IMD Devices, which has an instrument body with a longitudinal axis and a distal working end, is positioned against a patient's skin, as shown below:<br><br><br><br>The handpiece of the IMD Devices can be used with the tips supplied therewith. When the exfoliation tip is attached to the handpiece, the tip forms the working surface of the handpiece. The exfoliation tip includes an abrading structure having a plurality of edges, which are sharp elements for engaging and abrading the patient's skin, as shown below.<br><br><br><br>EXFOLIATION TIP<br><br>The skin interface portion includes an aperture arrangement, which is the large central bore of the working end of the handpiece. This aperture arrangement is coupled to a vacuum source in the IMD Devices. As shown below, the distal working end of the handpiece includes a raised periphery that completely encircles the abrading structure and the at least one aperture. |

<table>
<tr>
<td></td>
<td>



IMD conceded that this limitation is satisfied when the IMD Devices are used. Exhibit 7 at ¶¶ 7-8, 11, and 13.</td>
</tr>
<tr>
<td>(b) translating the working surface over the skin surface to thereby abrade the skin surface; and</td>
<td>During use, the user translates (moves) the handpiece of the IMD Devices across the patient's skin to abrade the skin.



IMD conceded that this limitation is satisfied when the IMD Devices are used. Exhibit 7 at ¶¶ 7-8, 11, and 13.</td>
</tr>
<tr>
<td>(c) contemporaneously actuating the vacuum source to thereby cause suction engagement of the skin surface against the raised outer periphery and the plurality of sharp elements of the working surface and to aspirate skin debris through the at least one aperture.</td>
<td>While the user moves the handpiece across the patient's skin, the vacuum source of the IMD Devices applies suction at the working surface of the handpiece. The suction provided by the vacuum source draws the patient's skin against the raised outer periphery and the sharp elements of the exfoliation tip. The suction draws skin debris through the aperture of the tip while the tip continues to move across the skin to facilitate treatment.

IMD conceded that this limitation is satisfied when the IMD Devices are used. Exhibit 7 at ¶¶ 7-8, 11, and 13.</td>
</tr>
</table>

| Claim Language | Induced Infringement |
|---|---|
| 2. The method as in claim 1 further comprising the step of providing a fluid to the skin to enhance suction engagement of the skin against the working surface. | In use fluid (i.e., Ageless Serum) is provided to the skin, which enhances the suction engagement against the working surface.<br><br><br><br><br><br>IMD conceded that this limitation is satisfied when the IMD Devices are used.  Exhibit 7 at ¶¶ 7-8, 11, and 13. |

| Claim Language | Induced Infringement |
|---|---|
| 3. The method as in claim 2 wherein the fluid is provided from a fluid source to a distal region of the instrument body. | In use, a fluid (i.e., Ageless Serum) is provided to the skin through the handpiece and tips from a fluid source. Ageless instructs users to provide fluid to the skin using the IMD Devices. *See* https://agelessserums.com/ageless-facial-protocols.html (last visited December 14, 2020).<br><br><br><br>Ageless provides sterile water (Pure Aqua) and saline solutions for use with the Aesthetic Devices, and instructions for using these solutions with various hydradermabrasion devices. *See* https://agelessserums.com/products.html (last visited December 14, 2020). |

53.     To take another example, the charts below demonstrate how use of an Ageless Serum with an Aesthetic Device practices at least claims 1-3 of the '886 Patent.

| Claim Language | Induced Infringement |
|---|---|
| 1. A method for treating a skin surface of a patient, comprising: | Ageless induced customers to use the Ageless Serums with the Aesthetic Devices as part of a method for treating the skin surface of a patient. *See* https://agelessserums.com/ageless-facial-protocols.html (last visited December 14, 2020). |
| (a) applying against the skin surface of a patient an instrument body with a longitudinal axis and a distal | During use, the handpiece of the Aesthetic Devices, which has an instrument body with a longitudinal axis and a distal working end, is positioned against a patient's skin, as shown below: |

working end, said distal working end comprising a working surface that carries an abrading structure comprising a plurality of sharp elements for engaging and abrading the skin surface together with a vacuum source coupled to at least one aperture about said working surface, the abrading structure and the at least one aperture positioned within a raised outer periphery that completely circumscribes the abrading structure and the at least one aperture;



The handpiece of the Aesthetic Devices can be used with the tips supplied therewith. When a tip is attached to the handpiece, the tip forms the working surface of the handpiece. The tips include an abrading structure having a plurality of edges, which are sharp elements for engaging and abrading the patient's skin, as shown below.



As shown in the exemplary tip below, the tips also include a raised outer periphery that encompasses an aperture and the abrading structure. The Aesthetic Devices include a vacuum source communicatively coupled with the aperture of the tip being used. The vacuum source is configured to generate suction through the aperture which draws the patient's skin against the abrading structure of the tip.

| |  |
|---|---|
| (b) translating the working surface over the skin surface to thereby abrade the skin surface; and | In use, the user translates (moves) the handpiece of the Aesthetic Devices across the patient's skin to abrade the skin.  |
| (c) contemporaneously actuating the vacuum source to thereby cause suction engagement of the skin surface against the raised outer periphery and the plurality of sharp elements of the working surface and to aspirate skin debris through the at least one aperture. | While the user moves the handpiece across the patient's skin, the vacuum source of the Aesthetic Devices applies suction at the working surface of the handpiece. The suction provided by the vacuum source draws the patient's skin against the raised outer periphery and the sharp elements of the tips. The suction draws skin debris through the aperture of the tip while the tip continues to move across the skin to facilitate treatment. |



| Claim Language | Induced Infringement |
|---|---|
| 2. The method as in claim 1 further comprising the step of providing a fluid to the skin to enhance suction engagement of the skin against the working surface. | In use, fluid (i.e., Ageless Serum) is provided to the skin, which enhances the suction engagement against the working surface. |

| Claim Language | Induced Infringement |
|---|---|
| 3. The method as in claim 2 wherein the fluid is provided from a fluid source to a distal region of the instrument body. | In use, a fluid (i.e., Ageless Serum) is provided to the skin through the handpiece and tips from a fluid source. Ageless instructs users to provide fluid to the skin using the Aesthetic Devices. *See* https://agelessserums.com/ageless-facial-protocols.html (last visited December 14, 2020). |



Ageless provides sterile water (Pure Aqua) and saline solutions for use with the Aesthetic Devices, and instructions for using these solutions with various hydradermabrasion devices. *See* https://agelessserums.com/products.html (last visited December 14, 2020).

