JAMES E. DOROSHOW (SBN 112920)
JDoroshow@FoxRothschild.com
**FOX ROTHSCHILD LLP**
Constellation Place
10250 Constellation Boulevard, Suite 900
Los Angeles, California 90067
Telephone:  310.598.4150
Facsimile:   310.556.9828

Attorneys for Defendant
AGELESS SERUMS LLC

# THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| EDGE SYSTEMS LLC, a California limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>AGELESS SERUMS LLC, a Texas limited liability company,<br><br>Defendant. | Case No. 2:20-cv-09669 FLA (PVCx)<br><br>Judge:  Fernando L. Aenlle-Rocha<br><br>**DEFENDANT AGELESS SERUM'S OPPOSITION TO PLAINTIFF EDGE SYSTEM'S MOTION FOR SUMMARY JUDGEMENT ON AGELESS' ANTITRUST DEFENSES**<br><br>**[DEMAND FOR JURY TRIAL]** |

# <u>Table of Contents</u>

<u>Page No.</u>

I.   INTRODUCTION ........................................................................................ 1

II.  STATEMENT OF FACTS ......................................................................... 3

    A.   The Parties ....................................................................................... 3

        1.   Edge ....................................................................................... 3

        2.   Ageless ................................................................................. 6

    B.   Edge's Trademark License Program .......................................... 6

    C.   Edge's Authenticity Campaign And Tying Practices .......................... 7

III. ARGUMENT ............................................................................................. 7

    A.   Summary Judgment Legal Standards ........................................ 7

    B.   Antitrust Laws And Elements .................................................... 8

    C.   Per Se Violation ............................................................................. 9

        1.   Two Separate Products ........................................................ 10

        2.   Conditioning the Sale and Use of One Product on the
            Purchase and Use of Another ............................................ 11

        3.   Sufficient Economic Power in the Tying Product ................... 13

        4.   Substantial Volume of Commerce Affected in the Tied
            Product ............................................................................... 14

    D.   Rule of Reason Violation .......................................................... 15

        1.   Market Definitions ............................................................. 15

            a.   The Tying Product Market (Edge's HydraFacial
                Equipment) ............................................................. 15

            b.   The Tying Product Market (Edge's Serums) ............... 21

        2.   Edge's Market Power ........................................................ 21

        3.   An Illegal Tie Can be Proven ............................................. 24

        4.   Harm to Competition ......................................................... 24

i

135417522.6

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agnew v. National Collegiate Athletic Ass'n*,
    683 F.3d 328 (7th Cir. 2012) .................................................................. 10

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................................... 8

*Apple, Inc. v. Psytar Corp.*,
    586 F. Supp. 2d 1190 (N.D. Cal. 2008) .......................................... 18, 19

*Blough v. Holland Realty, Inc.*,
    534 F.3d 1084 (9th Cir. 2009) ................................................................ 9

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................................... 4

*City of Tuolumne v. Sonora Cmty. Hosp.*,
    263 F.3d 1148 (9th Cir. 2001) .............................................................. 10

*Datagate, Inc. v. Hewlett Packard Co.*
    1421, 1426 (9th Cir. 1995) ................................................................... 24

*DataGate, Inc. v. Hewlett-Packard Co.*,
    60 F.3d 1421 (9th Cir. 1995), *cert. denied*, 116 S.Ct. 1344 (1996) ................... 14

*Eastman Kodak Company v. Image Technical Services, Inc.*,
    504 U.S. 451 ............................................................................... *passim*

*In re Extraction Oil & Gas*,
    Case No. 20-11548 (CSS) (Bankr. D. Del 2020) ................................... 2

*In re Flat Glass Antitrust Litigation*
    385 F.3d 350 (3rd Cir. 2004) ................................................................ 10

*Fortner Enterprises, Inc. v. United States*,
    394 U.S. 495 (1969) ........................................................................ 13, 14

*Fraser v. Goodale*,
    342 F.3d 1032 (9th Cir. 2003) ................................................................ 4

ii

*High Technology Careers v. San Jose Mercury News*,
    996 F.2d 987 (9th Cir. 1993) ............................................................... 15

*In re Insurance Brokerage Antitrust Litigation*,
    618 F.3d 300 (3rd Cir. 2010) .............................................................. 10

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ...................................................................... 13, 23

*Matsushita Electric Industrial Co. v. Zenith Radio Corp*,
    475 U.S. 574 (1986) ..................................................................... 8, 23

*Microbyte Corp. v. New Jersey State Golf Ass'n*,
    1986-2 Trade Cas. (CCH) 67 (D.N.J.) (1986) ....................................... 14

*National Soc. of Professional Engineers v. U.S.*,
    435 U.S. 679 (1978) ........................................................................ 10

*NCAA v. Board of Regents*,
    468 U.S. 85 (1984) .......................................................................... 24

*Newcal Industries, Inc. v. IKON Office Solution*,
    513 F.3d 1038 (9th Cir. 2008) ....................................................... 19, 20

*Northern Pac. Ry. Co. v. United States*
    356 U.S. 1 (1958) ................................................................. 10, 14, 24

*Paladin Assocs. v. Mont. Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) ............................................................. 9

*Queen City Pizza, Inc. v. Domino's Pizza*,
    124 F.3rd 430, 436 (3rd Cir. 1997) ..................................................... 21

*In re Southeastern Milk Antitrust Litigation*,
    739 F.3d 262 (6th Cir. 2014) ............................................................. 10

*Tic-X-Press, Inc. v. Omni Promotions Co.*,
    815 F.2d 1407 (11th Cir. 1987) .......................................................... 14

*U.S. v. E.I. du Pont de Meours & Co.*,
    351 U.S. 377 (1956) ..................................................................... 21, 24

*United States v. Loew's, Inc.*,
    371 U.S. 38 (1962) ...................................................................... 13, 14

iii

1

**Statutes**

2

Antitrust Laws ...................................................................................................... 8

3

Cartwright Act ..................................................................................................... 8

4

Lanham Act Section 33(b)(7) ............................................................................. 8

5

Sherman Act ................................................................................... 8, 9, 14, 19, 21

6

7

**Other Authorities**

8

Cal. Rule of Prof. Conduct Rule 3.3 .................................................................. 20

9

Fed.R.Civ.P. 8(d)(2) .......................................................................................... 17

10

Fed.R.Civ.P. 8(d)(3) ..................................................................................... 17, 19

11

Fed.R.Civ.P. 26(a) ............................................................................................. 21

12

Fed.R.Civ.P. 30(b)(6) ................................................................................ 1, 11, 12

13

Fed.R.Civ.P. 37(c)(1) ........................................................................................... 2

14

Fed.R.Civ.P. 37(c)(l) ......................................................................................... 20

15

Fed.R.Civ.P. 56 .................................................................................................... 3

16

Fed.R.Civ. P. 56(c) .............................................................................................. 4

17

Federal Rule of Evidence 803 ............................................................................. 4

18

Federal Rule of Evidence 803(17) ...................................................................... 4

19

Federal Rule of Evidence 902(6) ........................................................................ 4

20

21

22

23

24

25

26

27

28

iv

135417522.6

1

## I.    **INTRODUCTION**

2

3       Throughout this litigation, Plaintiff Edge Systems LLC ("Edge") has tried to

4  persuade the Court that, if an Edge customer-licensee use a third party serum, they

5  merely forfeit the right under Edge's Trademark License Agreement to advertise

6  services using Edge's HydraFacial® mark -- nothing more.  This same argument is

7  repeated in Edge's Summary Judgment Motion ("Motion") ("Ageless continues to

8  point to Edge's License Agreement to establish tying").  *See* Edge Mem. at 4. Edge

   is not being truthful.