54.　　Thus, Ageless indirectly infringed at least claims 1-3 of the '886 Patent under 35 U.S.C. § 271(b).　As a direct and proximate result of its infringement, Ageless has derived and received gains, profits and advantages.　Edge has been damaged by Ageless's activities in an amount to be determined at trial, but in no event less than a reasonable royalty.

55.　　Ageless's infringement was willful.　Pursuant to 35 U.S.C. § 284, Edge is entitled to augmented damages.　Because Ageless acted willfully, this is an exceptional case.　Edge is therefore entitled to recover its reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

### VII.　COUNT IV: INDUCED INFRINGEMENT OF THE '464 PATENT

56.　　Edge reiterates and re-alleges the allegations of paragraphs 1-55 of this Complaint as if set forth fully herein.

57.　　Ageless knowingly and intentionally infringed the '464 Patent through, for example, intentionally selling Ageless Serums to owners of infringing hydradermabrasion

machines for use in those machines, and by providing instructions that enabled owners of such machines to use Ageless Serums in their machines. The foreseeable and intended result of these actions was that end users combined their machines with Ageless Serums to form hydradermabrasion systems which, when used to perform skin-treatment services, practiced patented methods of the '464 Patent.

58.　Ageless had actual knowledge of the '464 Patent at least as early as 2017. Despite its knowledge of the '464 Patent, Ageless sold Ageless Serums and intentionally induced its customers to use those serums in a manner that infringed the '464 Patent, including customers who owned Ageless Device, IMD Devices and Aesthetic Devices. Ageless knew – or was willfully blind to the likelihood – that its actions would induce end users to infringe the '464 Patent during the lifetime of the patent. Ageless intended that end users infringe so that it could profit from that infringement.

59.　As shown in the exemplary chart below, owners of IMD Devices that Ageless induced to infringe the '464 Patent practiced at least claim 1 of that patent.

| Claim Language | Induced Infringement |
|---|---|
| 1. A method of treating a skin surface of a subject, comprising: | Ageless Induced customers to use Ageless Serums with IMD Devices as part of a method for treating the skin surface of a patient. *See* https://agelessserums.com/ageless-facial-protocols.html (last visited December 14, 2020).<br><br>IMD conceded that this limitation is satisfied when the IMD Devices are used. Exhibit 7 at ¶¶ 7-8, 11, and 13. |
| positioning a handheld device against a skin surface of the subject, the handheld device comprising: | During use, the handpiece of the IMD Devices is positioned against a patient's skin, creating a treatment region at a skin treatment site, as shown below: |

| | |
|---|---|
| | <br><br>IMD conceded that this limitation is satisfied when the IMD Devices are used.  Exhibit 7 at ¶¶ 7-8, 11, and 13. |
| a body comprising a housing; | The IMD Devices have a body with a housing, as shown below:<br><br><br><br>IMD conceded that this limitation is satisfied when the IMD Devices are used.  Exhibit 7 at ¶¶ 7-8, 11, and 13. |
| a working end portion positioned along a first end of the body, the working end portion comprising a distal end configured to contact the skin surface, wherein the working end portion comprises a perimeter along the distal end; | When a tip is attached to the handpiece of the IMD Devices, the tip forms the working end portion, with a perimeter in contact with the skin surface.<br><br><br><br>IMD conceded that this limitation is satisfied when the IMD Devices are used.  Exhibit 7 at ¶¶ 7-8, 11, and 13. |

| | |
|---|---|
| a first aperture arrangement comprising at least one first port located along or near the working end portion, the at least one first port being in fluid communication with a vacuum source via at least one passageway; and | The tips for the IMD Devices contain at least one first port located along the working end portion, which is in fluid communication with a vacuum source via a passageway.<br><br><br><br>IMD conceded that this limitation is satisfied when the IMD Devices are used. Exhibit 7 at ¶¶ 7-8, 11, and 13. |
| a second aperture arrangement comprising at least one second port located along or near the working end portion, the at least one second port being in fluid communication with a treatment media source; | The IMD Devices have a second port located along the working end that is in fluid communication with a treatment media source containing fluid (i.e., Ageless Serum).<br><br> |

| | |
|---|---|
| |  IMD conceded that this limitation is satisfied when the IMD Devices are used. Exhibit 7 at ¶¶ 7-8, 11, and 13. |
| activating the vacuum source to simultaneously deliver a treatment media to the skin surface through the at least second port, wherein the treatment media comprises a liquid, and to aspirate spent treatment media through the at least one first port and at least one passageway, thereby selectively providing a volume of the treatment media to the skin surface of the subject; | In use, the IMD Devices use the suction generated by the vacuum source to aspirate debris and spent media from the working end of the handpiece, while simultaneously facilitating the delivery of treatment media (i.e., Ageless Serum) through the port of the second aperture arrangement of tip. This is illustrated in the below example.  IMD conceded that this limitation is satisfied when the IMD Devices are used. Exhibit 7 at ¶¶ 7-8, 11, and 13. In addition, in use, a fluid (i.e., Ageless Serum) is provided to the skin through the handpiece and tips from a fluid source. Ageless instructs users to provide fluid to the skin using the Aesthetic Devices. *See* https://agelessserums.com/ageless-facial-protocols.html (last visited December 14, 2020). Ageless provides sterile water (Pure Aqua) and saline |