9       In its Third Amended Answer and Counterclaims [Dkt. 41] ("TAC"),

10 Defendant Ageless Serums LLC ("Ageless") cites facts **outside of Edge's**

11 **Trademark License Agreement** to show that Edge has engaged in unlawful tying.

12 For example, Edge has adopted an "Authenticity Campaign" which prohibits

13 customers from offering HydraFacial treatments using Edge's equipment unless

14 Edge's serums are purchased and used.  The language of the Authenticity

15 Campaign makes this perfectly clear.  It states: "[f]or any offending providers who

16 use third party serums…the following **changes** will take place…they are no longer

17 able to market **or provide** HydraFacial services." (Emphasis supplied).  As this

18 **"change"** makes perfectly clear, Edge has not merely conditioned use of its mark

19 on the purchase of Edge's serums.  Instead, as the "**change**" plainly states, if an

20 Edge customer uses a third party serum they cannot "**provide** HydraFacial

21 services."

22       To ensure there was no misunderstanding about what Edge meant about the

23 language found in the Authenticity Campaign, Ageless repeatedly attempted to

24 conduct discovery to question Edge about it.  **Edge refused**.  For example, when

25 Ageless served Edge with a Rule 30(b)(6) deposition notice asking Edge to produce

26 a corporate witness to testify about Ageless' antitrust claims and defenses, **Edge**

27 **refused to designate a witness**. *See* Doroshow Decl., ¶¶5-6, Exs. 1 and 2.  Instead,

28 without even seeking a protective order, **Edge simply ignored the notice**. *Id.*

1

135417522.6

Subsequently, when Ageless sought to depose Edge's CEO who authored and announced the Authenticity Campaign, **Edge refused to produce him for examination**. *Id.*, ¶¶8-10, Exs. 7-9. Thus, without allowing discovery, Edge now appears before this Court seeking summary judgment having refused to explain the terms of its Authenticity Campaign and how it has been implemented and practiced.

While Edge may now want to try to distance itself from the terms of its Authenticity Campaign and how it has been practiced, the law will not permit it. *Fed.R.Civ.P. Rule 37(c)(1)* states that, if a party fails to provide information in discovery, the party is not permitted to supply evidence on a motion. Even, however, if the Court were to allow Edge the opportunity to try to show that the language it drafted does not mean what it states, there is independent evidence outside of the Authenticity Campaign to prove how Edge has implemented and practiced the Campaign.

For example, Ageless has recently obtained a tape recorded telephone conversation between Edge and one of its customers that took place after the close of discovery. Edge's customer recorded this conversation and a transcript of the call is being submitted with this Opposition for the Court's review. *See* accompanying Tanella Decl., Ex. 1.[1]

During this conversation, **without ever mentioning the HydraFacial mark,** Edge scolded its customer for using an Ageless serum while describing it as a "counterfeit."[2] In response, Edge's customer told Edge it was using Ageless' serums to **train aestheticians**. This however did not placate Edge. Even though

---

[1] An audio version of the conversation is also available for the Court to listen to should it desire to do so.

[2] **Edge testified it has never tested Ageless' serums and does not know what ingredients are found in them**. Doroshow Decl. at ¶ 18, Ex. 13. Edge's conversation with Ageless' customer also took place after Ageless filed for bankruptcy. As such, there is a serious question whether Edge has violated the stay provisions under bankruptcy law. *See e.g., 11 U.S.C. § 362; In re Extraction Oil & Gas*, Case No. 20-11548 (CSS) (Bankr. D. Del 2020) (Dkt. No. 1250) (interference with customer relations are prohibited after bankruptcy is filed).

Edge's License Agreement only prohibits use of Edge's mark in "**advertising,**" Edge objected to the use of Ageless' serums even for the limited purpose of "**training.**"  Edge then made its true intentions known.  To try to coerce its customer to stop using Ageless' serums, Edge told its customer that if a third party serum was used "**it's no longer a HydraFacial, period, end of story.**"  Tanella Decl., Ex. 1 at 18, lines 18-22 (emphasis supplied).  Thus, while Edge has continued to represent to the Court to this day that a customer is free to use any serum it wants to perform HydraFacial treatments, Edge in truth has a Campaign and policies it practices that are designed to restrict customer-licensees from offering HydraFacial services if a third party serum is used.

Summary judgment is permitted under *Fed.R.Civ.P. Rule 56* only if the moving party shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Since there are genuine issues of material fact, *Rule 56* will not allow summary judgment here as a matter of law.  Edge's motion should be denied.[3]

## II.    STATEMENT OF FACTS

### A.    The Parties

#### 1.    Edge

Edge is a California corporation that designs and manufacturers "skin resurfacing and rejuvenation systems, including. . .hydradermabrasion systems."  Dkt. 1 ("Compl.") at ¶¶ 5, 8.  According to Edge, **Edge created hydra-dermabrasion** by developing a patented Vortex-Fusion Delivery System to cleanse, peel, exfoliate, extract, infuse, and hydrate the skin with proprietary solutions and serums.  Doroshow Decl., Ex. 22 at Part 1, Item 1.  Edge describes its HydraFacial systems (equipment) as "**revolutionary.**"  Emphasis supplied.  *See*

---

[3] If the Court grants Ageless' Summary Judgment Motion [Dkt. 123], there is no need for it to decide this Motion.  Since the Court is only being asked to rule on Ageless' affirmative defenses in Edge's Motion, Edge's Motion is moot if the Court dismisses Edge's claims.

1  Compl. ¶ 8.

2      Edge describes itself as a "category creator" -- a company that has brought a

3  **new, unique product** to market successfully.  Doroshow Decl., Ex. 16 at p. 37;

4  Ex. 22, Item 1.  Edge states it is at the forefront of the cosmetic industry, and is the

5  **"market leader"** for hydradermabrasion.  Edge further asserts it has grown to

6  become an **iconic brand** (the "99% most searched for brand"), and that "nothing

7  compares" to HydraFacial.  *Id.*, Ex. 23.  Emphasis supplied.

8      Edge's market analysts have stated there is no "serious competition" for what

9  Edge describes as its "unique," "revolutionary" HydraFacial products.  Thus,

10  according to analysts, **"while there are very few direct competitors to**

11  **HydraFacial**, Chinese knockoffs known as HydraPeel exist.  However, **these**

12  **competitors have failed to gain any meaningful traction outside of the Chinese**

13  **market.  Likewise, alternative procedures such as microdermabrasion have**

14  **not mounted a serious challenge."** *Id.*, Ex. 17.  Emphasis supplied.[4]

15      Edge has been able to dictate pricing without losing customers, revenue or

16  profits.  Edge's market analysts have observed:  "HydraFacial is known for its

17  strong customer loyalty."  They also add:  "branding power matters a lot in the

18  beauty market (think Herman or Louis Vuitton) **with price inelasticity, and**

19  **HydraFacial is the undisputed leader**."  Emphasis added.  They have further

[4] *Federal Rule of Evidence* 902(6) provides that newspapers and periodicals like analyst reports are self-authenticating and require no extrinsic evidence of authenticity to be admitted.  While *Fed.R.Civ. P. Rule* 56(c) requires that a party submit "admissible" evidence in making or opposing a summary judgment, in ruling on a summary judgment motion, the court will consider the admissibility of the proffered evidence **contents, not its form**. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its content."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.").  In any event, should this matter ever reach trial, Edge cannot seek to exclude analyst reports as hearsay. Regardless of whether a declarant is available as a witness, *Fed.R.Ev. Rule 803* provides that, among other exceptions to the rule against hearsay, market reports and similar commercial publications "that are generally relied on by the public or by persons in particular occupations" are admissible under *Rule 803(17)*.