| | solutions for use with the Aesthetic Devices, and instructions for using these solutions with various hydradermabrasion devices. *See* https://agelessserums.com/products.html (last visited December 14, 2020). |
|---|---|
| wherein activating the vacuum source facilitates delivery of treatment media to subsurface skin tissue of the subject and causes adjacent skin surface to at least partially puff up to facilitate the treatment method. | In use, the localized suction created at the working end of the handpiece by the vacuum source engages the patient's skin and causes the skin to expand toward the tip. This expansion or puffing up of the skin allows the treatment media (i.e., Ageless Serum) provided through the second aperture arrangement of the tip to penetrate the outer skin layer and reach subsurface skin tissue, thereby facilitating the treatment.<br><br> |

60. To take another example, the chart below demonstrates how use of an Ageless Serum with an Aesthetic Device practices at least claim 1 of the '464 Patent.

| Claim Language | Induced Infringement |
|---|---|
| 1. A method of treating a skin surface of a subject, comprising: | Ageless induced customers to use Ageless Serums with Aesthetic Devices as part of a method for treating the skin surface of a patient. *See* https://agelessserums.com/ageless-facial-protocols.html (last visited December 14, 2020). |
| positioning a handheld device against a skin surface of the subject, the handheld device comprising: | During use, the handpiece of the Aesthetic Devices is positioned against a patient's skin, creating a treatment region at a skin treatment site, as shown below: |



| | |
|---|---|
| | (image) |
| a body comprising a housing; | The Aesthetic Devices have a body with a housing, as shown below: |
| a working end portion positioned along a first end of the body, the working end portion comprising a distal end configured to contact the skin surface, wherein the working end portion comprises a perimeter along the distal end; | When a tip is attached to the handpiece of the Aesthetic Devices, the tip forms the worked portion, with a perimeter in contact with the skin surface. |

| a first aperture arrangement comprising at least one first port located along or near the working end portion, the at least one first port being in fluid communication with a vacuum source via at least one passageway; and | The tips for the Aesthetic Devices contain at least one first port located along the working end portion, which is in fluid communication with a vacuum source via a passageway. As shown in the examples below.  |
|---|---|
| a second aperture arrangement comprising at least one second port located along or near the working end portion, the at least one second port being in fluid communication with a treatment media source; | The Aesthetic Devices have a second port located along the working end that is in fluid communication with a treatment media source containing fluid (i.e., Ageless Serum), as shown in the examples below.  |



| activating the vacuum source to simultaneously deliver a treatment media to the skin surface through the at least second port, wherein the treatment media comprises a liquid, and to aspirate spent treatment media through the at least one first port and the at least one passageway, thereby selectively providing a volume of the treatment media to the skin surface of the subject; | In use, the Aesthetic Devices use the suction generated by the vacuum source to aspirate debris and spent media from the working end of the handpiece, while simultaneously facilitating the delivery of treatment media (i.e., Ageless Serum) through the port of the second aperture arrangement of tip. This is illustrated in the below example. |



In addition, in use, a fluid (i.e., Ageless Serum) is provided to the skin through the handpiece and tips from a fluid source. Ageless instructs users to provide fluid to the skin using the Aesthetic Devices. *See* https://agelessserums.com/ageless-facial-protocols.html (last visited December 14, 2020).

Ageless provides sterile water (Pure Aqua) and saline solutions for use with the Aesthetic Devices, and instructions for using these solutions with various

| | hydradermabrasion devices. *See* https://agelessserums.com/products.html (last visited December 14, 2020). |
|---|---|
| wherein activating the vacuum source facilitates delivery of treatment media to subsurface skin tissue of the subject and causes adjacent skin surface to at least partially puff up to facilitate the treatment method. | In use, the localized suction created at the working end of the handpiece by the vacuum source engages the patient's skin and causes the skin to expand toward the tip. This expansion or puffing up of the skin allows the treatment media (i.e., Ageless Serum) provided through the second aperture arrangement of the tip to penetrate the outer skin layer and reach subsurface skin tissue, thereby facilitating the treatment.  |

61. Thus, Ageless indirectly infringed at least claim 1 of the '464 Patent under 35 U.S.C. § 271(b). As a direct and proximate result of its infringement, Ageless has derived and received gains, profits and advantages. Edge has been damaged by Ageless's activities in an amount to be determined at trial, but in no event less than a reasonable royalty.

62. Ageless's infringement was willful. Pursuant to 35 U.S.C. § 284, Edge is entitled to augmented damages. Because Ageless acted willfully, this is an exceptional case. Edge is therefore entitled to recover its reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

## VIII.  COUNT V: INDUCED INFRINGEMENT OF THE '513 PATENT

63.     Edge reiterates and re-alleges the allegations of paragraphs 1-62 of this Complaint as if set forth fully herein.

64.     Ageless knowingly and intentionally infringed the '513 Patent through, for example, intentionally selling Ageless Serums to owners of infringing hydradermabrasion machines for use in those machines, and by providing instructions that enabled owners of such machines to use Ageless Serums in their machines.  The foreseeable and intended result of these actions was that end users combined their machines with Ageless Serums to form hydradermabrasion systems that embodied patented systems of the '513 patent.

65.     Ageless had actual knowledge of the '513 Patent at least as early as 2017. Despite its knowledge of the '513 Patent, Ageless sold Ageless Serums and intentionally induced its customers to use those serums in a manner that infringed the '513 Patent, including customers who owned Ageless Device, IMD Devices and Aesthetic Devices.  Ageless knew – or was willfully blind to the likelihood – that its actions would induce end users to infringe the '513 Patent during the lifetime of the patent.  Ageless intended that end users infringe so that it could profit from that infringement.