4

135417522.6

reported that: **"[g]iven HydraFacial's established brand and leading market positions it has unique value levers it can pull, including annual price increases for consumables [like] serums."** *Id.* Emphasis supplied. In fact, while increasing prices for its products, Edge has still seen significant growth. *See id.,* Ex. 18.

HydraFacial generates revenue through manufacturing and selling HydraFacial equipment (so-called "Delivery Systems"). In conjunction with the sale of HydraFacial equipment, Edge also sells serum solutions and consumables (collectively "Consumables"). Edge has reported that "Consumables" are sold **solely and exclusively by HydraFacial** and are available for **purchase separately** from Delivery Systems. *Id.*, Ex. 22, Part 1, Item 1 (HydraFacial "Business Model").

In its SEC reports, Edge has stated that it has a "Business Model" which is a "razor/razor blade business model." According to Edge, the equipment that "facilitates the HydraFacial experience, the Delivery System [*i.e.*, Edge's HydraFacial equipment] is the razor." *Id.*[5] The serums Edge sells **separately** allow Edge to earn additional revenue. According to Edge, "Consumables like Edge serums, which are used in HydraFacial treatments to moisturize skin, are the 'razor blades.'" *Id.*

Edge has reported that its Delivery Systems (Edge's equipment) "follows a traditional capital equipment cycle, with the Delivery System lasting providers for years." By contrast, "[c]onsumables [serums] follow a recurring revenue model as they are purchased on a periodic basis by providers as they exhaust their supplies." When Edge increases the number of Delivery Systems it sells (what Edge calls its "install base"), Edge "increases the foundation for **future recurring revenue**" by providing a "platform" for more treatments, "**driving higher Consumables sales…and revenue.**" *Id.* Emphasis supplied. Edge (HydraFacial) was acquired

---

[5] Edge's equipment (so-called "Delivery Systems") are highly expensive to purchase, *i.e.,* as much as $30,000 or more per unit. *Id,* Ex. 17.

OPPOSITION TO SUMMARY JUDGEMENT

135417522.6

in a recent merger that was consummated in 2021.  As part of this merger, Edge was valued at over $1 billion.  Edge is now part of a publicly traded company operating under the name of "The Beauty Health Company."  *Id.*, Ex. 15.  The amount of commerce effected by Edge's HydraFacial business is unquestionably substantial.  Consumables (including serums) sold by Edge account for hundreds of millions of dollars of revenue per year.[6]

### 2. Ageless

Ageless is a small, family owned Texas limited liability company that develops serums for use with hydradermabrasion systems.  Chlumecky Decl. at ¶ 1.  Edge has alleged Ageless urges customers to use Ageless' serums with Edge's equipment as a substitute for Edge's serums.  Compl. ¶¶ 21, 31-32.  Edge's customers have stated they prefer to purchase Ageless' serums for use with Edge's HydraFacial systems for two simple reasons.  First, **Ageless' serums are sold at half the price of Edge's serums**.  Second, **Ageless' serums work equally well (if not better) than Edge's serums**.  *See* Chlumecky Decl., Ex. 4; Doroshow Decl., ¶ 19, Exs. 14 and 20.

### B. Edge's Trademark License Program

Edge alleges it has continuously used the mark "HYDRAFACIAL" to advertise and promote its hydradermabrasion systems since 2005 and registered the mark on April 9, 2013 as Trademark Reg. No. 4,317,059.  Compl. at ¶¶ 11-12.  Edge contracts with customers-licensees pursuant to a license agreement (the "Trademark License Agreement" or "Agreement").  Under the Trademark License Agreement, Edge authorizes customers-licensees to use the HYDRAFACIAL mark in connection with the sale and promotion of hydradermabrasion treatments, "so

---

[6] According to Edge's financial reports the company's current revenue is $0.28 billion.  In 2021, the company made a revenue of $0.26 billion – a significant increase over the 2020 revenue that was $0.11 billion.  During the first quarter of 2022 alone, Delivery Systems (equipment) net sales increased to $41.6 million, and Consumables (including serums) net sales increased to $33.8 million.  *Id.*, Ex. 18. *See also* Exs. 19, 21.

6

135417522.6

long as those treatments are performed solely using genuine HydraFacial Systems and genuine HydraFacial Serums." Compl. ¶ 20, Dkt. 1-2. While Edge argues that an Edge customer-licensee is free to use third party serums in rendering HydraFacial services should it desire to do so, **Edge's policies tell an entirely different story**.

## C. <u>Edge's Authenticity Campaign And Tying Practices</u>

In August 2020, Edge introduced what it described as a **"change"** to its policies by introducing what it called a "**new** authenticity campaign." Emphasis supplied. While representing to customers-licensees that third party serums are "inferior (or, even worse, possibly harmful)," Edge's CEO (Clint Carnell) told Edge's customers-licensees they were "no longer able to market **or provide** HydraFacial services" if third party serums were used. Emphasis supplied. Significantly, there is no mention of Edge's Trademark License Agreements or Edge's HydraFacial mark found in the announcement of Edge's **"new"** Authenticity Campaign. Doroshow Decl., ¶ 7, Ex. 5.

The terms of the Authenticity Campaign clearly demonstrate there is a triable issue of material fact whether Edge has tied the purchase and use of its equipment to the purchase and use of Edge's serums totally independent from Edge's License Agreements. Edge's customer communications also confirm tying violations are taking place. With this Opposition, as merely one example of tying, Ageless is submitting a transcript of a recent tape-recorded telephone conversation that took place between Edge and one of its large customers. This conversation clearly shows Edge does not merely restrict the use of Edge's HydraFacial mark to the purchase and use of Edge's serums. Rather, Edge has in fact clearly tried to coerce customers to use Edge serums instead of third party (Ageless') serums as a condition of **"providing"** HydraFacial services. Tanella Decl., Ex. 1.

## III. <u>ARGUMENT</u>

### A. <u>Summary Judgment Legal Standards</u>

7

135417522.6

Since this case is before this Court on a summary judgment motion, "[t]he evidence of [Ageless] is to be believed, and all justifiable inferences are to be drawn in [Ageless'] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp*, 475 U.S. 574, 587 (1986). Historically, courts have been reluctant to grant summary judgment in antitrust cases for one simple reason – *i.e.*, antitrust claims and defenses are **fact intensive**. *See e.g.*, *Eastman Kodak Company v. Image Technical Services, Inc.*, 504 U.S. 451, 462 ("[t]his court has preferred to resolve antitrust claims on a case-by-case basis, **focusing on the 'particular facts described by the record.'**"). Emphasis added.