66.     As shown in the exemplary charts below, owners of IMD Devices that Ageless induced to infringe the '513 Patent practiced at least claims 1, 2, 4 and 6 of that patent.

| Claim Language | Induced Infringement |
|---|---|
| 1. A system for treating skin, comprising: | Defendant induced customers to use Ageless Serums with IMD Devices, forming the patented system.  *See* https://agelessserums.com/ageless-facial-protocols.html (last visited December 14, 2020).  The IMD Devices, combined with the Ageless Serums, are systems for treating skin.<br><br>IMD conceded that the IMD devices satisfy this limitation. Exhibit 7 at ¶¶ 7-8, 11, and 13. |

| a handheld device comprising a main body and a working end along a distal end of the main body; | The IMD Devices include a handheld device that includes a main body. The handpiece also includes a working end along the distal end of the handpiece, as shown in the below example.<br><br><br><br>IMD conceded that the IMD devices satisfy this limitation. Exhibit 7 at ¶¶ 7-8, 11, and 13. |
| --- | --- |
| an outer periphery extending along the distal end of the handheld device; | The handpiece of the IMD Devices includes an outer periphery that extends along its distal end, as shown below.<br><br><br><br>IMD conceded that the IMD devices satisfy this limitation. Exhibit 7 at ¶¶ 7-8, 11, and 13. |
| at least one surface element extending distally from the working end of the handheld device, said at least one surface element being positioned within an interior area circumscribed by the outer periphery; | The exfoliation tip supplied with the IMD Devices includes at least one surface element that extends distally from the working end of the handheld device, as shown below. When used with the IMD Devices' handpiece, the at least one surface element of this tip is encompassed by the outer periphery of the handpiece. |

- 38 -



| | |
|---|---|
| | IMD conceded that the IMD devices satisfy this limitation. Exhibit 7 at ¶¶ 7-8, 11, and 13. |
| wherein the at least one surface element comprises at least one sharp edge configured to abrade skin when said handheld device is moved relative to a skin surface; and | The exfoliation tip supplied with the IMD Devices includes sharp edges configured to abrade skin when the handpiece is moved across the skin, as shown in the below example.<br><br>IMD conceded that the IMD devices satisfy this limitation. Exhibit 7 at ¶¶ 7-8, 11, and 13. |
| at least one opening along the working end of the handheld device; | The working end of the handpiece has at least one opening, which is the large central bore of the working end of the handpiece. |

| | |
|---|---|
| | <br><br>IMD conceded that the IMD devices satisfy this limitation. Exhibit 7 at ¶¶ 7-8, 11, and 13. |
| wherein the at least one opening is configured to be placed in fluid communication with a vacuum source via a passageway, said passageway being configured to convey debris away from the working end when said vacuum source is activated; and | The IMD Devices include a vacuum source. The handpiece is configured so that the opening is in communication with the vacuum source through a passageway, with the passageway configured to convey debris away from the working end when the vacuum source is activated, as illustrated in other representative claims above<br><br>IMD conceded that the IMD devices satisfy this limitation. Exhibit 7 at ¶¶ 7-8, 11, and 13. |
| wherein substantially an entire circumference of the outer periphery is configured to contact a skin surface during a treatment procedure. | The entire circumference of the outer periphery of the handpiece of the IMD Devices is designed to contact a skin surface during a treatment procedure.<br><br><br><br>IMD conceded that the IMD devices satisfy this limitation. Exhibit 7 at ¶¶ 7-8, 11, and 13. |

| Claim Language | Induced Infringement |
|---|---|
| 2. The system of claim 1, further comprising at least one inflow port located along the working end, wherein said at least one inflow port is configured to deliver a flowable media to the skin during a treatment. | The handpiece of the IMD Devices includes an inflow port that is in communication with a flowable media source. The inflow port is designed to deliver flowable media to the skin during treatment.<br><br>IMD conceded that the IMD devices satisfy this limitation. Exhibit 7 at ¶¶ 7-8, 11, and 13.<br><br>In addition, Ageless provided a flowable media source to customers (i.e., bottles of Ageless Serums). Ageless further induced customers to connect the bottles to the IMD Devices as media sources, thereby inducing customers to form the patented system. *See* https://agelessserums.com/index.html; https://agelessserums.com/how-to-hang-bottles.html (both last visited December 14, 2020). |

| Claim Language | Induced Infringement |
|---|---|
| 4. The system of claim 2, wherein the at least one inflow port is in fluid communication with a fluid media reservoir. | The inflow port is in fluid communication with a fluid media reservoir in the IMD Devices.<br><br>IMD conceded that the IMD devices satisfy this limitation. Exhibit 7 at ¶¶ 7-8, 11, and 13.<br><br>In addition, Ageless provided a flowable media reservoir to customers (i.e., bottles of Ageless Serums). Ageless further induced customers to connect the bottles to the IMD Devices as media reservoirs, thereby inducing customers to form the patented system. *See* https://agelessserums.com/index.html; https://agelessserums.com/how-to-hang-bottles.html (both last visited December 14, 2020). |

| Claim Language | Induced Infringement |
|---|---|
| 6. The system of claim 4, wherein the fluid media reservoir comprises a remote reservoir that is separate from the handheld device. | The IMD Devices include a fluid media reservoir that is remote from the handpiece, as shown in the below examples. |



***BioXFusion MD***          ***BioXFusion Mini***

IMD conceded that the IMD devices satisfy this limitation. Exhibit 7 at ¶¶ 7-8, 11, and 13.

In addition, Ageless provided a flowable media source to customers (i.e., bottles of Ageless Serums). Ageless further induced customers to connect the bottles to the IMD Devices as media sources, thereby inducing customers to form the patented system. *See* https://agelessserums.com/index.html; https://agelessserums.com/how-to-hang-bottles.html (both last visited December 14, 2020).