For Ageless to defeat Edge's summary judgment motion seeking dismissal of Ageless' two antitrust affirmative defenses, a reasonable trier of fact must simply be able to find, first, that Edge's equipment and serums are two distinct products, and second, that Edge has tied the sale of the two products. *See Eastman Kodak Company v. Image Technical Services, Inc.,* 504 U.S. 451, 460 (1992).

### B.    Antitrust Laws And Elements

As a general provision against antitrust violations by a trademark owner, *Section 33(b)(7)* of the *Lanham Act* allows a defendant in a trademark suit the defense "that the mark has been or is being used to violate the antitrust laws of the United States."

It is widely recognized that there are two primary goals under antitrust law – the first being consumer welfare (*i.e.*, maximum economic efficiency to achieve low prices for consumers and costs for producers). Antitrust laws are equally concerned with injury to competitors. This action implicates both concerns.

There are two federal antitrust statutes and one California statute at issue in this lawsuit.[7] *Section 1* of the *Sherman Act* provides, simply: "Every contract,

---

[7] As this Court has correctly noted: "The analysis under the Cartwright Act mirrors the analysis under federal law because the Cartwright Act was modeled after the Sherman Act." Dkt. 33 at 2, n. 2 (citations omitted).

OPPOSITION TO SUMMARY JUDGEMENT

135417522.6

1  combination in the form of trust or otherwise, or conspiracy, in restraint of trade or

2  commerce among the several States, or with foreign nations, is declared to be

3  illegal." *Section 3* of the *Clayton Acts* also makes it illegal to enter into **tying**

4  **arrangements** if such arrangements or contracts tend to lessen competition.

5        "A tying arrangement is a device used by a competitor with market power in

6  one market to extend its market power to an entirely distinct market.  To

7  accomplish this objective, 'the competitor agrees to sell one product (the tying

8  product) on the condition that the buyer also purchase a different product (the tied

9  product), or at least agrees that he will not purchase the tied product from any other

10  supplier.'" *Paladin Assocs. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir.

11  2003).[8]  "Tying is unlawful under Section 1 [of the Sherman Act] on the theory

12  that, if the seller has market power over the tying product, the seller can leverage

13  the market power through tying arrangements to exclude other sellers of the tied

14  product."  *Blough v. Holland Realty, Inc.*, 534 F.3d 1084, 1089 (9th Cir. 2009).

15        **C.    Per Se Violation**

16        As this Court previously recognized, "[t]ying can be either a per se violation

17  or a violation under the rule of reason."  Dkt. 33 at 5 (citations omitted).  "A

18  plaintiff that fails to state a per se unlawful tying claim may still prevail under the

19  rule of reason."  *Id.* at n. 4 (citations omitted).  In its Motion, **Edge completely**

20  **ignores the per se rule**.  Instead, Edge simply asks the Court to consider the more

21

22  _____

23  [8] As discussed further below, tying does not require a contractual agreement. **A policy (like Edge's Authenticity Campaign) qualifies absent a contract**. Nor does tying require customers to buy a separate product or service in tandem with a desired product or service (so-called "vertical tying").  By contrast, "horizontal

24  tying," includes a requirement that customers buy a related product or service

25  together from the same party. A good example of horizontal tying (like the present case) is requiring a Mobile phone buyer to buy a product or service from a single

26  provider or run the risk of having their phone become inoperable or otherwise result in other adverse consequences. *See also Eastman Kodak Company v. Image*

27  *Technical Services, Inc.*, 504 U.S. 451 (1992) (where an illegal tie was recognized when the defendant required that the defendant's services be used in an after-

28  market after the tied product had been purchased).

9

135417522.6

1  demanding standards found under the rule of reason.  As this Court has ruled an

2  antitrust violation can be proven under either rule.  We begin initially with the

3  per se violation rule and standards.

4      As the Court also previously recognized [Dkt. 33 at 5]:  "A per se tying

5  violation is proscribed **without examining the actual market conditions**, when

6  the seller has such power in the tying product or service market that **the existence**

7  **of forcing is probable**. . . and there is '**a substantial potential for impact on**

8  **competition**.'"  Citing *City of Tuolumne v. Sonora Cmty. Hosp.,* 263 F.3d 1148,

9  1157 (9th Cir. 2001) (emphasis supplied).  The Court has listed the elements of a

10  per se violation as follows:  "[t]ying arrangements are unlawful per se where a

11  plaintiff states:  (i) the defendant tied together the sale of two distinct products or

12  services; (2) the defendant possesses sufficient economic power, *i.e.,* market power

13  in the tying product market to coerce its customers into purchasing the tied product;

14  and (3) the tying arrangement affects 'not insubstantial volume of commerce' in the

15  tied product market, such that there is reduced competition in the market for the tied

16  product."  Dkt. 33 at 6 (citations omitted).[9]  All elements of a per se violation can

17  easily be proven here.

18              **1.    Two Separate Products**

19      There is no dispute that Edge is selling two separate products, *i.e.*, equipment

20  and serums.  *See e.g.*, Compl. at ¶¶ 8-9; Doroshow Decl., Ex. 12.  **Edge never**

21

22  [9] In applying the per se rule, a plaintiff is generally only required to prove that the specific anticompetitive conduct actually took place.  **The plaintiff does not need**

23  **to demonstrate the conduct's competitive unreasonableness or negative competitive effects in the relevant product markets.**  Second, under the per se

24  rule, defendants are not entitled to justify their behavior based on any objective competitive justifications. *See e.g., Northern Pac. Ry. Co. v. United States* 356

25  U.S. 1 (1958); *Agnew v. National Collegiate Athletic Ass'n*, 683 F.3d 328 (7th Cir. 2012); and *In re Flat Glass Antitrust Litigation* 385 F.3d 350 (3rd Cir. 2004).

26  Finally, **a plaintiff has less responsibility to analyze the market where the restraint is per se anticompetitive**. *National Soc. of Professional Engineers v.*

27  *U.S.*, 435 U.S. 679 (1978); *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300 (3rd Cir. 2010); and *In re Southeastern Milk Antitrust Litigation*, 739 F.3d 262

28  (6th Cir. 2014).

**addresses this element in its Motion.**  As such, the first element of a *per se*
violation is undisputed and can therefore unquestionably be proven.

### 2.    Conditioning the Sale and Use of One Product on the Purchase and Use of Another

It is equally clear there is more than adequate proof that Edge has
conditioned the use of its equipment on the purchase and use of its serums.  As
shown, the plain language of Edge's Authenticity Campaign confirms this: *i.e.*,
**"[f]or any offending providers who use third party serums…the following
changes will take place…they are no longer able to…provide HydraFacial
services**."  Emphasis supplied.  Doroshow Decl., Ex. 5.

The prohibitions found in Edge's Authenticity Campaign are not merely
theoretical – Edge practices them in the real world.  This is reflected in a recent
telephone call Edge had with one of its large customers.  On May 18, 2022, two
Edge representatives (Leigh Rydell and Carroll Lamarque) called BOHO
Alternative Med Spa, a longstanding Edge customer-licensee located in Allen,
Texas ("BOHO").[10]  This telephone conversation was recorded by BOHO and a
transcript is being submitted with this Opposition for the Court's review.  Tanella
Decl., Ex. 1.