67. To take another example, the charts below demonstrate how use of an Ageless Serum with an Aesthetic Device practices at least claims 1, 2, 4 and 6 of the '513 Patent.

| Claim Language | Induced Infringement |
|---|---|
| 1. A system for treating skin, comprising: | Ageless induced customers to use Ageless Serums with Aesthetic Devices, forming the patented system. *See* https://agelessserums.com/ageless-facial-protocols.html (last visited December 14, 2020).<br><br>The Aesthetic Devices, combined with the Ageless Serums, are systems for treating skin, as shown below: |

| | |
|---|---|
| |  |
| a handheld device comprising a main body and a working end along a distal end of the main body; | The handpiece of the Aesthetic Devices is a handheld device that includes a main body. The handpiece of the Aesthetic Devices can be used with various tips, for example the tips supplied therewith. When one of the tips is attached to the handpiece, the tip forms the working end along the distal end of the handpiece, as shown in the below example.<br><br> |
| an outer periphery extending along the distal end of the handheld device; | All of the tips supplied with the Aesthetic Devices include an outer periphery that extends from the distal end of the tip, as shown in the example below.<br><br> |

| at least one surface element extending distally from the working end of the handheld device, said at least one surface element being positioned within an interior area circumscribed by the outer periphery; | The tips supplied with the Aesthetic Devices include a surface element that extends from the distal end of the tip and is encompassed by the outer periphery, as shown in the below examples.  |
| wherein the at least one surface element comprises at least one sharp edge configured to abrade skin when said handheld device is moved relative to a skin surface; and | Tips supplied with the Aesthetic Devices include a sharp-edged surface element configured to abrade skin when moved across the skin, as shown in the below example.  |
| at least one opening along the working end of the handheld device; | Tips supplied with the Aesthetic Devices include an opening and a media inflow port extend along the working end of the handpiece, as shown in the below example. |

| | |
|---|---|
| |  |
| wherein the at least one opening is configured to be placed in fluid communication with a vacuum source via a passageway, said passageway being configured to convey debris away from the working end when said vacuum source is activated; and | Tips supplied with the Aesthetic Devices include an opening that places the vacuum source in communication with the working end, as shown in the below example. In use, the vacuum source applies suction to the skin surface through the aspiration opening to remove debris and abraded skin from the working surface.<br><br> |
| wherein substantially an entire circumference of the outer periphery is configured to contact a skin surface during a treatment procedure. | Tips supplied with the Aesthetic Devices include an outer periphery configured to contact the skin in use, as shown in the below example.<br><br> |

| Claim Language | Induced Infringement |
|---|---|
| 2. The system of claim 1, further comprising at least one inflow port located along the working end, wherein said at least one inflow port is configured to | The handpiece of the Aesthetic Devices can be used with various tips, for example the tips supplied therewith. When attached to the handpiece, the tip forms the working end. Tips supplied with the Aesthetic Devices include a media inflow port that is in communication with a flowable media |

- 45 -

| | |
|---|---|
| deliver a flowable media to the skin during a treatment. | source. As shown in the below example, flowable media is delivered to the skin through the media inflow port to facilitate therapy and enhance suction between the skin interface and the skin.  In addition, Ageless provided a flowable media source to customers (i.e., bottles of Ageless Serums). Ageless further induced customers to connect the bottles to the Aesthetic Devices as media sources, thereby inducing customers to form the patented system. *See* https://agelessserums.com/index.html; https://agelessserums.com/how-to-hang-bottles.html (both last visited December 14, 2020). |

| Claim Language | Induced Infringement |
|---|---|
| 4. The system of claim 2, wherein the at least one inflow port is in fluid communication with a fluid media reservoir. | As shown in the below example, flowable media is delivered from the fluid media source to the skin through the media inflow port to facilitate therapy. |

|  | In addition, Ageless provided a flowable media reservoir to customers (i.e., bottles of Ageless Serums). Ageless further induced customers to connect the bottles to the Aesthetic Devices as media sources, thereby inducing customers to form the patented system. *See* https://agelessserums.com/index.html; https://agelessserums.com/how-to-hang-bottles.html (both last visited December 14, 2020). |

| **Claim Language** | **Induced Infringement** |
|---|---|
| 6. The system of claim 4, wherein the fluid media reservoir comprises a remote reservoir that is separate from the handheld device. | The Aesthetic Devices include a fluid media reservoir that is remote from the handpiece and communicates with the handpiece and through a supply line, as shown in the example below.  In addition, Ageless provided a fluid media reservoir to customers (i.e., bottles of Ageless Serums). Ageless further induced customers to connect the bottles to the Aesthetic Devices as media sources, thereby inducing customers to form the patented system. *See* https://agelessserums.com/index.html; https://agelessserums.com/how-to-hang-bottles.html (both last visited December 14, 2020). |

68.      Thus, Ageless indirectly infringed at least claims 1, 2, 4 and 6 of the '513 Patent under 35 U.S.C. § 271(b).   As a direct and proximate result of its infringement, Ageless has derived and received gains, profits and advantages.   Edge has been damaged by Ageless's activities in an amount to be determined at trial, but in no event less than a reasonable royalty.

69.      Ageless's infringement was willful.   Pursuant to 35 U.S.C. § 284, Edge is entitled to augmented damages.   Because Ageless acted willfully, this is an exceptional case.   Edge is therefore entitled to recover its reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

## IX.  COUNT VI: INDUCED INFRINGEMENT OF THE '052 PATENT

70.      Edge reiterates and re-alleges the allegations of paragraphs 1-69 of this Complaint as if set forth fully herein.

71.      Ageless has knowingly and intentionally infringed the '052 Patent through, for example, intentionally selling Ageless Serums to owners of infringing hydradermabrasion machines for use in those machines, and by providing instructions that enabled owners of such machines to use Ageless Serums in their machines.   The foreseeable and intended result of these actions was that end users combined their machines with Ageless Serums to form hydradermabrasion systems that embodied patented systems of the '052 patent.