At the outset of the call, Edge told BOHO that it was going to have a "serious
conversation" with the customer, which it wanted the parties to keep "private."  *Id.*
Tr. at 1, lines 3-6.  Edge then informed BOHO it had reason to believe the spa was
using third party (Ageless') serums in providing HydraFacial treatments.  *Id.* at 13-
17.  **During the call, Edge never mentioned the HydraFacial mark or any of the
terms of its Trademark License Agreement**.  Instead, Edge told BOHO that: "[a]t

---

[10] Lamarque was Edge's Rule 30(b)(6) deponent in this action.  While Lamarque
testified under oath in this action in his deposition that a customer-licensee is free to
use a third party serum to provide HydraFacial services without suffering any
consequences,  Lamarque's recent telephone conversation with BOHO disproves
his sworn testimony.

11

some point, we have to take a serious look at what might be going on **and what that could mean for our partnership and moving forward**." *Id.* at 3, lines 8-11 (emphasis supplied). In other words, Edge never asked BOHO to stop using Edge's HydraFacial mark if it was using Ageless' serums as the Trademark License Agreements might otherwise permit. **Instead, Edge threatened BOHO in no uncertain terms that, if Ageless' serums were being used, BOHO's "partnership" with Edge was in jeopardy and would end**.

During the conversation, Edge then insisted BOHO admit whether it was using Ageless' serums. *Id.* at 13-17. In interrogating BOHO, Edge stated that it was wondering whether there was "a possibility of Ageless serums, not just being in these you know, rinky-dink med spas, that nobody has heard of, **in an effort to save money** or is this something more widespread than maybe we initially thought?" *Id.* at 17, lines 10-15 (emphasis supplied).[11]

In response, BOHO stated that it was merely using Ageless' serums to **train** aestheticians to perform HydraFacial services. *Id.* at 7-15. BOHO explained: "… when I have somebody in the past come and train, I don't have the support for solutions [*i.e.,* serums from Edge], and **HydraFacial solutions are expensive**, so it's nice to go to a product that is similar, and that **we can train on**, and then move on to the real ones. **But it's never for actual clients**." *Id.* at 13, lines 22 through 14, lines 1-12. Emphasis supplied. Even though BOHO made it clear to Edge it was merely **training** aestheticians with Ageless' serums, Edge nevertheless chastised BOHO for doing so. In Edge's words, if Ageless' serums were used "you could put water in there, or mayonnaise, or whatever you put in there, **it's no longer a HydraFacial, period, end of story**." *Id.* at 18, lines 18-22 (emphasis

---

[11] During the conversation, Edge described Ageless' serums as "counterfeit" even though Edge's Rule 30(b)(6) witness (Lamarque) testified that **Edge never tested Ageless' serums and did not know what ingredients are found in them**. *Id.* at 10, lines 7-16.

135417522.6

1  added).  *See also id.* at 26, lines 18-22.[12]

2        As such, read in a light most favorable to Ageless as the law requires, there is

3  clearly admissible evidence in this action that can be used to show that Edge is not

4  merely conditioning the use of Edge's serums on the use of Edge's HydraFacial

5  mark.  Rather, Edge in fact has policies and practices which clearly demonstrate

6  that customer-licensees **must use** Edge serums if they want **"to provide"**

7  HydraFacial services – or, in Edge's words:  **"end of the story."**  Of course, the net

8  effect of Edge's conduct is to place Edge's customers-licensees in a position where

9  (having spent tens of thousands of dollars to purchase highly expensive

10  HydraFacial equipment), Edge insists they must also purchase and use high-priced

11  Edge serums (instead of cheaper, equally effective third party serums) as a

12  condition of **"providing"** HydraFacial treatments.  Therefore, even though the law

13  does not require Ageless to prove that there are negative effects in the relevant

14  tying markets for purpose of proving a per se violation, in this instance, it is clear

15  consumer welfare and fair competition in the relevant markets are both being

16  adversely impacted.

17              **3.    Sufficient Economic Power in the Tying Product**

18        This prong of the per se test simply asks whether defendants have enough

19  economic power to impose "burdensome terms such as a tie-in, with respect to any

20  appreciable number of buyers within the market." *Fortner Enterprises, Inc. v.*

21  *United States*, 394 U.S. 495, 504 (1969). Sufficient economic power can be shown

22  **either if the tying product is unique or if the defendant has a large market**

23  **share in the tying product**. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466

24  U.S. 2, 17 (1984); *United States v. Loew's, Inc.*, 371 U.S. 38, 45 (1962) (**even**

25  **absent a showing of "market dominance, the crucial economic power may be**

---

26  [12] Edge refused to accept BOHO's explanation.  In the end, Edge insisted BOHO
27  give Edge the right to inspect BOHO's premises for itself so Edge could verify
   whether Ageless' serums were being used. *Id.* at p. 19, lines 18-24; p. 28, lines 7-
28  12.

OPPOSITION TO SUMMARY JUDGEMENT

135417522.6

**inferred from the tying product's desirability to consumers or from uniqueness in its attributes.**").[13]  Emphasis supplied.  Here, there can be no dispute that Edge is selling what it claims to be a "unique" ("revolutionary") product that Edge and its analysts have stated faces no serious competition and which enjoys strong brand recognition, consumer loyalty and appeal because of its claimed "unique" attributes.

### 4.    Substantial Volume of Commerce Affected in the Tied Product

Finally, the volume of commerce in the tied (serum) product market is clearly "substantial."  The Supreme Court has stated that that this "substantial volume" prong of the per se test is met so long as the volume is not "insubstantial" or "*de minimis.*"  *Northern Pacific*, 356 U.S. at 11; *Fortner*, 394 U.S. at 501; *see also DataGate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1424-25 (9th Cir. 1995), *cert. denied*, 116 S.Ct. 1344 (1996); *Tic-X-Press, Inc. v. Omni Promotions Co.*, 815 F.2d 1407, 1419 (11th Cir. 1987).  Courts have in fact held that this element is satisfied when the volume of tied commerce amounted to as little as $27,264 or even $10,091.  *Tix-X-Press*, 815 F.2d at 1419 ($10,091); *Microbyte Corp. v. New Jersey State Golf Ass'n*, 1986-2 Trade Cas. (CCH) 67, 228, at 61, 163 (D.N.J.) (1986) ($27,264).  *See also Fortner*, 394 U.S. at 502 (Supreme Court disagrees that $190,000 is paltry or "insubstantial" in the tying content).

Here, the volume of tied commerce is clearly not "insubstantial" or "*de minimis.*"  As discussed above, Edge earns hundreds of millions of dollars annually from the sale of serums.  In fact, for 2021 alone, Edge's net sales from the

---

[13] In *Loew's*, the Supreme Court further explained: "**[s]ince the requisite power may be found as the basis of either uniqueness or consumer appeal, and since market dominance in the present context does not necessitate a demonstration of market power in the sense of §2 of the *Sherman Act,* it should seldom be necessary in a tie-in case to embark upon a full-scale factual inquiry into the scope of the relevant market for the tying product and into the corollary problem of the seller's percentage share in that market**." *Id.* (emphasis supplied).

135417522.6

sale of serums and other consumables exceeded $130,000,000.  Doroshow Decl., Ex. 22.  Edge's damage expert has also submitted a report in this lawsuit claiming Edge has lost millions of dollars simply because Ageless has tried to fairly compete with Edge in selling serums which can be used with Edge's HydraFacial equipment.  Thus, the amount of commerce at issue in this lawsuit is clearly not "insubstantial" and the final prong of the per se tying test can therefore be met.