72.      Ageless had actual knowledge of the '052 Patent at least as early as 2017. Despite its knowledge of the '052 Patent, Ageless sold Ageless Serums and intentionally induced its customers to use those serums in a manner that infringed the '052 Patent, including customers who owned Ageless Glow MD, BioXFusion MD, and Aqua Skin Facial Devices.   Ageless knew – or was willfully blind to the likelihood – that its actions would induce end users to infringe the '052 Patent during the lifetime of the patent.   Ageless intended that end users infringe so that it could profit from that infringement.

73.      As shown in the exemplary charts below, owners of IMD's BioXFusion MD that Ageless induced to infringe the '052 Patent practiced at least claims 1 and 4 of that patent.

- 48 -

| Claim Language | Induced Infringement |
|---|---|
| 1. A system for performing a skin treatment procedure, the system comprising: | Ageless induced customers to use Ageless Serums with the BioXFusion MD, forming the patented system. *See* https://agelessserums.com/ageless-facial-protocols.html (last visited December 14, 2020). The BioXFusion MD, combined with the Ageless Serums, is a system for treating skin.<br><br>IMD conceded that the BioXFusion MD satisfies this limitation. Exhibit 7 at ¶¶ 7-8, 11, and 13. |
| a console including a manifold, the manifold being in fluid communication with a first fluid container and at least a second fluid container, the first fluid container and the at least the second fluid container being configured to contain a treatment material for a skin treatment procedure, wherein the treatment material comprises a liquid; | The BioXFusion MD has a console that included a manifold in communication with two fluid containers (i.e., bottles of Ageless Serums) that are each configured to store a liquid treatment material. The manifold includes a collection of tubing within the console that is located in the region shown in the examples below.<br><br><br><br><br><br>IMD conceded that the BioXFusion MD satisfies this limitation. Exhibit 7 at ¶¶ 7-8, 11, and 13. |

| | In addition, Ageless provides fluid containers to customers (i.e., bottles of Ageless Serums). Ageless further induced customers to connect the bottles to the BioXFusion MD as media sources, thereby inducing customers to form the patented system. *See* https://agelessserums.com/index.html; https://agelessserums.com/how-to-hang-bottles.html (both last visited December 14, 2020). |
|---|---|
| a handpiece assembly comprising a tip, the tip being configured to contact a skin surface of a subject; | The handpiece of the BioXFusion MD can be used with the tips supplied therewith. These tips are configured to contact the skin of a subject in use.<br><br><br><br>IMD conceded that the BioXFusion MD satisfies this limitation. Exhibit 7 at ¶¶ 7-8, 11, and 13. |
| a supply conduit placing the manifold of the console in fluid communication with the handpiece assembly, wherein a distal end of the supply conduit is configured to couple to the handpiece assembly; | The distal end of the supply line of the BioXFusion MD connects to the proximal end of the handpiece to place the handpiece in fluid communication with the manifold of the console, as shown in the examples below.<br><br><br><br>IMD conceded that the BioXFusion MD satisfies this limitation. Exhibit 7 at ¶¶ 7-8, 11, and 13. |

- 50 -

| | |
|---|---|
| wherein the manifold is configured to control a flow of treatment material from the first fluid container and at least the second fluid container through the supply conduit; and | The manifold of the BioXFusion MD allows the user to select which treatment material is desired to flow to the handpiece in use, as shown in the example below. In addition, the manifold of the BioXFusion MD is designed to control, and controls, the flow of treatment material from either fluid container (i.e., bottles of Ageless Serums), to the handpiece using knobs on the front of the console.<br><br><br><br>IMD conceded that the BioXFusion MD satisfies this limitation. Exhibit 7 at ¶¶ 7-8, 11, and 13.<br><br>In addition, Ageless provides fluid containers to customers (i.e., bottles of Ageless Serums). Ageless further induced customers to connect the bottles to the BioXFusion MD as media sources, thereby inducing customers to form the patented system. *See* https://agelessserums.com/how-to-hang-bottles.html https://agelessserums.com/index.html (last visited 12/14/2020). |

| a vacuum source; | The BioXFusion MD includes a vacuum source.  IMD conceded that the BioXFusion MD satisfies this limitation. Exhibit 7 at ¶¶ 7-8, 11, and 13. |
|---|---|
| a waste conduit in fluid communication with the tip of the handpiece assembly to remove waste away from a skin surface of a subject during a skin treatment procedure, wherein the waste conduit is operatively coupled to the vacuum source; and | The BioXFusion MD includes a supply conduit that includes a waste conduit, as shown below.  In use, the waste conduit is in fluid communication with the opening of the tip of the handpiece and is operatively connected to the vacuum source. This allows the vacuum source to draw spent treatment media and abraded skin back to the console. This is illustrated in the below examples with reference to the exfoliation tip. |



|  | IMD conceded that the BioXFusion MD satisfies this limitation. Exhibit 7 at ¶¶ 7-8, 11, and 13. |
| wherein the system is configured to permit a user to select the treatment material from the first fluid container or the at least second fluid container to be delivered through the supply conduit to the handpiece assembly; and | The manifold of the BioXFusion MD allows the user to select which treatment material (i.e., Ageless Serum) is desired to flow to the handpiece by operating a switch on the console. Use of the switch permits the user to select the treatment material from either the first or second fluid container (i.e., bottles of Ageless Serums). The manifold responds according to the user input by placing the selected fluid container in communication with the handpiece for use. |



IMD conceded that the BioXFusion MD satisfies this limitation. Exhibit 7 at ¶¶ 7-8, 11, and 13.