In sum, there is clear evidence that all required elements for finding a per se violation under the *Sherman, Clayton* and *Cartwright Acts* can be proven here. Edge's motion for summary judgment should therefore be denied based upon the per se rule alone.

**D.    Rule of Reason Violation**

In the event it is necessary, as this Court has ruled, a tying violation can also be proven under the rule of reason.  As shown, the first element of a rule of reason violation is undisputed.  Edge concedes it is **selling two separate products**.  There is also evidence that all remaining elements of a rule of reason violation can be proven here.

**1.    Market Definitions**

**a.    The Tying Product Market (Edge's HydraFacial Equipment)**

In *Eastman Kodak*, the United States Supreme Court ruled that, like all other elements of an antitrust violation, market definitions are normally a **factual** issue for a jury to decide.  504 U.S. at 462.  *See also, High Technology Careers v. San Jose Mercury News,* 996 F.2d 987, 990 (9th Cir. 1993) (holding that the market definition depends on "a **factual inquiry** into the commercial realities faced by consumers") (citations omitted) (emphasis supplied).  Thus, given the **fact intensive** nature of determining whether there has been a tying violation, summary judgment should not be granted without careful consideration of **factual proof**.

15

135417522.6

In its moving papers, **Edge never addresses Ageless' factual proof**. Instead, as it previously did in its Motion to Dismiss, Edge instead relies on four **legal** arguments. Mem. at 6-10. ***First***, Edge argues that because Ageless has not offered expert testimony defining the parameters of the relevant tying product market, the Court should dismiss Ageless' antitrust affirmative defenses on **legal grounds** alone. *Id.* at 6-8. In making this argument, however, Edge fails to address how the rules of reasonable interchangeability and cross-elasticity of demand apply when a single-product market is at issue. Contrary to what Edge argues, expert testimony is not essential to prove that a tying violation has occurred here under the rule of reason.[14]

As Edge has repeatedly been advised, Ageless' antitrust Counterclaim and related Affirmative Defenses rely upon a **single-product tying market** theory, *i.e.,* what Edge describes as an "unique," "revolutionary," patented product (Edge's HydraFacial equipment). As shown, Edge's allegations in its Complaint alone demonstrate that a single-product tying market can be proven here. Additionally, as Edge's analysts have reported: "while there are very **few direct competitors to HydraFacial**, Chinese knockoffs known as HydraPeel exist. However, **these competitors have failed to gain any meaningful traction** outside the Chinese market. **Likewise, alternative procedures such as microdermabrasion have not mounted a serious challenge.**" Doroshow Decl, Ex. 17. Emphasis supplied. Thus, among other admissible evidence, Edge's own statements (including how Edge has an iconic brand and is the "market leader"), and statements by Edge's market analysts show that **there are no substitute products that are reasonably interchangeable with Edge's HydraFacial systems**. As such, expert testimony is

---

[14]Even though an antitrust expert is not critical here, to leave open the possibility that Ageless might eventually decide to use an expert, Ageless has filed a pending motion before the Texas court requesting additional time to submit an expert report because the Texas Court has not yet ruled on Edge's pending motion to dismiss Ageless' antitrust Counterclaim and related Affirmative Defenses in Texas. Doroshow Decl., Exh. 11. The motion for additional time to submit an expert report has yet to be decided by the Texas court. *Id.* at ¶ 16.

135417522.6

not necessary to address the issue of reasonable interchangeability since there is evidentiary proof that there are no competitive products that are reasonably interchangeable with Edge's HydraFacial equipment.

The issue of cross-elasticity of demand can also be decided by a jury without expert testimony. As shown, Edge's market analysts have stated that: "HydraFacial is known for its strong customer loyalty." They further add: "branding power matters a lot in the beauty market (think Herman or Louis Vuitton) **with price inelasticity**, and HydraFacial is the undisputed leader." Emphasis supplied. Moreover, the same analysts have reported that: **"[g]iven HydraFacial's established brand and leading market position it [Edge] has unique value levels it can pull, including annual price increases for consumables [like serums]."** *Id.* Emphasis supplied. Thus, based upon **Edge's own statements and analyst reports** it is therefore clear that there is proof Edge can adjust prices for its products without loss of customers, revenue or profits. As such, an expert is also not critical to address the issue of cross-elasticity of demand.[15]

***Second***, in its Motion, similar to what Edge previously argued its Motion to Dismiss [Dkt. 44 at 4-7], Edge continues to argue that Ageless has allegedly made "deficient and inconsistent descriptions of the tying market." Mem. at 5. This argument searches for confusion where none exists.[16] The relevant tying product market (*i.e.*, Edge's HydraFacial equipment) has clearly been defined here.

---

[15] Cross-elasticity of demand evaluates the relationship between two competing products when the price of one of them changes or shows the relative change in demand for one product as the other rises or falls. Whereas here there is a single-product tying market at issue as in this case, and where **price inelasticity** can be proven, expert testimony is unnecessary to address how two or more competitive products might respond to price changes or relative demand.

[16] In making the argument that there is alleged "inconsistency" in how the tying market is defined, Edge ignores *Fed.R.Civ.P. Rule 8(d)(2)* which provides that: "[i]f a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." *Rule 8(d)(3)* also states that "[a] party may state as many claims or defenses as it has **regardless of consistency**." Emphasis supplied.

17

135417522.6

By improperly parsing allegations in the TAC (rather than addressing **factual proof**), Edge tries to convince the Court that there are alleged "inconsistencies" about how the Tying Product Market is defined. The TAC could not however be any more clear about how the Tying Product Market is defined. In fact, in the TAC at ¶ 26, this section of the TAC is entitled "***The HydraFacial Systems And Equipment (The 'Tying Product')***." *Id.* (emphasis supplied).

In addition to the clear definition found in the TAC, Edge's own Complaint itself defines the relevant tying product market. *See* Compl. at ¶ 8 ("Edge's HydraFacial MD System [and the other Systems identified in its Complaint] are so revolutionary that [they are] protected by numerous United States patents"). As such, Edge cannot possibly claim there is confusion or in Edge's words "inconsistency" in how the relevant tying product market is defined. As the Supreme Court held, market definitions should be determined on a **"case-by-case basis"** based upon **factual proof** not on a game of semantics, as Edge would ask the Court to engage in here.[17]

***Third***, Edge argues that as a **matter of law**, there is supposedly no legal support for proving a single-product tying market. Again, Edge could not be any more wrong. In its moving papers, Edge cites a single Northern District of California decision, *Apple, Inc. v. Psytar Corp.*, 586 F. Supp. 2d 1190 (N.D. Cal. 2008), for the broad proposition that single-brand markets are "extremely rare." *Id.*, 586 F. Supp. 2d at 1198; Mem. at 9. However, even the *Apple* decision itself holds that markets consisting of a single brand "**are not per se prohibited**," and

---

[17] By referring to other companies that provide facial treatments outside the relevant market and by demonstrating how they cannot compete with Edge does not show confusion as to how the relevant tying-product market is defined. In fact, in describing third party treatments and showing why these treatments do not have the claimed unique attributes that Edge claims its HydraFacial systems and treatments enjoy, Ageless is in fact demonstrating why other products and services are not reasonable substitutes for Edge's HydraFacial products and services. This is done to address the very issue Edge claims Ageless has ignored, *i.e.*, the absence of reasonable interchangeability.