In addition, Ageless provides fluid containers to customers (i.e., bottles of Ageless Serums). Ageless further induced customers to connect the bottles to the BioXFusion MD as media sources, thereby inducing customers to form the patented system. *See* https://agelessserums.com/index.html; https://agelessserums.com/how-to-hang-bottles.html (both last visited December 14, 2020).

| wherein, when the vacuum source is activated and the tip contacts the skin surface, a suction force is created within the waste conduit and along the tip, thereby removing waste from the skin surface via the waste conduit while drawing treatment material from the first fluid container or the second fluid container to the tip via the supply conduit. | The BioXFusion MD uses the suction generated by the vacuum source to aspirate debris and spent media through the opening of the tip while also providing new media from the first or second fluid containers through the supply conduit delivery opening to the tip, as shown in the below example.<br><br><br><br>IMD conceded that the BioXFusion MD satisfies this limitation. Exhibit 7 at ¶¶ 7-8, 11, and 13.<br><br>In addition, Ageless provides fluid containers to customers (i.e., bottles of Ageless Serums). Ageless further induced customers to connect the bottles to the BioXFusion MD as media sources, thereby inducing customers to form the patented system. *See* https://agelessserums.com/index.html; https://agelessserums.com/how-to-hang-bottles.html (both last visited December 14, 2020). |

| Claim Language | Induced Infringement |
|---|---|
| 4. The system of claim 1, wherein the first fluid container or the at least a second fluid container is releasably coupled to the manifold. | Each of the two fluid containers is releasably coupled to the manifold to allow refilling and replacement of the containers, as shown in the example below. |



IMD conceded that the BioXFusion MD satisfies this limitation. Exhibit 7 at ¶¶ 7-8, 11, and 13.

In addition, Ageless provides fluid containers to customers (i.e., bottles of Ageless Serums). Ageless further induced customers to replace the fluid containers in the BioXFusion MD with fluid containers it supplies by connecting Ageless Serum bottles to the BioXFusion MD as media sources, thereby inducing customers to form the patented system. *See* https://agelessserums.com/index.html; https://agelessserums.com/how-to-hang-bottles.html (both last visited December 14, 2020).

74. To take another example, the charts below demonstrate how use of an Ageless Serum with the Aesthetic Aqua Skin Facial device practices at least claims 1 and 4 of the '052 Patent.

| Claim Language | Induced Infringement |
|---|---|
| 1. A system for performing a skin treatment procedure, the system comprising: | Ageless induces customers to use Ageless Serums with the Aqua Skin Facial, forming the patented system. *See* https://agelessserums.com/ageless-facial-protocols.html (last visited December 14, 2020).<br><br>The Aqua Skin Facial, combined with the Ageless Serums, is a system for treating skin, as shown below:<br><br> |
| a console including a manifold, the manifold being in fluid communication with a first fluid container and at least a second fluid container, the first fluid container and the at least the second fluid container being configured to contain a treatment material for a skin treatment procedure, wherein the treatment material comprises a liquid; | The Aqua Skin Facial has a manifold in communication with four fluid containers (i.e., Ageless Serum containers) that are configured to store a liquid treatment material. The manifold includes a collection of tubing within the console that is located as shown in the example below. |

- 57 -

|  | In addition, Ageless provides fluid containers to customers (i.e., bottles of Ageless Serums). Ageless further induced customers to connect the bottles to the Aqua Skin Facial as media sources, thereby inducing customers to form the patented system. *See* https://agelessserums.com/index.html; https://agelessserums.com/how-to-hang-bottles.html (both last visited December 14, 2020). |
|---|---|
| a handpiece assembly comprising a tip, the tip being configured to contact a skin surface of a subject; | The handpiece of the Aqua Skin Facial can be used with various tips supplied therewith. Tips supplied with the Aqua Skin Facial are configured to contact the skin in use.  |
| a supply conduit placing the manifold of the console in fluid communication with the handpiece assembly, wherein a distal end of the supply conduit is configured to couple to the handpiece assembly; | The distal end of the supply line of the Aqua Skin Facial connects to the proximal end of the handpiece to place the handpiece in communication with the vacuum source and manifold of the console, as shown in the example below.  |

| wherein the manifold is configured to control a flow of treatment material from the first fluid container and at least the second fluid container through the supply conduit; and | The manifold of the Aqua Skin Facial is controlled by the user input device and user input. The user input device allows the user to select which treatment material is desired to flow to the handpiece in use, as shown in the example below. The manifold then places the fluid container corresponding to the selected treatment material in communication with the handpiece for use.  |
|---|---|
| a vacuum source; | The console of the Aqua Skin Facial contains the fluid media source, vacuum source, and manifold of the system.  |

| | |
|---|---|
| a waste conduit in fluid communication with the tip of the handpiece assembly to remove waste away from a skin surface of a subject during a skin treatment procedure, wherein the waste conduit is operatively coupled to the vacuum source; and | Tips supplied with the Aqua Skin Facial include an opening which places the tip being used in communication with the handpiece of the Aqua Skin Facial. The supply line includes a waste conduit and places the handpiece and the tip being used in communication with the media source and vacuum source of the console.<br><br><br><br>In use, the waste conduit is in communication with the opening of one of the tips to allow the vacuum source to draw spent treatment media and abraded skin back to the console in use. This is illustrated in the below example.<br><br> |
| wherein the system is configured to permit a user to select the treatment material from the first fluid container or the at least | The manifold of the Aqua Skin Facial is controlled by the user input device and user input. In use, the system permits the user to select, through the user input device, the treatment material (i.e., Ageless Serum) desired to be used and supplied to the |