18

that "**a relevant market may consist of only one brand of a market**." *Id.* (emphasis supplied).  Thus, even based upon the single decision Edge cites, there is **legal** authority for proving a single-product tying market.  As such, summary judgment cannot be granted as a **matter of law** even  based on the *Apple* decision Edge relies upon.

In any event, while citing *Apple* alone, Edge ignores a long history of Supreme Court and Ninth Circuit authority that holds **a single-product market can be used to prove an antitrust violation**.  In *Eastman Kodak Company v. Image Technical Services, Inc.*, 504 U.S. 451 (1992), the United States Supreme Court again held that market definition is a **factual question**. *Id.*, 504 U.S. at 462 ("**[t]his Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the 'particular facts disclosed by the record'**") (citations omitted) (emphasis supplied).[18]

Next, the Supreme Court rejected the same legal argument that Edge now makes to this Court, *i.e.*, that, **as a matter of law, without regard to factual proof**, a single brand can never be proven under the *Sherman Act*.  The Supreme Court's decision could not make it any more clear that Edge is wrong:  "[t]his Court's prior cases support the proposition that in some instances **one brand of a product can constitute a separate market**." *Id.*, 504 U.S. at 463 (citations omitted).

The Ninth Circuit made similar rulings in *Newcal Industries, Inc. v. IKON Office Solution*, 513 F.3d 1038 (9th Cir. 2008).  Like the Supreme Court's ruling in *Eastman Kodak*, the Ninth Circuit first ruled in *NewCal* that the relevant market is **"a factual element rather than a legal element,"** thereby finding that the issue of whether a relevant market definition is plausible driven by **factual evidence** – not based upon **legal** arguments like Edge asks the Court to consider here alone.  513

---

[18] In *Eastman Kodak*, the Supreme Court further explained that:  "[t]he proper market definition **can be determined only after a factual inquiry** into the 'commercial realities' faced by consumers." *Id.* (emphasis supplied).

OPPOSITION TO SUMMARY JUDGEMENT

135417522.6

F.3d at 1041 (emphasis supplied).  Citing *Eastman Kodak*, the Ninth Circuit similarly ruled as the Supreme Court had previously decided that:  "**it is legally permissible to premise antitrust allegations on a submarket**." *Id.* at 1042 (emphasis supplied).  Thus, Edge's **legal** arguments are therefore clearly contrary to longstanding, controlling legal authority determined by both the United States Supreme Court and the Ninth Circuit Court of Appeals.[19]

*Finally*, Edge argues that Ageless should not be permitted to prove that there is a single-product tying market in this case because Ageless allegedly failed to disclose this market definition at either the pleading stage or during discovery.  Edge again is clearly stretching the truth.  As shown, in the TAC the tying product was clearly defined as Edge's HydraFacial equipment.  In addition, Edge itself defined the relevant product market in its own Complaint by describing it as Edge's HydraFacial equipment. *See e.g.,* Compl. at ¶ 8 (where Edge alleges it is selling equipment for hydradermabrasion systems (the "tying product")).  In addition to its equipment (what Ageless clearly identified in the TAC as the "Tying Product"), Edge further alleged that it "designs, develops, manufactures and sells . . . serums for use in the HydraFacial Systems" (the "Tied Product"). *Id.* at ¶ 9.  Thus, Edge has unquestionably known (in fact itself alleged) since the outset of this case that Edge's equipment was defined as the single-product tying market and Edge's serums as the tied product market.[20]

---

[19] Inexplicably, even though the Supreme Court's *Eastman* and Ninth Circuit's *Newcal* decisions were repeatedly cited and discussed at length in Ageless' Opposition to Edge's Motion to Dismiss (Dkt. 47, pp. 4-5, 8-9), Edge has chosen to ignore both decisions in its Summary Judgment Motion.  By ignoring governing legal authority and failing to discuss these decisions in its current Motion, the Rules of Professional Conduct are implicated. *Cal. Rule of Prof. Conduct Rule 3.3* entitled "Candor Toward the Tribunal" states that it is a violation of the Rules of Professional Conduct if a lawyer fails to disclose to the tribunal governing legal authority.

[20] Even if Edge somehow could have possibly overlooked the allegations in the TAC and in its own Complaint, Ageless' Opposition to Edge's Motion to Dismiss again made it perfectly clear how both relevant markets are defined in this action. Even, however, if this was not done, *Fed.R.Civ.P. 37(c)(l)* provides in relevant part that:  "[i]f a party fails to provide information or identify a witness as required by

20

135417522.6

1    **b.**    **The Tying Product Market (Edge's Serums)**

2    Ageless also argues that Ageless' definition of the Tied Product Market

3    consisting of Edge's serums is somehow also **legally** "deficient" because it too is

4    somehow allegedly "inconsistent."  Mem. at pp. 7-8.  Again, like the Tying Market

5    definition, the TAC could not be any more clear about how the "Tied Product

6    Market" is defined.  Section 2 of the TAC (at p. 31) is entitled the "Tied Product

7    Market" and defines it as "Edge's HydraFacial Serums (The 'Tied Product')."

8    Despite the clarity of this definition, Edge again asks the Court to dismiss Ageless'

9    antitrust defenses **as a matter of law** because there is allegedly "confusion" how

10    the tying market is defined.  Again, the scope of the tying product market is a

11    **factual** issue for a jury to decide.  Even if the TAC was not however clear about

12    how the tying product is defined, there is clearly **factual** proof here to show there is

13    a separate market for the sale of competitive serums that can be substituted for

14    Edge's serums.[21]

15    **2.**    **Edge's Market Power**

16    Ageless has already discussed Edge's market power at length above in

17    

18    Rule 26(a) or (e), the party is not allowed to use that information or witness to
supply evidence on a motion, at a hearing, or at trial, **unless the failure was**
19    **substantially justified or is harmless**."  Emphasis supplied.  As Edge concedes
(Mem. at 9, lines 6-7), when Ageless opposed Edge's Motion to Dismiss, Ageless
20    again made it perfectly clear that it was relying on a single-product tying market.
Dkt. 47 at 9-12.   Although Edge has had clear notice throughout this lawsuit that
21    Ageless would be relying on a single-product market theory, Edge has elected not
to question Ageless about its single-product market theory in discovery.  Under
22    these circumstances, Edge cannot possibly claim prejudice or harm because of its
own inaction.

23    [21] To define a relevant tied product market, the inquiry is the actual and potential
24    options available to the consumer. The relevant tied product market includes the
different products that consumers can purchase to accomplish the purpose for which
25    they buy the products. Such products compete with one another for the consumer's
favor and are said to be "reasonably interchangeable substitutes."  *See U.S. v. E.I.*
26    *du Pont de Meours & Co.,* 351 U.S. 377, 396 (1956); *Queen City Pizza, Inc. v.*
*Domino's Pizza,* 124 F.3rd 430, 436 (3rd Cir. 1997).  Here, Edge itself alleges in its
27    Complaint that Ageless urges customers to use Ageless' serums with Edge's
equipment as a substitute for Edge's serums. Compl. ¶¶ 21, 31-32.  Thus, Edge
28    clearly knows (in fact has itself alleged) what products are included in the tied
product market.