- 60 -

| | |
|---|---|
| second fluid container to be delivered through the supply conduit to the handpiece assembly; and | handpiece and tip in use. The manifold responds according to the user input by placing the selected fluid container (i.e., bottle of Ageless Serum) in communication with the handpiece and tip for use.<br><br><br><br>In addition, Ageless provides fluid containers to customers (i.e., bottles of Ageless Serums). Ageless further induced customers to connect the bottles to the Aqua Skin Facial as media sources, thereby inducing customers to form the patented system. *See* https://agelessserums.com/index.html; https://agelessserums.com/how-to-hang-bottles.html (both last visited December 14, 2020). |
| wherein, when the vacuum source is activated and the tip contacts the skin surface, a suction force is created within the waste conduit and along the tip, thereby removing waste from the skin surface via the waste conduit while drawing treatment material from the first fluid container or the second fluid container to the tip via the supply conduit. | Tips supplied with the Aqua Skin Facial include an opening. In use, the Aqua Skin Facial uses the suction generated by the vacuum source to aspirate debris and spent media through the opening of the tip being used while also providing new media through the supply conduit delivery opening to the tip, as shown in the below example. |

DELIVERY OPENING    OPENING

← TIP

SUCTION GENERATED BY THE VAC.
SOURCE OF THE CLOSED-LOOP SYSTEM
SIMULTANEOUSLY USES SUCTION TO
DRAW DEBRIS AND SPENT MEDIA
THROUGH OPENING TO WASTE CONDUIT
WHILE PROVIDING FRESH MEDIA
THROUGH SUPPLY CONDUIT AND
DELIVERY OPENING TO THE TIP

In addition, Ageless provides fluid containers to customers (i.e., bottles of Ageless Serums). Ageless further induced customers to connect the bottles to the Aqua Skin Facial as media sources, thereby inducing customers to form the patented system. *See* https://agelessserums.com/index.html; https://agelessserums.com/how-to-hang-bottles.html (both last visited December 14, 2020).

| Claim Language | Induced Infringement |
|---|---|
| 4. The system of claim 1, wherein the first fluid container or the at least a second fluid container is releasably coupled to the manifold. | Each of the four fluid containers of the Aqua Skin Facial is releasably coupled to the manifold to allow refilling and replacement of the containers, as shown in the example below. |



In addition, Ageless provides fluid containers to customers (i.e., bottles of Ageless Serums). Ageless further induced customers to replace the fluid containers in the Aqua Skin Facial with fluid containers it supplies by connecting Ageless Serum bottles to the Aqua Skin Facial as media sources, thereby inducing customers to form the patented system. *See* https://agelessserums.com/index.html; https://agelessserums.com/how-to-hang-bottles.html (both last visited December 14, 2020).

75. Thus, Ageless indirectly infringed and infringes at least claims 1 and 4 of the '052 Patent under 35 U.S.C. § 271(b). As a direct and proximate result of its infringement, Ageless has derived and received gains, profits and advantages. Edge has been damaged by Ageless's activities in an amount to be determined at trial, but in no event less than a reasonable royalty.

76. Ageless's infringement was and is willful. Pursuant to 35 U.S.C. § 284, Edge is entitled to augmented damages. Because Ageless acted willfully, this is an exceptional case. Edge is therefore entitled to recover its reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

77. Ageless's infringement has caused and is causing Edge irreparable injury for which Edge has no adequate remedy at law.

78. Unless enjoined by this Court, Ageless will continue to infringe Edge's patent rights and cause Edge further irreparable injury.

## X.  **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Edge Systems LLC prays for the following relief:

A.      A judgment in favor of Edge and against Ageless on all claims alleged herein;

B.      A judgment that Ageless has violated 35 U.S.C. § 271 by inducing infringement of U.S. Patent Nos. 6,641,591; 7,678,120; 7,789,886; 8,337,513; 9,468,464 and 9,550,052 during the term of each patent;

C.      An accounting of all gains, profits and advantages that Ageless derived from its infringement of the Asserted Patents;

D.      An order that Ageless pay actual damages in the form of Edge's lost profits or other damages adequate to compensate for the infringement, but in no event less than a reasonable royalty, as provided by 35 U.S.C. § 284;

E.      An injunction barring Ageless, its officers, directors, agents, employees, attorneys, and any others acting in concert with Ageless, from (1) selling or offering to sell serums for use with skin-treatment devices encompassed by the claims of the '052 Patent, or (2) otherwise infringing the '052 Patent in violation of 35 U.S.C. § 271;

F.      An order trebling or otherwise increasing damages pursuant to 35 U.S.C. § 284 because of Ageless's willful infringement;

G.      An order finding this case exceptional under 35 U.S.C. § 285 and requiring Ageless to pay Edge its reasonable attorneys' fees incurred in this action;

H.      Pre-judgment and post-judgement interest and costs as fixed by the Court; and

I.      Such other and further relief as the Court may deem just and proper.

## XI. <u>DEMAND FOR JURY TRIAL</u>

Plaintiff Edge Systems LLC hereby demands a trial by jury of all issues so triable.

Respectfully submitted,

BAKER BOTTS L.L.P.

Dated:   December 22, 2020      By:  */s/ Paul R. Morico*
Paul R. Morico
State Bar No. 00792053
Brandon Chen
State Bar No. 24095814
One Shell Plaza
910 Louisiana Street
Houston, Texas 77002
Telephone: (713) 229-1234
Facsimile: (713) 229-1522
paul.morico@bakerbotts.com
brandon.chen@bakerbotts.com

OF COUNSEL:

Craig S. Summers (*pro hac vice* pending)
Email: craig.summers@knobbe.com
Ali S. Razai (*pro hac vice* pending)
Email: ali.razai@knobbe.com
Sean M. Murray (*pro hac vice* pending)
Email: sean.murray@knobbe.com
Karen M. Cassidy (*pro hac vice* pending)
Email: karen.cassidy@knobbe.com
**Knobbe, Martens, Olson & Bear, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone: (949) 760-0404
Facsimile: (949) 760-9502

ATTORNEYS FOR PLAINTIFF
EDGE SYSTEMS LLC