21

135417522.6

discussing a per se violation. If needed, however, there is additional evidence to prove market power under the rule of reason. As shown, Ageless has defined the relevant tying product market as consisting of what Edge itself has described as its "unique," "revolutionary," patented product (*i.e.*, Edge's HydraFacial equipment). Edge's HydraFacial systems, according to Edge and Edge's market analysts, face no serious competition. Thus, according to Edge and its analysts, Edge effectively has a **monopoly** in the tying product market since Edge claims that it has an "unique" product which has no competition. Where there is effectively a claim of **monopoly power** as in this case, Edge of course enjoys significant market power that ensures it can continue to earn large profits because, among others, there is according to Edge and its analysts "inelastic demand."

Despite these facts, in its Motion, Edge devotes two-pages of its moving papers to purportedly show that "Ageless Cannot Establish Market Power In Any Relevant Market." Motion at 11-12. Several arguments are made by Edge to try to support this **legal** argument. **First**, Edge repeats the same argument that Ageless has allegedly not clearly defined the relevant economic tying market. This argument has already been shown to lack merit above. Accordingly, there is no reason to repeat it again here. The relevant tying market has clearly been defined as Edge's HydraFacial equipment and the tied market as Edge's HydraFacial serums.

**Second**, Edge again argues that, because the TAC refers to a number of companies that provide facial treatments that do **not compete** with Edge in the single-product tying market that Edge claims it monopolizes (*i.e.*, Edge's "unique," "revolutionary" HydraFacial equipment market), this too somehow demonstrates that market power cannot be proven since the Court will be unable to "estimate the market share" Edge has for its tying product. Mem. at 12. Again, Edge misses the mark. As shown, third parties who offer facial treatments that do not and cannot compete in the relevant, single-product tying market do not deprive Edge of market power. Instead, they have merely been referenced in the TAC to show that there are

22

no reasonable interchangeable (substitute) products that compete with Edge's HydraFacial equipment.

Edge also insists that "Ageless cannot show Edge's purported market power ever **forced** customers to accept serum they did not want." *Id.* at 12 (emphasis in original). The evidence proves otherwise. In this case, the evidence in fact demonstrates that customers have been and remain interested in purchasing serums from third party manufacturers like Ageless instead of Edge. Chlumecky Decl, Ex. 4; Doroshow Decl., Ex. 14. The fact that Ageless' prices serums at **half the price** of Edge's serums which work equally well (if not better) than Edge serums, clearly supports the inference that Edge's policies have compelled Edge's customers into making a purchase from Edge they would not have made in the open market. *See Jefferson Parish,* 466 U.S. at 14-15 (explaining that the primary harm from tying arrangements is the impairment of competition on the merits in the market for the tied products). This inference is clearly supported by the evidence here since Edge has seen increased revenue from serum sales even after introducing its restrictive tying Authenticity Campaign in August 2020 -- despite the fact that Edge sells serums at twice the price that Ageless does. Doroshow Decl., Exs. 16, 18-22.

The United States Supreme Court has provided alternate legal definitions for the term "market power" in the antitrust context. For example, in *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), the Court defined market power to mean **the power to price profitably above cost**. If that standard is used here, it is clear that there is more than adequate proof to prove market power in the relevant tying market. In fact, Edge itself has reported that in 2020 and during the first quarter of 2021 alone that its gross profits (the difference between net sales and the cost of sales) had a gross margin of 54.4% in 2020 and 68.6% for the first three quarters of 2021. *Id.,* Ex. 16 at pp. 45, 55; *See also* Ex. 19. As such, if the Court uses the *Matsushita* definition of market power,

23

Ageless can clearly prove that Edge has market power in the single-product, tying equipment market in this action.

In *NCAA v. Board of Regents*, 468 U.S. 85 (1984), the Supreme Court defined "market power" as "**the ability to raise prices above those that would be charged in a competitive market**." Emphasis supplied. In *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956), the Supreme Court also defined "monopoly power" as "**the power to control prices or exclude competition**." Emphasis supplied. Here, there is unquestionably proof that Edge has the ability to both control prices and to exclude competition. As shown, Edge and Edge's market analysts have concluded that Edge has "unique value levels" and "pricing inelasticity" that allows Edge to raise prices without losing customers, revenue or profits. At the same time, Edge and its market analysts have concluded there is no "serious" competition for Edge's products and services. Thus, market power can also clearly be demonstrated under the *NCAA* and *du Pont* standards as well.[22]

### 3.    An Illegal Tie Can be Proven

As discussed above, there is more than adequate proof to show that illegal tying has taken place here.[23]

### 4.    Harm to Competition

Finally, Edge insists that Ageless "cannot establish harm to competition in the market for the allegedly tied product [Edge' serums]." Mem. at 15. In doing so, Edge repeats the same groundless arguments discussed above about how: (i)

---

[22] Given the existing market conditions, the HydraFacial market structure obviously comes with high restrictions for new entries and consumer welfare has been jeopardized.

[23] While Edge previously argued in its Motion to Dismiss that it is "essential" to a tying claim that there is "proof that the seller coerced a buyer to purchase the tied product," Edge has abandoned this argument in its Summary Judgment Motion. *See* Dkt. No. 16 at p. 11. The reason is obvious. Coercion need not be independently proven whereas here there is an unlawful tying arrangement or policy. *See Datagate, Inc. v. Hewlett Packard Co.* 1421, 1426 (9th Cir. 1995); *see also N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 7 (contractual obligation to purchase tied product is coercive).

24

135417522.6

1    Ageless has allegedly failed to define an antitrust market for the tied product

2    market; (ii) Ageless has no expert to opine on the impact on competition from

3    Edge's misconduct; and (iii) Ageless has allegedly failed to identify any harm to

4    competition. *Id*. at 15-16. As shown, each of these arguments lack merit.

5    **First**, Ageless has clearly defined the relevant tied product market as

6    including Edge' serums and competitive serums (including Ageless' serums) that

7    can be used in place of Edge's serums. **Second**, an expert is not needed to prove

8    that Edge's illegal tying activities are adversely impacting (reducing) competition.

9    As shown, the facts demonstrate that Ageless sells its serums at half the price of

10   Edge's serums and Ageless' serums work equally well (if not better) than Edge'

11   serums.  Yet, despite what should otherwise be open, normal market competition,

12   Edge has nevertheless seen revenue significantly increased profits and revenue

13   from the sale of its serums by prevent competition in the serum market.  If Edge's

14   revenues have increased despite the fact that Edge charges twice as much for its

15   serums than competitors like Ageless charge for equally effective (if not better)

16   serums, this can of course be used to prove that competition is being adversely

17   impacted since Edge demands that customers-licensees purchase Edge serums as a

18   condition of providing Hydra Facial treatments. The additional revenue Edge has

19   earned and which Edge forecasts it expects to continue to earn because it has

20   "unique values level it can pull, including annual price increases for [serums]," can

21   of course both be used to prove to a jury that there has been and will continue to be

22   negative impact on competition in the separate tied serum market.

23   Edge's Motion should be denied.

24   Dated:  August 19, 2022              **FOX ROTHSCHILD LLP**

25

26                                        */s/ James E. Doroshow*
                                         James E. Doroshow
27                                        *Attorneys for Defendant*
                                         AGELESS SERUMS LLC

28

OPPOSITION TO SUMMARY JUDGEMENT

135417522.6